UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE GENERAL HOSPITAL CORPORATION and DANA-FARBER CANCER INSTITUTE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ESOTERIX GENETIC LABORATORIES, LLC and LABORATORY CORPORATION OF AMERICA HOLDINGS, <br><br> Defendants. | C.A. NO. 1:18-cv-11360-IT |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' UNOPPOSED MOTION TO IMPOUND CONFIDENTIAL INFORMATION CONTAINED IN AND ATTACHED TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendants Esoterix Genetic Laboratories, LLC ("EGL") and Laboratory Corporation of America Holdings ("LabCorp") (collectively "Defendants"), by their undersigned counsel, respectfully submit this memorandum of law in support of their unopposed motion, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure and Rule 7.2 of the Local Rules of the United States District Court for the District of Massachusetts, to impound certain confidential and competitive business information contained in and attached to The General Hospital Corporation and Dana-Farber Cancer Institute, Inc.'s (collectively, "Plaintiffs") Second Amended Complaint.

**STATEMENT OF FACTS**

**A.** **Background**

Plaintiffs own or control the rights to certain patents providing for a method of detecting

the presence of epidermal growth factor receptor ("EGFR") mutations. (Watson Decl. ¶ 4.)[1] In 2005, Plaintiffs entered into an Exclusive License Agreement granting to EGL an exclusive, royalty-bearing license to sell products and services utilizing the EGFR patents, as well as the right to sublicense those patents to third parties (the "Master License Agreement"). (Watson Decl. ¶ 5.) The Master License Agreement contains a confidentiality provision prohibiting either party from disclosing the existence or terms of the agreement without the other party's prior written consent. (Watson Decl. ¶ 5.)

In 2008, EGL entered into a sublicense with DxS, Ltd. (the "Sublicense"), which subsequently assigned its Sublicense rights to QIAGEN Manchester, Ltd. ("QIAGEN") (Watson Decl. ¶ 6.) The Sublicense likewise contains a confidentiality provision prohibiting either party from disclosing the existence or terms of the Sublicense without the other party's prior written consent. (Watson Decl. ¶ 6.)

In 2014, EGL instituted an action against QIAGEN in the United States District Court for the District of Massachusetts, alleging breach of the Sublicense, infringement of the EGFR patents, and other related claims (the "QIAGEN Litigation"). (Watson Decl. ¶ 7.) QIAGEN asserted counterclaims against EGL and LabCorp. (Watson Decl. ¶ 8.) EGL, LabCorp, and QIAGEN settled the QIAGEN Litigation in June 2017, and Plaintiffs asserted a right to a portion of the settlement proceeds QIAGEN paid to Defendants. (Watson Decl. ¶¶ 9, 10.) As a result, Defendants entered into two separate settlement agreements. (Watson Decl. ¶¶ 9, 10.)

First, Defendants entered into a Settlement Agreement with QIAGEN, dated June 27, 2017 (the "QIAGEN Settlement Agreement") which included, among other things, a payment

---

[1] "Watson Decl." refers to the Declaration of Kellie Watson in Support of Defendants' Motion to Impound Confidential Information Contained in and Attached to Plaintiffs' Second Amended Complaint, dated November 9, 2018, which is submitted herewith.

from QIAGEN to Defendants, the dismissal of all claims and counterclaims that had been asserted in the QIAGEN Litigation, and certain substantive amendments to the Sublicense. (Watson Decl. ¶ 9.) The QIAGEN Settlement Agreement contains a confidentiality provision that requires the parties to keep the terms of the settlement, and any documents or information exchanged pursuant to those terms, confidential. (Watson Decl. ¶ 9.)

Second, Defendants entered into a Settlement Agreement and Release with Plaintiffs, dated June 27, 2017 (the "MGH Settlement Agreement"), pursuant to which Defendants agreed to pay Plaintiffs a portion of the settlement proceeds received from QIAGEN, in exchange for a broad general release of all claims and obligations arising before the effective date of the agreement, which relate to or arise from the QIAGEN Litigation or the Master License Agreement. (Watson Decl. ¶ 10.) The MGH Settlement Agreement, like the QIAGEN Settlement Agreement, contains a confidentiality provision that requires the parties to keep the terms of the settlement, and any documents or information exchanged pursuant to those terms, confidential. (Watson Decl. ¶ 10.) In addition, the MGH Settlement Agreement contains an integration clause that "supersedes in its entirety any and all written or oral agreements previously existing between the Parties with respect to the subject matter of" the agreement. (SAC Ex. J, § 7.6.)

Plaintiffs were represented by sophisticated counsel from two law firms in the negotiation of the MGH Settlement Agreement, and warranted "that they have had the opportunity to consult with legal counsel of their choice prior to the execution of this Settlement Agreement, have in fact done so, and have been specifically advised by counsel of the consequences of this Settlement Agreement and their respective rights and obligations hereunder." (SAC Ex. J, § 7.10.)

On May 31, 2018, Plaintiffs initiated an action against Defendants in the Superior Court of the Commonwealth of Massachusetts, Suffolk County, claiming a breach of the Master License Agreement and related claims. (Case No. 18-01657-BLS.) Defendants removed the action to this Court on June 28, 2018, and then moved to dismiss the complaint for failure to state a claim for relief. (ECF Nos. 1; 9-11.) In their motion, Defendants asserted, among other things, that Plaintiffs' claims are barred by the broad release contained in the MGH Settlement Agreement. (ECF No. 10.) Plaintiffs filed an Amended Complaint on July 18, 2018, which Defendants again moved to dismiss on substantially the same grounds. (ECF Nos. 18; 31-33; 35.) Plaintiffs opposed Defendants' motion and cross-moved for partial summary judgment. (ECF Nos. 41-44.) Because of the confidentiality provisions in the relevant agreements, a substantial portion of the parties' motions papers were filed under seal with the Court's permission. (ECF Nos. 12; 16; 37; 40; 63; 65.)

On October 26, 2018, the parties appeared before this Court to discuss whether and to what extent the parties' filings should be kept under seal in light of the confidentiality provisions at issue and the presumption of public access to judicial documents. (ECF No. 71.)

**B.  Plaintiffs' Proposed Second Amended Complaint**

On November 9, 2018, Plaintiffs filed a Second Amended Complaint ("SAC"), and Exhibits A through K thereto. In light of the confidentiality provisions explained above, and pursuant to the parties' discussion with the Court at the October 26 hearing, the parties have conferred and agreed to redact certain portions of the Exhibits, which they agree are not relevant to the pending motions. Defendants have also requested that Plaintiffs file the following information under seal pending a decision on this Motion, which Plaintiffs represented they would not oppose:

1) the dollar amount that Defendants paid to Plaintiffs under the MGH Settlement

4

  Agreement, including offers of dollar amounts that were exchanged prior to the final agreement, which are referenced in: (i) paragraphs 21, 22, 24, 68, and 69 of the SAC; (ii) a November 28, 2017 letter from Defendants to Plaintiffs (Ex. B); (iii) a May 26-27, 2017 email exchange between the parties' counsel (Ex. I); and (iv) the MGH Settlement Agreement (Ex. J);

2) information concerning the substantive terms of the QIAGEN Settlement Agreement, including the amendments made to the Sublicense as a result of the QIAGEN Settlement Agreement, which is referenced in: (i) paragraphs 21, 22, 24, 68, and 69 of the SAC; and (ii) the MGH Settlement Agreement (Ex. J); and

3) the dollar amounts allegedly owed to Plaintiffs under the Master License Agreement, as reflected in paragraphs 28, 42, 49, 56, 65, 67, 69, 72, and 73 of the SAC.

  **C.** **Defendants' Competitive Business Interests**

  As reflected in the declaration of Dr. Kellie Watson, Head of Licensing for LabCorp's Corporate Development, the materials that Defendants seek to maintain under seal contain highly confidential and sensitive competitive business information, the disclosure of which would pose a substantial risk to Defendants' businesses.

  Defendants operate in the field of genetic testing, which is a highly competitive market. (Watson Decl. ¶ 16.) In addition, their businesses rely on a web of confidential, interrelated, third-party license and sublicense agreements. (Watson Decl. ¶¶ 16, 18.) The provisions of those agreements—which vary greatly in terms of their scope and financial requirements—are confidential and proprietary because their disclosure would substantially reduce Defendants' bargaining position with other third parties, and therefore jeopardize Defendants' ability to compete in the genetic testing industry. (Watson Decl. ¶¶ 16, 23-28.)

  For example, EGL has exercised its rights under the Master License Agreement to enter into a number of EGFR sublicenses with various companies covering different geographic areas. (Watson Decl. ¶ 16.) Many of those sublicensees are Defendants' (and QIAGEN's) direct competitors, who—if given access to certain confidential information contained in other sublicense agreements or in the Master License Agreement—could make competitive use of that

5

information to gain more favorable terms in their own agreements with Defendants or with third parties. (Watson Decl. ¶ 25.) Indeed, shortly after EGL settled the QIAGEN Litigation, another EGFR sublicensee threatened to sue EGL if EGL did not disclose the terms and conditions of that settlement. (Watson Decl. ¶ 26.) This threat was based solely on the *existence* of the QIAGEN Settlement; if the *details* of that settlement, including the substantive amendments to the Sublicense, were made public, Defendants' bargaining position would be further jeopardized—not only with existing sublicensees, but also with third parties with whom EGL is in the process of negotiating additional EGFR sublicenses. (Watson Decl. ¶¶ 26-29.)

The same applies to the dollar amount that Plaintiffs claim is owed to them under the Master License Agreement. Disclosure of that information would provide some indication as to the volume of Defendants' EGFR testing, and would also allow Defendants' sublicenses to make certain calculations and assumptions about Defendants' upstream royalty obligations. (Watson Decl. ¶¶ 30-34.) This information is not currently available to Defendants' competitors or sublicensees, and, if disclosed, would provide them with a competitive advantage in negotiating their own agreements. (Watson Decl. ¶¶ 30-34.)

The dollar amounts paid by QIAGEN to Defendants under the QIAGEN Settlement Agreement, and by Defendants to Plaintiffs under the MGH Settlement Agreement, are also highly confidential because they reflect Defendants' (and Plaintiffs') valuations of the relative strengths and weaknesses of the parties' respective claims in the QIAGEN Litigation, as well as their own interpretation of what Plaintiffs were, or were not, entitled to under the terms of the Master License Agreement. (Watson Decl. ¶ 15.) If other EGFR sublicensees (or other competitors of Defendants or QIAGEN), had access to this information, they would not only gain a competitive advantage in their licensing activities, but would also be able to use the

6

information to evaluate the risks of violating their own sublicenses with Defendants. (Watson Decl. ¶¶ 14, 17-20.) Disclosure of this information could also reflect Defendants' litigation strategy and, in turn, negatively impact Defendants' ability to negotiate future settlement agreements. (Watson Decl. ¶ 21.)

In short, the QIAGEN Settlement was reached to resolve an extremely complicated litigation, based on the particular facts at issue in that dispute. Disclosing the terms of that settlement, including the portion of that settlement that Defendants paid to Plaintiffs, to the public would violate the parties' intent to keep these agreements confidential, and could have a substantial and detrimental impact on both Defendants' and QIAGEN's businesses with respect to their EGFR licensing arrangements, as well as their licensing arrangements for other technologies. (Watson Decl. ¶¶ 14-29.)

## ARGUMENT

A district court may grant a motion to impound where the moving party demonstrates "good cause" to justify the impoundment. *Dunkin Donuts Franchised Restaurants, LLC v. Agwam Donuts, Inc.*, No. 07-11444-RWZ, 2008 WL 427290, at *1 (D. Mass. Feb. 13, 2018). "Demonstrating 'good cause' entails making a particularized factual showing," on a document-by-document basis, "of the harm that would be sustained if the court did not allow the filing under seal." *Id.* at *14; *see also United States ex rel. Cunningham v. Millennium Labs., Inc.*, 202 F. Supp. 3d 198, 207 (D. Mass. 2016). In determining whether to grant a motion to impound, courts "must carefully balance" the "well-established presumption of public access to judicial documents" with the "competing interests that are at stake in the particular case." *Cunningham*, 202 F. Supp. 3d at 207.

"What constitutes sufficient cause depends on the nature of the records the parties seek to impound." *Id.* "In civil cases, interests which courts have found sufficient to justify

7

impoundment include trade secrets, confidential business information, [and] information covered by a recognized privilege[.]" *Id.; see also Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 415 (3d Cir. 2013) (finding good cause to seal court records in order "to protect the parties' confidential proprietary business and competitive interests."). This Court has also granted a motion to impound where the documents at issue "contain[ed] references to settlement terms and information that the parties . . . [had] designated as confidential." *Tuckerbrook Alternative Investments, LP v. Banerjee*, No. 12-11643-GAO, 2014 WL 4965739, at *4 (D. Mass. Sept. 30, 2014); *see also Cadell v. XL Specialty Ins. Co.*, No. 11-cv-394-JF, 2013 U.S. Dist. LEXIS 36044, at *3 (D.N.H. Mar. 15, 2013) ("Sufficient compelling reasons [to seal documents] may include where the unsealing of documents would make public . . . the terms of a confidential settlement agreement or where the information is subject to a confidentiality agreement.").

Here, good cause exists to justify the impoundment of the materials at issue because they contain proprietary and confidential contract terms and settlement negotiations, the disclosure of which would pose a serious risk to Defendants' competitive business interests. In addition, the claims and issues in this action are not matters of significant public concern, such as litigation involving a government entity or widespread consumer deception, where "[t]he threshold showing required for impoundment of the materials is correspondently elevated." *F.T.C. v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 412 (1st Cir. 1987). Rather, Plaintiffs' claims rest entirely on the interpretation of a heavily negotiated, confidential settlement agreement between two private parties. There is simply no reason to make this information available to Defendants' competitors or the public at large in light of the potential risks to Defendants' business interests.

Moreover, much of the information that Defendants seek to impound is not even admissible because Plaintiffs rely on it solely for purposes of demonstrating the parties' *intent* in

entering into MGH Settlement Agreement.  (*See* SAC Exs. I, J; SAC ¶¶ 21, 22, 24, 68, 69.)  As explained at length in Defendants' memoranda of law in support of their Motion to Dismiss the Amended Complaint and in opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment, evidence of intent is inadmissible to interpret an unambiguous agreement under the parol evidence rule—particularly where, as here, the agreement contains an enforceable merger clause.  *See, e.g.*, *Hermes Automation Tech., Inc. v. Hyundai Elecs. Indus. Co.*, 915 F.2d 739, 747 (1st Cir. 1990) ("[W]here the language of an integrated release agreement is unambiguous as applied to the question at hand and the intent of the parties is clear solely on the basis of that language, the parol evidence rule bars the use of extrinsic evidence to contradict that plain language."); *Warner Co. v. Liberty Mut. Ins. Co.*, 80 Mass. App. Ct. 1104, 2011 WL 3611396, at *4 (2011) (refusing to consider a term sheet that preceded an integrated settlement agreement, holding that "no injustice would result from literal enforcement of the chosen language"); *NJR Const. Co. v. Saunders*, No. CA936407F, 1994 WL 879942, at *1 (Mass. Super. May 18, 1994) (refusing to consider an attorney affidavit "for the purpose of altering the unambiguous terms of the [integrated] Settlement Agreement and the release").  (*See also* ECF Nos. 31; 58.)

Some of this parol evidence is inadmissible for the additional reason that it reflects confidential settlement negotiations which are inadmissible at trial under Federal Rule of Evidence 408, and therefore inappropriate for consideration on a motion for summary judgment under Federal Rule of Civil Procedure 56(c)(2).  (*See* SAC Ex. I; SAC ¶¶ 21, 22, 24.)

The inadmissibility and irrelevance of these materials further justify their impoundment because there is no need for the Court to consider or address them in issuing a decision on the pending motions.

I. **Good Cause Exists to Impound the Dollar Amount Paid to Plaintiffs Under the MGH Settlement Agreement and the Inadmissible, Confidential Settlement Negotiations Concerning That Amount**

The MGH Settlement Agreement (Ex. J), Defendants' November 28, 2017 letter to Plaintiffs (Ex. B), the May 26-27, 2017 email exchange between the parties' counsel (Ex. I), and paragraphs 21, 22, 24, 68, and 69 of the SAC all reference either: (i) the confidential dollar amount that Defendants paid Plaintiffs under the MGH Settlement Agreement, or (ii) the parties' confidential settlement negotiations concerning that amount.

To the extent this information reflects confidential settlement negotiations, it is inadmissible on a motion for summary judgment. *See* Fed. R. Evid. 408, Fed. R. Civ. P. 56(c)(2). This information is also inadmissible under the parol evidence rule because it constitutes extrinsic evidence offered to prove the parties' intent in entering into a fully integrated agreement. *See Hermes*, 915 F.2d at 747; *Warner*, 2011 WL 3611396, at *4; *NJR*, 1994 WL 879942, at *1. These materials should therefore be disregarded by the Court in their entirety in deciding the merits of the pending motions.

If the Court does consider these materials, however, then all such materials should be kept under seal in order to protect Defendants' competitive business interests. The viability of Defendants' business depends on Defendants' ability to negotiate and enforce favorable licensing terms with third parties. (Watson Decl. ¶¶ 16-18.) Disclosing information regarding the parties' settlement negotiations and terms in an action arising out of one of those licenses would jeopardize Defendants' bargaining power and cause substantial, irreparable harm to Defendants' business. (Watson Decl. ¶¶ 17, 19, 20.) In addition, this information is highly confidential because it reflects Defendants' valuation of the relative strengths and weaknesses of the claims and counterclaims in the QIAGEN Litigation. (Watson Decl. ¶ 15.) If competitors

had access to this information, they would not only gain a competitive advantage in their licensing activities, but would also be able to use the information to evaluate the risks of violating their own sublicenses with Defendants. (Watson Decl. ¶ 17, 20, 21.) Accordingly, good cause exists to impound these materials in order to protect Defendants' competitive business interests.

Plaintiffs do not oppose the impoundment of this material.

## II. Good Cause Exists to Impound Inadmissible Extrinsic Evidence Concerning the Substantive Terms of the QIAGEN Settlement Agreement

The MGH Settlement Agreement (Ex. J) and paragraphs 21, 22, 24, 68, and 69 of the SAC contain information concerning the substantive terms of the QIAGEN Settlement Agreement, including information regarding the amendments made to the Sublicense pursuant to the QIAGEN Settlement Agreement. This information constitutes inadmissible parol evidence, and therefore should be disregarded by the Court in deciding the merits of the pending motions. *See Hermes*, 915 F.2d at 747; *Warner*, 2011 WL 3611396, at *4; *NJR*, 1994 WL 879942, at *1.

Even if the Court considers these materials, however, they should be kept under seal in order to protect Defendants' competitive business interests. QIAGEN is only one of several entities to which EGL has sublicensed the EGFR patent rights under the Master License Agreement, and EGL continues to negotiate additional sublicenses. (Watson Decl. ¶¶ 16, 18.) Many of these existing and potential sublicensees are competitors of Defendants or QIAGEN, who could use the QIAGEN Settlement Agreement and Sublicense to gain more favorable terms in their agreements with Defendants, or even to evaluate the potential upside in breaching those agreements. (Watson Decl. ¶¶ 22-29.) Disclosing this information would therefore significantly weaken Defendants' bargaining power and inhibit their ability to compete in the genetic testing market. (Watson Decl. ¶¶ 22-29.)

Plaintiffs do not oppose the impoundment of this material.

### III. Good Cause Exists to Impound the Dollar Amounts Allegedly Owed to Plaintiffs Under the Master License Agreement

Paragraphs 28, 42, 49, 56, 65, 67, 69, 72, and 73 of the SAC reference the dollar amounts that Plaintiffs claim they are owed under the Master License Agreement. As discussed above, Defendants' business relies on the confidentiality of its third-party license agreements—including information about its upstream royalty obligations—because, if the terms of any one agreement were disclosed, Defendants' bargaining position with respect to the negotiation of other licenses would be severely weakened. (Watson Decl. ¶¶ 30-34.) Accordingly, good cause exists to impound these materials in order to protect Defendants' competitive business interests.

Plaintiffs do not oppose to the impoundment of this material.

### CONCLUSION

For the foregoing reasons, Defendants' motion to impound should be granted in its entirety, along with such other and further relief as the Court deems just and proper. Defendants request that any impoundment order remain in effect until further order of the Court.

Dated: November 9, 2018
      Boston, MA

Respectfully submitted,

ESOTERIX GENETIC LABORATORIES, LLC and LABORATORY CORPORATION OF AMERICA HOLDINGS

By their attorneys,

CAMPBELL EDWARDS & CONROY, P.C.

/s/ Christopher R. Howe

        James M. Campbell (BBO # 541882)
        jmcampbell@campbell-trial-lawyers.com
        Christopher R. Howe (BBO #652445)
        chowe@campbell-trial-lawyers.com
        One Constitution Center
        Boston, MA  02129
        Tel: (617) 241-3041
        Fax: (617) 241-5115

        KELLEY DRYE & WARREN LLP
        Robert I. Steiner (admitted *pro hac vice*)
        rsteiner@kelleydrye.com
        Jaclyn M. Metzinger (admitted *pro hac vice*)
        jmetzinger@kelleydrye.com
        101 Park Avenue
        New York, NY 10178
        Tel: (212) 808-7800
        Fax: (212) 808-7897

## **CERTIFICATE OF SERVICE**

     I, Christopher R. Howe, counsel for defendants Esoterix Genetic Laboratories, LLC and Laboratory Corporation of America Holdings, hereby certify that on November 9, 2018, I electronically filed the foregoing Memorandum of Law in Support of Defendants' Motion to Impound with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.  I also served a true copy of the above Memorandum by first class mail, postage pre-paid, on all parties of record.

        */s/ Christopher R. Howe*
        Christopher R. Howe