## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE GENERAL HOSPITAL CORPORATION and DANA-FARBER CANCER INSTITUTE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ESOTERIX GENETIC LABORATORIES, LLC and LABORATORY CORPORATION OF AMERICA HOLDINGS, <br><br> Defendants. | CIVIL ACTION NO: 1:18-CV-11360-IT |

## DECLARATION OF KELLIE WATSON IN SUPPORT OF DEFENDANTS' UNOPPOSED MOTION TO IMPOUND CONFIDENTIAL INFORMATION CONTAINED IN AND ATTACHED TO PLAINTIFFS' SECOND AMENDED COMPLAINT

I, Kellie Watson, Ph.D., declare as follows:

1.      I am the Head of Licensing, Corporate Development, for Laboratory Corporation of America Holdings ("LabCorp").  I make this declaration in support of Defendants Esoterix Genetic Laboratories, LLC ("EGL") and LabCorp's motion to maintain under seal certain confidential information contained in and/or attached to Plaintiffs The General Hospital Corporation ("MGH") and Dana-Farber Cancer Institute, Inc.'s ("DFCI") (collectively "Plaintiffs") Second Amended Complaint.

2.      As Head of Licensing for LabCorp's Corporate Development, I am responsible for managing various license agreements on behalf of LabCorp and EGL, including the Master License Agreement between Plaintiffs and EGL, as well as the Sublicense between QIAGEN and EGL, as those Agreements are defined herein.

3.      In preparing this declaration, I have relied upon my personal knowledge of EGL and LabCorp's business, as well as my review of EGL and LabCorp's business records, some of which are maintained under my supervision and control and others of which are maintained under the supervision of other employees of EGL and/or LabCorp.

4.      Plaintiffs own a number of patents directed to detecting the presence of the epidermal growth factor receptor ("EGFR") mutation which, when present, is predictive of the efficacy of certain chemotherapeutic treatments for lung cancer.

5.      In 2005, Plaintiffs entered into an agreement with EGL[1] granting to EGL the right to use Plaintiffs' EGFR patents and technology, as well as the right to enter into sublicenses governing the use of Plaintiffs' EGFR patents and technology, in exchange for the payment of royalties and other obligations as set forth in the agreement (the "Master License Agreement"). The Master License Agreement contains a confidentiality provision prohibiting either party from disclosing the existence or terms of the agreement without the other party's prior written consent.

6.      In 2008, EGL entered into one such sublicense with QIAGEN Manchester, Inc. ("QIAGEN")[2] to allow QIAGEN to manufacture and sell certain products utilizing the patents set forth therein (the "Sublicense"). The Sublicense has a confidentiality provision prohibiting either party from disclosing the existence or the terms of the Sublicense without the

---

[1] The original licensee was Genzyme Corporation ("Genzyme"). In or around December 2010, LabCorp purchased certain assets from Genzyme, including substantially all of its genetic testing business and, as applicable here, its rights under the Master License Agreement. LabCorp subsequently created EGL as a wholly owned subsidiary to control the assets purchased from Genzyme, and EGL became the responsible party under the Master License Agreement.

[2] The original sublicense was entered into between Genzyme and non-party DxS, Ltd. In or around September 2009, QIAGEN N.V. acquired DxS and QIAGEN Manchester assumed all of DxS's rights and obligations under the Sublicense. The Sublicense has since been amended to reflect these changes in ownership and obligations under the Sublicense.

other party's prior written consent.  QIAGEN has not consented to EGL or LabCorp's disclosure of the terms of the Sublicense.

7.      In August 2014, EGL filed a lawsuit in the United States District Court for the District of Massachusetts asserting claims against QIAGEN[3] for (1) patent infringement, (2) violation of Massachusetts General Laws Chapter 93A, (3) breach of the Sublicense, and (4) breach of the duty of good faith and fair dealing (the "QIAGEN Litigation").

8.      QIAGEN subsequently filed an answer and counterclaims against EGL and LabCorp.

9.      The QIAGEN Litigation was settled in June 2017.  The parties entered into a Confidential Settlement Agreement which included, among other things, a payment from QIAGEN to EGL and LabCorp, the dismissal of all claims and counterclaims that had been asserted in the QIAGEN Litigation, and certain substantive amendments to the Sublicense (the "QIAGEN Settlement").  The QIAGEN Settlement contains a confidentiality provision that requires the parties to keep the terms of the QIAGEN Settlement confidential, as well as any documents or information delivered pursuant to the terms of the QIAGEN Settlement.  QIAGEN has not consented to EGL or LabCorp's disclosure of the terms of the QIAGEN Settlement.

10.      Defendants paid a portion of the amount received under the QIAGEN Settlement to Plaintiffs in exchange for a release provided by Plaintiffs.  This agreement was memorialized in a separate written settlement agreement entered into between Plaintiffs and Defendants (the "MGH Settlement"), which also contains a confidentiality provision that requires the parties to keep the terms of the MGH Settlement confidential, as well as any

---

[3] Additional QIAGEN-related entities were named as defendants, but subsequently dismissed from the action.

documents or information exchanged in connection with the MGH Settlement.  The parties to the MGH Settlement also agreed to keep the provisions of the QIAGEN Settlement confidential.

11.     In this action, Plaintiffs are asserting breach of contract and other claims against Defendants based on Defendants' failure to make a royalty payment that Plaintiffs allege to be required by the Master License Agreement.  Defendants have moved to dismiss on the grounds that Plaintiffs' claims are barred by the release in the MGH Settlement Agreement.

12.     I have been informed that Plaintiffs included in or attached to their Second Amended Complaint three pieces of confidential information arising from this dispute: (a) the dollar amount that Defendants paid to Plaintiffs under the MGH Settlement Agreement, including offers of dollar amounts that were exchanged prior to the final agreement; (b) substantive terms of the QIAGEN Settlement; and (c) the dollar amount of the royalty payment that Defendants allegedly owe to Plaintiffs under the Master License Agreement.

13.     This information is highly confidential and would pose a substantial risk to Defendants' business if made available to the public and to Defendants' competitors.

**Dollar Amount of the MGH Settlement**

14.     The portion of the QIAGEN Settlement proceeds that Defendants were willing to pay to Plaintiffs is highly confidential and its disclosure could have severe impacts on Defendants' business.

15.     As is true with any settlement agreement, this amount reflects Defendants' internal valuation of the relative strengths and weaknesses of the parties' respective claims, as well as their own interpretation of what Plaintiffs were, or were not, entitled to under the terms of the confidential Master License Agreement.

16.     Moreover, the genetic testing market is highly competitive, and EGL has exercised its rights under the Master License Agreement to enter into a number of EGFR

4

sublicenses with various companies covering different geographical areas. The terms of these sublicense agreements vary from one another, both in terms of the substantive rights being granted, the scope of the sublicenses, and the financial terms of the sublicenses.

17.     If Defendants' competitors and sublicensees learned of the value of the MGH Settlement, they could try to use the information to their competitive advantage in re-negotiating the terms of their own licenses, in the EGFR context or with respect to other technologies.

18.     EGL is also in the process of negotiating additional EGFR sublicenses, and the disclosure of the amount of the MGH Settlement could negatively impact EGL's bargaining position with respect to those pending sublicenses.

19.     The same reasoning supports the confidentiality of settlement demands and offers exchanged between Plaintiffs and Defendants during the negotiation of the MGH Settlement.

20.     Disclosure of this information to Defendants' competitors and sublicensees would put Defendants at a competitive disadvantage with respect to current, pending, and future EGFR sublicense agreements.

21.     This information could also be used by any parties with whom Defendants are involved in litigation in the future. Disclosure of this information to the general public could reflect Defendants' litigation strategy, which could negatively impact Defendants' ability to negotiate future settlement agreements.

**The Substantive Provisions of the QIAGEN Settlement**

22.     Both the substantive and the financial aspects of the QIAGEN Settlement constitute confidential and highly sensitive competitive information that, if disclosed to the public, could result in substantial harm to Defendants' business.

23.     EGL's sublicensees are not privy to the terms of EGL's agreements with other sublicensees.  Thus, the specific terms of any given sublicense, including the QIAGEN Sublicense, is highly confidential because it would impact EGL's ability to negotiate favorable terms with other sublicensees.

24.     As part of the QIAGEN Settlement, EGL and QIAGEN agreed to make certain substantive amendments to the underlying Sublicense.  These amendments are highly confidential to EGL and LabCorp (and to QIAGEN), and disclosure of these amendments could substantially harm EGL and LabCorp's business.

25.     Indeed, many of EGL's sublicensees are competitors of EGL and LabCorp (as well as QIAGEN), and these competitors could potentially use the amendments to the Sublicense to their advantage, either in the context of trying to re-negotiate their licenses with Defendants, either in the context of EGFR testing or in the context of other technologies.

26.     As an example, one of EGL's sublicensees approached EGL shortly after the QIAGEN Litigation had settled, inquiring as to the terms and conditions upon which that settlement was reached and the terms of the underlying Sublicense, and threatening litigation if EGL did not provide the requested information.  This inquiry was based solely on the *existence* of the QIAGEN Settlement, and that sublicensee was unaware of the terms of either the Sublicense or the QIAGEN Settlement agreement.

27.     If the details of the QIAGEN Settlement, including the substantive amendments to the Sublicense, were made public, I would expect EGL's other sublicensees to try to use this information in a similar manner.

28.     As mentioned above, EGL is also in the process of negotiating additional EGFR sublicenses, and the disclosure of the terms of the QIAGEN Settlement could negatively impact EGL's bargaining position with respect to those pending sublicenses.

29.     Current or future licensees or sublicensees could also use this information to make predictions about how strongly Defendants would pursue allegedly infringing conduct, or conduct in violation of their own sublicenses (again, both in the context of EGFR testing as well as other types of testing), and could choose to breach the sublicense (or infringe on any of Defendants' patents) and then try to use the substantive terms of the QIAGEN Settlement as a baseline for their own settlement negotiations.

## The Value of the Alleged Royalty Payment Owed to Plaintiffs

30.     The value of the royalty payment that Plaintiffs allege is owed to them pursuant to the Master License Agreement is also highly confidential to Defendants.  Disclosure of this amount would provide Defendants' competitors with sensitive and non-public industry knowledge regarding Defendants' EGFR testing activity, and could also competitively disadvantage Defendants, both in the context of their EGFR sublicenses as well as licensing arrangements with respect to other technologies.

31.     With respect to the EGFR market, disclosure of the royalty payment would provide some indication of the volume of Defendants' EGFR testing, which is not currently available to the public or to Defendants' competitors.

32.     Defendants' competitors and sublicensees are also unaware of the terms of the Master License Agreement, and specifically do not know the extent of Defendants' upstream

royalty obligations to Plaintiffs.  If the amount that Plaintiffs allege they are owed is disclosed to the public, this information would permit Defendants' sublicensees to make certain calculations and assumptions about Defendants' upstream royalty obligations and may provide an incentive to try to re-negotiate their own terms

33.    As mentioned above, EGL is also in the process of negotiating additional EGFR sublicenses, and the disclosure of Defendants' upstream royalty obligations could negatively impact EGL's bargaining position with respect to those pending sublicenses.

34.    Additionally, potential licensees or sublicensees of other, non-EGFR technologies could try to use Defendants' upstream royalty obligations under the Master License Agreement as a benchmark for royalty provisions in other licenses.

35.    In sum, disclosure of the three pieces of information Defendants seek to impound could have a substantial and detrimental effect on Defendants' business, and could competitively disadvantage Defendants both in the EGFR context and with respect to current and future licensing arrangements as they concern other types of technologies.


I declare under penalty of perjury under the laws of the State of Massachusetts that the foregoing is true and correct.

Executed on November 9, 2018 at Westborough, MA.

Kellie Watson, Ph.D.

8