UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE GENERAL HOSPITAL CORPORATION and DANA-FARBER CANCER INSTITUTE, INC., | ) ) ) ) | C.A. NO. 1:18-cv-11360-IT |
| Plaintiffs, v. | ) ) ) | Leave to File Excess Pages Granted on July 24, 2018 |
| ESOTERIX GENETIC LABORATORIES, LLC and LABORATORY CORPORATION OF AMERICA HOLDINGS, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendants Esoterix Genetic Laboratories, LLC ("EGL") and Laboratory Corporation of America Holdings ("LabCorp") (collectively "Defendants"), by their undersigned counsel, respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Second Amended Complaint filed by The General Hospital Corporation and Dana-Farber Cancer Institute, Inc. (collectively, "Plaintiffs").

**PRELIMINARY STATEMENT**

This simple breach of contract case arises out of a June 27, 2017 Settlement Agreement, which resolved a dispute over an underlying Master License Agreement between EGL and Plaintiffs.  In the Settlement Agreement, Plaintiffs broadly released all claims and obligations against EGL and LabCorp "of any nature whatsoever . . . that may have arisen before the Effective Date . . . relating to or arising from . . . the Master License Agreement, including but not limited to . . . the payment of **_any_** past royalties . . ."  (SAC Ex. J § 3.1 (emphasis added).)

Plaintiffs seek to recover royalty payments that arose in the six months prior to June 27,

2017—the very "past royalties" that they released.  In an attempt to overcome this broad and unambiguous release, Plaintiffs resort to an unsupportable interpretation of the payment provision in the Master License Agreement.  Under that agreement, royalties accrue on each sale, or performance, of a licensed test, but EGL makes aggregate payments to Plaintiffs only twice per year, following six month "reporting periods."  (SAC Ex. H §§ 1.28, 4.5(e).)  According to Plaintiffs, the Settlement Agreement did not release royalty payments relating to tests performed prior to the Settlement Agreement's Effective Date because EGL's payment to Plaintiffs for those tests was not due until August 15, 2017, after the Effective Date.

Plaintiffs' position ignores both the text of the Settlement Agreement and governing Massachusetts law.  The general release is not limited to fully matured claims or royalties that are "payable" to Plaintiffs, but instead extends to "any past royalties," including those that "may have arisen" before the Effective Date.  (SAC Ex. J § 3.1.)  Any common sense reading of the Master License Agreement dictates that EGL's obligation to pay royalties "arose" upon the sale of a licensed test, even if payment was not due until after the end of the reporting period.   The termination provision of the Master License Agreement further confirms this, providing that, upon termination, EGL is required to pay not only royalties that were "due" but also royalties that have "accrued . . . as of the termination date."  (SAC Ex. H § 10.7.)

EGL explained all of this in its original motion to dismiss (ECF Nos. 9-11).  In response, Plaintiffs amended their Complaint to include two new, Hail Mary theories.  First, Plaintiffs include in their Second Amended Complaint two confidential settlement communications that took place a month before a final agreement was reached.  Since there is no ambiguity in the text of the Settlement Agreement, such parol evidence is irrelevant and certainly cannot be used to create an ambiguity that does not exist in the written agreement.  Moreover, reference to these

communications is explicitly barred by the integration clause in the Settlement Agreement.

Second, Plaintiffs now argue that the Settlement Agreement was based on a "mistake," and should be equitably reformed. But Plaintiffs are sophisticated parties that were represented by counsel. They expressly represented in the agreement that counsel advised them of the consequences of the Settlement Agreement. Under these circumstances, the conclusory allegation of mistake is insufficient to survive a motion to dismiss.

In short, Defendants paid Plaintiffs a substantial sum of money in exchange for a general release of any and all obligations and claims that arose – or may have arisen – prior to June 27, 2017, including "any past royalties" that would otherwise have been owed under the Master License Agreement. Defendants wanted (and paid handsomely for) a fresh start, and are now being forced to defend precisely the kind of suit (and ancillary allegations about alleged wrongdoing in bringing and conducting the underlying litigation) that the release was intended to prevent. The Second Amended Complaint should be dismissed in its entirety with prejudice.

## STATEMENT OF FACTS

### A. Plaintiffs License the Patent Rights to EGL

Plaintiffs own or control the rights to certain patents (the "Patents") providing for a method of detecting the presence of epidermal growth factor receptor ("EGFR") mutations which, when present, are predictive of the efficacy of certain chemotherapeutic treatments for lung cancer. (SAC ¶ 13, Ex. H § 1.9.)

In 2005, Plaintiffs entered into an Exclusive License Agreement granting to EGL an exclusive, royalty-bearing license to sell products and services utilizing the Patents (the "Master License Agreement"). (SAC ¶ 14, Ex. H § 2.1.)[1] Under the Master License Agreement, EGL

---

[1] The original Master License Agreement was entered into between Plaintiffs and Genzyme Corporation ("Genzyme"). In 2010, LabCorp purchased most of Genzyme's genetic testing business, including its rights under

was permitted to conduct its own EGFR testing and enter into sublicenses.  (*Id.*)

In exchange for the rights granted under the Master License Agreement, EGL agreed to pay to Plaintiffs, among other things, a license issue fee, an annual license fee, royalties based on EGL's own EGFR testing, and sublicense fees and royalties.  (SAC Ex. H §§ 4.1, 4.3, 4.5, 4.6.) Pursuant to Section 4.3 of the Master License Agreement, the annual license fee was to be credited against royalties due during the same calendar year.  (*Id*. § 4.3.)

Royalties were to be paid to Plaintiffs on a "per sale" basis; in other words, a royalty was due for each EGFR test (defined as a "PROCESS") conducted by EGL.  (SAC Ex. H § 4.5(a).) The required payments, however, were payable to Plaintiffs only twice per year, "within forty-five (45) days after the end of each REPORTING PERIOD," with "REPORTING PERIOD" defined as "each six month period ending June 30 and December 31 of each calendar year." (SAC ¶ 26, Ex. H §§ 1.28, 4.5(e).)

Section 5.4 of the Master License Agreement grants Plaintiffs the right to audit EGL's records solely to confirm the accuracy of any payments made thereunder or to determine compliance with the Master License Agreement.  (SAC ¶ 38, Ex. H § 5.4.)

Upon termination of the Master License Agreement, "all royalties and other payments . . . accrued or due to [Plaintiffs] as of the termination date shall become immediately payable." (SAC Ex. H § 10.7.)  Thus, if the Master License Agreement were terminated in the middle of a REPORTING PERIOD, Plaintiffs' claim to royalties that previously arose based on EGFR tests conducted during that REPORTING PERIOD would become due.

LabCorp is not a party to the Master License Agreement.

---

the Master License Agreement, and created EGL to manage the purchased assets.  EGL is Genzyme's successor-in-interest to the Master License Agreement.  (SAC ¶ 14, Ex. J at 1; Howe Decl. Ex. A ¶¶ 21, 23.)

### B.     The Sublicense

In 2008, EGL (then-Genzyme) entered into a sublicense agreement with non-party DxS,
Ltd. (the "Sublicense"), which subsequently assigned its rights to the Sublicense to QIAGEN
Manchester, Ltd. ("QIAGEN").  (SAC ¶ 16, Ex. J at 1; Howe Decl.[2] Ex. A ¶ 18.)[3]  LabCorp is
not a party to the Sublicense.

### C.     The Prior Litigation and Settlement Agreement

In 2014, EGL filed a complaint against QIAGEN alleging breach of the Sublicense,
infringement of the Patents, and other related claims (the "Prior Litigation").  (SAC ¶ 17, Ex. J at
1; Howe Decl. Ex. A.)   The Court granted QIAGEN's motion to dismiss EGL's patent
infringement claim, but denied QIAGEN's motion as to the remaining three claims.  (Howe
Decl. Ex. C.)  QIAGEN subsequently filed counterclaims against EGL and third-party claims
against LabCorp.  (Howe Decl. Ex. B.)  During the Prior Litigation, the Plaintiffs here made
numerous accusations that EGL's commencement and prosecution of its claims against QIAGEN
violated the terms of the Master License Agreement.  (SAC ¶¶ 17-18.)

In June 2017, EGL, LabCorp, and QIAGEN settled the Prior Litigation, and Plaintiffs
asserted a right to a portion of the settlement funds received by Defendants.  (SAC ¶¶ 19-24, Ex.
J at 1.)[4]  After numerous emails, letters, and an in-person meeting, Plaintiffs and Defendants
entered into their own settlement agreement, which became effective June 27, 2017 (the
"Settlement Agreement").  (SAC Ex. J.)  During these negotiations, Plaintiffs again raised issues
concerning EGL's commencement and prosecution of its claims against QIAGEN.  (SAC ¶¶ 17-

---

[2] References to the "Howe Decl." are to the declaration of Christopher R. Howe submitted herewith.
[3] When ruling on a motion to dismiss, a district court may consider "matters of public record, and other matters
susceptible to judicial notice."  *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008).
[4] Plaintiffs' assertion that "[u]nder the License Agreement, the defendants required the plaintiffs' approval before
any such settlement could be executed" (SAC ¶ 19) is incorrect.  While the Master License Agreement required
EGL to obtain Plaintiffs' consent before settling an "infringement action" (SAC Ex. H § 7.4), the Prior Litigation
was no longer an "infringement action" because the patent infringement claim had been dismissed.  This distinction
is irrelevant to the present motion given that Plaintiffs ultimately did provide their consent.

19.)

Defendants paid $██████████[5] dollars to Plaintiffs under the Settlement Agreement—

well more than what they were entitled to under the Master License Agreement.  (SAC ¶ 24, Ex.

J § 5.2.)  Given Plaintiffs' numerous accusations concerning EGL's conduct with respect to the

Prior Litigation, Plaintiffs agreed to provide broad and general releases in favor of both EGL and

LabCorp.  (SAC ¶¶ 17-18, Ex. J § 3.)

> Specifically, Plaintiffs executed a broad general release in favor of EGL and LabCorp:

> of, from, and with respect to, any and all liabilities, losses, damages, charges, complaints, claims, counterclaims, obligations, promises, agreements, controversies, actions, causes of action, suits, rights, demands, costs, debts and expenses (including attorneys' fees and court costs) *of any nature whatsoever,* known or unknown, suspected or unsuspected *that may have arisen before the Effective Date, which [MGH and DFCI] may have, own or hold,* or claim to have, own or hold against [EGL and LabCorp] relating to or arising from (i) the acts or omissions that were stated in, arose out of, or which may have arisen out of, the [Prior Litigation], (ii) the Patent Rights; (iii) the Master License Agreement, *including but not limited to the provision of any notice(s) required under the Master License Agreement* **or the payment of <u>any</u> past royalties or other fees pursuant to the Master License Agreement** . . . .

(SAC Ex. J § 3.1 (emphasis added).)

The Settlement Agreement also contains an integration clause, which "supersede[d] in its

entirety any and all written or oral agreements previously existing between the Parties with

respect to the subject matter of this Settlement Agreement."  (SAC Ex. J § 7.6.)

Plaintiffs were represented by sophisticated counsel from two law firms in these

negotiations—Ron Eisenstein of Nixon Peabody LLP and Joshua Barlow of Haug Partners—and

warranted "that they have had the opportunity to consult with legal counsel of their choice prior

to execution of this Settlement Agreement, have in fact done so, and have been specifically

---

[5] The redactions contained in this Memorandum of Law are subject to Defendants' Motion to Impound, filed on November 9, 2018 (ECF Nos. 82-84.).

advised by counsel of the consequences of this Settlement Agreement and their respective rights and obligations hereunder."  (SAC Ex. J § 7.10.)

Contrary to Plaintiffs' repeated allegations (SAC ¶¶ 22, 23, 24, 25, 29, 66), Defendants never agreed to continue making "all" royalty payments due under the Master License Agreement.  Indeed, while that allegation appears no less than six times in the Second Amended Complaint, that purported agreement appears nowhere in the settlement communications attached to the Second Amended Complaint, let alone in the fully integrated Settlement Agreement itself, which expressly releases claims to "any past royalties."  (SAC Ex. J § 3.1.)

### D.   The Instant Dispute

June 30, 2017 (three days after the Settlement Agreement's Effective Date) marked the end of a semi-annual reporting period under the Master License Agreement.  (SAC Ex. H § 1.28.)  Because Plaintiffs expressly released all claims and liabilities that arose before June 27, including "any past royalties," EGL's royalty report provided the required revenue and royalty information for June 28 through June 30.  (SAC Ex. A, Ex. J § 3.1.)  In addition, because EGL had already paid the Annual License Fee required by Section 4.3, and this annual license fee was to be credited against royalties due within the same calendar year, no further payments were due for this three-day period.  (SAC Ex. A, Ex. H § 4.3.)

Plaintiffs subsequently demanded that EGL (i) pay or account for royalties for EGFR tests conducted between January 1 and June 30, 2017, and (ii) permit an audit of EGL's records concerning all royalty-bearing occurrences during the six-month reporting period ending June 30, 2017.  (SAC ¶¶ 36-39, Ex. K.)  Because Plaintiffs are permitted to audit EGL's records only to verify reports and payments, and since no payments were due from the beginning of the reporting period through the Effective Date of the Settlement Agreement, EGL refused Plaintiffs' request to review its records for that time period.  (SAC ¶ 39, Ex. B, Ex. H § 5.4.)

EGL did, however, offer to allow Plaintiffs to audit its records for June 28 through June 30, 2017.  (SAC Ex. B.)

Plaintiffs subsequently filed this action in the Superior Court for the Commonwealth of Massachusetts, which Defendants removed to this Court on June 28, 2018.   (ECF No. 1.) Defendants, thereafter, moved to dismiss the Complaint in its entirety, in response to which Plaintiffs filed a First Amended Complaint on July 18, 2018 (ECF No. 18) and a Second Amended Complaint on November 9, 2018 (ECF No. 81).[6]  The First and Second Amended Complaints add a claim to reform the Settlement Agreement based on "mistake," and includes allegations and references to settlement discussions between the parties that occurred prior to entering into the Settlement Agreement, which includes a full merger clause.

## ARGUMENT

Rule 12(b)(6) requires the dismissal of a complaint if it fails to allege "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is "plausible" only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010); *A.G. ex rel. Maddox v. v. Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013) ("threadbare" allegations that "omit any meaningful factual content" are insufficient).  Where a complaint "strains the language of the [contract] beyond recognition," it must be dismissed.  *Sherman v. Clear Channel Outdoor, Inc.*, 889 F. Supp. 2d 168, 174-75 (D. Mass. 2012).

---

[6] In furtherance of the discussion held with the Court during the October 26, 2018 hearing, the parties filed a Joint Motion to Strike the papers submitted in support of Defendants' motions to dismiss the Complaint and First Amended Complaint, and Plaintiffs' cross-motion for summary judgment.  (ECF No. 87.)

I.     **THE BROAD RELEASE EXECUTED BY PLAINTIFFS PRECLUDES THEIR BREACH OF CONTRACT CLAIM AS A MATTER OF LAW**

Where the language of a written contract is "plain and unambiguous," it must be "construed in accordance with the 'fair and reasonable meaning of its words.'" *Sherman*, 889 F. Supp. 2d at 174.   Moreover, the interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law for the court.   *See HSBC Realty Credit Corp. (USA) v. O'Neill*, 745 F.3d 564, 574 (1st Cir. 2014).   Here, the unambiguous text of the Settlement Agreement and the Master License Agreement defeats Plaintiffs' claims as a matter of law, and the Court should therefore disregard Plaintiffs' allegations concerning the parties' supposed intent in entering into the Settlement Agreement.

A.     **The Settlement Agreement Clearly and Unambiguously Released Defendants From Any Obligation to Pay Royalties for EGFR Tests Conducted Prior to June 27, 2017**

"It is beyond debate that general releases are enforceable under Massachusetts law." *EveryScape, Inc. v. Adobe Sys. Inc.*, No. CIV.A. 10-11597-RGS, 2013 WL 5550901, at *3 (D. Mass. Oct. 7, 2013); *see also Craft v. Regions Mortg., Inc.*, 769 F. Supp. 2d 7, 10 (D. Mass. 2011) ("Massachusetts law . . . favors the enforcement of releases").   "Moreover, a general release will settle all matters covered by its language"; "if a party intends to limit the scope of a release, she should say so explicitly."   *Craft*, 769 F. Supp. 2d at 10-11; *see also Eck v. Godbout*, 444 Mass. 724, 726, 831 N.E.2d 296, 299 (2005).

Here the Settlement Agreement contains a broad and general release with no relevant exclusions or limitations.   Plaintiffs released Defendants from any and all claims and obligations "of any nature whatsoever . . . that may have arisen before the Effective Date . . . relating to or arising from . . . the Master License Agreement, including but not limited to . . . the payment of any past royalties or other fees pursuant to the Master License Agreement."   (SAC Ex. J § 3.1.)

The Parties could have easily carved out certain royalty payments from the general release, but they did not. In fact, just the opposite is true. The parties specifically stated that Defendants were released from paying "**any** past royalties." (*Id.* (emphasis added).) Thus, by releasing Defendants from the obligation to pay "any past royalties" that "may have arisen before" June 27, 2017, Plaintiffs plainly relieved Defendants of any obligation to pay royalties that arose based on EGFR testing conducted prior to that date. *See Bean's Glass Serv., Inc. v. Speedy Auto Glass, Inc.*, No. CIV.A. 00-30115-MAP, 2002 WL 974675, at *6 (D. Mass. May 10, 2002) (holding breach of contract action barred by the parties' settlement and release agreement).

Plaintiffs' citation to various provisions in the Master License Agreement does not mandate a different result and, in fact, supports *Defendants'* position that the royalties at issue are covered by the general release in the Settlement Agreement.

Plaintiffs first cite Section 4.5 of the Master License Agreement, which states that "royalty payments are first due and payable . . . within 45 days of the end of each reporting period." (SAC ¶ 26, Ex. H § 4.5.) According to Plaintiffs, this means that Defendants' obligation to pay royalties for EGFR testing conducted between January 1 and June 27, 2017 "did not arise until August 15, 2017" and therefore "was clearly a future obligation, not a prior or past obligation." (SAC ¶ 30.) This argument is contradicted by the text of the Master License Agreement as well as Massachusetts case law.

In Massachusetts, a claim "arises at the time of the 'underlying incident' giving rise to the claim." *See Eck*, 831 N.E.2d at 302. The term "arise" is defined in Black's Law Dictionary 23 (9th ed. 2009) as "'[t]o originate; to stem (from).'" *John Doe No. 4 v. Levine*, 77 Mass. App. Ct. 117, 119 (2010). Because Plaintiffs' claim to the royalties at issue originates, or stems from, the performance of EGFR tests that occurred prior to the June 27 Settlement Agreement, the

obligation to pay those royalties "arose" when the tests were conducted even though they did not become payable until the end of the reporting period. *See id.* Any claim for payment of pre-June 27 royalties was therefore released in the Settlement Agreement.

The text of the Master License Agreement confirms that EGL's obligation to pay royalties to Plaintiffs arises when an EGFR test is performed. EGL's payment of royalties commence with the first test conducted by EGL and are calculated with a formula that accounts for the total number of tests conducted during the reporting period. (SAC Ex. H § 4.5(a) ("Beginning with the first COMMERCIAL SALE of a PROCESS … and continuing during the term of the Agreement, COMPANY shall pay HOSPITAL a royalty . . . .").)

Section 10.7 of the Master License Agreement further confirms that EGL's obligation to pay royalties arose as tests were sold. It provides that "[u]pon termination of this AGREEMENT . . . all royalties . . . accrued or due to [Plaintiffs] as of the termination date shall become immediately payable." (SAC Ex. H § 10.7.) If Plaintiffs were to terminate the Master License Agreement in the middle of a reporting period, EGL would nevertheless be obligated to make royalty payments for EGFR tests conducted prior to the date of termination because Plaintiffs' entitlement to royalties "arises" when an EGFR test is performed, *not* when the royalty payments become due. Thus, Plaintiffs' right to the royalties for EGFR tests conducted prior to June 27, 2017 "arose" when that testing was conducted, and was released by the plain language in the Settlement Agreement.

Plaintiffs next allege that Defendants' payment of "the annual fee for the calendar year 2017" "confirms" Plaintiffs' interpretation of the contract, and that if Defendants' interpretation were correct, they should have "prorated" this annual payment "because it covered a period of 2017 before the effective date of the Settlement Agreement[.]" (SAC ¶¶ 31-32.) Plaintiffs'

position has no basis in the text of the Master License Agreement.

As an initial matter, the annual license fee is not "for the calendar year 2017" (SAC ¶ 31), but rather for the 12-month period from the August payment date to the following August each year the agreement is in effect. Indeed, Section 4.1 required the payment of a "license issue fee" within 45 days of EGL's predecessor's execution of the Master License Agreement. (SAC Ex. H § 4.1.) EGL's predecessor signed the Master License Agreement on April 28, 2005, which made this payment due in mid-June 2005. (*Id.* at Signature Page.) This payment maintained the license through August of 2006, when the first "annual license fee" was due. (*Id.* § 4.3(a).) All subsequent annual license fees are due and payable on or before August 15. Thus, the annual license fee does not maintain the Master License Agreement for a past calendar year, but rather from August 15 through the following August 14 of any given year.

Thus, for Plaintiffs' argument to make sense, EGL would have had to seek a prorated refund of the prior annual fee that was payable in August *2016*, not prorate the annual license fee payable in August *2017*. But EGL could not have done so, as the annual license fees are plainly "nonrefundable" under the Master License Agreement. (SAC Ex. H § 4.3.)

There is also a fundamental difference between a royalty payment and an annual license fee. As discussed above, in Massachusetts, a claim "arises at the time of the 'underlying incident' giving rise to the claim." *See Eck*, 831 N.E.2d at 302. Royalties under the Master License Agreement are to be calculated on a "per-test" basis (SAC Ex. H § 4.5), and so the right to a royalty payment "arises" when the underlying EGFR test is performed. Annual license fees, on the other hand, do not arise based on the performance of an EGFR test, but are triggered every year on August 15 so long as the Master License Agreement is in effect. (*Id.* § 4.3.) Thus, EGL's obligation to pay the annual license fee did not "arise" until August 15, 2017, after the

Effective Date of the Settlement Agreement.[7]

**B.    Defendants' Refusal to Permit an Audit of Its Records Prior to June 27, 2017 Was Consistent with the Terms of the Settlement Agreement**

To the extent Plaintiffs base their breach of contract claim on Defendants' refusal to permit an audit of its pre-Settlement Agreement records (SAC ¶ 45), this claim also fails. Plaintiffs' audit request was based on the portion of Section 5.4 of the Master License Agreement that grants Plaintiffs the right to audit EGL's records to confirm the accuracy of any payments made.  (SAC Ex. J § 5.4.)  Because the Settlement Agreement unambiguously released Defendants from any obligation to pay royalties that arose between January 1 and June 27, 2017, Plaintiffs are not entitled to audit EGL's records during that time, and EGL could not have breached the contract by refusing to permit such an audit.

**C.    The Court Should Disregard Plaintiffs' Allegations Concerning the Parties' Intent in Entering into the Settlement Agreement**

Plaintiffs have failed to identify a single ambiguity in the text of the Settlement Agreement.   Instead, they ask this Court to *create* an ambiguity based on Plaintiffs' mischaracterization of confidential settlement negotiations, as well as Plaintiffs' own claimed "assumption and understanding" in entering into the Settlement Agreement.  (SAC ¶¶ 19-29, 66.) These allegations fail as a matter of law.

First, the email attached as Exhibit I to the Second Amended Complaint states, on its face, that it is a "CONFIDENTIAL SETTLEMENT COMMUNICATION" and that it is "INADMISSIBLE FOR ANY PURPOSE."  (SAC Ex. I.)  While settlement negotiations may be

---

[7] Plaintiffs' allegation concerning EGL's credit of the annual license fee against royalties from the first and second quarter of 2017 (SAC ¶ 32) again confuses when a royalty obligation "arises" versus when payment is "due."  The fact that the royalties from the first and second quarter were not payable until after the Effective Date of the Settlement Agreement has no bearing on when Plaintiffs' right to those royalties actually *arose*, which was unquestionably prior to June 27, 2017.

admissible to aid the Court in interpreting an ambiguous settlement agreement,[8] such negotiations are not admissible where, as here, the settlement agreement is clear and unambiguous.

Second, the Settlement Agreement contains a standard integration clause which, on its face, "supersedes in its entirety any and all written or oral agreements previously existing between the Parties with respect to the subject matter of this Settlement Agreement." (SAC Ex. J § 7.6.) Thus, even if Defendants *had* proposed at some point during the negotiations that they would make all ongoing royalty payments (they did not), such a proposal would be irrelevant because it was not incorporated into the final written agreement. *See Gravelle v. Hudson Lock LLC*, No. 16-CV-12548-LTS, 2018 WL 627373, at *7 (D. Mass. Jan. 30, 2018) (holding that integration clause foreclosed a breach of contract claim); *Burke v. Altisource Sols., Inc.*, No. CV 17-11867-IT, 2018 WL 3118434, at *6 (D. Mass. June 7, 2018) (same).[9]

"It is well-settled that 'where an agreement is unambiguous and contains an integration clause, a court must give effect to its obvious meaning.'" *Duckworth v. R3 Educ., Inc.*, No. CV 17-11169-FDS, 2017 WL 5196384, at *6 (D. Mass. Nov. 9, 2017); *see also Agri–Mark, Inc. v. Niro, Inc.*, 233 F. Supp. 2d 200, 208 (D. Mass. 2002) ("integration clauses are well recognized and enforceable in this district"). "That means, of course, that an inquiring court should construe the written documents within its four corners, unfestooned with covenants the parties did not see fit to mention." *Duckworth*, 2017 WL 5196384, at *6.

This case is a perfect example of why integration clauses are used in settlement agreements: settlement negotiations are fluid by nature, and integration clauses prevent one party

---

[8] Defendants reserve all rights to challenge the admissibility of these negotiations on summary judgment or at trial.

[9] Comparing the Settlement Agreement to the emails in Exhibit I to the Second Amended Complaint further demonstrates that the parties had not reached a final agreement as of the date of the emails. Mr. Eisenstein's May 26 email proposes an obligation on LabCorp to take various actions with respect to its application and maintenance of various patents, yet these obligations are absent from the final Settlement Agreement. (SAC Exs. I, J.)

from taking a single settlement communication out of context and using it to support a contradictory interpretation of a subsequent and fully integrated written agreement. Thus, "where the language of an integrated release agreement is unambiguous as applied to the question at hand and the intent of the parties is clear solely on the basis of that language, the parol evidence rule bars the use of extrinsic evidence to contradict that plain language." *Hermes Automation Tech., Inc. v. Hyundai Elecs. Indus.* Co., 915 F.2d 739, 747 (1st Cir. 1990); *see also White Construction Co., Inc. v. Commonwealth*, 11 Mass. App. 640, 418 N.E.2d 357, 360 (1981) ("A release . . . which is unequivocal in its terms cannot be explained by parol evidence"). This is particularly true where the parties "had the benefit of sophisticated corporate management and competent counsel for creation of the superseding final settlement document." *Warner Co. v. Liberty Mut. Ins. Co.*, 80 Mass. App. Ct. 1104, 951 N.E.2d 1013 (2011).

Plaintiffs' attempt to use the May 27, 2017 email exchange (which does not even contain the purported "agreement" that Plaintiffs repeatedly allege) to contradict the clear, unambiguous, and integrated language of the written Settlement Agreement entered into over one month later should be rejected. Between the date of that email exchange and the date of the Settlement Agreement, the parties exchanged emails and letters, and engaged in telephone and in-person negotiations. (SAC ¶ 69.) Thus, Plaintiffs' mischaracterization of a single email at the start of those negotiations is irrelevant to the Court's analysis of the final integrated Settlement Agreement, which on its face excludes most of the terms of these preliminary proposals. *See Warner Co. v. Liberty Mut. Ins. Co.*, 80 Mass. App. Ct. 1104, 2011 WL 3611396, at *4 (2011) (refusing to consider a term sheet that preceded an integrated settlement agreement, holding that "no injustice would result from literal enforcement of the chosen language"); *NJR Const. Co. v. Saunders*, No. CA936407F, 1994 WL 879942, at *1 (Mass. Super. May 18, 1994) (refusing to

consider an attorney affidavit "for the purpose of altering the unambiguous terms of the [integrated] Settlement Agreement and the release").

> **D.     The Master License Agreement Does Not Entitle Plaintiffs to an Audit of Defendants' Records Between January 1, 2017 and June 27, 2017**

Plaintiffs further allege that Defendants breached the Master License Agreement by refusing to allow Plaintiffs to audit their records concerning royalty-bearing occurrences that took place between January 1 and June 27, 2017.  (SAC ¶ 45.)  As a result of the general release in the Settlement Agreement, no royalty-bearing occurrences took place during this time period and so there are no "payments" or "reports" for Plaintiffs to "verify."  Because Plaintiffs have no audit rights during the relevant time period, Defendants' refusal to allow an audit was not a breach of the Master License Agreement.

## II.     PLAINTIFFS' CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING FAILS AS A MATTER OF LAW

> **A.     Plaintiffs' Allegations Are Insufficient to State a Claim for Breach of the Implied Covenant**

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is entirely duplicative of their breach of contract claim, and devoid of any allegations of deceit or maliciousness.  It should be dismissed.

"[N]ot every breach of contract is a breach of the implied covenant of good faith and fair dealing."  *Christensen v. Kingston School Committee*, 360 F. Supp. 2d 212, 226 (D. Mass. 2005); *see also Nagel v. Provident Mut. Life Ins. Co.*, 51 Mass. App. Ct. 763, 768, 749 N.E.2d 710 (2001).  Rather, breach of the implied covenant "requires conduct taken in bad faith either to deprive a party of the fruits of labor already substantially earned or unfair leveraging of the contract terms to secure undue economic advantage."  *Christensen,* 360 F. Supp. 2d at 226.  Harms suffered as a result of a breach of the implied covenant "generally involve deceit or

'unfair subterfuge' and usually are 'compounded by deceptive or unfair behavior that prevented—or at a minimum diverted—the injured parties from seeking immediate redress." *Id.*

Accordingly, "[c]laims for breach of the implied covenant . . . require additional factual allegations" beyond those required to state a claim for breach of contract. *Brand Grp. Int'l, LLC v. Established Brands Int'l, Inc.*, No. CIV.A. 10-11783-JLT, 2011 WL 3236078, at *3 (D. Mass. July 26, 2011). "[U]nless a plaintiff can establish that a defendant willfully and maliciously refused to perform an express obligation of the underlying contract, the covenant does not provide an independent basis of recovery." *Edlow v. RBW, LLC*, No. CIV A 09-12133-RGS, 2010 WL 2034772, at *5 (D. Mass. May 21, 2010).

Plaintiffs' allegations do not even state a claim for breach of contract, much less meet this heightened standard for breach of the implied covenant. Indeed, Plaintiffs' implied covenant claim is based *exclusively* on the same allegations that form the basis of their breach of contract claim—namely, Defendants' alleged failure to pay royalties for EGFR testing conducted between January 1 and June 27, 2017.

Plaintiffs' Second Amended Complaint makes no new factual allegations, but instead alleges that this conduct constitutes "an unfair, knowing, deceptive, malicious and bad faith scheme." (SAC ¶ 49.) Absent any additional *factual* allegations, tacking on these adjectives to Plaintiffs' breach of contract allegations does not give rise to a plausible inference of bad faith. *See Rosa v. PNC Mortg.*, No. 16-10739-GAO, 2017 WL 4176971, at *2 (D. Mass. Sept. 21, 2017) (dismissing implied covenant claim because "the plaintiff's assertion of bad faith [was] not supported by any particular factual allegation"); *Burbank v. Town of Hubbardston*, 146 F. Supp. 3d 402, 406 (D. Mass. 2015) (dismissing implied covenant claim where the plaintiff failed to plead facts suggesting that the defendant acted in bad faith). Moreover, Plaintiffs' threadbare

allegation that Defendants' "misconduct serves to prevent the objectives of the License Agreement from being realized" (SAC ¶ 50) is "too meager, vague, [and] conclusory" to warrant the presumption of truth or state a plausible claim for relief. *Tambone*, 597 F.3d at 442.

**B.     Plaintiffs' Claim for Breach of the Implied Covenant is Refuted By the Terms of the Master License Agreement and Settlement Agreement**

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing likewise fails because it seeks to impose on Defendants obligations that conflict with the parties' agreements. "The scope of the covenant is only as broad as the contract that governs the particular relationship." *Karter v. Pleasant View Gardens, Inc.*, 248 F. Supp. 3d 299, 308 (D. Mass. 2017). Thus, while a covenant of good faith is implied in every contract, it may not "be invoked to create rights and duties not otherwise provided for in the existing contractual relationship." *Shealey v. Fed. Ins. Co.*, 946 F. Supp. 2d 193, 199 (D. Mass. 2012) (citing *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004)); *see also Ford v. Lehman Capital*, No. 10-40092-FDS, 2012 WL 1343977, at *5 (D. Mass. Apr. 17, 2012) (the implied covenant cannot "undermine the express terms of the contract").

Here, Plaintiffs claim that Defendants breached the implied covenant by failing to pay royalties for EGFR tests conducted between January 1 and June 27, 2017. As explained above, however, the Settlement Agreement expressly released Defendants from the obligation to pay "any past royalties." (SAC Ex. J § 3.1.) Because Plaintiffs "cannot use the implied covenant to impose an obligation on defendants . . . [that] otherwise does not exist," *Karter*, 248 F. Supp. 3d at 308, their claim for breach of the implied covenant fails as a matter of law.

**III.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER M.G.L. CHAPTER 93A**

Plaintiffs' attempt to transform their breach of contract claim into a claim for "unfair and deceptive" trade practices should also be rejected. "A successful claim under Chapter 93A

requires a showing of (1) a deceptive act or practice on the part of the defendant; (2) an injury or loss suffered by the plaintiff, and (3) a causal connection between the defendant's deceptive act or practice and the plaintiff's injury." *Gallagher v. Amedisys, Inc.*, No. 17-CV-11390-ADB, 2018 WL 2223673, at *7 (D. Mass. May 15, 2018). "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law." *Id.*

"In the context of disputes among businesses, where both parties are sophisticated commercial players, the 'objectionable conduct must attain a level of rascality that would raise an eyebrow to the rough and tumble of the world of commerce.'" *Zurich Am. Ins. Co. v. Watts Regulator Co.*, 796 F. Supp. 2d 240, 244 (D. Mass. 2011). Thus, to prove a violation of Chapter 93A, Plaintiffs must show that Defendants' conduct "fell within the penumbra of some established concept of unfairness or was immoral, unethical, oppressive or unscrupulous." *Id.* (internal citations and quotations omitted). Plaintiffs' allegations are woefully insufficient.

"It is well settled that the mere breach of a contract, without more, does not amount to a [Chapter] 93A violation." *Id.* Indeed, even an "intentional[] breach [of contract] is insufficient[.]" *Whitman & Co., Inc. v. Longview Partners (Guernsey) Ltd.*, No. 14-CV-12047-ADB, 2015 WL 4467064, at *9 (D. Mass. July 20, 2015). Rather, the breach must be "so egregious as to possess an extortionate quality that gives it the rancid flavor of unfairness." *Zurich*, 796 F. Supp. 2d at 244; *see also Killian Corp. v. Murphy*, No. 063453, 2010 WL 4244829, at *4 (Mass. Super. Aug. 6, 2010). "In cases in which Chapter 93A claims relating to a contract dispute have been found to have been adequately alleged, courts have often cited additional damages incurred by the plaintiff or third parties, or additional unfair benefits sought by the defendants, as a basis for finding the necessary 'extortionate' conduct."

*Formulatrix, Inc. v. Rigaku Automation, Inc.*, No. CV 15-12725-MLW, 2016 WL 8710448, at *3 (D. Mass. Apr. 1, 2016).  "[A] good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a [Chapter] 93A claim is made." *Zurich*, 796 F. Supp. 2d at 244-45.

   In *Whitman v. Longview*, for example, the plaintiff alleged that the defendants improperly withheld payment under an agreement.  2015 WL 4467064, at *6.  In an effort to satisfy Chapter 93A, the plaintiff alleged that the defendants "acted in concert with one another in an unfair and deceptive effort to coerce [plaintiff] into unfairly compromising or otherwise abandoning its rights to receive the amounts due to it under the Agreement"; "ignored [plaintiff's] efforts to collect the amounts owed to it"; and "engaged in conduct in disregard of known contractual arrangements with the intention of securing an unbargained-for-benefit for themselves."  *Id.* at *9.  The court dismissed the plaintiff's claim, holding that the alleged facts "suggest[ed] nothing more than a mere breach of contract, even if it [wa]s a knowing or intentional breach."  *Id.*; *see also Formulatrix v. Rigaku Automation*, 2016 WL 8710448, at *3 (dismissing Chapter 93A claim where plaintiff failed to allege that the breach "was motivated by a desire to extort some extra-contractual benefit," or that "it suffered any damages beyond those resulting from the breach.").

   In their attempt to satisfy Chapter 93A, Plaintiffs similarly characterize Defendants' alleged breach of the Master License Agreement as "knowing[]," "willful[]," "improper," "unfair[]," "inequitabl[e]," "unscrupulous," "extort[ionate], and "deceptive."  (SAC ¶¶ 54-57.) This is simply not enough.  Indeed, Plaintiffs allege no *facts* which indicate that Defendants acted upon anything other than a good faith belief that the Settlement Agreement relieved the obligation to pay the royalties at issue.  Plaintiffs' claim that Defendants breached (or even willfully or unscrupulously breached) the Master License Agreement is insufficient under

Chapter 93A and their claim should be dismissed accordingly.

IV.     **PLAINTIFFS' CLAIM FOR AN ACCOUNTING FAILS AS A MATTER OF LAW**

A.      **Plaintiffs' Accounting Claim Fails Because They Do Not Allege the Existence of a Fiduciary Relationship**

"[A]n equitable accounting is available only if there exists a fiduciary or trust relationship between the parties[.]"  *Chedd-Angier Prod. Co. v. Omni Publications Int'l, Ltd.*, 756 F.2d 930, 937 (1st Cir. 1985); *see also Beram v. Ceaco, Inc.*, 219 F. Supp. 3d 274, 282 (D. Mass. 2016) (dismissing accounting claim where no fiduciary relationship existed); *Boston Light Source, Inc. v. Axis Lighting, Inc.*, No. 17-CV-10996-NMG, 2017 WL 6543868, at *5 (D. Mass. Nov. 13, 2017) (same).  As was true with their original Complaint, Plaintiffs allege no *facts* to support the existence of a fiduciary relationship, and their conclusory allegation that "[t]he plaintiffs' relationship with the defendants was one of trust and confidence" (SAC ¶¶ 62-63) is not enough. There is nothing in the Second Amended Complaint or in the Master License Agreement to suggest that the relationship between Plaintiffs and Defendants is anything more than an arms' length commercial relationship.  The claim should be dismissed.

B.      **Plaintiffs' Accounting Claim Is Refuted by the Terms of the Master License Agreement and Settlement Agreement**

Even if Plaintiffs could establish the existence of a fiduciary relationship, their accounting claim would still fail because, like their other claims, it is refuted by the unambiguous terms of the relevant agreements.  Plaintiffs requested an audit of EGL's records "relating to royalty bearing occurrences attributable to the Reporting Period ending on June 30, 2017."  (SAC Ex. K at 2, Ex. H § 5.4.)  Because EGL did not make, and was not required to make, any royalty payments in connection with EGFR testing performed between January 1 and June 27, 2017, Plaintiffs have no audit rights related to the payment of royalties during that time period.  Accordingly, Plaintiffs' accounting claim should be dismissed as a matter of law.

## V.     "PIERCING THE CORPORATE VEIL" IS NOT A VALID CLAIM UNDER MASSACHUSETTS LAW

Plaintiffs admit that LabCorp is not a party to the Master License Agreement.  Thus, it cannot be held liable for breach of the Master License Agreement or other contractual remedies unless Plaintiffs are able to pierce the corporate veil, which should be rejected in this case.

First, "[t]he doctrine of corporate disregard or 'veil-piercing' is not a cause of action, but instead is an equitable remedy that may be applied where it is necessary 'to provide a meaningful remedy for injuries and to avoid injustice.'"  *Hisert on behalf of H2H Assocs., LLC v. Blue Waters Dredging LLC*, No. CV 16-11960-FDS, 2017 WL 2662470, at *4 (D. Mass. June 20, 2017); *see also Specialty Mktg. Grp., Inc. v. Katz*, No. CIV.A. 13-12636-LTS, 2014 WL 2453105, at *7 (D. Mass. May 30, 2014) ("piercing does not state a separate cause of action"*); Madico, Inc. v. GMX Performance Films, Pte, Ltd*, No. 2006-CV-10953-JLT, 2009 WL 10692742, at *1 (D. Mass. Feb. 19, 2009).  The claim should be dismissed for this reason alone.

Second, Plaintiffs allege no facts requiring the veil to be pierced.  EGL is a wholly-owned subsidiary of LabCorp.  (Howe Decl. Ex. A ¶ 2.)  It is not surprising, therefore, that LabCorp is "the sole member of [EGL]" and that the companies "share the same principal place of business."  (SAC ¶ 76.)  However, a parent-subsidiary relationship is not enough to hold a parent liable for the actions of its subsidiary.  *See TechTarget, Inc. v. Spark Design, LLC*, 746 F. Supp. 2d 353, 356 (D. Mass. 2010) ("Control in and of itself is not sufficient to disregard the corporate entity"); *Lothrop v. N. Am. Air Charter, Inc.*, 95 F. Supp. 3d 90, 103 (D. Mass. 2015) ("[C]ommon ownership . . . together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another").

Indeed, Massachusetts courts pierce the corporate veil in only two situations: (1) "when the parent exercises 'some form of pervasive control' of the activities of the subsidiary 'and there

is some fraudulent or injurious consequence of the intercorporate relationship'"; or (2) "when there is a confused intermingling of activity of two or more corporations engaged in common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." *TechTarget*, 746 F. Supp. 2d at 356.  In applying this veil-piercing analysis, courts consider the following twelve factors:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

*Id*.  "[T]o pierce the corporate veil, a court must conclude *both* that the parent corporation directed and controlled the subsidiary *and* used it for an improper purpose."  *Id*. (emphasis added).

Plaintiffs allege that both of these scenarios are present (SAC ¶¶ 76, 79), but fail to make any supporting factual allegations.  Instead, they recite a litany of innocuous facts regarding the connection between LabCorp and EGL, such as correspondence sent from LabCorp employees using a LabCorp email address, or shared officers between the two companies.  (*Id*. ¶¶ 77-78.) There is nothing improper about these actions and, in fact, they are common among members of a large corporate family.

Nor do Plaintiffs allege any facts to show how LabCorp's alleged control of EGL or lack of corporate formalities were used for an improper purpose.  *See TechTarget*, 746 F. Supp. 2d at 356.  They simply repeat what has already been alleged—that Defendants "engag[ed] in bad-faith negotiations" and "knowingly and willfully breach[ed] the [Master] License Agreement."

(SAC ¶ 79.)  These allegations fail to state a claim for breach of contract and they likewise fail to support the requested veil-piercing.

## VI.   PLAINTIFFS' UNJUST ENRICHMENT CLAIM AGAINST LABCORP FAILS AS A MATTER OF LAW

The purpose of unjust enrichment is to provide "an equitable stopgap for occasional inadequacies in contractual remedies at law." *Watkins v. Omni Life Sci., Inc*., 692 F. Supp. 2d 170, 179 (D. Mass. 2010).  Thus, "where a binding contract governs the parties' relationship, the contract provides the measure of the [aggrieved party's] right and no action for unjust enrichment lies." *Flores v. OneWest Bank, F.S.B*., 172 F. Supp. 3d 391, 396 (D. Mass. 2016); *see also Mitchell v. U.S. Airways, Inc.*, 858 F. Supp. 2d 137, 158-59 (D. Mass. 2012) ("an unjust enrichment claim is permissible only where there is no express agreement").  To the extent Plaintiffs have a cause of action for breach of the Master License Agreement, they have a remedy against EGL as the party to that agreement.  Accordingly, Plaintiffs have an adequate "contractual remed[y] at law" and may not avail themselves of unjust enrichment.  *See Watkins*, 692 F. Supp. 2d at 179.

Plaintiffs' unjust enrichment claim also fails because, like their other claims, it is refuted by the terms of the Settlement Agreement.  "In an unjust enrichment action, a court can infer an implied contract where none would otherwise exist," but "[w]here there is an express contract, . . . the terms therein are controlling." *Fernandes v. Havkin*, 731 F. Supp. 2d 103, 115 (D. Mass. 2010).  "Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment." *Id.*; *see also Shaulis*, 865 F.3d at 16.  Plaintiffs may not, on a theory of unjust enrichment, recover royalties that were expressly released in the Settlement Agreement.

## VII.   PLAINTIFFS' REFORMATION CLAIM FAILS AS A MATTER OF LAW

Recognizing that the Settlement Agreement's unambiguous terms plainly refute their

claims, Plaintiffs contend that provision was a mistake, and should be reformed "to exclude such royalty payment from its scope." (SAC ¶ 65.) This claim fails because Plaintiffs have not alleged—and cannot allege—sufficient facts to raise a plausible inference of mistake.

Under Massachusetts law, reformation of a contract may be warranted by mutual mistake in order "to effectuate the agreement intended by the parties to a contract where the contract language fails to capture that agreement." *First Am. Title Ins. Co. v. Lane Powell PC*, 764 F.3d 114, 119 (1st Cir. 2014). "Central to [the mutual mistake] doctrine is the fundamental underpinning that the parties had reached an agreement on a point which they intended to enshrine in the written contract but which, for some reason, was mistakenly omitted from that written contract." *Id.* Thus, "[a] court will not grant reformation unless the movant has shown 'that the parties expressed agreement and an intention to be bound in accordance with the terms that [it is] asked to establish and enforce." *Id.*

To state a claim for mutual mistake, the plaintiff must allege that *both* parties made a mistake about the same subject matter, and that the mistake relates to an essential element of the agreement. *See Finamore v. Garcia*, No. CV 06-11855-RBC, 2011 WL 13244945, at *7 (D. Mass. Dec. 8, 2011). In addition, the mistake must "involve a fact capable of ascertainment at the time the contract was entered into, and not a mere expectation or opinion about future events." *Id.* Accordingly, "the mere fact that a release as worded extends to matters that the parties did not specifically have in mind at the time of execution does not operate to exclude those matters from the scope of the release." *Eck*, 831 N.E.2d at 303.

A party may also seek reformation of a contract based on unilateral mistake, but only in "limited circumstances"—namely, where "the mistake formed a basis on which [the plaintiff] entered into the contract, and . . . the defendant knew or had reason to know of the mistake."

*Poley-Abrams Corp. v. Chaney & James Const. Co.*, 220 F. Supp. 401, 404 (D. Mass. 1963).

Plaintiffs claim that: (i) at the time they entered into the Settlement Agreement, they "made a basic assumption and understanding that the general release did not cover the royalty due on August 15, 2017 attributable to the reporting period ending June 30, 2017"; (ii) this assumption was based on communications with Defendants' counsel which purportedly suggested that Defendants "would continue to make **all** ongoing royalty payments under the License Agreement"; and (iii) Defendants either "knew that the plaintiffs had made a mistake" or were similarly mistaken about the scope of the release. (SAC ¶¶ 66, 72, 73.) These allegations misrepresent the parties' communications, but, in any event, are insufficient to state a claim for either mutual or unilateral mistake.

First, setting aside that the parties' pre-contractual settlement communications are inadmissible and cannot be used to alter the plain language of the Settlement Agreement (*see* Pt. I(C), *supra*), those communications do not in any way suggest that Defendants understood that they would be required to pay royalties in connection with EGFR testing conducted between January 1 and June 27, 2017. Although Plaintiffs repeatedly allege that Defendants agreed to "continue making **all** of their royalty payments" due under the License Agreement (SAC ¶¶ 22, 23, 24, 25, 29, 66), that language appears nowhere in the settlement communications attached to the Second Amended Complaint (let alone in the fully integrated Settlement Agreement). The only language that Plaintiffs point to is a statement made by Defendants' counsel on May 27, 2017 that "the **only** issue now is how to divide the settlement proceeds." (SAC ¶ 22; *see also* Ex. I.) But that statement does not suggest that Defendants or their counsel understood that Defendants would be obligated to pay royalties that arose between January 1 and June 27, 2017.

Second, even if Plaintiffs could demonstrate that they understood that Defendants would

pay the royalties at issue and mistakenly agreed to contract terms which released that obligation, their reformation claim still fails because they do not allege facts to demonstrate that Defendants knew or had reason to know of Plaintiffs' purported mistake.  Notably, Plaintiffs do not allege that they explicitly informed Defendants of their understanding that the Settlement Agreement would not release Defendants from their obligation to pay the royalties at issue.  Instead, Plaintiffs merely claim that "the parties never discussed releasing a more than $▮▮▮▮▮ royalty payable to the plaintiffs."  (SAC ¶ 72.)  The fact that Plaintiffs may have "silently harbored an assumption" regarding the scope of the general release "is not a basis for reformation of a [contract] whose written [language] . . . plainly contradicts such an assumption."  *Caron v. Horace Mann Ins. Co.*, 466 Mass. 218, 225, 993 N.E.2d 708, 713 (2013).

Third, Plaintiffs were represented in these settlement negotiations by two sophisticated law firms—Nixon Peabody LLP and Haug Partners—as well as their own in-house counsel. (SAC Ex. I.)  Indeed, Plaintiffs warranted "that they have had the opportunity to consult with legal counsel of their choice prior to execution of this Settlement Agreement, have in fact done so, and have been specifically advised by counsel of the consequences of this Settlement Agreement and their respective rights and obligations hereunder."  (SAC Ex. J § 7.10.)  Plaintiffs do not have a claim for reformation against Defendants if their own counsel failed to explain the consequences of the general release they were executing.

"[T]o the extent that there was a mistake made here, it was a unilateral mistake by [Plaintiffs] based upon [their] own negligence" in negotiating and drafting the contract terms. *Finamore*, 2011 WL 13244945, at *9; *see also Rohm & Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc.*, 759 F. Supp. 2d 110, 123 (D. Mass. 2010) (holding that "even if the defendant knew that the plaintiff was mistaken, the claim for reformation based on mistake still

failed because" the mistake "was apparent on a cursory examination" of the contract.)  Under

such circumstances, no claim for reformation is present.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be granted in its

entirety, along with such other and further relief as the Court deems just and proper.

Dated: November 15, 2018
       Boston, MA

Respectfully submitted,

ESOTERIX GENETIC LABORATORIES,
LLC and LABORATORY CORPORATION
OF AMERICA HOLDINGS

By their attorneys,

CAMPBELL EDWARDS & CONROY, P.C.

*/s/ Christopher R. Howe*
James M. Campbell (BBO # 541882)
jmcampbell@campbell-trial-lawyers.com
Christopher R. Howe (BBO #652445)
chowe@campbell-trial-lawyers.com
One Constitution Center
Boston, MA  02129
Tel: (617) 241-3041
Fax: (617) 241-5115

KELLEY DRYE & WARREN LLP
Robert I. Steiner (admitted *pro hac vice*)
rsteiner@kelleydrye.com
Jaclyn M. Metzinger (admitted *pro hac vice*)
jmetzinger@kelleydrye.com
101 Park Avenue
New York, NY 10178
Tel: (212) 808-7800
Fax: (212) 808-7897

## CERTIFICATE OF SERVICE

I, Christopher R. Howe, counsel for defendants Esoterix Genetic Laboratories, LLC and
Laboratory Corporation of America Holdings, hereby certify that on November 15, 2018, I
electronically filed the foregoing Memorandum of Law in Support of Defendants' Motion to
Dismiss Plaintiffs' Second Amended Complaint with the Clerk of the Court using the ECF

system, which will send notification of such filing to all counsel of record.  I also served a true copy of the above Memorandum by first class mail, postage pre-paid, on all parties of record.

*/s/ Christopher R. Howe*
Christopher R. Howe