UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ ) | | |
| THE GENERAL HOSPITAL CORPORATION and DANA-FARBER CANCER INSTITUTE, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 1:18-cv-11360-IT |
| v. | ) ) | [Leave to File Oversized Brief Allowed on 7/24/18 (Dkt. No. 26)] |
| ESOTERIX GENETIC LABORATORIES, LLC and LABORATORY CORPORATION OF AMERICA HOLDINGS, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____) | | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF
THEIR CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

**BARCLAY DAMON LLP**
*Attorneys for Plaintiffs*
The General Hospital Corporation and
Dana-Farber Cancer Institute, Inc.
Office and Post Office Address
One Financial Center, Suite 1701
Boston, MA 02111
(617) 274-2900
dnash@barclaydamon.com
cmarcotte@barclaydamon.com

**DOUGLAS J. NASH
CAROLYN A. MARCOTTE**
*of Counsel*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................. 3

    1.    The License Agreement ................................................................... 3

    2.    The Sublicense and the Underlying Litigation ............................... 4

    3.    The Settlement Agreement .............................................................. 6

    4.    The Defendants' Breach of the License Agreement ....................... 8

STANDARD OF REVIEW .............................................................................................. 8

    1.    Motion to Dismiss .......................................................................... 8

    2.    Summary Judgment ........................................................................ 9

ARGUMENT ................................................................................................................... 9

    I.    THERE IS NO BASIS FOR DISMISSAL OF THE PLAINTIFFS' BREACH OF CONTRACT CLAIM, AND THE PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THAT CLAIM ....................... 9

        1.    The Royalty Payment Due on August 15, 2017 Was Outside the Scope of the Release ....................................................... 9

        2.    The Defendants' Reliance on the Reference to "Past" Royalties in the Release Is Misplaced .................................... 11

        3.    The Defendants' Own Actions Confirm That the Royalty Payment Was Outside the Scope of the Release ..................... 12

        4.    The Plaintiffs Are Entitled to Summary Judgment as to Count I for Breach of Contract ............................................. 13

    II.    THERE IS NO BASIS FOR DISMISSAL OF THE PLAINTIFFS' CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ....................... 14

    III.    THE PLAINTIFFS ALLEGE SUFFICIENT FACTS TO SUPPORT THEIR CLAIM UNDER CHAPTER 93A ....................... 15

    IV.    THE PLAINTIFFS STATE A CLAIM FOR AN ACCOUNTING ................... 17

V.      THE   PLAINTIFFS   SUFFICIENTLY   PLED   PIERCING   THE
        CORPORATE VEIL........................................................................................18

VI.     THE   PLAINTIFFS   HAVE   A   VIABLE   UNJUST   ENRICHMENT
        CLAIM AGAINST LABCORP......................................................................19

VII.    THERE   IS   NO   BASIS   FOR   DISMISSAL   OF   THE   PLAINTIFFS'
        REFORMATION CLAIM.............................................................................20

        1.      Evidence of the Parties' Intent Is Admissible...........................................21

        2.      The Plaintiffs Sufficiently Pled a Reformation Claim.............................22

CONCLUSION..................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451 (1991)...........................................15, 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................8, 22

*Atlas Tack Corp. v. Crosby*, 41 Mass. App. Ct. 429 (1996) .........................................................9

*Attorney General v. M.C.K., Inc.*, 432 Mass. 546 (2000) ...........................................................19

*Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12 (1st Cir 1998).........................................8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................................8

*Berkshire Mut. Ins. Co. v. Burbank*, 422 Mass. 659 (1996) ...........................................1, 10, 13

*Brody v. Stone & Webster, Inc.*, 414 F.3d 187 (1st Cir. 2005) ...................................................22

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................9

*Community Builders, Inc. v. Indian Motorcycle Assocs., Inc.*, 44 Mass. App. Ct. 537 (1998)..............................................................................................................................................16

*Cooperman v. Individual, Inc.*, 171 F.3d 43 (1st Cir. 1999).................................................8, 19

*Eck v. Godbout*, 444 Mass. 724 (2005)..................................................................................1, 10

*Finamore v. Garcia*, No. CV 06-11855-RBC, 2011 WL 13244945 (D. Mass. Dec. 8, 2011) .............................................................................................................................................25

*HipSaver Co. v. J.T. Posey Co.*, 490 F. Supp. 55 (D. Mass. 2007) ........................................10, 21

*Incase, Inc. v. Timex Corp.*, 421 F. Supp. 2d 226 (D. Mass. 2006)............................................15

*Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp.*, 44 F.3d 40 (1st Cir. 1995)...........................17

*Louis Stoico, Inc. v. Colonial Dev.*, 369 Mass. 898 (1976) ........................................................10

*Martino v. First Natl. Bank*, 361 Mass. 325 (1972)...................................................................12

*Mulvihill v. Top-Flight Golf Co.*, 335 F.3d 15 (1st Cir. 2003) .....................................................9

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614 (1968) ................................18

*OneBeacon Am. Ins. Co. v. Travelers Indem. Co. of Ill., 465 F.3d 38 (1st Cir. 2006)* ..............21

*Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747 (1993) ...........................................21, 22

*Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92 (1st Cir. 2007) ........................................... 8

*Rohm & Hass Elec. Materials, LLC v. Elec. Circuits Supplies, Inc.*, 759 F. Supp. 2d 110 (D. Mass. 2010).................................................................................................................. 25, 26

*Seaco Ins. Co. v. Barbosa*, 435 Mass. 772 (2002) ................................................................. 9, 13

*Shea v. Eisenberg*, 02-4411, 2004 Mass. Super. LEXIS 465 (Middlesex Sup. Ct. Oct. 2, 2004) ............................................................................................................................ 22, 24

*Singarella v. Boston*, 342 Mass. 385 (1961) ............................................................................ 13

*Stark v. Advanced Magnetics, Inc.*, 50 Mass. App. Ct. 226 (2000) ........................................... 17

*Stone v. Gelinas*, No. 16-30087-MGM, 2017 U.S. Dist. LEXIS 116471 (D. Mass. Jan. 17, 2017)............................................................................................................................ 21

*TechTarget, Inc. v. Spark Design, LLC*, 746 F. Supp. 2d 353 (D. Mass. 2010) ..................... 18, 19

*Watkins v. Omni Life Sci., Inc.*, 692 F. Supp. 2d 170 (D. Mass 2010) ...................................... 19

*Zabin v. Picciotto*, 73 Mass. App. Ct. 141 (2008) .................................................................... 16


**Statutes**

M.G.L. c. 93A ....................................................................................................... 2, 15, 16


**Rules**

Fed. R. Civ. P.  8(d)(3)............................................................................................................ 22

Fed. R. Civ. P. 10(c) ............................................................................................................... 8

Fed. R. Civ. P. 12(b)(6)............................................................................................................ 8

Fed. R. Civ. P. 56(c) ............................................................................................................... 9


**Other Authorities**

2 James Wm. Moore *et al.*, *Moore's Federal Practice* § 12.34[2] (3d ed. 1997) ....................... 8

Black's Law Dictionary 122 (9th ed. 2009)................................................................................ 1

Restatement (Second) of Contracts § 152.................................................................................. 23

## PRELIMINARY STATEMENT

The plaintiffs, The General Hospital Corporation and Dana-Farber Cancer Institute, Inc., submit this Memorandum of Law in opposition to the defendants' Motion to Dismiss the Second Amended Complaint and in Support of their Cross-Motion for Partial Summary Judgment as to the breach of contract claim in Count I of the Second Amended Complaint.

The key issue with respect to both motions is whether the release provision in a Settlement Agreement (defined below) between the parties relieved the defendants from their contractual obligation to pay more than $ ███████[1] of a royalty payment due under a separate License Agreement.  It is undisputed that the release **only** applied to claims that "may have arisen **before** the Effective Date" of the Settlement Agreement, which was June 27, 2017.  It also is undisputed that the royalty payment at issue was not due until August 15, 2017, almost two months **after** the Effective Date of the Settlement Agreement.

Under Massachusetts law, a "'claim' arises at the time of the 'underlying incident' giving rise to the claim."  *Eck v. Godbout*, 444 Mass. 724, 730 (2005).  The word "arise" means "[t]o originate; to stem (from)."  Black's Law Dictionary 122 (9th ed. 2009).  With respect to a claim for breach of contract, the "underlying incident" giving rise to the claim occurs when the breach occurs – *i.e.*, when what was supposed to happen under the contract did not happen.  *See*, *e.g.*, *Berkshire Mut. Ins. Co. v. Burbank*, 422 Mass. 659, 661 (1996) ("[A] contract action accrues at the time the contract is breached," and "[p]rior to the time when the contract is violated there is no justiciable controversy . . . .").

In this case, the underlying incident giving rise to the plaintiffs' claim for breach of contract occurred on August 15, 2017 when the defendants did not pay the entire royalty that

---

[1] Information has been redacted from this Memorandum pursuant to the Court's November 16, 2018 Order [Dkt. No. 91] granting the defendants' motion to impound [Dkt. No. 82].  The plaintiffs will submit an unredacted version under seal to the Court.

became due on that date under the License Agreement.  This was almost two months **after** the June 27, 2017 Effective Date of the Settlement Agreement, which takes the plaintiffs' breach of contract claim out of the scope of the release provision.  As such, the defendants' motion to dismiss the plaintiffs' breach of contract claim should be denied, and the plaintiffs' motion for partial summary judgment as to their breach of contract claim should be granted.

The defendants' motion to dismiss should be denied for several additional reasons.

First, there is no basis for dismissal of the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.  The plaintiffs allege conduct sufficient to demonstrate the defendants' lack of good faith, including, without limitation, allegations that the defendants, which, upon information and belief, were unhappy with the terms of the License Agreement engaged in a bad faith scheme to deprive the plaintiffs of more than $▮▮▮▮▮ of a royalty payment in an improper attempt to secure an un-bargained for benefit to the detriment of the plaintiffs.  (*See, e.g.*, Second Amended Complaint ("SAC") ¶¶ 25, 29 & 49.)

Second, there is no basis for dismissal of the plaintiffs' claim under Massachusetts General Laws Chapter 93A ("Chapter 93A") because the plaintiffs allege facts sufficient to demonstrate the defendants' bad faith.  For example, the plaintiffs allege that "the defendants' misconduct, founded in what is believed to be their general dissatisfaction with the terms of the License Agreement and their inability to use the Settlement Agreement to force the plaintiffs to agree to different terms, ha[ve] been unscrupulous and motivated by a desire to extort an extra-contractual benefit at the expense of the plaintiffs and their patients."  (SAC ¶ 55.)

Third, the plaintiffs' accounting claim should not be dismissed because the plaintiffs allege the requirement that the relationship with the defendants was "one of trust and confidence" with respect to royalty reporting.  (*Id*. at ¶¶ 62-63.)

2

<u>Fourth</u>, the plaintiffs also pled sufficient facts that tend to prove either of the two alter ego and/or "veil-piercing" scenarios recognized under Massachusetts law, and further allege a litany of facts that would support a judgment in their favor on the relevant factors applicable to the alter ego or "veil-piercing" analysis.

<u>Fifth</u>, the plaintiffs have pled a viable unjust enrichment claim against LabCorp.  If the defendants are correct, and the plaintiffs do not have a valid breach of contract cause of action against LabCorp, and if the Court declines to pierce the corporate veil, then there is an absence of a remedy at law against LabCorp, which is the beneficiary of the defendants' unjust failure to pay more than $██████ of the royalty payment due under the License Agreement.

<u>Finally</u>, the plaintiffs sufficiently and properly pled an alternative claim for reformation of contract.  While the plain language of the release in the Settlement Agreement makes clear that the plaintiffs did **<u>not</u>** release the more than $██████ of the royalty payment that was due on August 15, 2017, should the Court determine otherwise, and as an alternative form of relief, the Court should, based on mistake, as alleged in the Second Amended Complaint, reform the release to exclude such royalty payment from its scope.

<u>**BACKGROUND**</u>

**1.      The License Agreement**

The plaintiffs are world-renowned centers for patient care, research and education.  (SAC ¶ 3.)  They utilize the royalties paid by the defendants pursuant to the License Agreement to help fund innovative research and treatment for cancer and other patients who have sought treatment in their hospitals and other facilities.  (*Id.*)  The plaintiffs own a number of patents directed to detecting the presence of the epidermal growth factor receptor ("EGFR") mutation which, when present, is predictive of the efficacy of certain chemotherapeutic treatments for lung cancer.  (*Id.* at ¶ 13.)  This groundbreaking technology was developed by the plaintiffs as part of their multi-

million dollar investment in research and development directed to improving patient care and saving lives.  (*Id.*)

In 2005, as reflected in the License Agreement, the plaintiffs licensed these patents and this technology to Genzyme Corporation.  (*Id.*; SAC Ex. H.)  Years later, in 2010, LabCorp purchased most of Genzyme's genetic testing business, including its rights under the License Agreement.  (*Id.*)  LabCorp created Esoterix to manage those assets for the benefit of LabCorp and thus had the License Agreement assigned to Esoterix which, at least nominally, would be the licensee going forward.  (*Id.*)

Under the License Agreement, royalty payments were due twice a year.  More specifically, pursuant to Sections 4.5(e) and 4.6(d) of the License Agreement, royalty payments, including, without limitation, all payments owed to the plaintiffs under any sublicenses, are first due and payable within 45 days of the end of each reporting period, which the License Agreement defines as "each six month period ending June 30 and December 31 of each calendar year" during the term of the agreement.  (*See* SAC Ex. H §§ 1.28, 4.5(e) & 4.6(d).)

**2.      The Sublicense and the Underlying Litigation**

Consistent with the plaintiffs' mission, which is to ensure that its groundbreaking and life-saving technology is widely available, under the terms of the License Agreement, the licensee is entitled to sublicense the right to use the plaintiffs' patents and technology to third-parties.  (SAC ¶ 15.)  One such sub-license was granted in two different agreements to a company called DxS, Ltd., whose rights under the sub-license were later assumed by another company called QIAGEN Manchester Ltd. ("QIAGEN").  (*Id.* at ¶ 16.)

In 2014, Esoterix sued QIAGEN for infringement of certain of the plaintiffs' patents, breach of the sublicense, and related claims.  (*Id.* at ¶ 17.)  Notably, Esoterix did not name the plaintiffs as a party to that lawsuit (even though the plaintiffs owned the patents).  The

defendants did not even tell the plaintiffs that Esoterix was going to file the lawsuit. (*Id.*) Instead, the defendants just filed the lawsuit, which, in violation of the License Agreement, had the practical effect of putting the validity of the plaintiffs' patents at issue without their knowledge, consultation, or consent to do so. (*Id.*)

When the defendants disclosed the QIAGEN lawsuit to the plaintiffs, the defendants mischaracterized it as being primarily a breach of contract action and, thereafter, despite being asked to do so, failed to keep the plaintiffs apprised of developments in the case. In fact, the defendants did not tell the plaintiffs that the court had ruled in favor of QIAGEN on a dispositive motion challenging the validity of the plaintiffs' patents put in suit by the defendants, nor did the defendants tell the plaintiffs that QIAGEN had asserted counterclaims challenging the validity of other of plaintiffs' patents and had successfully obtained a ruling invalidating those patents as well. (SAC ¶ 18.)

It was in this context that the defendants and QIAGEN explored settlement of their case. As that was occurring, it became clear to the plaintiffs that the defendants were seemingly unwilling to protect the plaintiffs' rights to defend the validity of the plaintiffs' patents in further proceedings before this Court or on appeal. (SAC ¶ 19.) This caused the plaintiffs concern that the defendants' interests were actually served by the finding of invalidity by the Court given that, at the very least, that ruling would have given the defendants an opening to attempt to renegotiate the terms of the license. (*Id.*) In any event, the plaintiffs were prepared to seek to intervene in the QIAGEN litigation to defend the validity of their patents. At about the time the plaintiffs' intervention was to occur, the defendants notified the plaintiffs that the defendants and QIAGEN had agreed on settlement terms. Under the License Agreement, the defendants required the plaintiffs' approval before any such settlement could be executed. (*Id.*)

3.      **The Settlement Agreement**

The defendants, from the start, put significant pressure on the plaintiffs to review the proposed terms of settlement and approve them quickly.   However, the proposed terms of settlement were both complicated and unacceptable to the plaintiffs.  (SAC ¶ 20.)

For example, the proposed terms called for QIAGEN to pay the defendants an amount of money █████████████████████████████████████████████████████ (SAC ¶ 21.)  █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

(*Id.*)  Upon information and belief, the defendants were themselves unhappy with the terms of the License Agreement and also demanded that Esoterix be given a paid-up license to the plaintiffs' patents.   (*Id.*)   That clearly was not a term sought by QIAGEN or that affected QIAGEN.  Rather, it was a brazen attempt by the defendants to leverage the QIAGEN settlement of a lawsuit the defendants had initiated as a vehicle to eliminate their own going forward royalty payments to the plaintiffs.  (*Id.*)  In consideration for these and the other settlement terms, the defendants proposed that the plaintiffs be given $██████ of the amount to be paid by QIAGEN. (*Id.*)  This amount was █████████████████████████████████████████

███████████████████████████████ (*Id.* at ¶ 68.)

Contrary to the defendants' unsupported assertion that they never agreed to continue to make royalty payments (*see* Def. Mem. 7), that is precisely what they agreed to do.  (SAC ¶ 22.) Specifically, as reflected in an e-mail exchange, the plaintiffs rejected the defendants' proposal that Esoterix be given a paid-up license (such that the defendants still would be required to continue to make **all** of the royalty payments due under the License Agreement), and asked that the plaintiffs receive $████████ of the amount to be paid by QIAGEN ████████████

███████████████████████████████████████████████████████

████ (*Id*.)  In response, the defendants necessarily accepted and agreed that they would have

to continue making **all** of their royalty payments due to the plaintiffs under the License

Agreement because they represented to the plaintiffs that "[y]our 'counteroffer' makes clear that

the **only** issue now is how to divide the settlement proceeds," and that "we can continue the

discussions as to the proper division of the proceeds . . . ."  (SAC Ex. I, p. 1 (emphasis added).)

On May 31, 2017, the parties met in person in Boston.  Given that the defendants already

had agreed that they would continue to pay **all** their royalties due under the License Agreement,

and given their prior representation that the **"only"** unresolved issue was how to divide up the

proceeds, the focus of that meeting, not surprisingly, was on how to divide up the amount to be

paid by QIAGEN pursuant to the settlement.  (SAC ¶ 23.)

The meeting concluded with the plaintiffs discounting the value of the QIAGEN royalty

stream to $ ██████ and the defendants offering $ ██████ to the plaintiffs.  (*Id.* at ¶ 24.)

Shortly thereafter, the parties agreed that the plaintiffs would receive $ ██████ of the

amount to be paid by QIAGEN ███████████████████████

████████████████████████████████████ (*Id.*)

███████████████████████████████████████████████████████

████ (*Id*. at ¶ 68.)  The defendants were to receive the remainder of the settlement

proceeds to be paid by QIAGEN (an amount substantially greater than the portion paid to the

plaintiffs) and continue to pay **all** the royalty payments due to the plaintiffs under Section 4 of

the License Agreement.  (*Id.* at ¶¶ 24 & 26.)  These terms were contingent on this Court's

vacating its orders invalidating the plaintiffs' patents in order to restore the status *quo ante* to the

defendants' filing of the lawsuit, the basis on which the defendants would continue to pay all

their royalties due to the plaintiffs.  (*Id.*)  This was reflected in a settlement agreement effective June 27, 2017 ("Settlement Agreement").  (*Id.*, Ex. J.)

### 4.        The Defendants' Breach of the License Agreement

On August 15, 2017, the defendants breached the License Agreement by failing to pay more than $ ███ of the royalty due on that date under Sections 4.5(e) and 4.6(d) of the License Agreement.  (SAC ¶¶ 26 & 28.)  Further, the defendants refused to allow the plaintiffs to audit their records for the full reporting period ending on June 30, 2017, as required under the License Agreement.  (*Id.* at ¶ 34.)

### STANDARD OF REVIEW

### 1.        Motion to Dismiss

When ruling on a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the court must accept as true all well-pleaded facts, and give the plaintiffs the benefit of all reasonable inferences.  *See Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir. 1999).  In addition, a party may rely on documents attached to or referenced in a complaint, which also must be accepted as true.  *See Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 16-17 (1st Cir 1998); 2 James Wm. Moore *et al.*, *Moore's Federal Practice* § 12.34[2] (3d ed. 1997) (explaining that courts may consider "undisputed documents alleged or referenced in the complaint" in deciding a motion to dismiss); *see generally* Fed. R. Civ. P. 10(c) (stating that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof").  Dismissal is only appropriate if the pleadings and exhibits, viewed in the light most favorable to the plaintiff, fail to support "'a plausible entitlement to relief.'"  *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir. 2007), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).  A complaint that states a plausible claim for relief survives a motion to dismiss.  *Ashcroft v.*

*Iqbal*, 556 U.S. 662 (2009). The plaintiffs' Second Amended Complaint plainly satisfies these threshold standards.

**2.      Summary Judgment**

Summary judgment is appropriate where the evidence shows that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Mulvihill v. Top-Flight Golf Co.*, 335 F.3d 15 (1st Cir. 2003). Where, as here, a contract is "unambiguous, its interpretation is a question of law that is appropriate for a judge to decide on summary judgment." *Seaco Ins. Co. v. Barbosa*, 435 Mass. 772, 779 (2002). This case is ripe for summary judgment because both the License Agreement and Settlement Agreement are unambiguous, the material facts with respect to the plaintiffs' breach of contract claim are not in dispute, and the case may be decided based on the applicable law.

## ARGUMENT

**I.      THERE IS NO BASIS FOR DISMISSAL OF THE PLAINTIFFS' BREACH OF CONTRACT CLAIM, AND THE PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THAT CLAIM**

**1.      The Royalty Payment Due on August 15, 2017 Was Outside the Scope of the Release**

The plaintiffs agree with the defendants that if a party intends to limit the scope of a release, it should say so explicitly. *See Atlas Tack Corp. v. Crosby*, 41 Mass. App. Ct. 429, 433 (1996). Here, the plaintiffs did exactly that – the release in the Settlement Agreement was limited by the Effective Date. Specifically, the release includes an express and unambiguously clear limitation in scope – *i.e.*, it does **not** apply to claims arising **after** June 27, 2017, the Effective Date of the Settlement Agreement. (SAC ¶ 30.)

Under Massachusetts law, a "'claim' arises at the time of the 'underlying incident' giving rise to the claim." *Eck*, 444 Mass. at 730. Here, that underlying incident giving rise to the plaintiffs' breach of contract claims was the defendants' failure to pay more than $ █████ of the royalty payment due on August 15, 2017, pursuant to Sections 4.5(e) and 4.6(d) of the License Agreement. (SAC ¶¶ 26 & 28.) Thus, the plaintiffs' breach of contract claim did not arise until almost two months **after** the Effective Date of the Settlement Agreement, when, on August 15, 2017, the breach occurred. *See, e.g., Berkshire*, 422 Mass. at 661 ("[A] contract action accrues at the time the contract is breached," and "[p]rior to the time when the contract is violated there is no justiciable controversy . . . .").[2] As a result, the plaintiffs' breach of contract claim is outside the express scope of the release. *See HipSaver Co. v. J.T. Posey Co.*, 490 F. Supp. 55, 62 (D. Mass. 2007) (release is an affirmative defense, meaning that any "ambiguity in a release should be resolved in favor of the claimant").

This plain reading is in keeping with the circumstances that gave rise to the release in the Settlement Agreement. *See, e.g., Louis Stoico, Inc. v. Colonial Dev.*, 369 Mass. 898, 902 (1976) ("It is basic contract law . . . that the circumstances surrounding the making of an agreement must be examined to determine the objective intent of the parties."); *HipSaver*, 490 F. Supp. at 61 ("Release interpretation turns on the expectations and intentions of the parties at the time of the agreement with regard to the future effect of the release."). That is, the Settlement Agreement resolved the division of the proceeds from the QIAGEN litigation. (SAC ¶ 25.) It did not resolve a dispute between the plaintiffs and the defendants concerning royalty payments because there was no such dispute at that time. Not surprisingly, therefore, releasing any portion of the royalty payment due on August 15, 2017 under Sections 4.5(e) and 4.6(d) of the License

---

[2] The cases relied on by the defendants for when a claim arises all involved tort claims where, in contrast to claims for breach of contract, the claim can arise earlier when the accident occurs and not later when an injured party becomes aware of its injury.

Agreement was never discussed by the parties, which clearly would have occurred if the parties actually intended for the plaintiffs to release that contractual right in the context of settling a wholly unrelated issue – *i.e.*, the division of the QIAGEN proceeds.  (SAC ¶ 29.)  Indeed, quite the opposite occurred.   In the lead up to the Settlement Agreement, the defendants failed to leverage the QIAGEN settlement into a paid-up royalty for themselves, and thus, they acknowledged they would have to continue to make all royalty payments due to the plaintiffs under the License Agreement.  (*Id.* at ¶ 22.)

> **2.**    **The Defendants' Reliance on the Reference to "Past" Royalties in the Release Is Misplaced**

The defendants attempt to make much of the fact that the release covers "the payment of any past royalties" required under the License Agreement.  (Def. Mem. 1-2.)  Yet, in the context that gave rise to the Settlement Agreement, the reference to "past" royalties is a clear reference to royalties that had been due for reporting periods before the Settlement Agreement, ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████.   That was the "fresh start" the defendants bargained for.  It certainly was not, as the defendants now contend, an unspoken and prospective elimination of a more than $ ██████  royalty payment that had not yet come due and had never been disputed by the parties.

Moreover, the underlying premise of the defendants' argument is wrong.  The defendants contend that, under the License Agreement, royalties were to be paid to the plaintiffs on a "per sale" basis.  (Def. Mem. 4.)  This assertion is an attempt by the defendants to mischaracterize the royalty due on August 15, 2017 as a "past" royalty under the release.  Yet, royalties were never to be paid on a per sale basis, and never have been paid on that basis.  (*See* SAC ¶ 26 & Ex. H §§ 4.5(e) and 4.6(d).)  The royalties are to be paid just twice a year.  (*Id.*)  Indeed, Section 4.5(a)

of the License Agreement, which is the provision the defendants rely on for this point, says nothing about royalties being paid on a "per sale" basis, and the defendants fail to address Section 4.6 with respect to the royalties due from the sublicenses, which also are not paid on a "per sale" basis.

3.     **The Defendants' Own Actions Confirm That the Royalty Payment Was Outside the Scope of the Release**

The defendants paid the plaintiffs the annual fee for the calendar year 2017 on August 15, 2017.  (SAC ¶ 31 & Ex. A.)  This was required under Section 4.3 of the License Agreement.  Notably, the defendants took a credit against the annual fee for the royalty payment attributable to the first half of 2017 under Sections 4.5(e) and 4.6(d) of the License Agreement.  (*See* SAC Ex. A.)  While that is permitted by the License Agreement, pursuant to Section 4.3, it is only permitted for a royalty payment that is "**subsequently**" due in the same calendar year.  (SAC Ex. ¶ 32 & Ex. H § 4.3.)

In other words, a credit can only be taken against the annual fee if the royalty payment for which the credit is being taken is to be paid **after** the annual fee was paid.  The defendants took a credit against the royalty payment attributable to the first half of 2017.  Under Section 4.3, that is both an admission and an affirmative assertion by the defendants that their obligation to make the royalty payment, which they did in early September 2017, arose **after** the point in time the annual fee was paid on August 15, 2017.  Otherwise they would not have been entitled to take the credit.  This is, therefore, consistent with the royalty payment being outside the scope of the release because the defendants' own actions confirm it arose **after** June 27, 2017 – *i.e.*, Effective Date of the Settlement Agreement.  *See Martino v. First Natl. Bank*, 361 Mass. 325, 332 (1972), ("[t]here is no surer way to find out what the parties meant, than to see what they have done") (citation and internal quotation marks omitted).

**4.      The Plaintiffs Are Entitled to Summary Judgment as to Count I for Breach of Contract**

To prevail on their breach of contract claim, the plaintiffs must prove that:  (1) there was an agreement supported by consideration; (2) they were ready, willing, and able to perform; (3) the defendants breached the contract; and (4) the plaintiffs suffered damages from the breach. *Singarella v. Boston*, 342 Mass. 385, 387 (1961).   As noted above, where a contract is "unambiguous, its interpretation is a question of law that is appropriate for a judge to decide on summary judgment." *Seaco*, 435 Mass. at 779.

Here, the only legal issue in contention concerning the plaintiffs' breach of contract claim is whether the defendants' decision to withhold more than $▮▮▮▮▮ of the royalty payment that was due on August 15, 2017 under Sections 4.5(e) and 4.6(d) constituted a breach of the License Agreement in view of the release in the Settlement Agreement.  (*See* Statement of Undisputed Material Facts ¶¶ 15-19.)  Yet, it is undisputed that the release did not apply to any claims that arose **after** June 27, 2017, which was the Effective Date of the Settlement Agreement.  (*Id.* at ¶ 17.)  As a matter of law, the plaintiffs' breach of contract claim could not have arisen, and did not arise, until August 15, 2017 when the defendants failed to make the full royalty payment as required by Sections 4.5(e) and 4.6(d) of the License Agreement.  *See, e.g., Berkshire*, 422 Mass. at 661.  Thus, as a matter of law, the royalty payment was outside the scope of the release, and the defendants' failure to pay the full amount constituted a breach of the License Agreement. *See Berkshire*, 422 Mass. at 661; *Seaco*, 435 Mass. at 779.

Based on these undisputed facts, the plaintiffs are entitled to Summary Judgment on their claim for breach of contract.  Accordingly, Judgment should enter in favor of the plaintiffs on Count I of their Second Amended Complaint.

## II.   THERE IS NO BASIS FOR DISMISSAL OF THE PLAINTIFFS' CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The defendants' assertions that the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is "devoid of any allegations of deceit or maliciousness" (Def. Mem. 16) and "based exclusively on the same allegations that form the basis of their breach of contract claim" (Def. Mem. 17) ignore, and thus are divorced from, the actual allegations in the plaintiffs' Second Amended Complaint.

As discussed above, the plaintiffs' claim for breach of contract is based on the defendants' failure to make the full royalty payment on August 15, 2017 under Sections 4.5(e) and 4.6(d) of the License Agreement.  In contrast, with respect to the plaintiffs' claim for breach of the implied covenant, the plaintiffs separately allege in their Second Amended Complaint, *inter alia*, that the following conduct violates the covenant of good faith and fair dealing inherent in the License Agreement:

- "Neither at the May 31, 2017 meeting, nor during the subsequent negotiation of the Settlement Agreement did anyone for any party ever state, suggest or even imply that one of the terms of settlement would be that the defendants would forgo a substantial portion of a significant royalty payment due to the plaintiffs under the License Agreement.  Indeed, by that point, as noted above, the defendants had already agreed that they would continue making all of their royalty payments due under the License Agreement, and that the "only" issue between the parties was how to divide up the proceeds being paid by QIAGEN." (SAC ¶ 25.)

- "[T]he plaintiffs already had made clear, and the defendants already had accepted, that the defendants would continue making all of their royalty payments due under the License Agreement.  As Mr. Steiner's earlier e-mail clearly represented, the "only" economic issue the Settlement Agreement resolved was how to divide up the settlement proceeds paid by QIAGEN.  In attempting now to interpret the agreement to include a further economic term never discussed, contemplated or objectively intended by the parties to the Settlement Agreement, the defendants are acting in bad faith and improperly attempting to secure an un-bargained for benefit to the detriment of the plaintiffs.  (SAC ¶ 29.)

- "Having failed to secure different license terms from the plaintiffs as part of the QIAGEN settlement, and having represented to the plaintiffs that the "only"

14

economic issue that the Settlement Agreement resolved was how to divide up the settlement proceeds paid by QIAGEN, the defendants, who upon information and belief were unhappy with the terms of the License Agreement, [] engaged in an unfair, knowing, deceptive, malicious and bad faith scheme to deprive the plaintiffs of a more than $████ royalty payment to which the plaintiffs are clearly entitled." (SAC ¶ 49.)

These factual allegations, which, on a motion to dismiss, have to be accepted as true, and must be viewed in a light most favorable to the plaintiffs, are more than sufficient to demonstrate the defendants' bad faith and show that their misconduct was motivated by a desire to gain an unfair advantage, and/or had the effect of injuring the plaintiffs' rights to the fruits of the License Agreement. *See Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 471-472 (1991) (The implied covenant of good faith and fair dealing provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . .")

The plaintiffs' implied covenant claim is also not refuted by the terms of the relevant agreements, as the defendants' contend.  (Def. Mem. 18.)  The plain language of the general release in the Settlement Agreement makes clear that the plaintiffs did not release the more than $████ royalty payment due on August 15, 2017 under Sections 4.5(e) and 4.6(d) of the License Agreement.

For these reasons, there is no basis for dismissal of plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, and the defendants' motion to dismiss should be denied.

## III.   THE PLAINTIFFS ALLEGE SUFFICIENT FACTS TO SUPPORT THEIR CLAIM UNDER CHAPTER 93A

As an initial matter, whether a particular set of circumstances are unfair or deceptive under Chapter 93A is a question of fact, which means that issue generally cannot be resolved on a motion to dismiss.  *See, e.g., Incase, Inc. v. Timex Corp.*, 421 F. Supp. 2d 226, 239 (D. Mass.

2006).  In any event, the defendants' assertion that the "Plaintiffs allege no facts which indicate that Defendants acted upon anything other than a good faith belief that the Settlement Agreement relieved the obligation to pay the royalties at issue" (Def. Mem. 20) ignores the detailed pleadings here, as well as the relevant legal standard.  In addition to the allegations set forth in the preceding section (*see* SAC ¶¶ 25, 29 & 49), the plaintiffs' allege that:

- "[t]he defendants' failure to pay the plaintiffs the amount owed in breach of the License Agreement, notwithstanding the defendants' known contractual obligations under the License Agreement, was done for the improper purpose of unfairly and inequitably securing un-bargained for benefits to the detriment of the plaintiffs.  In other words, the defendants' misconduct, founded in what is believed to be their general dissatisfaction with the terms of the License Agreement and their inability to use the settlement with QIAGEN to force the plaintiffs to agree to different terms, ha[ve] been unscrupulous and motivated by a desire to extort an extra-contractual benefit at the expense of the plaintiffs and their patients."  (SAC ¶ 55.)

The plaintiffs also allege that the defendants "were secretly interpreting [the Settlement Agreement] as releasing such a royalty all while knowing that the plaintiffs, who originally thought they were entitled to twice as much as they ultimately received under the Settlement Agreement, held the opposite understanding."  (SAC ¶ 72.)

These well-pleaded facts, which must be accepted as true and viewed in a light most favorable to the plaintiffs, defeat a motion to dismiss under the proper legal standard for a Chapter 93A claim.  That is, Massachusetts courts have consistently held that "conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes."  *See Anthony's Pier Four*, 411 Mass. at 583; *see also Zabin v. Picciotto*, 73 Mass. App. Ct. 141, 170 (2008) (withholding payment due under contract is a 93A violation if used "as a wedge against the other party to gain advantages"); *Community Builders, Inc. v. Indian Motorcycle Assocs., Inc.*, 44 Mass. App. Ct. 537, 558-559 (1998) (failure to make payments was an unfair trade practice where breaching parties withheld payment to pressure the other party to compromise its claims for payment).

IV.     **THE PLAINTIFFS STATE A CLAIM FOR AN ACCOUNTING**

The defendants make two arguments challenging the plaintiffs' claim for an accounting. First, that the plaintiffs "allege no facts to support the existence of a fiduciary relationship" and, second, that plaintiffs' accounting claim is refuted by the terms of the License Agreement.  (Def. Mem. 21.)  Both of the arguments lack merit.

As to the first argument, the plaintiffs adequately pled a claim for an accounting.  "In the commercial context, an ordinary arms-length business relationship can only be transformed into a fiduciary relationship if certain indicia are present."  *Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 44 (1st Cir. 1995).  These include:  (1) whether the parties' relationship was one of trust and confidence in one another; (2) whether the plaintiff relied upon the defendant's specialized knowledge or judgment; (3) whether the defendant was aware of that reliance; and (4) whether the defendant abused the plaintiff's trust and confidence to its own benefit.  *Stark v. Advanced Magnetics, Inc.*, 50 Mass. App. Ct. 226, 234 (2000).

Here, the plaintiffs alleged that the "relationship with the defendants was one of trust and confidence."  (SAC ¶ 62.)  By way of example, the plaintiffs alleged that they "trusted and relied on the defendants to accurately report the underlying information and data concerning royalty payments due under the License Agreement," that "[s]uch information and data is the defendants' specialized knowledge," and that "it is information over which the defendants have exclusive control."  (*Id.*)  The plaintiffs also alleged that the "defendants were aware that the plaintiffs were relying on the defendants' specialized knowledge."  (*Id.*)  Finally, the plaintiffs alleged that the defendants, for their own benefit, abused the plaintiffs' trust and confidence as a result of the conduct alleged in the Second Amended Complaint, including, without limitation, by the defendants' refusal to permit access to the records needed to review the royalty payment attributable to the reporting period ending on  30, 2017.  (*Id.* at ¶ 63.)

Regarding the defendants' second argument, which accepts that the plaintiffs have pled the existence of a fiduciary relationship, the plaintiffs' claim for an accounting is supported by the unambiguous terms of the relevant agreements.  The plain and unambiguous language of the release in the Settlement Agreement makes clear that they did not release more than $█████ of the royalty payment due on August 15, 2017 under Sections 4.5(e) and 4.6(d) of the License Agreement.  As such, because the royalties were required to be paid for the entire reporting period, the defendants were required to permit an audit for the entire reporting period ending on June 30, 2017 under the License Agreement.  (SAC Ex. H § 5.3.)

## V.   THE PLAINTIFFS SUFFICIENTLY PLED PIERCING THE CORPORATE VEIL

A court may "pierce the corporate veil" between parent and subsidiary corporations in two situations.  *TechTarget, Inc. v. Spark Design, LLC*, 746 F. Supp. 2d 353, 356 (D. Mass. 2010).  First, the "veil may be pierced when the parent exercises 'some form of pervasive control' of the activities of the subsidiary 'and there is some fraudulent or injurious consequence of the intercorporate relationship.'"  *Id.*, quoting *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1968).  Second, a court may disregard corporate formalities "when there is a confused intermingling of activity of two or more corporations engaged in common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting."  *My Bread Baking*, 353 Mass. at 619.

"In applying this veil-piercing analysis, Massachusetts courts have endorsed a twelve factor approach:

The relevant factors are (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the

corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud."

*TechTarget*, 746 F. Supp. 2d at 356, quoting *Attorney General v. M.C.K., Inc.*, 432 Mass. 546, 555 n.19 (2000).

Here, the plaintiffs pled an extensive list of sufficient facts that tend to prove either of the two veil-piercing situations and allege facts that would support conclusions in their favor on the various relevant factors.  (*See* SAC ¶¶ 7-8, 78 & Exs. A-G.)  The defendants simply argue that the plaintiffs' "litany" of facts evidencing that Esoterix is LabCorp's alter ego are "innocuous." (Def. Mem. 23.)  But, far from "innocuous," each of those facts bear directly on the test for piercing the corporate veil under Massachusetts law, and each of the facts must be accepted as true on a motion to dismiss.  *See Cooperman*, 171 F.3d at 46.

Given the allegations of LabCorp's pervasive control over Esoterix, the shared employees and ownership, the intermingling of business assets, the failure to observe corporate formalities, the improper use of Esoterix as a conduit for its own transaction, the operation of Esoterix as its alter ego, and that LabCorp directed and controlled the misconduct of Esoterix for an improper and injurious purpose, *e.g.*, engaging in bad-faith negotiations with the plaintiffs and knowingly and willfully breaching the License Agreement, the plaintiffs have more than pled sufficient facts to survive a motion to dismiss with respect to "veil-piercing" and/or alter ego, and LabCorp's attempt to use a motion to dismiss to avoid the consequences of its misconduct should be denied.

## VI.    THE PLAINTIFFS HAVE A VIABLE UNJUST ENRICHMENT CLAIM AGAINST LABCORP

Unjust enrichment is an "equitable stopgap for occasional inadequacies in contractual remedies at law."  *Watkins v. Omni Life Sci., Inc.*, 692 F. Supp. 2d 170, 179 (D. Mass 2010). Under the doctrine of unjust enrichment, a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable.  *Id.*

The defendants' argument that the plaintiffs' unjust enrichment claim against LabCorp fails to the extent that the plaintiffs have a cause of action for breach of the License Agreement against Esoterix misses the point.  (Def. Mem. 24).  While it is correct that where a plaintiff has an adequate remedy at law, a claim of unjust enrichment is unavailable – here, LabCorp denies that it is a party to the License Agreement.  (Def. Mem. 4.)  In addition, LabCorp asserts that the plaintiffs do not have a valid breach of contract claim against LabCorp.  (Def. Mem. 22, 24.)  Accordingly, the plaintiffs have alleged in their Second Amended Complaint that "[i]f LabCorp is correct, and the plaintiffs do not have a valid breach of contract cause of action against LabCorp, and if the Court declines to pierce the corporate veil, [then] there is an absence of a remedy at law against LabCorp."  (SAC ¶ 89.)

The facts alleged support a claim for unjust enrichment against LabCorp.  Specifically, the plaintiffs allege that the defendants' misconduct in this case has occurred at the direction and control of LabCorp and for the express benefit of LabCorp.  Indeed, the defendants have already told the Court that Esoterix was created simply to manage LabCorp assets, including the License Agreement.  (*Id*. at ¶ 86.)  "Given that the defendants' breach was done at LabCorp's direction and for LabCorp's benefit, it would unjustly enrich LabCorp if LabCorp was allowed to retain such ill-gotten gains simply because LabCorp is not a party to the License Agreement."  (*Id.* at ¶ 87.)

## VII.   THERE IS NO BASIS FOR DISMISSAL OF THE PLAINTIFFS' REFORMATION CLAIM

As discussed above, the plain language of the general release in the Settlement Agreement makes clear that the plaintiffs did **not** release the more than $▮▮▮▮ royalty payment due on August 15, 2017 under Sections 4.5(e) and 4.6(d) of the License Agreement.

However, should the Court determine otherwise, and as an alternative form of relief, the Court should, based on mistake, reform the release to exclude such royalty payment from its scope.

### 1.     Evidence of the Parties' Intent Is Admissible

"Release interpretation turns on the expectations and intentions of the parties at the time of agreement with regard to the future effect of the release." *HipSaver*, 490 F. Supp. 2d at 61. And, release is an affirmative defense – meaning that any "ambiguity in a release should be resolved in favor of the claimant." *See id.* at 62. Thus, in a reformation case, particularly one involving a release provision, "[i]f an agreement does not express the true intent of the parties because of a mutual mistake that existed at the time of the agreement's execution, the contract may be revised by a court of equity at the request of the aggrieved party to correct the mutual mistake." *Shea*, 2004 Mass. Super. LEXIS 465, at *10, citing *Mickelson v. Barnet*, 390 Mass. 786, 791 (1984).

For this reason, evidence of the parties' intent is always admissible, and must always be considered by the Court, with respect to a claim for reformation of contract. *See OneBeacon Am. Ins. Co. v. Travelers Indem. Co. of Ill.*, 465 F.3d 38, 41 (1st Cir. 2006) (In a reformation case, "the usual restrictions on contract interpretation, such as the parol evidence rule, do not apply to a court's inquiry into the parties' intent," and "it does not matter that a contract unambiguously says one thing. A court still will accept extrinsic evidence in evaluating a claim that both parties to the contract intended it to say something else."); *see also Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 756 (1993) ("The parol evidence rule does not bar extrinsic proof of intent" in a reformation case.")

Where, as here, such evidence is pled in the complaint, it must be regarded as true in the face of a motion to dismiss. *See Stone v. Gelinas*, No. 16-30087-MGM, 2017 U.S. Dist. LEXIS 116471, *9 (D. Mass. Jan. 17, 2017) (The court inferred that the plaintiffs may be able to prove

that there was a mistake that would justify reformation, and "at this stage of the litigation, the court must accept the truth of the facts alleged in the complaint, and these facts alleged provide a sufficient basis for equitable relief," citing *Iqbal*, 556 U.S. at 678.)  Moreover, the plaintiffs are entitled to plead in the alternative and doing so does not in any way undermine the validity of the complaint.  *See Brody v. Stone & Webster, Inc.*, 414 F.3d 187, 200 n.8 (1st Cir. 2005) ("A plaintiff has the right to plead in the alternative" and "that inconsistent pleading does not deprive the pleader of the right to have the complaint read, as between the inconsistencies, in the manner that supports the adequacy of the pleading."); *see also* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

Here, the allegations concerning the parties' settlement communications go directly to the plaintiffs' claim, in the alternative, for reformation based on mistake, and not their breach of contract claim.  The parol evidence is offered to this Court to demonstrate that the plaintiffs clearly did not intend to release the defendants from the royalties.  As such, in assessing whether the release excludes the royalty payment at issue from its scope, this Court may take into account the parol evidence as to the parties' intent in entering into the release – namely, whether the parties intended to exclude the royalty payment due on August 15, 2017 from its scope.  *See Polaroid Corp.*, 414 Mass. at 756.

### 2.     The Plaintiffs Sufficiently Pled a Reformation Claim

"The elements necessary for reformation of a contract, are:  1) a mistake as to a 'basic assumption' of the contract, 2) having a 'material effect on the agreed exchange of performances,' and 3) the party seeking reformation does not bear the 'risk of mistake.'"  *Shea v. Eisenberg*, 02-4411, 2004 Mass. Super. LEXIS 465, *11-12 (Middlesex Sup. Ct. Oct. 2, 2004), quoting *Dover Pool & Racquet Club, Inc. v. Brooking*, 366 Mass. 629, 633 (1975); *see also*

Restatement (Second) of Contracts § 152.   Contrary to the defendants' assertions, the plaintiffs pled all of these elements.  (SAC ¶¶ 64-74).

The defendants' contention that the plaintiffs fail to state a claim for reformation of contract based on unilateral mistake because the plaintiffs "do not allege that the defendants knew or had reason to know of Plaintiffs' purported mistake" (Def. Mem. 27) is directly refuted by the allegations in the Second Amended Complaint.   Specifically, in paragraph 72 of the Second Amended Complaint, the plaintiffs allege that the "defendants had reason to know of the mistake" and that the defendants knew the plaintiffs "originally thought they were entitled to twice as much as they ultimately received under the Settlement Agreement."  (SAC ¶ 72.)  In addition, the plaintiffs allege that "the parties never discussed releasing a more than $███ royalty payable to the plaintiffs" under Sections 4.5(e) and 4.6(d) of the License Agreement, and such "reduction in the net proceeds payable to the plaintiffs, had it been the parties' objective intent (which it was not), would have been expressly stated in the Settlement Agreement, not silently and/or mistakenly incorporated into the general release provision."  (SAC ¶¶ 69, 72.)

In addition, the plaintiffs allege that "if the release is found to cover the royalty payment, the defendants knew that the plaintiffs had made a mistake, but chose to stay silent and allow the mistake to be made."   (SAC ¶ 72.)   Further, the plaintiffs allege that the defendants, upon information and belief, "were unhappy with the terms of the License Agreement" and had already tried to eliminate their royalty obligation, which supports the plaintiffs' assertion that the defendants "were secretly interpreting [the Settlement Agreement] as releasing such a royalty all while knowing that the plaintiffs, who originally thought they were entitled to twice as much as they ultimately received under the Settlement Agreement, held the opposite understanding."

(*Id.*)  The plaintiffs' allegations, at a minimum, are sufficient to raise a reasonable inference of mistake, which requires the denial of the defendants' motion.

The defendants also assert that the plaintiffs "do not allege that they explicitly informed the Defendants of their understanding that the Settlement Agreement would not release Defendants from their obligation to pay the royalties at issue." (Def. Mem. 27.)  Yet, that is not an element of a reformation claim.  *See Shea*, 2004 Mass. Super. LEXIS 465, at *11-12.  But, in any event, as alleged in the Second Amended Complaint, the defendants knew full well that the plaintiffs were unwilling to eliminate the defendants' royalty payments under the License Agreement when the plaintiffs expressly told them so, which, at best, makes the defendants' assertion that they did not know they would be obligated to pay royalties between January 1 and June 27, 2017 difficult to understand.  (*See* SAC ¶ 22 & Ex. I).  The defendants' further suggestion that the "[p]laintiffs merely claim that 'the parties never discussed releasing a more than $███████ royalty payable to the plaintiffs'" (Def. Mem. 27), is contradicted by the litany of other factual allegations in the Second Amended Complaint, including, without limitation, the following:

- In a brazen attempt to use the QIAGEN settlement of a lawsuit the defendants had initiated as a vehicle to try to eliminate their own going forward royalty payments to the plaintiffs, "[t]he defendants, who upon information and belief were themselves unhappy with the terms of the License Agreement, also **demanded that Esoterix be given a paid-up license to the plaintiffs' patents**." (SAC ¶ 21 (emphasis added).) In consideration for these and the other settlement terms, the defendants proposed that the plaintiffs be given $██████ of the amount to be paid by QIAGEN.  (SAC ¶ 21.)

- "As reflected in the e-mail exchange [], the plaintiffs **rejected** the proposal that Esoterix be given a paid-up license (such that the defendants still would be required to continue to make **all** of their royalty payments due under the License Agreement), and asked that they receive $████████ of the amount to be paid by QIAGEN i█████████████████████████████████████  (*Id.* at ¶ 22 (emphasis added) & Ex. I.)

- After trying to get rid of their royalty obligation, "the defendants accepted that they would have to continue making **all** of their royalty payments due to the plaintiffs under the License Agreement, and Mr. Steiner went so far as to represent to the plaintiffs that "[y]our 'counteroffer' makes clear that the **only** issue now is how to divide the settlement proceeds," and that "we can continue the discussions as to the proper division of the proceeds . . . ." (*Id.* (emphasis added).)

The defendants next assertion, that the plaintiffs "do not have a claim for reformation against Defendants if their own counsel failed to explain the consequences of the general release they were executing," is similarly baseless. (Def. Mem. 27.) The defendants do not cite any legal authority to support this proposition, and there is no evidence in the record bearing on this issue, just an attorney argument.

The defendants also assert that if there was a unilateral mistake made by the plaintiffs it was based on their own negligence and, under such circumstances, there can be no claim for reformation. (Def. Mem. 27-28.) While the plaintiffs dispute they were negligent, it is sufficient for present purposes to point out that negligence is a factual question for trial, and the only thing in the record concerning negligence is an unsupported assertion made by the defendants' attorneys. That isn't evidence, and it can't be used to support a motion to dismiss. The defendants' reliance on *Finamore v. Garcia*, No. CV 06-11855-RBC, 2011 WL 13244945, at *7 (D. Mass. Dec. 8, 2011), is misplaced. In *Finamore*, after a bench trial (not a motion to dismiss), the Court found in its Findings of Fact and Conclusions of Law Pursuant to Rule 52, Fed. R. Civ. P. that, "to the extent that there was a mistake made [in the case], it was a unilateral mistake by Garcia based upon his own negligence," and "[h]e has not presented 'clear and convincing' evidence of a mutual mistake." 2011 WL 13244945, at *9. Here, there is no evidence of negligence, and the Second Amended Complaint is replete with evidence of a mistake, all of which must be accepted as true on a motion to dismiss.

The defendants' reliance on *Rohm & Hass Elec. Materials, LLC v. Elec. Circuits Supplies, Inc.*, 759 F. Supp. 2d 110, 123 (D. Mass. 2010), similarly is misplaced.  In *Rohm & Hass Elec.*, the Court denied the plaintiff's motion for a preliminary injunction because the plaintiff had not shown a likelihood of success on its claim for contract reformation, including because the plaintiff had not presented evidence of mutual mistake or that the defendant was aware of the plaintiff's mistake.  *Id.* at 123-124.  Here, the plaintiffs have alleged the factual allegations for reformation based upon mistake that the Court found were missing in *Rohm & Hass Elec.*, and those facts have to be accepted as true.

In light of the foregoing, there is no basis for dismissal of the plaintiffs' reformation claim.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, the plaintiffs The General Hospital Corporation and Dana-Farber Cancer Institute, Inc. respectfully request that the Court deny the defendants' Motion to Dismiss, that the Court grant plaintiffs' Cross-Motion for Summary Judgment on Count I of their Second Amended Complaint, and that the Court order further relief as it deems just and proper.

Respectfully submitted,

THE GENERAL HOSPITAL
CORPORATION AND DANA-FARBER
CANCER INSTITUTE, INC.
By their attorneys,

*/s/ Carolyn A. Marcotte*
Douglas J. Nash (BBO# 633050)
Carolyn A. Marcotte (BBO# 663616)
Barclay Damon LLP
One Financial Center, Suite 1701
Boston, MA 02111
(617) 274-2900
dnash@barclaydamon.com
cmarcotte@barclaydamon.com

Dated:  November 16, 2018

## CERTIFICATE OF SERVICE

I, Carolyn A. Marcotte, certify that on November 16, 2018, plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss and in Support of Their Cross-Motion for Partial Summary Judgment filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to the non-registered participants.

*/s/ Carolyn A. Marcotte*
Carolyn A. Marcotte