```
1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4      THE GENERAL HOSPITAL              )
       CORPORATION, et al,               )
5                          Plaintiffs,   )
                                         )
6                                        )
       vs.                               )  CA No. 18-11360-IT
7                                        )
                                         )
8      ESOTERIX GENETIC LABORATORIES,    )
       LLC, et al,                       )
9                          Defendants.   )

10

11     BEFORE:  THE HONORABLE INDIRA TALWANI

12

13       HEARING ON MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

14

15

16              John Joseph Moakley United States Courthouse
                            Courtroom No. 9
17                          One Courthouse Way
                            Boston, MA 02210
18                    Wednesday, January 23, 2019
                              11:02 a.m.
19

20

21

22                     Cheryl Dahlstrom, RMR, CRR
                          Official Court Reporter
               John Joseph Moakley United States Courthouse
23                  One Courthouse Way, Room 3510
                            Boston, MA 02210
24            Mechanical Steno - Transcript by Computer

25
```

1    APPEARANCES:

2    ON BEHALF OF THE PLAINTIFFS:

3         BARCLAY DAMON, LLP
          By:  Carolyn A. Marcotte, Esq.
4         One Financial Center
          Boston, Massachusetts 02111

5
          BARCLAY DAMON, LLP
6         By:  Douglas J. Nash, Esq.
          125 East Jefferson Street
7         Syracuse, New York 13202

8
     ON BEHALF OF THE DEFENDANTS:
9
          CAMPBELL, CAMPBELL, EDWARDS & CONROY, PC
10        By:  Christopher Robert Howe, Esq.
          One Constitution Center
11        Boston, Massachusetts 02129

12        KELLEY, DRYE & WARREN, LLP
          By:  Jaclyn M. Metzinger, Esq.
13             Robert I. Steiner, Esq.
          101 Park Avenue
14        New York, New York 10178

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE CLERK:  U.S. District Court is now in session.
The Honorable Judge Indira Talwani presiding.  This is Case No.
18-cv-11360, The General Hospital, et al v. Esoterix Genetic
Laboratories, LLC, et al.  Will counsel please identify
themselves for the record.

MR. NASH:  Good morning, your Honor.  Doug Nash from
Barclay Damon, on behalf of the plaintiffs.

THE COURT:  Good morning.

MS. MARCOTTE:  Good morning, your Honor.  Carolyn
Marcotte from Barclay Damon, on behalf of the plaintiffs as
well.

THE COURT:  Good morning.

MR. STEINER:  Good morning, your Honor.  Robert
Steiner from Kelley Drye, on behalf of the defendants.

THE COURT:  Good morning.

MS. METZINGER:  Good morning, your Honor.  Jaclyn
Metzinger, also from Kelley Drye, on behalf of defendants.

THE COURT:  Good morning.

MR. HOWE:  Your Honor, Christopher Howe, also on
behalf of the defendants.

THE COURT:  Good morning.  So I have the cross-motions
-- well, motion to dismiss and a cross-motion for partial
summary judgment.  And I have the redacted and sealed versions
of the documents.  I appreciate the filings here where there is

1    a fair bit that is redacted that I never have to look at, and

2    we don't have to worry about that staying off of the public

3    docket.  And so what it is on the public docket has only very

4    small amounts that are essentially sealed that I -- has been

5    called to my attention.

6         So what I would like to start with is to try to make

7    sure I understand what and how the original -- or original

8    amended license agreement functioned and then talk about what

9    happened once the -- how the settlement language then addresses

11:04 10   that.  And I probably will ask my questions going back and

11   forth here rather than by a formal presentation of one side

12   versus the other.

13        I'm realizing I've left my regular glasses down in the

14   robing room, but -- thank you.

15        The royalty provision of the license agreement, I

16   think is where I would like to start and make sure I understand

17   what the parties contend -- how the parties contend the royalty

18   provision works.  So --

19        MR. STEINER:  Your Honor, would you like me at the

11:05 20   podium or --

21        THE COURT:  Whatever you're more comfortable with.

22        MR. STEINER:  So I think the issue with the royalty

23   provisions in the license agreement obviously is very

24   intertwined with the language of the release that brings us

25   here today.  And if you look at 4.5 in the license agreement,

1     it talks about how royalties accrue.  And it says that

2     royalties begin to accrue with the first commercial sale of a

3     test.

4          THE COURT:  So let me ask you a question.  Your client

5     sells a test.  Are you talking about when the test is invoiced,

6     or are you talking about when the money is received for the

7     test?

8          MR. STEINER:  Your Honor, I believe that there's a

9     provision -- and I think it's in 1.1 -- which talks about net

11:06 10   sales.  If you could just give me a moment.

11         THE COURT:  It's 1.22.

12         MR. STEINER:  Thank you.  It's 1.22.  It says, in (C),

13    it talks about net sales shall occur every time the company or

14    any affiliate of the company actually receives the amount

15    payable by the purchaser of a process or product sold by the

16    company.  So under the plain language of 1.22(c), it would

17    appear that a royalty obligation accrues at the time that an

18    invoice is paid.

19         THE COURT:  Okay.  So let's start with that because

11:07 20   you kept -- throughout your brief you talk about when the test

21    is performed, but that's really not the question.  The question

22    is when you get money.

23         MR. STEINER:  Yeah.  The issue is when you get money.

24    Sorry, your Honor.  I'm just looking for my notes here.

25         THE COURT:  It's not when the test is performed.  And

1    then it's when you get money; and when you get money, in the

2    normal course, if you were going to set aside the royalty that

3    you were going to have to then pay to the plaintiffs here, in

4    your view, if you were going to set it aside, how would you do

5    that?

6          MR. STEINER:  Well, you set aside the percentage of

7    the invoice, the amount, and it's accrued.

8          THE COURT:  Okay.  You just jumped a step.  You set

9    aside a percentage.  What is that percentage?  What do you

11:08 10   mean?

11          MR. STEINER:  Your Honor, the amount of the percentage

12   is obviously redacted in the documents.

13          THE COURT:  No, no.  I'm not asking for the amount,

14   but it isn't a single amount in the contract.  That's not what

15   the royalty rate is.

16          MR. STEINER:  No.  But the royalty rate is applied to

17   each commercial sale, and then what occurs, your Honor --

18          THE COURT:  But it isn't.  So the way you're talking

19   about it, you know, I have X rate, X percentage, and I'm going

11:08 20   to apply that.  And if I wanted to go and take that money and

21   put it in the bank until the reporting period, I could do that.

22   But I don't think you have in the contract a rate at the date

23   that you've gotten the money.  I don't think you know what your

24   royalty is until the reporting period is over.

25          MR. STEINER:  Your Honor, honestly, I'm not -- I don't

1    have an answer for you on that.

2          THE COURT:  So let me drill down and ask you my

3    question a little more specifically.  The 4.5 doesn't say a

4    royalty is a percentage of the sale.  It says a royalty is a

5    product of a royalty rate times a contract net sale.  And a

6    royalty rate, we know that is an average reimbursement for the

7    prior reporting period.  And we know the contract net sale is

8    the average reimbursement times -- from the past period, times

9    the number of processes invoiced in this period.  So until the

11:10 10   period is over, how do you know what the royalty is?

11          MR. STEINER:  Your Honor, even if you didn't know,

12   even if you didn't know what the exact amount of the royalty

13   was, you would still have made those sales; and based on the

14   formula, you would apply those sales, those amounts of those

15   sales, to whatever the rate comes -- comes out to based on the

16   terms of the agreement.

17          THE COURT:  But work with me here a little bit slowly

18   because, if I'm off, you need to figure out where I'm off and

19   correct me.  As I read this, royalty is not defined in the

11:11 20   agreement as a percentage of amounts received.  Royalty is

21   defined in this incredibly complicated way, in my view, which

22   is that a royalty is a product; and it's really a product of

23   two things, and one is a product of another.

24          And so a royalty due -- it comes down to average

25   reimbursement for prior reporting period.  And there's some

1    minimum there, but I take it that's not at issue.  Average

2    reimbursement for prior reporting period times average

3    reimbursement of the past period times the number of processes

4    invoiced in this period.

5         So I don't understand from -- you keep saying in your

6    brief that it -- the claim arises when the product is --

7         MR. STEINER:  No.  Actually, we don't talk about

8    claims at all, your Honor.  The plaintiff talks about claims,

9    and they talk about claims because the only way that they're

10   successful in narrowing the scope of the release --

11        THE COURT:  Okay.  The obligation then or whatever --

12        MR. STEINER:  The obligation -- I apologize.

13        THE COURT:  The obligation or whatever broader word

14   you want to use.  That wasn't the focus of my sentence.  The

15   focus of any sentence is you're saying something arises, and

16   you were saying in your brief it arises when the test is

17   conducted.  And now you've conceded it arises when you get

18   paid.  That's what you're saying happens.

19        And I'm saying, when I read this, you actually are

20   paying a royalty that's calculated on this formula of a net

21   contract sale, which is calculated on an average reimbursement

22   rate times your invoices.  So if you've invoiced a thousand

23   tests and so far in this six-month period you've only gotten

24   paid for ten of those thousand but last six-month period you

25   got paid for 95 percent of everything you invoiced, under this,

1    the royalty is the invoice -- is an amount based on 95 percent

2    of what you've invoiced, not on the cost that you've gotten.

3          So I don't understand, since royalty is defined as

4    this not intuitive number but it's this complicated process

5    that requires as one of the factors the number of processes

6    invoiced for the period, how you can say to me that the

7    obligation arises as you go.

8          MR. STEINER:  Well, your Honor, concededly, the

9    provision on calculation is somewhat complex, and it's not an

11:13 10   issue that either side briefed.  And apologize if I'm not as

11   familiar with how the calculation works as perhaps I should be.

12         I think the point, though, remains the same, which is

13   that the genesis of the obligation -- and this is reinforced in

14   the contract in several places -- is based on that commercial

15   sale.  And whether you want to call it the sale or the -- or

16   the amount that is actually paid, when it ultimately is paid,

17   the obligation does not accrue at the time of the termination

18   of a reporting period.  A claim may accrue at that point in

19   time if it's not paid, but it certainly is a liability.  It

11:14 20   certainly is a debt.  It's an obligation.

21         And if you look at -- I know we briefed this, and I

22   know your Honor has read the briefs.  If you look at the

23   termination provision, you know, what happens if you terminate

24   the agreement, you automatically -- payment has to happen at

25   that point in time.

1          In addition, your Honor, 10. -- sorry, 4.5(f), if you

2   look at 4.5(f), it further explains that the obligation to pay

3   the royalty, if you look at -- I think it's 4.5(f)(iii).  It

4   says, "Except as specified in 4.5(g) below, no royalty shall

5   accrue on the transfer without charge of processes or products

6   by company and its affiliates."

7          So the agreement throughout contemplates the idea that

8   the obligation to pay the royalty, whatever that amount is,

9   whatever that amount is, the obligation to pay the royalty

11:15 10   accrues at the time of the sale or the payment of the invoice,

11   as your Honor has stated it.

12          So I don't think you need -- the point that I'm trying

13   to make, your Honor, is I don't think you necessarily need to

14   know the exact amount.

15          THE COURT:  I'm not concerned about the amount.  I'm

16   concerned about the parties' concept of what royalty means.

17   You're saying to me, essentially, a royalty is a percentage of

18   an amount we receive.  And I'm saying to you, that's not what I

19   see in the contract.  What I'm seeing here is that the royalty

11:16 20   is an amount essentially based on an average recovery or some

21   kind of an amount of -- I mean, it's this product of various

22   things, which aren't a dollar amount.  I'm not looking at any

23   of the dollar amounts or percentage amounts.  I'm saying it's a

24   product of some concepts.

25          To just ignore and say, well, I don't know what those

1   concepts -- I don't need to worry about those concepts, I'm

2   saying, if those concepts include the contemplation of a total

3   number of events within a period, how can you say to me that it

4   arises before you have that period?  Now, that period may be

5   shorter than six months.  If the contract terminates, I would

6   agree with you that the period then is a one-month period or a

7   two-month period.  I'm not sure that's agreeing with you.  I

8   would suggest that if it terminates earlier it's a shorter

9   period.

11:17 10        But there's nothing that suggests here, if the -- to

11  me that would suggest that if the rate -- that if the royalty

12  is defined with a reference to a total number of things that

13  happen within a period, how I can just ignore that and say,

14  well, but we don't really need to pay attention to that.

15        MR. STEINER:  But, your Honor, I think that even if I

16  -- you know, I understand your point, but I don't think that

17  the release, which is what we're talking about here -- I don't

18  think you need to parse the language in the release to that

19  level of detail because the language in the release, your

11:18 20  Honor, is very broad, and it doesn't require you to know a

21  specific amount.  It doesn't require you to know -- I

22  understand you're not focused on the amount.  But the language

23  -- the language, your Honor, in the release is the type of

24  broad general release that you see in litigations all the time,

25  in those litigations where people, you know, are maybe

1    uncertain as to what their rights are, maybe uncertain as to

2    what claims they may or may not have, what their obligations

3    may be.

4         And so when you draft a release of this type, which

5    includes the type of, you know, broad and expansive language,

6    which I'll -- which, if you look at it, goes well beyond, you

7    know, well beyond claims, well beyond the ability to calculate

8    a specific amount, and talks about things like liabilities and

9    obligations and debts.

11:19  10         THE COURT:  But the word I have to determine here -- I

11    agree with you that it isn't just a claim, but I don't think

12    that's the issue.  I think the issue is what does arising --

13    that has arisen.  And I need to determine whether something has

14    arisen.

15         And I would -- I think I would agree with you that if

16    this contract -- if you said to the plaintiffs, Here's a

17    settlement agreement, and we are terminating the license

18    agreement effective on this date, then I think your

19    construction might work because all of those amounts would then

11:19  20    have been immediately due upon the termination, and they would

21    have arisen there.  And it would have -- essentially, by

22    terminating the license agreement, you would have had the

23    acceleration of the license agreement, which happens when you

24    terminate it, that would make these things due.

25         But I think the question I need to focus on -- I

1   completely agree with you that it is broader than the word

2   "claim."  It's all everything that you already have, whichever

3   word you want to use as to obligations that are owed to you.

4   But you still have to have that it has at this point arisen as

5   of May 27th.

6            MR. STEINER:  June 27th, your Honor.

7            THE COURT:  June 27th.

8            MR. STEINER:  But the liability -- but it's not just

9   that word "arisen" in isolation, you know.  The word "arisen,"

11:20 10   as it's included in the release, talks about liabilities; it

11   talks about obligations; it talks about promises; it talks

12   about rights and demands and debts.

13            THE COURT:  All of those words are modified by

14   "arise."  No?

15            MR. STEINER:  No.  In fact, I think, the way I would

16   read it, your Honor, is it says, "As of the court's granting

17   the motion to vacate," and then it goes on to say -- you know,

18   it talks about the things I just talk about, "which the

19   hospital releasees may have, own, hold" -- "may have, own, hold

11:21 20   or claim to them."  They don't even have to necessarily have

21   them.  They may have them.

22            THE COURT:  Right, "may have arisen."  But "may have

23   arisen" modifies every single word.

24            MR. STEINER:  "Relating to, arising from, the act or

25   omissions that were stated in" -- "stated in, arose out of, or

which may have arisen out."  "Stated in, arose out" -- this is

the type of expansive language that -- you know, I recognize

the technical point, your Honor, but, again -- and I don't mean

to be repetitive, those -- the ability to calculate, the

obligation to pay the amount, is derived from the receipt of

invoiced tests and the receipt of those -- of those monies, as

your Honor is construing that clause.  So the fact that you

can't necessarily calculate with certitude until the end of the

reporting period doesn't make it any less of an obligation.

THE COURT:  I think you're -- I think the disconnect

here for us is that you're saying this is sort of a detail of

calculation, and I'm saying that the parties actually

substituted the actual amounts received, and instead of saying

we want to know -- they could have negotiated, for the amounts

you actually received, give us a percentage.  Instead, they

negotiated, appears to be, a reimbursement that is based on

your rate of reimbursement from the prior year and your number

of invoices from this year.

Am I -- this isn't something that you argued, so let

me turn to plaintiffs.  Am I off in my construction of this, or

is that what you were trying to flag in the reply brief?

MR. NASH:  No.  I think I recognize this issue wasn't

briefed to the extent it should have been.  It came up in the

context of their argument that each royalty is on a --

THE COURT:  You know what?  I'm going to let you stop

1     because he's going to need to respond to you.

2                MR. STEINER:  I apologize.

3                THE COURT:  That's okay.

4                MR. STEINER:  My client is the expert in the license

5     agreement, and I was attempting to get a little bit of clarity

6     from her.

7                THE COURT:  I'm going to let your brother respond for

8     a minute, and then we'll come back to you.

9                MR. NASH:  Your Honor, it's not a PowerPoint in the

11:23 10     sense that it outlines my argument, but I have a few

11     demonstratives.  I have 4.5 and another provision that I think,

12     bears on this.  Could we turn the monitor on?

13                THE COURT:  We could do that.

14                MR. NASH:  I anticipated this issue coming up, your

15     Honor.  Is it on your screen?

16                THE COURT:  It is, but --

17                MR. NASH:  Is it hard to read?

18                THE COURT:  It is.  I think I do better just on my own

19     thing.  We're looking at 4.5?

11:24 20                MR. NASH:  Your Honor, may I approach?  I have it in

21     hard copy.

22                THE COURT:  Sure.

23                MR. NASH:  I showed these to the defendants yesterday,

24     your Honor.

25                So if you -- if we look at 4.5(a), your Honor is

1    exactly right.  The agreement and the conception of a royalty

2    under 4.5(a) is looked at in the aggregate, and it's looked at

3    -- it's a look back.  What happened after the reporting period

4    ended.  You can't calculate it under the terms of 4.5(a) until

5    the reporting period has ended, which is why, in 4.5(e), the

6    defendants are given 45 days to actually make the payment

7    because there's some effort involved in following that

8    complicated formula.

9         So your Honor's exactly right, and this does directly

11:25 10   bear on the question of when did the promise, the obligation,

11   the right, when did it arise?  Well, the obligation arose

12   after.  By the express terms of 4.5(e), it arose 45 days after

13   the close of the reporting period, which was August 15th.

14   That's when the payment should have been made under the terms

15   of the agreement.  That's when it arose.

16        There was no promise to make it before that.  There

17   was no obligation to make it before that.  There was no right

18   for us to demand that it be made before that.  Whatever words

19   you want to pick out of that release language that is modified,

11:26 20   your Honor is correct, by "may have arisen," whatever words you

21   want to pick out of that, that didn't arise before the

22   effective date of the agreement.

23        The other thing that I think is lost in the briefing,

24   and I wanted to bring your Honor's attention to it, is actually

25   the next page, which is the royalty actually comes from two

different places.  The royalty that's due on August 15th comes from both 4.5(a), which has to do with when the defendants themselves sell a kit, test; and 4.6, which is when the defendants receive payment from a sublicensee, which happens -- and it also, just like 4.5, 4.6 treats the sublicensee payments in the aggregate.  It's not a pay as you go.  It's a pay once. The obligation arises at the end of the period.  You take a look back and you see how much money did you receive during the reporting period in aggregate.  And then you have 45 days at that point to make the payment.  So I think your Honor is exactly on point.

THE COURT:  But what you just said there is that the point that I'm making here about not having the payment tied to the actual sale but instead tied to a calculated net sale based on a number of invoices versus prior track records on payment, that rule doesn't apply to payment of the sublicenses.

MR. NASH:  No, but 4.56 [sic] is based on the aggregate amount.  It's the same -- there's not a complicated formula in 4.6.  4.5, what you end up with is you follow this complicated formula; you end up with an aggregate amount.  4.6, the math is easier.  They're going to get certain number of payments during the reporting period.

THE COURT:  With regard to the first question I asked your brother, which was -- or the first series of questions, as transactions are happening, can you set aside a percentage of

1    that and say that's what I'm going to have to pay to the

2    plaintiffs?  The answer is yes for the sublicenses even if it's

3    not correct for the sale of the product.

4         MR. NASH:  But there's nothing in the record on either

5    motion that suggests they received any money from sublicensees

6    before the effective date.  There's nothing in that record.

7    And had they, could they have calculated that amount?  They

8    could have.  But one of the things, your Honor, that I think is

9    important is what they told us in one of the letters that led

11:29 10   up to --

11        THE COURT:  I don't want to get to that yet.

12        MR. NASH:  Okay.

13        THE COURT:  I'd like to -- both sides have asserted to

14   me that you think that the language is unambiguous, and,

15   therefore, I don't get to the evidence behind it or in the

16   negotiations.  And just on this point, for your cross-motion

17   for partial summary judgment, if I get to the point of saying I

18   think the language is ambiguous, are we set up for addressing

19   those ambiguities on summary judgment?  I don't think we're

11:30 20   there yet because your summary judgment record is based

21   entirely -- it's not based on these letters.

22        MR. NASH:  Correct.

23        THE COURT:  Your summary judgment record is based on

24   the claim being unambiguous.

25        MR. NASH:  If you determine that the release language

1    is ambiguous, then I think denial of the summary judgment

2    motion would be appropriate at this point.

3         THE COURT:  Okay.  So for today, I don't think -- as I

4    am addressing the motions here, I don't think I get to the

5    question of these underlying -- certainly not on your motion,

6    on the cross-motion for summary judgment, I don't get to those

7    underlying letters.

8         MR. NASH:  With one exception, your Honor.  It has not

9    so much to do with the summary judgment motion but how you

11:30 10   started the line of questioning, which is, how do the parties

11   conceive of the royalty obligation?  And the only point I

12   wanted to make is that they have told us -- and this was in the

13   complaint attached to -- in a letter attached to the

14   complaint -- they don't keep records on a daily basis.  They

15   certainly don't keep them on a per-sale basis or per-payment

16   basis.  The most granule they get is on a monthly basis.

17        And so this idea that the conception of this royalty

18   obligation under 4.5 or even 4.6 is this sort of running tally

19   of what you owe the plaintiffs.  It's not how, in practice,

11:31 20   they actually do business, which is, frankly, consistent with

21   the language of the agreement which treats it all in the

22   aggregate.

23        THE COURT:  Okay.  I don't want to get into those -- I

24   don't think I need to get into those facts on your motion for

25   summary judgment.  And to the extent I need to get to them on

1    the motion to dismiss, I'm going to still put that off for

2    right now.  I'd like to stay with the contract documents.

3         MR. STEINER:  Your Honor, again, I recognize that this

4    issue that you've raised was not one, I think, that either side

5    breached -- I'm sorry, briefed, so I'm a little bit on my heels

6    on kind of construing the specific provision.

7         My client tells me -- and I would have to walk through

8    the language of the agreement -- that the way the parties

9    operated was that they paid -- we paid a percent, a straight

11:32 10   percent, based on all of the invoices we received.  So I'm not

11   quite sure why it's reflected in the agreement as this kind of

12   complicated formula, and perhaps, standing here today, again,

13   on my heels, I'm missing something.  But what my client tells

14   me is that it is calculable on a daily or monthly basis based

15   on monies that are received, and --

16        THE COURT:  This gets to a related part of the dispute

17   here, which is, putting aside -- putting aside for one moment

18   monies due and just talking about the auditing, you've taken

19   the position in your papers that, since we paid all the money,

11:33 20   we don't have to give you any records of the sales.  And I come

21   back to this same provision.  If the rates for the following

22   six-month period are determined based on the prior six-month

23   period's numbers, how do you get away with saying I don't have

24   to give you any numbers for that for -- how would you calculate

25   the next period?

1       MR. STEINER:  Your Honor, what I'm understanding,

2  again, and I'm -- again, just apologize for being on my

3  heels -- is that there other amendments to this contract that

4  are actually not in the record that explain this percentage

5  issue.  And so to the extent that this is an issue of concern,

6  I realize now we have this -- this could be the fourth or the

7  third false start in trying to kind of argue this thing.  I

8  would like an opportunity to provide those amendments or at

9  least look at those amendments because if what your Honor is

11:34 10  saying is, look, I think there's either an ambiguity here or

11  perhaps the release doesn't cover the royalty payments based on

12  this formulaic calculation, rather than have you reach that

13  conclusion, I would certainly like an opportunity to go and

14  look at those other amendments which are not part of the

15  record.  I think they weren't part of the record because,

16  frankly, we didn't foresee this being an issue, either side

17  foreseeing it being an issue.  But there is a third or fourth

18  amendment which lays out a calculation methodology which is

19  based on a percentage.

11:34 20       MR. NASH:  They're in the record.  In fact, this slide

21  that I have up there, your Honor, and that I handed you in hard

22  copy is the Section 4.5 as amended.

23       THE COURT:  Yeah.  The only change -- I went back and

24  forth to see what the amendment was.  I didn't think that the

25  amendment -- it got rid of a "couldn't go over amount" or

1    under, but I didn't see it as actually --

2         MR. NASH:  The change had to do with the floor rate,

3    your Honor.

4         THE COURT:  Yeah, exactly.

5         MR. NASH:  It had to do with the floor.

6         THE COURT:  I do think this is -- it may not be

7    exactly as it was briefed.  I think it's hinted at in the

8    plaintiffs' papers.  And I found, as I was reading the

9    defendants' papers, that it seemed to me, the way you were

11:35 10   describing the contract, seemed very different than the way I

11   was reading it.  I do think it would be helpful to have you

12   address these concerns, and I will give you that opportunity.

13   I don't think anything is gained.  There's enough at stake here

14   that if I've got it wrong you're going to be asking for

15   reconsideration and everything else.  So I would like to try

16   and get it right.  So let me frame my questions a little bit

17   more to you, and then maybe we set something up for early next

18   week and continue this conversation.

19        I had the same reaction on your response about not

11:36 20   having to allow for an audit or give any details as to what

21   happened.  And your briefing essentially says, We don't owe any

22   money; and since we don't owe any money, we don't have to tell

23   you these numbers.  And my response to that is:  If your

24   formula for reimbursement is -- uses the numbers -- certain

25   numbers from the prior period, then even if you were right

1    about having released the payments, I don't see how that gets

2    you to release the audit, that the audit -- the notion that the

3    audit is based only on this -- that the purpose of the audit is

4    for what we pay you now; and since we've paid you enough, we

5    don't have to pay you anything, seems to me ignores this whole

6    contractual scheme which looks to transactions from the prior

7    six-month period.

8            MR. STEINER:  Two things, your Honor.  One is, I don't

9    believe that the amendment that Mr. Nash is referring to is the

11:37 10  final amendment.  I don't believe that that is the final

11   amendment.  Secondly, your Honor -- and, again, I don't want to

12   go too far afield here, but assuming that my understanding is

13   correct and that it is a straight percentage of the amount of

14   sales made, then one ties to the other because your Honor's

15   point is, well, you need to go back and go through this whole

16   scheme to figure out what would be paid for over those three

17   days.  And if I'm right, your Honor, then that concern, I

18   think, falls away.

19           THE COURT:  I agree that these are related, and I'm

11:38 20  simply using this not to further put you on the spot right now

21   but to give you sort of the various points where I'm seeing a

22   concern in your reading of the contract that would be helpful

23   if we're all on the same page of what we're looking at and how

24   I'm getting to the language I'm getting at.

25           So the first point is that I think that the

1    calculation of a royalty is a calculation that requires knowing

2    your numbers for the whole reporting period before a royalty

3    can be calculated.  My second related point, which is, if I'm

4    correct on that, then as to the audit, even if you had a

5    settlement agreement that said here's all the money, they would

6    still need the data from that six-month period in order to

7    calculate the next period's rate.  And then a third point,

8    which is slightly different, turns to your payment of the -- or

9    nonpayment of the three days at the end of the period.  And you

11:39 10    say those three days at the end of the period is included in

11    the annual license fee.  But the language about the annual

12    license fee says that it -- you apply it to royalties

13    subsequently due in the same calendar year, which my read of

14    that would be that means royalties that are due -- or that are

15    subsequently incurred in the same calendar year.

16           MR. NASH:  I have it on the screen, your Honor.

17           MR. STEINER:  I can tell you, your Honor, that -- what

18    was done in practice because if you look at this provision -- I

19    think, actually, this provision is ambiguous.  This provision

11:40 20    is ambiguous because, if you read it literally, you would never

21    be able to really take a credit for those -- for the first six

22    months of the reporting period.  You would never be able to

23    take a credit.  The reason you couldn't do it is because it has

24    -- the credit has to be taken against royalties due from the

25    company in that calendar reporting period.

1          And so what the parties did, what they did in practice

2    -- and, again, I don't know that -- to my mind, this is not

3    something that actually impact the results, but the parties did

4    in practice, was that that credit was taken based on sales that

5    had made -- been made to date.

6          THE COURT:  But doesn't that go directly against your

7    argument?

8          MR. STEINER:  I don't believe --

9          THE COURT:  Isn't the point then that, on August 15,

11:41  10   the way the parties conceptualized it, is the first thing that

11    happened on August 15th would be that you're paying your annual

12    license fee for the following year?  The second thing is you

13    would now have due, subsequently due, your first six months

14    royalty, and you could credit those against your annual fee,

15    which would suggest that your idea that they were due as you

16    came is directly contradicted by this word "subsequently due"

17    and then the parties practice.

18          If the parties' practice is to say, we're taking the

19    first six months and we are now saying it's subsequently due

11:41  20   from when that annual license fee is paid, then you would be

21    essentially conceding that those first six months aren't due

22    until after the license.  And if that's wrong, then you're

23    absolutely right that you could never get money from that

24    calendar year because you wouldn't be calculating the next

25    month's money until the following calendar year.

1          MR. STEINER:  I don't think so, your Honor, because

2     what's happening under the license agreement is that the

3     royalty amounts and the license fees are both being paid 15

4     days -- I'm sorry, 45 days after the end of the reporting

5     period, which is June 30th so, thus, August 15th.  And so I

6     don't think conceptually under 4.3 there's this idea that you

7     pay the annual license fee and then a minute later, you know,

8     you pay the royalties.  I mean, they're due --

9          THE COURT:  What does the word "subsequent" mean?

11:42 10          MR. STEINER:  Again, I think, your Honor, that the

11    language in here is -- you know, is problematic.  I don't think

12    it's problematic for my argument.  I think that what the

13    parties did is they -- as I understand it, and what happened in

14    this particular case, is they took, you know, the three days

15    that were payable, and those were, you know, deducted from the

16    license fee.  And that's how they did it, I think, from the

17    beginning of the master license agreement, is that those monies

18    would be taken from the prior reporting period to the extent

19    that anything was due, to the extent that anything was due.

11:43 20          THE COURT:  But that's consistent with what the

21    plaintiffs' position here is, which is that none of these

22    amounts are due for 45 days after the end of the reporting

23    period.  And that's why the parties used the word "subsequently

24    due."

25          MR. STEINER:  But whether or not they're due to be

1    paid, right, whether or not a cause of action accrues because

2    they are -- the monies are due to be paid, it's -- you know,

3    4.5 talks about all -- (e), "All royalty payments due to

4    Hospital under this Section 4.5 shall be due and payable by

5    company within 45 days."  So it's parsing out "all royalty

6    payments due to Hospital."  That's one portion of it.  And then

7    it says under this section, "shall be due and payable to

8    company within 45 days after the end of each reporting period."

9    So there are royalty payments that are due to the hospital that

11:44 10   then the obligation to pay those actual amounts happens 45 days

11   after the end of the reporting period.

12        The whole scheme of 4.5 talking about the beginning of

13   the first commercial sale, talking about the idea that, you

14   know, in 4.5(f), that intercompany transfers don't create

15   obligations, the termination provision, all of those provisions

16   I think clearly indicate that the obligation arises upon the

17   commercial sale.  And then the payment obligation, you know,

18   the obligation to actually make that payment by a due date, is

19   15 days after -- is 45 days after the reporting period.

11:45 20        THE COURT:  I think the place that it seems is

21   different from that is, if you talk about when this whole thing

22   becomes due, if you were right, then it would not have mattered

23   that the contract starts in the middle of a six-month period.

24   You could have said, at the end of that first six-month period,

25   you would have amounts due because you were collecting it.  But

1 they didn't do that.  The first payment is due, you know,

2 between six and eleven months after the first transaction.

3   There's no way to say, okay -- the contract does not

4 allow, at least as to the royalties -- I'm not sure about the

5 licenses.  But as to the royalties, the payments aren't due

6 until you've had a full reporting period of calculating the

7 transactions.

8   MR. STEINER:  But, your Honor, that type of language

9 just makes commercial sense.  We would not be paying them every

11:46 10 time we got paid by a third party.

11   THE COURT:  No, but --

12   MR. STEINER:  We would accumulate the royalty

13 obligation, and we would make that payment in a lump sum.  The

14 idea that we held onto it for 45 days or for -- from January 1

15 to August 15th --

16   THE COURT:  I'm saying you started a contract in

17 October, and yet you didn't have payments due on -- after 45

18 days after December 31.  You had payments due for a contract --

19 I believe the contract started -- at least the amendment

11:47 20 started in October, but let's go back to the first contract.

21 The first contract started in April.  There was no payments

22 should be due following that first June.  It was payments are

23 due that first little initial chunk of the contract, plus a

24 full six months of getting your numbers straight, and then the

25 payment is due 45 days later.

1          I think -- I just think it would be probably a more

2     fruitful conversation here if you would drill down with your

3     client and this contract on these issues that I'm focusing on.

4     And I understand the notion that you're saying, if something is

5     due on a certain set of events happening, the fact that you

6     might have a payment plan later would be irrelevant in light of

7     the language of the settlement agreement.  I understand your

8     argument there.

9          My problem here, as I look at -- and I've really been

11:48 10    focused on the royalties.  I haven't been focused on the

11    license, sublicense, and I need to see if there's a different

12    analysis there.  But my analysis here, as I look at the

13    contract, is that, although the parties could have negotiated

14    something that essentially says a royalty is due even though

15    not payable until later, that it is essentially that that

16    transaction is sufficient that you could consider it a ripe

17    matter that has now been released or unripe matter that has now

18    been released.  I understand that notion.  I'm just in here, as

19    I look at what the parties conceived of as the royalty, it

11:49 20    doesn't seem to me that royalty means a percentage of actual

21    consummated sales.

22          MR. STEINER:  And I appreciate, your Honor, the

23    opportunity to provide that additional information to you

24    because I do think it's important.  I do think, based on your

25    questions, you know, it will be impactful in your ultimate

1    determination.

2             THE COURT:  Would it make sense to simply see if we

3    have a little time next week that we could continue this

4    conversation?

5             MR. STEINER:  That's fine, your Honor.

6             THE COURT:  What's my schedule?

7             So let's just do it a week from today at the same

8    time, at 11.

9             MR. STEINER:  I'm sorry, your Honor.  Which day?

11:49 10          THE COURT:  Wednesday, the 30th.

11            MR. STEINER:  Just give me a moment.  I just turned my

12   phone off.

13            THE COURT:  The number of phones I've had ringing in

14   the last few days, I appreciate your having turned it off.

15            MR. STEINER:  That's fine, your Honor.  I assume you'd

16   like us to submit something either -- you know, which includes

17   the amendments or some --

18            THE COURT:  If there is, in fact, different language

19   you want me to look at, give me the different language, but I

11:50 20   don't need any more briefing.  I'll just continue this argument

21   after you've had an opportunity to look at what I'm focused on.

22            MR. STEINER:  We'll just submit that additional

23   language to you.

24            MR. NASH:  Is that going to be it for today, your

25   Honor, or are we going to talk about some of the other issues

1    that I think are important irrespective of how the royalty is

2    defined in the agreement?  It's certainly very important.

3            THE COURT:  Well, you're here, and I'm happy to go a

4    little further, but I don't want to -- this seems to me fairly

5    central to the conversation.

6            MR. NASH:  And I think I take from what your Honor

7    said earlier that, at least for today, you'd like to stay away

8    from the extrinsic evidence that's in the record or not?

9            THE COURT:  I think I do.  I think that as this is

11:51 10   teed up for me, as I'm looking at it here, I am starting with

11   the premise that the language is unambiguous.  And until --

12   unless it's ambiguous, I don't get to that other question.  So

13   if I find that it is ambiguous, then I guess the question I

14   need to deal with is:  What do I have in front of me?  And is

15   it appropriate for me to resolve things based on what I have in

16   front of me?

17           And certainly as to your summary judgment motion, I

18   don't think I can make a decision looking at these things -- I

19   mean, I don't think the record is appropriate for me to make my

11:52 20   decision as to extrinsic evidence based only on what I have

21   here.  As I said, you didn't include that as your undisputed

22   facts.

23           MR. NASH:  Agreed.  On summary judgment, your Honor,

24   the -- we're not relying on the extrinsic evidence to -- that

25   would be where you decide that it's -- the contract

1       unambiguously excludes the royalty.

2            THE COURT:  Right.  So on a motion to dismiss, I am

3       accepting the allegations in the complaint as true.  I don't

4       know -- the letters are attached, which doesn't mean the

5       statements in there are accepted as true.  It's these -- this

6       is a true copy of the letter you sent to them.  I'm not sure

7       what that -- I haven't dug deep enough into that.  I've been

8       trying to resolve this based on the language if I can because I

9       think, if it's not on the language, I think there's two sides

11:53 10  to whatever story of how we got to where we are.  I just don't

11      feel I have enough of a record to get there.

12           MR. STEINER:  There certainly are two sides to the

13      story, your Honor.

14           I would suggest that, given, you know, this what I

15      think is a fundamental issue as it relates to your Honor's

16      interpretation of the release and the master license, that, you

17      know, we'll be back here on Wednesday unless there are other

18      kind of fundamental issues that you think we need to be

19      prepared to address, that we address those parol evidence

11:53 20  issues, if at all --

21           THE COURT:  Let me ask you this question because -- so

22      that I'm prepared for next Wednesday:  If I were to find that

23      the contract language is ambiguous and, therefore, I don't

24      think, on an ambiguous record, I would be granting the

25      defendants' partial -- motion for partial summary judgment.  If

1  I were to find that, when I am considering your motion to

2  dismiss, wouldn't I similarly, if I have found it ambiguous,

3  find that you can't dismiss their breach of contract claim on a

4  motion to dismiss?

5            MR. STEINER:  I think --

6            THE COURT:  Wouldn't that --

7            MR. STEINER:  I agree, yes, your Honor.  I think if

8  you concluded, because it is the -- it is a question of law in

9  the first instance as to whether or not -- I think the standard

11:54 10  is, you know, reasonable people could reach a different

11  conclusion as to the meaning of the language -- then that would

12  create an ambiguity, and you would have to, I guess in that

13  circumstance, deny the motion to dismiss.

14            Our position on the parol evidence is that it doesn't

15  come in because the contract is unambiguous; and so, therefore,

16  you know, because it's a fully integrated document, because

17  everyone had advice of counsel for multiple reasons, that

18  there's no reason to look outside of the four corners of the

19  document.

11:55 20            THE COURT:  But so isn't my decision-making tree here

21  as follows:  One, is the language unambiguous?  If the language

22  is unambiguous, one side or the other wins here on the -- at

23  least the first count, that either it's unambiguous and I agree

24  with the defendant and I grant partial summary judgment, or it

25  is unambiguous an I agree with -- sorry, agree with the

1    plaintiff and I grant partial summary judgment, or I agree with

2    the defendant and I grant the motion to dismiss if it's

3    unambiguous?  If I instead find it's ambiguous, don't I deny

4    both motions?

5              MR. NASH:  I think the answer to the second question

6    is yes; if you find it ambiguous, you deny both motions.  If

7    you find it unambiguous and -- then there's still the issue of

8    the other claims.

9              THE COURT:  Yeah.  That's sort of focusing on Count 1.

11:56 10              MR. NASH:  Breach of contract only -- my apologies.

11   Breach of contract only.

12              THE COURT:  That's right.

13              MR. NASH:  If I could just be heard just for a moment,

14   your Honor, on this issue of unambiguous versus ambiguous and

15   extrinsic evidence.  I'm not going to get into the extrinsic

16   evidence.  But Massachusetts law -- and this comes up in a case

17   that they cited in their brief, the Bank v. IBM case.

18   Massachusetts law allows a court, in its role as the decider of

19   the law, to consider extrinsic evidence for the purpose of

11:56 20   determining whether or not the agreement is ambiguous in the

21   first place because there's a difference between your role as

22   the decider of law and the trier of fact's role as deciding

23   what the facts are.  And the Parol Evidence Rule precludes the

24   trier of fact from hearing extrinsic evidence if the contract

25   is deemed unambiguous as a matter of law.

1          In making that legal determination -- and this is in

2     the Bank case that they cite, it's also -- there's also a First

3     Circuit case, Donoghue v. IBC, which is reported at 70 F.3d

4     206.  I do have a copy of it, your Honor, if it would be of

5     assistance to hand it up.

6          THE COURT:  Certainly.  70 F.3d 206.  And the other

7     one you're relying on is in the defendants' briefing?

8          MR. NASH:  Yes, your Honor.  It's their opposition

9     brief.  It's -- they cite it for a different purpose, but they

11:57 10   cite it for the sua sponte summary judgment.  It's Bank v. IBM.

11    And that case talks about the case I just handed up, which is

12    the Donoghue case.

13         And Donoghue stands very clearly for the proposition

14    that your Honor, as the decider of what the law is -- and in

15    this case whether the contract is ambiguous or not -- can take

16    a what the courts have referred to as a peek at the extrinsic

17    evidence for the sole purpose of understanding what the

18    objective intent of the parties was based on the circumstances

19    of the agreement.

11:58 20        THE COURT:  Okay.  Let me ask you the question this

21    way:  First of all, are those cases summary judgment or motions

22    to dismiss?

23         MR. NASH:  The Donoghue case was an appeal of a grant

24    of a preliminary injunction, and the Bank case was a summary

25    judgment case in which the court granted the mirror image of

1    the summary judgment motion that was actually filed sua sponte.

2    I wouldn't encourage that in this case, your Honor.

3            THE COURT:  Okay.  So, again, just thinking through my

4    posture -- the posture of the motions that are in front of me,

5    on either motion, or on both motions, you're suggesting that I

6    should look at the letters that you have attached to the

7    complaint?

8            MR. NASH:  So what I'm saying, your Honor, is that

9    your role in deciding whether the contract is ambiguous or not

11:59 10   is ultimately an exercise to determine what was the objective

11   intent of the parties.  The first place you should start,

12   absolutely first place you should start, is the four corners of

13   the settlement agreement.  And when you look at the settlement

14   agreement, you'll see there's nine "whereas" clauses.  Not a

15   one of them mentions any royalty payment by the defendants.

16           THE COURT:  The release itself refers to rights under

17   the license agreement.

18           MR. NASH:  It does.

19           THE COURT:  It's a separate subclause of the release

12:00 20   language.

21           MR. NASH:  But you have to ultimately determine what

22   was the objective intent of the parties in adopting that

23   language.

24           MR. STEINER:  Your Honor.

25           THE COURT:  I think that gets further down than I

1    think my understanding of the four corners of a contract is.  I

2    understand the people explain "whereas," not to give everything

3    that's intended to be covered by the agreement, but it talks

4    somewhat about how -- what brings us here and how we're here.

5    Okay, fine.  The operative terms of the contract then go

6    through, and if they are unambiguous, I don't think the fact

7    that they reached something that's not listed in a "whereas"

8    clause would somehow make it ambiguous.

9         MR. STEINER:  Your Honor, there are cases that go to

12:01 10  that issue even in the context of their mutual mistake argument

11   or unilateral mistake.  I think the Eck v. Godbout case, you

12   know, talks about this issue.  And really what plaintiff

13   proposes would require parol evidence in every case where

14   there's a dispute as to what the parties' rights are under a

15   contract, and that's not the law.  In the Eck case, your Honor,

16   the Court says, "The mere fact that a release, as worded,

17   extends to matters that the parties did not specifically have

18   in mind at the time of execution does not operate to exclude

19   these matters from the scope of the release.  That they do not

12:01 20  have those matters in mind at the time and are thus in some

21   sense surprised when the release is later applied to exclude

22   such claims does not make the execution of the broadly worded

23   release a mistake."

24        The argument that plaintiff -- that plaintiffs'

25   counsel makes, I think well overstates the Parol Evidence Rule.

1    And we do cite the Bank v. IBM case, and what that court said

2    was, "To the extent Massachusetts permits the limited use of

3    extrinsic evidence in order to shed light on the circumstances

4    of the contract's execution, no such evidence would be helpful

5    in resolving whether the contract terms in this case are

6    ambiguous, rather allowing such evidence would simply frustrate

7    the policy of the Parol Evidence Rule."

8          So if you read the contract and the contract is

9    unambiguous, you don't go searching through the contentions of

12:02 10   the parties, and in this particular case, settlement

11   discussions, and say, well, wait a second.  Because they've

12   come forward and they've said we don't agree with how this

13   release is being applied to us, now there's a dispute and now

14   you have to look at parol evidence and create some ambiguity in

15   an agreement, your Honor, that is entirely unambiguous.  It has

16   specific reference to a release of everything under the master

17   license as of the effective date.

18          THE COURT:  The ambiguity -- I agree that this is a

19   broad release term, but I do think I need to figure out whether

12:03 20   the language of the -- I need to figure out when something

21   arises, and that's why I turn to the license agreement.  And I

22   need to figure that out, and I need to figure out if that's

23   clear.  I will read those cases and determine how much I should

24   or shouldn't be thinking about extrinsic evidence.

25          I do want to just sort of stop on one use of words you

1    were just bringing in there, which is focusing that this is

2    "settlement discussions."  I'm asked to interpret a contract.

3    The contract that I'm asked to interpret happens to be a

4    settlement agreement.  Once I'm forced to have to do that, if

5    the language is -- if I do find it is ambiguous, the fact that

6    the conversations that were involved in negotiating this

7    agreement were "settlement discussions," I don't think keeps me

8    from looking at it, does it?

9         MR. STEINER:  I think --

12:04 10         THE COURT:  Isn't the prohibition about settlement

11    conversations is bringing settlement conversations into things

12    that aren't the interpretation of the settlement agreement.

13         MR. STEINER:  I think the broader issue here, your

14    Honor, is that what the plaintiff has done is taken a single

15    email, prior to any document being drafted, prior to -- people

16    weren't parsing language in agreement and saying, This is what

17    I think this means; this is what I think that means; Are we

18    covered here?  They've taken a settlement communication six

19    weeks before the parties ever had put pen to paper, before the

12:05 20    parties met in person --

21         THE COURT:  Okay.  So if I reach extrinsic evidence, I

22    think there was a question of what extrinsic evidence I would

23    look at and how much and how far back.  But the notion that it

24    is settlement isn't a magic word.  I mean, it's sort of like,

25    if you were fighting about keeping attorney/client

1    communications confidential when the fight is about a fee

2    dispute with your client, at some point when you're fighting

3    about the underlying things you get to figure out what you were

4    talking about with each other.

5         If what you're saying is we had settlement

6    conversations that were not part of negotiating a settlement

7    agreement, if they're part of the conversations of the contract

8    that is in dispute in front of me, I think I get to it.  If

9    it's not part of that, then I don't get to it and -- assuming

12:06 10   it's ambiguous.

11         MR. STEINER:  Exactly.  I think that's obviously the

12   first step.  I don't think we get there because I think that,

13   you know, hopefully, with the supplemental submission and the

14   discussion on Wednesday, your Honor will conclude that the

15   agreement is unambiguous and that the broad language of the

16   release, which includes obligations, liabilities, debts,

17   everything related to the master license as of the effective

18   date, bars the plaintiffs' claim.

19         MR. NASH:  On your 408 question, your Honor, the

12:06 20   committee notes to the 2006 amendments addresses your Honor's

21   question directly.  It actually cites a -- in addition to a

22   First Circuit case, it cites a Fourth Circuit case that says

23   evidence -- it stands for the proposition that evidence of

24   settlement is not precluded by Rule 408 when offered to prove a

25   party's intent with respect to the scope of a release.  It's

1    something -- that's not precluded.  The rule precludes

2    something else, which is evidence having to do with the

3    validity of the underlying claim or the amount.

4         THE COURT:  So I think we -- there's a fair bit here

5    that we'll pick up with next week.  If there is different

6    contract language than what I've been focused on, I will take a

7    look at it.

8         If you could follow the same procedure that you did

9    before, which is, if you are concerned that things should not

12:07 10    be in the public domain, divvy up what needs to be redacted,

11    and I don't need to see it all, versus if there's something

12    that needs to be filed under seal.

13         MR. STEINER:  Of course.  Thank you, your Honor.

14         MR. NASH:  Your Honor, may I just take a moment and

15    thank the Court for the last time we were supposed to be here

16    and having to cancel due to my medical issues?  I'm grateful

17    for the Court's indulgence there, and I can assure you I would

18    have rather have been here than where I ended up.

19         THE COURT:  Okay.  Well, I'm glad everybody made it

12:08 20    back here, and I'll see you next week.

21         ALL:  Thank you.

22         THE CLERK:  Court is in recess.  All rise.

23    (Whereupon, at 12:08 p.m. the hearing concluded.)

24

25

1                        C E R T I F I C A T E

2

3

4              I certify that the foregoing is a correct transcript

5     of the record of proceedings in the above-entitled matter to

6     the best of my skill and ability.

7

8

9

10

11

12     /s/Cheryl Dahlstrom

13     Cheryl Dahlstrom, RMR, CRR

14     Official Court Reporter

15

16     Dated:   January 25, 2019

17

18

19

20

21

22

23

24

25