```
 1                     UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3

 4   THE GENERAL HOSPITAL             )
     CORPORATION, et al,              )
 5                     Plaintiffs,    )
                                      )
 6                                    )
     vs.                              ) CA No. 18-11360-IT
 7                                    )
                                      )
 8   ESOTERIX GENETIC LABORATORIES,   )
     LLC, et al,                      )
 9                     Defendants.

10

11   BEFORE:  THE HONORABLE INDIRA TALWANI

12

13           DAY TWO OF HEARING ON MOTION TO DISMISS AND

14                 MOTION FOR SUMMARY JUDGMENT

15

16

17       John Joseph Moakley United States Courthouse
                      Courtroom No. 9
18                   One Courthouse Way
                     Boston, MA 02210
19              Wednesday, January 30, 2019
                       11:00 a.m.
20

21

22

23              Cheryl Dahlstrom, RMR, CRR
                   Official Court Reporter
24       John Joseph Moakley United States Courthouse
                 One Courthouse Way, Room 3510
                     Boston, MA 02210
25         Mechanical Steno - Transcript by Computer
```

1    APPEARANCES:

2    ON BEHALF OF THE PLAINTIFFS:

3         BARCLAY DAMON, LLP
          By:  Carolyn A. Marcotte, Esq.
4         One Financial Center
          Boston, Massachusetts 02111

5
          BARCLAY DAMON, LLP
6         By:  Douglas J. Nash, Esq.
          125 East Jefferson Street
7         Syracuse, New York 13202

8
     ON BEHALF OF THE DEFENDANTS:
9
          CAMPBELL, CONROY & O'NEIL, P.C.
10        By:  Eric M. Apjohn, Esq.
          One Constitution Center
11        Boston, Massachusetts 02129

12        KELLEY, DRYE & WARREN, LLP
          By:  Jaclyn M. Metzinger, Esq.
13             Robert I. Steiner, Esq.
          101 Park Avenue
14        New York, New York 10178

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2          THE CLERK:  U.S. District Court is now in session.

3    The Honorable Judge Indira Talwani presiding.  This is Case No.

4    18-cv-11360, The General Hospital Corporation, et al. v.

5    Esoterix Genetics Laboratories, LLC, et al.  Will counsel

6    please identify themselves for the record

7          MR. NASH:  Good morning, your Honor.  Doug Nash from

8    Barclay Damon, for the plaintiffs.

9          THE COURT:  Good morning.

11:00 10          MS. MARCOTTE:  Good morning, your Honor.  Carolyn

11    Marcotte of Barclay Damon, also for the plaintiffs.

12          THE COURT:  Good morning.

13          MR. STEINER:  Good morning, your Honor.  Robert

14    Steiner from Kelley Drye, for the defendants.

15          THE COURT:  Good morning.

16          MS. METZINGER:  Good morning, your Honor.  Jaclyn

17    Metzinger, also from Kelley Drye, for the defendants.

18          THE COURT:  Good morning.

19          MR. APJOHN:  Good morning, your Honor.  Eric Apjohn

11:00 20    from Campbell, Conroy & O'Neil, for the defendants.

21          THE COURT:  Good morning.  So we're continuing the

22    hearing we started a week ago.  And I have reviewed the

23    additional material and am ready to proceed.

24          MR. STEINER:  Your Honor, if I might?

25          THE COURT:  Yes.

1          MR. STEINER:  I want to start with 4.5(a) of the

2     license agreement because I think -- frankly, I know that's

3     where I got hung up in the argument last week.  And I want to

4     clarify that we've confirmed that Amendment 1 to -- as it

5     relates to 4.5 is the only substantive amendment at issue.  I

6     think I suggested to the Court that there may be other

7     amendments.  Quite frankly, I think the redactions and the lack

8     of numbers throughout the license agreement may have at least

9     confused me.  So I apologize for that.

11:01 10          Since your Honor has focused on Section 4.5 and how it

11     works and how that, in turn, ties in with the release, I want

12     to, with the Court's permission walk through the mechanics of

13     4.5 as it relates to two issues.  I think these are the two

14     issues that are in play here:  first, how you calculate what is

15     due, what royalty is due; and the second, when that obligation

16     to pay a royalty becomes due.

17          THE COURT:  Okay.

18          MR. STEINER:  And how much is due, okay, and how you

19     calculate that is really contained in the second part of

11:02 20     4.5(a), which sets forth a methodology.  And having spent a

21     substantial amount of time now going through that provision, I

22     think, to the extent I was confused, hopefully, I can walk

23     through that a little more clearly today.

24          Basically, there are three inputs into the calculation

25     of how much is due.  Importantly, for the questioning last

week, two of those inputs, two of them, are entirely known.

Even before the reporting period at issue here, January 1,

2017, through June 30, 2017, two of those inputs are known.

And they are the price per sale that EGL is going to be

attributed and the percentage of the royalty that MGH is going

to get in return.  I'll walk through the language and explain

exactly why that is.

The only thing -- I said there were three things that

you needed.  The only thing that you don't know -- the only

11:03 thing you don't know going into the reporting period, the

January 1 through June 30th reporting period at issue here, the

only thing you don't know is how many processes you are going

to sell during that reporting period because that's a

cumulative amount.  You sell some on January 1; you sell on

January 2.  And you continue to accumulate the number of

processes until, at the end of the reporting period, you know,

for instance, I sold a thousand units.  But I'll get to why

that number actually, I believe, is not consequential for the

analysis here.

11:04 So looking at 4.5(a)(i), your Honor, if you have that

in front of you.

THE COURT:  I do.

MR. STEINER:  Now, it says that the royalty rate is

determined in accordance with the following sentence.  And so I

said to your Honor the royalty rate is knowable when you're

1    going into the reporting period.  You need to know -- and this

2    is in (ii).  It says, "The contract net sales of processes sold

3    by the company or its affiliate during" -- I think that "for"

4    should be a "the."  I think that's an error -- "for the

5    reporting period where contract net sales is the product."

6    Now, "contract net sales," there's now a definition of what

7    contract net sales is, and that definition, your Honor, is

8    distinct from the definition of net sales that's in 1.22.

9            Why do I know that?  I know that because it says,

11:05 10   "Contract net sales is the product of," and it defines how you

11   calculate what the contract net sales is.

12           THE COURT:  Yes.  It's the average reimbursement times

13   the number of processes invoiced during the period.

14           MR. STEINER:  We missed an important qualification of

15   that, though, your Honor.  It's the average reimbursement from

16   the prior reporting period.  Why is that important?  That's

17   important because what is mechanically happening here, your

18   Honor, is that you are taking what you received on average

19   during the prior reporting period -- let's say, for example --

11:05 20   I'll throw out some numbers.  These aren't necessarily tied to

21   what happened.  Let's say, for example, that your average

22   reimbursement -- you sell ████████ tests in the prior

23   reporting period, and you collect ██████ on those tests.

24   Your average reimbursement per test then is ████.

25           And so what this means, your Honor, what this means is

1    that the average reimbursement from the prior reporting period,

2    that input, is ▮ here.  So whatever you sell, whatever EGL

3    sells during the current reporting period, no matter how much

4    they get reimbursed, there's is an imputed value of ▮ in my

5    example.

6          THE COURT:  I think there's two products that are

7    being -- maybe I'm misreading this.  But it seems to me that

8    what I had -- the conclusion I had put together looking at this

9    language was that the royalty was the product of the royalty

11:06 10   rate times the contract net sales and that that in turn meant

11   that it was the product of the average reimbursement from the

12   prior reporting period times that average reimbursement again

13   times the number of processes invoiced during the entire

14   period.

15         MR. STEINER:  I don't think -- sorry.  I don't think

16   that's right.  If I could just walk -- continue to walk through

17   it.

18         So the definition of average reimbursement is

19   contained in 1.34, and that section, your Honor, was redacted

11:07 20   during our prior argument.  Now --

21         THE COURT:  But it was exactly what you would think an

22   average reimbursement means.  It was just what -- what the word

23   average means, and that's, in fact, what it says.

24         MR. STEINER:  But it is -- it is backward looking.  It

25   has nothing to do with what is going on in the current

1    reporting period.

2          THE COURT:  One, absolutely.  We are completely agreed

3    that one of the factors is based on reimbursements from the

4    prior -- a calculation rate based on the reimbursement rate

5    from the prior reporting period.  We're on the same page.

6          MR. STEINER:  The second -- I said there were three

7    things that you needed to know.  One was what the average

8    reimbursement was.  That comes from the prior reporting period.

9          The second thing that you need to know is what is the

11:08 10   royalty rate?  Okay.  And the issue is, where does that royalty

11   rate come from?  And it says -- if you go to the next page of

12   the amendment, it talks about how the royalty rate is

13   established.  And it says that the royalty rate is established

14   for each reporting period equal to a percentage of the average

15   reimbursement of the prior reporting period.

16          So going back to my example, your Honor, I've sold.

17          ██████████ units.  I've collected ██████████ on those

18   units.  My average reimbursement is ██████ per unit.  Now I need

19   to get the royalty rate.  And I can do that from the

11:09 20   information I know from the prior reporting period, which is, I

21   take the ██████ and I multiply it by ██████ percent, and I get ██████.

22   The problem with that, though, your Honor -- and this is

23   addressed in the examples -- is that there is a floor.  There

24   is a floor of the amount of royalties that will be paid in any

25   instance no matter what your reimbursement rate is.  And that

1    floor is █ percent.  That's what it says.

2         ████████████, even though you would say, well,

3    it's ██ percent of ██ so, therefore, it's ██.  No, it's

4    actually ███.  If my average reimbursement rate was ██████

5    in my example, then I would go above the floor, and I would pay

6    █ percent in the current reporting period.

7         So the three things -- the three things you need to

8    know, two of them, the price per sale, the imputed value of

9    each sale based on the average reimbursement rate from the

11:10 10   prior reporting period, and the percent that MGH is going to

11   get on each and every one of those sales, you know going into

12   the reporting period or at least you know it as of February 15,

13   2017.

14        THE COURT:  What you're ignoring in this conversation

15   is -- I get the contract.  I get the royalty rate.  But it's a

16   product of the royalty rate and the contract net sales.  And

17   the contract net sales is defined as taking, again, average

18   reimbursement from the prior reporting times the number of

19   processes invoiced to third parties during the current

11:11 20   reporting period.  And I don't understand how that's any

21   different than where we were last week.

22        MR. STEINER:  So your Honor is -- I don't think -- as

23   I read that -- as I read this, your Honor, I don't -- I just

24   don't agree that the language says that.  It says that the

25   royalty rate is determined in accordance with the following

1    sentence, the contract set sales of processes sold, and then it

2    defines what contract net sales are.  That's all it's doing.

3    It's saying you have to pay contract net sales.  What is the

4    contract net sales?  It's giving you an equation to figure out

5    --

6           THE COURT:  So there's a couple words there.  So

7    starting -- I'm now starting, "The company shall pay Hospital a

8    royalty equal" -- okay.  We're all there.  It's the same

9    page -- "equal to."  Then the next word is a "product."

11:12 10  Product means you have two things multiplied, right?  It's a

11   product of one and two.  Product of one is the royalty rate,

12   which will be explained further down.  And two is the contract

13   net sales.  So you're multiplying royalty rate and contract net

14   sales.  That's what the word "product" means, correct?

15          And then royalty rate is then defined on the next

16   page, and contract sales is defined as average reimbursement

17   times number of processes.  So you have royalty rate, as it's

18   calculated on the next page, times average reimbursement, times

19   -- you have two products in there.  That's the contract

11:13 20  language.

21          MR. STEINER:  There's no -- reading it, your Honor --

22   and -- so is your Honor suggesting -- I usually don't like to

23   ask questions of the Court -- that you multiply the royalty

24   rate twice?

25          THE COURT:  That's what the language seems to --

1          MR. STEINER:  I don't think anyone -- maybe plaintiffs

2     take a different position.  I don't think anyone has argued

3     that that's the way this worked mechanically.  And I think that

4     it, frankly, wouldn't make -- to me it doesn't make any sense.

5     The royalty -- there's no product.  There are no two elements.

6     How do you get the second royalty rate?

7          THE COURT:  So you're taking -- it seems to me it's an

8     algebra -- straight algebra equation, and it may be very poorly

9     drafted.  But I have the word "product" there.  It says, Shall

11:14 10   pay Hospital a royalty equal to the product of sub-one and

11     sub-two.  Are we on the same page there?

12          MR. STEINER:  But sub-one, your Honor -- sub-one has

13     no way to get a number.  I think what it's indicating --

14          THE COURT:  I'm then going to explain to you what

15     sub-one is.  So bear with me a minute.

16          MR. STEINER:  Sure.

17          THE COURT:  A royalty equal to the product of one and

18     two, and then two is defined.  Contract net sales is defined as

19     the product of X and Y.  So we now have the royalty rate times

11:14 20   X, times Y, right?  i -- little i, times X, times Y.  And then

21     little i is defined on the next page as the average

22     reimbursement for the prior reporting period.

23          MR. STEINER:  So even if that's right, your Honor,

24     which I -- even if it's right, royalty rate is always

25     determined by the prior reporting period.

1          THE COURT:  And we don't have any disagreement there.

2   I think the problem here is that, when I read contract net

3   sales, one of the factors of a contract net sales, which is

4   marked here as sub-Y, X times Y, Y is the number of processes

5   during the current reporting period.

6          MR. STEINER:  I agree with you, and I want to get to

7   that.  I want -- because I said to you when we started, the

8   only thing that you don't know in terms of how to perform the

9   calculation is how many units are going to be sold in total

11:15 10   until the end of the reporting period, and that's just a factor

11   of chronology, right?  Every day you sell something.  You

12   accumulate what you've sold.  And then, because of the way this

13   agreement works, instead of a daily invoice or a daily payment

14   to MGH, you accumulate the obligation and then you pay it, the

15   total, at the end of the reporting period.

16          But even going back to your Honor's construction,

17   which is that contract net sales is the average reimbursement

18   rate from the prior period and -- and I think we're in

19   agreement -- that the royalty rate is determined by what

11:16 20   happened in the prior reporting period even in that instance --

21   even in that instance, if it is the -- and I don't think that

22   this intends to refer to is the product of X times Y.  But even

23   if that's wrong -- even if that's wrong and you are then

24   applying the royalty rate a second time, which I'm not sure MGH

25   would want because that would mean that my ▮ percent of ▮▮▮

would actually be -- which is ███, would then be █ percent of

that, which would then make it, you know, ██ per test.  So --

but let me continue to walk through it if that's okay.

So I said --

THE COURT:  The part I'm not hearing from you -- I

think the part I'm just not understanding what you're saying at

all is the part that is under the sub-Y, the number of

processes invoiced to third parties during the current period.

MR. STEINER:  All that that's saying, your Honor, is

11:17  that you have sales of a given number, and you're multiplying

that number by whatever the royalty rate is.

THE COURT:  Yes, and you're saying -- it's not saying

per event.

MR. STEINER:  I think --

THE COURT:  It's not saying reimbursed per event.

It's saying reimbursed with a product times the total events.

And you're saying, no, I should take that language and allow

you to say that we didn't mean take the total amount.  We meant

take it as it comes.

11:18  MR. STEINER:  But I think the agreement actually in

several places indicates that the obligation at least, even if

-- the agreement in a number of places explains that the

obligation to pay accrues upon an invoice sale.  And that -- I

said I wanted to deal with the second part, the calculation

first.  If I could now deal with the first part of 4.5(a),

1        which relates to when does the obligation to pay arise.

2               So 4.5(a) says, "Beginning with the first commercial

3        sale of a process, company shall pay Hospital."  And then

4        commercial sale, your Honor, is defined in 1.6.  So it says,

5        "Beginning with the first commercial sale."

6               THE COURT:  Yes.  And then it describes this during

7        the current reporting period number to be a six-month period

8        except for the first time this happens, in which point it could

9        be a nine points from -- continuing from the first date.

11:19 10               I understand that you're disagreeing with my reading

11       here.  I'm pretty certain about my reading on this part.  But I

12       do have a very big question, which may be helping you on this

13       on a different part.  So let me try to turn your attention to

14       another section for a moment.

15               The -- there are royalties due in three different

16       sections:  4.5, 4.6(a), and 4.6(b).  Am I correct?

17               MR. NASH:  I actually think 4, your Honor.  There's

18       4.5(a) and 4.5(b).

19               MR. STEINER:  Your Honor, 4.5(a), yes, obviously.

11:20 20       4.5(b) relates to the commercial sale of a product, not a

21       process, of a product.  What is going on here, what EGL is

22       doing, is they are selling processes.  They are not selling

23       products.

24               THE COURT:  So 4.5(b) is not relevant to the -- it's

25       not relevant to the dispute here?

1          MR. STEINER:  I agree.

2          MR. NASH:  I disagree.  I think it's relevant, your

3     Honor, because the question your Honor asked us last week was

4     how do the parties conceptualize -- how do they conceptualize

5     the issue of a royalty payment.  And the factual question as to

6     whether or not the defendants are actually selling a product or

7     not is -- that's not determinative.  The point is 4.5(b)

8     explains, in part, how the parties conceptualized a royalty.

9          THE COURT:  Okay.  So let me -- we can figure out if

11:21 10    one of these sections I don't need to read or one of these

11    sections I do need to read.  But let me put my question in a

12    little bit of a longer framework, and then we can come back and

13    figure it out.

14          There are payments that I'm not sure I understand the

15    distinction and I might need help from you.  But there are

16    payments under 4.5 and payments under 4.6.  Then there's the

17    annual license fee.

18          MR. STEINER:  Correct.

19          THE COURT:  And the annual license fee allows offsets

11:21 20    of some of those payments and not others of those payments,

21    correct?

22          MR. STEINER:  That's correct.

23          MR. NASH:  Correct.

24          THE COURT:  So it allows an offset for 4.5 -- I don't

25    remember if it was (a) or (b) or both but only -- on the 4.6,

1    only (a) and not (b), is that correct, or the other --

2              MR. STEINER:  I believe that that's right.  The

3    offset, your Honor, only relates to sublicensing fees and not

4    to what's in 4.5(a), although --

5              MR. NASH:  It's -- 4.6(a) is what you meant.

6              THE COURT:  Okay.  With that distinction in mind, that

7    one set of these -- that some of these expenses are offset and

8    some of them aren't, help me understand what these different

9    types of fees are for.

11:22 10              MR. STEINER:  Well, so the first type of fee --

11              THE COURT:  4.5(a).

12              MR. STEINER:  4.5(a), is for what EGL -- the processes

13    that EGL performs on a per-unit basis, the testing that it does

14    on -- in this case it would be tissue samples.

15              THE COURT:  Okay.  So that's what EGL does itself?

16              MR. STEINER:  That's what it does itself, your Honor.

17              THE COURT:  What's 4.5(b)?

18              MR. STEINER:  4.5(b) is based on the sale of a

19    product, and a product, your Honor -- I actually think it's

11:23 20    redacted.  The definition of product, I believe in your

21    version, is in 1.27.  And that definition is redacted, but I'll

22    summarize it for your Honor.  It's basically -- it's a kit.

23    It's a device that is being sold, and, frankly, EGL never sold

24    a kit or a device.  QIAGEN, which kind of is what brings us

25    here initially in the settlement agreement, QIAGEN sold

1    products.  They sold kits.

2              THE COURT:  Well --

3              MR. STEINER:  EGL sold processes.

4              THE COURT:  Is 4.5(b) a royalty that EGL would have to

5    pay if it sublicensed -- through a sublicense, it allowed

6    another entity to sell a product?  Is that what that is, or is

7    it only its direct things?

8              MR. STEINER:  I believe it's only direct things

9    because the sublicense fee is taken care of in 4.6.

11:24 10         THE COURT:  Okay.

11             MR. STEINER:  And the sublicense fee is what third

12   parties are selling.

13             MR. NASH:  Your Honor.

14             THE COURT:  So hold on one minute.  So 4.5(a), EGL

15   itself performs a test.  And 4.5(b) is if EGL itself sells a

16   product, and 4.6 -- is that correct?  Both parties agree?

17             MR. NASH:  I agree, yes.

18             THE COURT:  And 4.6 is what?

19             MR. STEINER:  4.6 is if a third party, a sublicensee

11:25 20   of the technology -- an example would be QIAGEN -- sells a kit

21   that utilizes the licensed technology.

22             THE COURT:  Okay.  So that's 4.6(b) or (a)?

23             MR. STEINER:  That is -- I believe it is.  That's

24   right, I believe, your Honor.

25             THE COURT:  Which one, (a) or (b)?

1         MR. STEINER:  I think it's (b), your Honor.

2         THE COURT:  So 4.6(b) would be if a sublicensee sells

3    a product.  What's 4.6(a)?

4         MR. NASH:  Your Honor, if I might.  4.6(b) would also

5    apply to a sublicensee selling a process.  It's both.

6         THE COURT:  What's 4.6(a)?

7         MR. NASH:  The sublicense is -- in addition to royalty

8    obligations from the sublicensee, sometimes have, like, an

9    annual fee like this one or other quarterly fees that are due.

11:26 10   And that would be what falls under (a).

11         MR. STEINER:  All of that, your Honor -- all of

12    that -- I think we're in agreement.  All of that relates to

13    sales by third parties of products.

14         MR. NASH:  No, or processes.  It says the word

15    "process" right in it.

16         THE COURT:  Okay.  So 4.6 is where those sublicense

17    numbers go through, and 4.5 is where the direct things go

18    through.

19         MR. STEINER:  That's right.

11:26 20        THE COURT:  Between the (a) and (b) on 4.5, it's a

21    distinction between performing it -- the test yourself or the

22    process yourself.  And 4.5(b) is the selling of the product.

23    4.6(b) combines both of those things:  performing the process

24    and performing -- and the sale.  And 4.6(a) are fees that

25    aren't tied to a particular product -- process or sale, is that

1    correct?  Just general sublicensing fees?

2         MR. STEINER:  Sublicensing income, that's right, your

3    Honor.

4         THE COURT:  Now, get me back to the section that talks

5    about the annual fee.  That's which section?

6         MR. STEINER:  That, I believe, is --

7         MR. NASH:  4.3.

8         MR. STEINER:  4.3, your Honor.

9         THE COURT:  Okay.  So under 4.3, each of these

11:28 10  per-unit or per-sale fees, 4.5 and 4.6(b), can be offset, but

11   the 4.6(a) annual fees cannot be -- sorry -- yeah, 4.6(a) fees

12   cannot be offset.

13        MR. STEINER:  It only says 4.6(b), that's correct,

14   your Honor.

15        THE COURT:  Okay.  Any thoughts on why that was

16   excluded?

17        MR. STEINER:  I don't have any thoughts as to why

18   specifically that was excluded, but I don't know that it

19   matters for purposes of the scope of the release as it relates

11:28 20  to royalty payments.

21        THE COURT:  You may be right, and I haven't quite

22   gotten to the scope of the release.  I'm trying to figure out

23   when the payments are -- when the obligation is ripe, I guess.

24        The reason -- so I believe, at the end of the last

25   argument, we were talking about how this offset would not be a

1   null set and that, in order to read it as there being something

2   meaningful to offset, you have to use the words -- you have to

3   think about what the words "subsequently due" would mean.  And

4   it seems that what subsequently due would mean is you make that

5   annual payment on August 15th; and then after you're making

6   that August 15th payment, you now have due all of your payments

7   for the processes in the first six months because, if you can't

8   get credit for them then, you could never get credit for them.

9          MR. STEINER:  I think that's correct, your Honor.

11:30 10         THE COURT:  Right?

11       And so those processes are subsequent, and they get to

12   be offset for that annual fee.  But other expenses that you --

13   other fees that you might have gotten under 4.6(a), any kind of

14   annual fees, those don't get offset on those, and those

15   presumably are due without that kind of delay.  Am I --

16         MR. STEINER:  I think, presumably, that's right,

17   although I don't see that as being an issue in front of your

18   Honor.

19         THE COURT:  It gets to the point that it's

11:31 20  subsequently due.  You have two things that make these fees not

21   due.  You're wanting to say they're due the moment they're

22   incurred, and I think that is true.  You could make that

23   argument as to any annual liability.  Something comes in in

24   March, you should have -- it was due right away.  It doesn't

25   get to be subsequently offset.  Maybe it's not due under 4.6(b)

1    until the end of the period.  But as you make the point, it's

2    completely ripe and calculable as soon as that transaction

3    happens.  But all of the 4.5(a), (b), and 4.6 are not until you

4    get to the end of the reporting periods.

5         MR. STEINER:  If I could, your Honor, if I could walk

6    through 4.5, the first part of 4.5(a), which explains why the

7    obligation -- I agree with you that the payment is not due

8    until the end of the reporting period but why the obligation

9    arises with each commercial sale, if you'll just indulge me for

11:32 10   a moment to do that.

11        4.5(a) talks about, "Beginning with the first

12   commercial sale, company shall pay Hospital a royalty," just

13   dealing with that terminology, okay.  And then if you look at

14   what a commercial sale is, which is in 1.6 -- and I think you

15   -- we had talked last time that perhaps it was when you

16   actually received the money that that -- that it was actually

17   when you got paid on the invoice.  Actually, that's not correct

18   under 1.6 which defines commercial sale.  It says that a

19   commercial sale shall be deemed completed -- so you've made a

11:33 20   sale.  A sale is completed when the company records a sale

21   under its accounting principles, policies, and services.

22        THE COURT:  But you only are paying at a rate based on

23   your reimbursement rate.

24        MR. STEINER:  That's right.  But we are -- we become

25   obligated --

1          THE COURT:  How can you be obligated?  You made the

2    sale, and no one ever paid you for it.

3          MR. STEINER:  Because, looking at the definition of

4    1.6, it says, "A commercial sale shall be deemed completed at

5    the time company or any affiliate records a sale."  And so if

6    you're looking at -- I said there are a number of things in the

7    agreement which show that the obligation to pay --

8          THE COURT:  So if you had ended this contract after

9    the first sale -- you had made the sale.  You had the

11:34 10    contractual obligation, and yet they never paid you.  You were

11    stiffed.  And then everything was over.  Tell me what you owe

12    plaintiff.

13          MR. STEINER:  You would look at 10.7 for that, your

14    Honor, which is the termination provision.

15          THE COURT:  Yeah.  But you have all of these things as

16    calculated on a reimbursement rate.

17          MR. STEINER:  Look, your Honor, obviously, I wasn't

18    involved in drafting this, but the plain language of the

19    agreement says that your average reimbursement rate under

11:34 20    4.5(a), which then defines what average reimbursement rate is

21    in the definition section, is how much you actually got paid

22    times -- divided by the number of units that you sold in the

23    prior period.

24          So it may be that -- you know, it may be,

25    hypothetically, that if you sold one unit -- let's say you sold

1    one unit, your Honor, and the company that you sold it to paid

2    you a dollar.  They paid you a dollar.  But the average

3    reimbursement rate is $600.  Let's say the company you sold it

4    to -- you sold the process to paid you $900.  The average

5    reimbursement rate is still $600.  The impact of that, of

6    getting stiffed, as your Honor says, or in my example, getting

7    paid more than the average reimbursement rate, is only

8    accounted for in the subsequent reporting period.

9         So in -- taking your Honor's example, January 1, 2017,

11:35 10   through June 30, 2017, I sell -- EGL sells two processes, and

11   they get paid a dollar on each of those processes.  Well, then,

12   when you're calculating the average reimbursement rate in --

13   from July 1, 2017, through December -- the end of December

14   2017, that would be an input.  You'd still have to pay ▪

15   percent because of the floor.  But the contract plainly says

16   that average reimbursement rate is determined by -- and then

17   there's a formula, and that formula actually does take into

18   account net sales.  But it's all backward looking.

19        And so if your Honor looks at 10.7, which is the

11:36 20   situation where there's a termination in the middle of a

21   reporting period, what it says is that you're liable to pay

22   royalties and other payments accrued or due, accrued.  So

23   there's clearly contemplation within the agreement.

24        THE COURT:  Except that there's a specific provision

25   for what happens in that circumstance.  There's sort of

1    essentially an early end.  If you're going to terminate it,

2    then it's due.  You don't have language saying that it is

3    accrued in the absence of a termination because you don't know

4    your total number of sales until you've gotten to the end of

5    the period.

6                MR. STEINER:  But you do, your Honor.  You do because

7    the definition of a commercial sale happens when you record the

8    sale under your accounting principles.  You do know that.  It's

9    really -- any situation where you're in a commercial process

11:38 10   and you are invoicing on a per-month or per-quarter or, in this

11   case, every six-month period, it's this --

12               THE COURT:  If this said -- your argument would be

13   fine if it's any contract which says you're going to invoice on

14   a per-transaction business.  This doesn't say you're going to

15   invoice on a per transaction.  It says there's going to be a

16   calculation based on the total number in the period.

17               MR. STEINER:  I was trying to stay away from analogies

18   for purposes of this argument but -- and none of these are

19   perfect.  But if I -- my own -- as a lawyer, I bill my clients.

11:38 20   I record hours on a daily basis for work that I do, but I send

21   the client a bill later on.  So -- but the obligation has

22   arisen every time I'm performing the work.  That's what this

23   contract says, is that the obligation arises every time you

24   make a sale.

25               THE COURT:  Let me ask the question this way because I

1   am hanging my analysis on how 4.5 fees are calculated.  How are

2   4.6 fees calculated, not when they're paid but how are they

3   calculated?

4            MR. STEINER:  So 4.6, there are a number of inputs

5   into 4.6.  But they are calculated essentially based on ▮

6   percent of a given product -- I'm using the word "product"

7   incorrectly -- of the sum total of various events including

8   offsets, including -- I think exchange rates is an issue in

9   4.6.

10           By the way, 4.6 -- there's an amendment to 4.6.  I'm

11  not sure if it's that in front of you.  The ▮ percent changed

12  to an amount that was greater than that.

13           THE COURT:  So you have this license -- or you

14  sublicense the rights here, and the company you sublicense it

15  to has its own agreement with you on how it's going to pay you

16  for these products, correct?

17           MR. STEINER:  That's correct.

18           THE COURT:  And it doesn't have the same language as

19  4.5.  It presumably has whatever its own language is.  It's not

20  in front of me.

21           MR. STEINER:  Nor me, correct, your Honor.

22           THE COURT:  Okay.  As far as this contract is

23  concerned, the one that is in here, there are no limits on how

24  you arrange your contract with the sublicensee.

25           MR. STEINER:  I think that's essentially correct, your

1    Honor.  I wouldn't want to take a --

2         THE COURT:  So if you had a contract that was like

3    your attorney's fee billing and you said, with a sublicensee, I

4    have amounts due.  Pay me once a month, right?  There's nothing

5    to say it has to be every six months, correct?

6         MR. STEINER:  I think that's right, your Honor.

7         THE COURT:  Would you agree?

8         MR. NASH:  I would.  I won't -- you don't have it

9    before you, but I'll tell you I actually went back and re-read

11:42 10   all of the old sublicenses that my client had access to.  And

11   there's a number of different -- to your point, there are a

12   number of different permutations they use as to when money

13   comes in to the defendants.

14        THE COURT:  So it seems to me that the argument that

15   the defendant is making, that the money is due immediately, and

16   when you gave up whatever you gave up in the releases, it was

17   -- you gave up any amounts that had already been accrued, that

18   argument has more traction to me with regard to the sublicenses

19   because, with regard to the sublicenses, I don't have anything

11:42 20   in front of me that sort of contradicts the notion that events

21   happen as they accrue.  It says simply you're going to pay --

22   it does say you don't pay it until the end, but it says that

23   you're going to pay ▮ percent of any amounts paid.  So as soon

24   as those amounts are paid, you are -- those amounts are, in

25   fact, accrued.  They may not be due until after the six-month

 1    period.

 2              So the argument that I'm latching on on the 4.5, which

 3    applies to the process -- sales of the products that the

 4    defendant does directly, you don't have any of that language

 5    with relating to the sublicensee's sale of the product.

 6              MR. NASH:  Can I address that, your Honor?

 7              THE COURT:  Yeah.

 8              MR. NASH:  As I do, I've got more handouts.  Is it

 9    okay if I approach?

11:43 10          THE COURT:  Okay.

 11             MR. NASH:  No one will have to be shuffling through

 12    pages.

 13             THE COURT:  Is this the same thing you gave me last

 14    time?

 15             MR. NASH:  It's an updated version, your Honor.  You

 16    asked us to go back and take a sort of fresh look at this issue

 17    as to how the royalties are conceptualized by the party, how

 18    the payments are conceptualized.

 19             4.6, your Honor, appears on Page 7 of the

11:44 20    demonstratives.  It's got 4.6(a) and (b) and (d), and this is

 21    as they were amended.  If you look at (d), it says any --

 22             THE COURT:  4.6(d) wasn't amended.

 23             MR. NASH:  Correct, you're a hundred percent right.

 24    But (a) and (b) were, so the composite that's on there, your

 25    Honor, is (a) and (b), as amended, and (d), as originally -- as

1    originally in the license agreement.

2        So if you look at (d), which, again, as your Honor

3    pointed out, is original, any payment under this Section 4.6

4    shall be due and payable within 45 days after the end of the

5    reporting period, during which the related amounts were

6    received by the company -- by the company, which is the

7    defendants.

8        So it uses different words than 4.5(a), but the idea

9    is the same.  It's an aggregate look-back at the entire

11:45 10   reporting period.  It's not a pay-as-you-go situation.  And I

11   know that for sure because of two other provisions in the

12   agreement.

13       And on the next page, your Honor, Page 8 --

14       THE COURT:  I agree with you that it isn't a pay as

15   you go, but I think defendants are making the point that

16   there's really sort of two things to think about.  One is, have

17   things accrued, in which case they would be released by the

18   settlement agreement even if you had set forth a different

19   payment schedule or not.  And I have been pushing back on 4.5

11:46 20   and saying, I don't know that they've accrued for 4.5.

21       But the reason I'm pushing back on that has been this

22   language of how you -- that it's how you calculate it.  I mean,

23   if you're going to say, no, no, the whole thing rises and falls

24   on the language that says you don't have to send it to us until

25   afterward, I think you have a harder argument.

1          MR. NASH:  Well, that isn't -- that's a portion of the

2     argument, but it certainly isn't the argument.  The argument is

3     actually it's not payable 45 days later.  It's due and payable.

4     They're different things.  And so the agreement is very clear

5     that the first time this payment becomes due, not just payable

6     but due, is 45 days after the reporting period.  And if you

7     look at the end of 4.6 --

8          THE COURT:  Let me ask you a question.

9          MR. NASH:  Yes.

11:47 10          THE COURT:  So the way this contract was phased in was

11     that there were certain timelines that -- certain things that

12     were due not at the end of the first reporting period, which

13     would have been a partial reporting period, but essentially

14     nine months later.  Did that apply to both 4.5 and 4.6?

15          MR. NASH:  I don't know the answer to that question.

16     I understand why your Honor is asking the question, but I don't

17     -- I'm not aware of anything in the agreement that addresses

18     that point.

19          THE COURT:  So the part where I got to it's not due

11:47 20     for 90 -- till a reporting period and a half, I don't remember

21     which section that was.  Can you help me?

22          MR. NASH:  I think it's 4.5.

23          THE COURT:  So 4.5 says, as to the 4.5 fees, they're

24     not due, let's say, for nine months after the contract starts.

25     There isn't parallel language like that for the 4.6?

1      MR. NASH:  Not -- no, I'm not aware of any, your

2  Honor.

3      MR. STEINER:  I'm not aware of any either, your Honor.

4      MR. NASH:  But if you look, your Honor -- again, this

5  is how did the parties conceptualize this obligation and this

6  payment?  4.6(d), also, in addition to send in the money,

7  you've got to send a report.  And that's in 5.3, which is on

8  the next page of my demonstratives.  There's a relevant

9  provision there in terms of what you have to do when you make

11:48 10  this payment.  And 5.3(d) requires the report to have all of

11  the fees and royalty payments received by the company during

12  the reporting period, not as sort of as-you-go accrual, not

13  anything like that; it's all of them.

14      But significantly -- Mr. Steiner alluded to this -- is

15  that there's also another provision which governs both the

16  payment under 4.5 and 4.6, and that is 4.7.  And that's on Page

17  9 of the demonstratives, your Honor.  And before anybody can

18  know exactly how much money is owed under this agreement, 4.5

19  or 4.6, before anyone can know what that number is -- because

11:49 20  there are foreign sublicensees.  There's a conversion rate that

21  has to occur.  You have to convert the currency into U.S.

22  dollars.  That conversion occurs using the conversion rate

23  that's published in the *Wall Street Journal* on the last working

24  day of the applicable period.  This case would have been

25  Friday, June 30, 2017.

1          So nobody could have told you with any precision

2     exactly what the amount that was due on August 15th until after

3     the *Wall Street Journal* published the conversion rate for the

4     currency conversion on the last day of the reporting period.

5     So -- and that applies to both 4.5 and 4.6.

6               MR. STEINER:  Your Honor, it doesn't apply to 4.5.

7               THE COURT:  So let me -- it doesn't apply to 4.5?

8               MR. STEINER:  No, because what we've talked about is

9     how 4.5 is calculated.  It may apply as it relates to some

11:50 10    subsequent reporting period, but I think we're all in agreement

11    that you're looking at the average reimbursement rate from a

12    prior reporting period and coming up with a number based on

13    that.

14              THE COURT:  Yes, but we're not in agreement as to what

15    you're putting on the other side of the product.  You're saying

16    on that you're putting it -- so we're not all in agreement on

17    that.  But his point is a different one, which is, the foreign

18    exchange rate, you wouldn't know until that date, is the point

19    he just made.

11:51 20    MR. STEINER:  I understand that.  The reason for that

21    is that, if you have foreign sublicensees -- and this is

22    revenue that comes under 4.6, not the royalty revenue that

23    we've been arguing about under 4.5 -- those foreign

24    sublicensees are obviously going to pay you, and you're going

25    to have to convert that currency so that EGL, a U.S. company,

1     can pay MGH in U.S. dollars.  But that has nothing to do with

2     4.5.

3          The other thing, your Honor -- and I -- what we're

4     losing here, what I believe we're losing here is the language

5     of the release.  And the language of the release doesn't just

6     say that you're releasing amounts that are due and owing.

7          THE COURT:  So -- and let me push this question to

8     plaintiffs' counsel here.  If I broke my leg and I entered into

9     a settlement and release with whoever was involved in the

11:52 10    accident that resulted in my breaking my leg, I might not know

11    all my medical costs or the -- it might not be reduced to a sum

12    certain.  But the fact that something is not yet reduced to a

13    sum certain, the fact that it is not yet due in a sense,

14    because there's been no adjudication, doesn't stop me from

15    entering into a settlement which says I released all claims

16    relating to this thing.

17         MR. STEINER:  And this instance, it's not just all

18    claims.  It's all claims known or unknown.

19         THE COURT:  It's a standard release.

11:53 20    MR. STEINER:  Exactly, your Honor.

21         THE COURT:  So with a standard release, it doesn't

22    need to be reduced to absolute certainty of your numbers.  It

23    is a claim, and it's a claim that could be undecided.  And so

24    to the extent you're hanging this thing on the money being due,

25    I think you get tripped up then that it's -- a release is

1    broader than amounts that are already due.

2         MR. NASH:  The question, though, your Honor, is, in

3    your hypothetical, what's the event that gives rise to the

4    claim?  What's the event?  The event is you broke your leg.

5    You slipped and fell.  You broke your leg.  Someone is at

6    fault.  That's the event that gives rise to the claim.  Here,

7    what's the event that gives raise to the claim?  It was when

8    they failed to make the payment on August 15th.

9         THE COURT:  And I would say that under your agreement,

11:54 10  as to the 4.6 transactions, the events that give rise to a

11   claim that you might later assert are the transactions that

12   happened during that period even though they're not yet due,

13   that those are -- those claims -- those transactions are

14   completed, in a sense, in a way that I feel differently about

15   the 4.5 because I think the parties contemplated something

16   different on the 4.5.

17        And it seems the 4.6 is a -- whatever money you get,

18   you have to give us.  Yes, it's a reporting period.  Yes, it's

19   once every six months and so forth.  But the calculation is

11:54 20  certain as the moment the transaction happens.

21        MR. NASH:  But it's not.  That's what -- it's not

22   under 4.6 because you have to do the currency conversion.

23        THE COURT:  But you always have to do currency

24   conversion.

25        MR. NASH:  I understand that but --

1          THE COURT:  I mean, my broken leg, I don't get to say

2     it happened in another country so it's, therefore --

3          MR. NASH:  But, your Honor, this -- last week and this

4     week, this discussion started with your Honor saying, I want to

5     understand how the parties conceptualized payments under the

6     license agreement.  How do they conceptualize the payments

7     because that informs when something arises.

8          THE COURT:  No.  I wanted to understand, and I do want

9     to understand, the obligations.

11:55 10          MR. NASH:  Understand.

11          THE COURT:  I think the obligations are a little bit

12     different than the payment.  I understand that what I'm saying

13     is not making either of you very happy probably.  But it does

14     seem to me that the parties conceptualize these obligations

15     differently, that the one set was essentially a pass-through.

16     Whatever you do through your licensee, we're going to get a

17     chunk of this.

18          MR. NASH:  Let me address this because we're talking

19     about the release now.  If I can game it out a little bit to

11:55 20     show why the interpretation the defendants are suggesting be

21     made on the release just isn't commercially reasonable.

22          So if this -- if the settlement agreement was signed,

23     instead of on June 27th, let's say it was signed on June 1st.

24     Not a single word in the agreement is changed, not a single

25     word.  But yet under their interpretation, the scope of the

1    release is smaller.  It's smaller because now the agreement --

2    the effective date of the agreement was earlier.

3         THE COURT:  Except that --

4         MR. NASH:  But --

5         THE COURT:  That is true as to all of the 4.5

6    obligations.  I have no idea if that's true as to the 4.6

7    obligations because it has -- there's a settlement with another

8    entity.  I don't know whether they're continuing to do

9    business.  I have no idea if there's something ongoing with the

11:56 10   other entity after the first of the month or the 27th of the

11   month.  But they had a settlement.  There was a lot of money

12   that changed hands.  They said, Okay, now we're settling that

13   with you.  Why isn't it reasonable to say that that includes

14   the sublicense fees paid by that sublicensee?

15        MR. NASH:  Well, your Honor, it does apply to 4.6

16   because, if the settlement agreement was signed on June 1st

17   instead of June 27th and a payment under a sublicense came in

18   to them on June 5th --

19        THE COURT:  And I'm saying to you -- maybe I don't

11:57 20   have the facts on the ground, and maybe I'm imagining things

21   here.  But I -- there is a sublicense agreement that has some

22   kind of a payment schedule in it there.  We have no idea.  I

23   have no idea what that is.  There's a settlement between the

24   defendants and that sublicensee, and a bunch of money changes

25   hands.  And now they say to you, Okay, and now we're resolving

1    our dispute and you're getting some chunk of money.  Why isn't

2    it reasonable to think that that covers the money they have

3    gotten thus far from the sublicensee?

4            MR. NASH:  So if we're talking about QIAGEN --

5            THE COURT:  Yes.

6            MR. NASH:  Oh, that's out.  I agree with you.  The

7    QIAGEN sublicense is out because the terms of the settlement --

8    QIAGEN license.  There are other sublicensees --

9            THE COURT:  Okay.

11:58 10        MR. NASH:  -- under 4.6.

11            THE COURT:  So as to QIAGEN, you would agree that even

12    if there was a subsequent --

13            MR. NASH:  There's a separate provision, 3.2, which

14    was filed under seal on the settlement agreement that addresses

15    QIAGEN.  ███████████████████  That was part of the

16    deal.  No question about it.  QIAGEN is a special case because

17    this dispute arose in the context of their lawsuit with QIAGEN.

18            MR. STEINER:  Your Honor, we agree that the QIAGEN

19    sales are out, but if all that --

11:59 20        THE COURT:  Helpful for me to know.

21            MR. STEINER:  Try to narrow the issues.  If all that

22    MGH is relying on for that is 3.2, which your Honor has, then

23    what was to be accomplished by 3.1?  3.1, which has a release

24    that is very broad and that specifically mentions claims that

25    they may have relating to or arising from, that arose out of or

1    which may have arisen out of the litigation, and then a whole

2    list of other things, including the master license agreement,

3    including, but not limited to, the payment of past royalties.

4    What is it that if we construe this release so narrowly to say

5    that only amounts that became due and owing between, you know,

6    June 27th and August 15th in this case, which was the payment

7    date or the reporting period, what is it that this release is

8    releasing?  Because it does --

9            THE COURT:  The QIAGEN payments.

12:00 10        MR. STEINER:  No.  They just said the QIAGEN payments

11   are only released by 3.2.

12           MR. NASH:  No.  I said there was a --

13           THE COURT:  Well, it's clearly not only released

14   because 3.1 specifically refers to the 2008 agreement, which is

15   the QIAGEN agreement.

16           MR. STEINER:  Exactly, your Honor.

17           THE COURT:  But to say that -- they have no rights

18   directly under the 2008.  The only way the 2008 agreement fees

19   go to them is via the master license agreement.  And so in

12:00 20  order to give up the QIAGEN for that thing to make sense is

21   you're saying, well, the QIAGEN fees under the 2008 agreement

22   and under our agreement, the QIAGEN fees are out of the

23   picture.

24           MR. STEINER:  Exactly, your Honor.  But what your

25   Honor read was just one portion of 3.1, referring to the 2008

1    agreement and the obligations, the liabilities, the debts, the

2    obligations that arose under the 2008 agreement.  But there's

3    more here.

4         THE COURT:  Yes, including, it says, the master

5    agreement.  But the master agreement, you're saying, Well, what

6    else would they have given up?  What they've given up is the

7    portion of the master agreement fees that they would have

8    gotten from QIAGEN.

9         MR. STEINER:  But it doesn't say that, your Honor.  It

12:01 10    doesn't specifically say -- it doesn't limit this to only the

11    monies that we received from QIAGEN.  It says the master

12    license.  Under the master license there -- as we've gone over

13    here, there are lots of obligations that EGL had, including

14    obligations to make payments to -- including obligations that

15    arose from each commercial sale.

16         THE COURT:  Let me ask you a question:  This would be

17    a knowing agreement with regard to the money you got from

18    QIAGEN.  Are you saying that you negotiated an agreement where

19    the other side gave up five and a half months of fees without

12:02 20    knowing what they were from some other sublicensee?

21         MR. STEINER:  I don't know what they knew or they

22    didn't know.

23         THE COURT:  How would they know what you got from some

24    other licensee -- sublicensee?

25         MR. STEINER:  I assume they would have some sense from

1   prior history, but the release says known or unknown.  It says

2   known or unknown.  And they were represented not just by their

3   in-house counsel but by outside counsel, who signed off on this

4   release, this broad release, which doesn't specifically limit

5   itself to QIAGEN.  It has many other provisions in it in here

6   beyond the 2008 agreement.  It talks about patent rights, and

7   it says the master license agreement, obligations under the

8   master license agreement.

9        And the root, your Honor, of the obligations under the

12:03 10  master license agreement as it relates to royalties are the

11  sales.  You can't just say that suddenly, on August 15th, an

12  obligation arose.  No.  The obligation arose as commercial

13  transactions were taking place.  That's when the obligation

14  arose.  Arose is much broader than claims.  It's much broader

15  than amounts due.  The obligation arose as sales were being

16  made.  And this release, that's exactly what it says.  It's

17  releasing those obligations.

18        MR. NASH:  The obligation was to pay a royalty.  That

19  obligation arose very clearly, unambiguously, from the license

12:04 20  agreement when it was due and payable, which is August 15th.

21  That's when the obligation arose.  Before that it was something

22  other than obligation because we couldn't demand it.  If it was

23  an obligation, we would be able to go to them and say, Pay up;

24  pay us.  If we had done that, we would have been in breach of

25  the agreement because there's no obligation to do anything with

1    respect to this payment until August 15 happens and the due

2    date comes for the first time.  That's when the obligation

3    arose for the very first time.  Before that, they were under no

4    obligation to do anything with respect to these --

5         MR. STEINER:  Your Honor, under your analogy of the --

6    you broke your leg and, you know, we've recognized that that

7    would result in a release of things that you knew or you didn't

8    know, harm that you may have suffered or that you might suffer

9    in the future.  Lots of unknowns there.  The contention that

12:05 10    that general release, which is what this is, would somehow save

11    claims that you may have in the future because you haven't

12    suffered the harm --

13         THE COURT:  The difference is, though -- and, you

14    know, at the end of the day, maybe there's -- you say somehow

15    this was a -- the release was far broader than the party would

16    have intended.  The difference, though, is that when you're

17    releasing claims, known and unknown, et cetera, it's both

18    parties are making informed estimates on what they're doing.

19    And, yes, they're releasing known and unknown, but you are --

12:05 20    it's because you can't know it yet.

21         What you're saying here is there was a number that was

22    completely known, but plaintiffs' counsel didn't bother asking

23    you, so we never told them, and we kept it as sort of this

24    hidden secret to try to offset the settlement that we were

25    working out.

1          MR. STEINER:  I'm not saying we kept it a hidden

2     secret.  What I'm saying, your Honor --

3          THE COURT:  But they had no access to that

4     information.  There's no -- I take it that if we get into

5     discovery of the settlement conversations there's not going to

6     be a single sentence where there's a discussion about royalty

7     from other sublicensees.

8          MR. STEINER:  I can't make that representation, your

9     Honor.  I'm not -- though I was involved, I would have to go

12:06 10     back and look at the documents to see that.  But what was

11     knowable, what was knowable on June 27th, the date they signed

12     the agreement and released everything as of the effective date,

13     was the amounts that they would otherwise be entitled to absent

14     the settlement agreement.  This is not a situation --

15          THE COURT:  Wait, wait.

16          MR. STEINER:  This is not a situation, your Honor --

17     these parties were involved in a --

18          THE COURT:  How would they know that?

19          MR. STEINER:  They would certainly have some idea as

12:07 20     to what the numbers were.

21          THE COURT:  How?  Based on what?

22          MR. STEINER:  Based on past experience, based on the

23     idea, your Honor, that these parties were in a commercial

24     relationship for many, many years.

25          THE COURT:  Okay.  I think I've gotten through all I

1   can -- I'm going to go back.  I will go back here and look at

2   this stuff one more time.

3        I read your case that you cited about using extrinsic

4   evidence to determine whether there's an ambiguity.  I think

5   plaintiff is correct that, although I can't interpret --

6   although it's pretty clear I'm not going to interpret --

7   determine the ambiguity -- use the extrinsic language in the

8   event that the language is not ambiguous, I think the First

9   Circuit says I can't be so hard and fast, and I need to

12:08 10   consider that to determine if there is an ambiguity.

11        So I -- I don't know if you have any response to the

12   case that they gave me last time, but that seems to be what it

13   says.

14        MR. STEINER:  I've read their case, your Honor.  It

15   seemed to be a very kind of specific factual circumstance in

16   which the language that we have here and the -- frankly, the

17   parol evidence is very different.  So, for instance, they point

18   out that there were discussions about a variety of things as it

19   related to a settlement.  For instance, they say that -- you

12:08 20   know, they made a demand to put something on what's called a

21   one-track application to the U.S. Patent Office.  They made a

22   demand that we ratify our commitment to fund ongoing EU

23   oppositions and that we pay an amount, frankly, far in excess

24   of what we agreed to.  None of that stuff made its way into the

25   settlement agreement.  So those are the facts as it relates to

1    the Parol Evidence Rule.

2            In addition, your Honor, in addition --

3            THE COURT:  Although all of those facts have to do

4    with the issue that in that underlying case they ended up with

5    their patent being attacked in the litigation that was going on

6    there, right?  That's what that all tied to.  It wasn't that

7    this was unrelated to any of the issues relating to Qualcomm

8    and that settlement.

9            MR. STEINER:  There was nothing -- there was nothing

12:09 10   in the litigation that related to one-track U.S. -- one-track

11   patent applications in the U.S.  There was nothing in the

12   litigation that related to our commitment to fund ongoing EU

13   oppositions.  There was nothing in the litigation that related

14   to any of that.

15           THE COURT:  Well, didn't that litigation end up with a

16   decision from another court here that their patents were

17   invalid that then had to be vacated?

18           MR. STEINER:  Here in the U.S., yes.  It had nothing

19   to do with Europe.

12:10 20          THE COURT:  Didn't send -- didn't cause issues to be

21   raised as to the validity of their patent?

22           MR. STEINER:  But the one-track patent application

23   related to other patents and other claims that were not at

24   issue in this litigation, your Honor.  And none of that made

25   its way into the settlement agreement, which is why using the

1    type of parol evidence that they suggest that you use creates

2    ambiguity where none exists.

3            THE COURT:  Okay.

4            MR. NASH:  Thank you, your Honor.

5            MR. STEINER:  Thank you, your Honor.

6            THE COURT:  Thank you.

7            THE CLERK:  Court is in recess.  All rise.

8    (Whereupon, at 12:10 p.m. the hearing concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            C E R T I F I C A T E

2

3

4              I certify that the foregoing is a correct transcript

5        of the record of proceedings in the above-entitled matter to

6        the best of my skill and ability.

7

8

9

10

11

12        /s/Cheryl Dahlstrom

13        Cheryl Dahlstrom, RMR, CRR

14        Official Court Reporter

15

16        Dated:  February 1, 2019

17

18

19

20

21

22

23

24

25