# United States Court of Appeals
## For the First Circuit

Nos. 20-2126
     20-2149

THE GENERAL HOSPITAL CORPORATION; DANA-FARBER CANCER INSTITUTE,
INC.,

Plaintiffs, Appellees/Cross-Appellants,

v.

ESOTERIX GENETIC LABORATORIES, LLC,

Defendant, Appellant/Cross-Appellee,

LABORATORY CORPORATION OF AMERICA HOLDINGS, a/k/a Laboratory
Corporation of America,

Defendant, Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Lynch, Selya, and Barron,
Circuit Judges.

Christopher R. Howe, with whom Campbell Conroy & O'Neil, P.C.,
Robert I. Steiner, Jaclyn M. Metzinger, and Kelley Drye & Warren
LLP were on brief, for defendants.
Douglas J. Nash, with whom Carolyn M. Crowley and Barclay
Damon LLP were on brief, for plaintiffs.

---

October 7, 2021

---

SELYA, **Circuit Judge**.  Although these appeals arise out of a dispute between sophisticated entities concerning intellectual-property rights, they turn on abecedarian principles of contract law.  Those principles, though familiar, are often difficult to apply.  Because the court below erred in applying the pertinent principles to the documents at hand, we vacate its million-dollar-plus damages award and certain of its other rulings, and we remand for further proceedings consistent with this opinion.

## I. BACKGROUND

We start by rehearsing the relevant facts and travel of the case.  The plaintiffs, The General Hospital Corporation and Dana-Farber Cancer Institute, Inc. (collectively, the Hospitals), own patents related to the detection of the epidermal growth factor receptor (EGFR) mutation that, when present, suggests that certain cancer treatments are likely to be effective.  In 2005, the Hospitals licensed the patents to a company that was in the genetic-testing business.  Under the master license agreement (the License), the licensee is permitted to use and sell certain products and processes covered by the EGFR-detection patents, as well as to sublicense those same rights to third parties.  In exchange, the licensee is required to pay stipulated amounts, including an annual license fee, royalties on its use and sales of the processes and products, and a portion of the fees and other

income received from sublicensees (including their royalty payments).

Approximately five years later, the prior licensee's rights were passed on to one of the defendants, Laboratory Corporation of America Holdings (LabCorp), when LabCorp purchased most of the seller's genetic-testing business. The rights later passed to defendant Esoterix Genetic Laboratories, LLC (Esoterix) — an entity created by LabCorp to manage the assets.

According to the License, royalties and sublicensing fees and income are to be paid twice a year following six-month reporting periods ending on June 30 and December 31. The License delineates how these payments are to be computed. Royalties owed on sales of processes, for example, are calculated by multiplying a "royalty rate" by the "CONTRACT NET SALES," as defined, of processes sold during a reporting period. Though simple on its face, this calculation requires further computation to determine the inputs. Payments owed for sublicensing arrangements are calculated more straightforwardly: Esoterix owes the Hospitals a fixed percentage of certain fees or income collected from sublicensees.

In 2014, Esoterix sued QIAGEN Manchester, Ltd. and other related entities (collectively, QIAGEN), for, inter alia, breach of a sublicense anent the EGFR-detection patents. QIAGEN filed counterclaims challenging the patents' validity. Esoterix and

LabCorp eventually settled all claims with QIAGEN. They also agreed to pay the Hospitals a portion of the settlement amount paid by QIAGEN. The parties entered into a settlement agreement to this effect on June 27, 2017.[1] Section 3.1 of the settlement agreement comprised a broad release, which was effective as of the date of execution of the agreement. In it, the Hospitals released Esoterix and LabCorp:

> of, from, and with respect to, any and all liabilities, losses, damages, charges, complaints, claims, counterclaims, obligations, promises, agreements, controversies, actions, causes of action, suits, rights, demands, costs, debts and expenses (including attorneys' fees and court costs) of any nature whatsoever, known or unknown, suspected or unsuspected that may have arisen before the Effective Date, which [the Hospitals] may have, own or hold, or claim to have, own or hold against [Esoterix and LabCorp], relating to or arising from (i) the acts or omissions that were stated in, arose out of, or which may have arisen out of, the [prior litigation], (ii) the Patent Rights; (iii) the [License], including but not limited to the provision of any notice(s) required under the [License] or the payment of any past royalties or other fees pursuant to the [License] . . . .

Under the terms of the License, a reporting period closed on June 30, 2017 (a few days after the effective date of the

---

[1] In the sealed record, both the License and the settlement agreement are in redacted form. The parties confirmed at oral argument that the redacted versions contain all of the provisions that bear on this dispute and that the omitted portions are not material to our decision.

release). Esoterix's royalties and sublicensing payments, along with a semi-annual royalty report, were due within forty-five days thereafter. Esoterix took the position that the release operated to discharge the payment obligations for all uses and sales that occurred before June 27. Accordingly, its report for that reporting period supplied revenue and royalty information only for the period between June 28 and June 30.[2] The payments owed for those few days were defrayed by application of Esoterix's annual license fee, an offset that was permissible under the License.

Unwilling to turn the other cheek, the Hospitals brought suit in a Massachusetts state court. Noting the existence of diversity jurisdiction, the defendants removed the action to the United States District Court for the District of Massachusetts. See 28 U.S.C. §§ 1332(a), 1441. The Hospitals alleged, among other things, that Esoterix and LabCorp violated the terms of the License by failing to pay amounts owed for the entire reporting period ending June 30, 2017. Soon after removal, the defendants moved to dismiss. See Fed. R. Civ. P. 12(b)(6). The Hospitals opposed that motion and went on the offensive, filing a motion for partial summary judgment on their breach of contract claim.

---

[2] The release is plain that it operates to wipe out matters arising before — and not on or before — June 27. We thus assume that the report did not contain royalty information for June 27 because there was none to report.

The district court consolidated these motions for hearing. Thereafter, the court granted the Hospitals' partial summary judgment motion, concluding that Esoterix had not been released from its obligation to pay royalties and sublicensing fees for uses and sales occurring before June 27.[3] See Gen. Hosp. Corp. v. Esoterix Genetic Lab'ys, LLC, No. 18-11360, 2019 WL 4218706, at *1, *4 (D. Mass. Sept. 4, 2019). Esoterix's motion to dismiss was denied, save for the count of the complaint that sought reformation of the settlement agreement (count five). See id. at *5-6. That count was dismissed as moot (due to the court's disposition of the breach of contract claim). See id. Following the parties' stipulation to dismiss without prejudice the remaining claims — including those pending against LabCorp — the court entered judgment for the Hospitals on the breach of contract claim in an agreed-upon sum of $1,291,427.13 plus interest. The judgment also granted the Hospitals' prayer for an audit and accounting. These timely appeals ensued.

## II. ANALYSIS

These appeals rise or fall on the Hospitals' claim that Esoterix breached the License by failing to pay certain royalties

---

[3] The district court deemed the record insufficient to determine whether LabCorp was liable for the breach and granted partial summary judgment against Esoterix only. See Gen. Hosp. Corp., 2019 WL 4218706, at *1 n.1. That ruling is not challenged before us.

and sublicensing fees.  Our analysis of that claim begins — and ends — with Esoterix's flagship contention:  that the terms of the release wiped out Esoterix's obligations to pay the unpaid royalties and sublicensing fees for uses and sales that occurred before the effective date of the release (June 27).  Contrary to the district court's determination, the terms of the release and the License do not indicate that Esoterix's obligations arose after the release's effective date (when they became due and payable).

We subdivide our analysis into three segments.  First, we review the text of the relevant release provision.  Next, we assess the district court's interpretation of that provision.  Finally, we address the effect of the release and explain how it operates in this case.

For the most part, the applicable legal standards are familiar.  We review the district court's entry of summary judgment de novo.  See Mason v. Telefunken Semiconductors Am., LLC, 797 F.3d 33, 37 (1st Cir. 2015).  In the course of that review, we take the facts in the light most hospitable to the nonmovant (here, Esoterix) and draw all reasonable inferences therefrom to that party's behoof.  See id.

This case, removed from a state court, is brought in diversity jurisdiction.  See 28 U.S.C. § 1332.  Thus, although we look to federal law for the summary judgment framework, we look to state law for the substantive rules of decision.  See Mason, 797

- 8 -

F.3d at 38 (citing Hanna v. Plumer, 380 U.S. 460, 473 (1965)).
The parties agree — and the choice-of-law provisions in the
settlement and license agreements reflect — that Massachusetts is
the wellspring of the relevant state law.

### A.  **The Settlement Agreement and Release**.

In matters of contract, words are the signposts that the
contracting parties use to demarcate the boundaries of their
agreement.  Consequently, we begin with the text of the release
provision contained within the settlement agreement.

Under Massachusetts law, the interpretation of a
contractual provision is a question of law for the court.  See NTV
Mgmt., Inc. v. Lightship Glob. Ventures, LLC, 140 N.E.3d 436, 443
(Mass. 2020); see also Bank v. Thermo Elemental Inc., 888 N.E.2d
897, 907 (Mass. 2008).  "Contract language is ambiguous where the
phraseology can support a reasonable difference of opinion as to
the meaning of the words employed and the obligations undertaken."
Bank, 888 N.E.2d at 907 (quotations omitted).  "[T]he parties'
intent must be gathered from a fair construction of the contract
as a whole and not by special emphasis upon any one part."  Bukuras
v. Mueller Grp., LLC, 592 F.3d 255, 262 (1st Cir. 2010) (quotations
omitted) (applying Massachusetts law).  Words that are "plain and
free from ambiguity" must be understood in their "usual and
ordinary sense," and a contract should be interpreted "in a
reasonable and practical way, consistent with its language,

background, and purpose." Id. (quotations omitted). "[A]bsent
ambiguous provisions, we look solely to the language of the
contract and do not consider extrinsic evidence." NTV Mgmt., 140
N.E.3d at 443.

The principal release provision — section 3.1 of the
settlement agreement — sweeps broadly. In it, the Hospitals agreed
to:

> release, waive, forever discharge, and hold
> harmless [Esoterix] . . . of, from, and with
> respect to, any and all liabilities, losses,
> damages, charges, complaints, claims,
> counterclaims, obligations, promises,
> agreements, controversies, actions, causes of
> action, suits, rights, demands, costs, debts
> and expenses . . . of any nature whatsoever,
> known or unknown, suspected or unsuspected
> that may have arisen before the Effective
> Date . . . relating to or arising
> from . . . the [License], including but not
> limited to . . . the payment of any past
> royalties or other fees pursuant to the
> [License] . . . .

By these terms, the parties manifestly intended to enter into a
release with many attributes of a general release — a release that
broadly discharges liability for all claims and demands, whether
known or unknown. See Eck v. Godbout, 831 N.E.2d 296, 300-01
(Mass. 2005).

The release is meaningfully limited in only two ways.
First, the release is limited temporally: it applies to any matter
that "may have arisen" before its effective date. Second, the
subject of the release is limited: the matter released must

"relat[e] to or aris[e] from" one of the release's enumerated topics (a taxonomy that includes the License).

Read in light of the settlement agreement as a whole, the release is unambiguous. The adjacent release provision — section 3.2 — releases obligations related to the QIAGEN litigation (the underlying incident that prompted the settlement agreement). The existence of this second (tailored) release provision confirms that a broader release was part and parcel of the parties' bargained-for settlement. See, e.g., Cohen v. Steve's Franchise Co., 927 F.2d 26, 29 (1st Cir. 1991) (explaining that, under Massachusetts law, "[a] reading rendering contract language meaningless is to be avoided"); Oliveira v. Com. Ins. Co., 112 N.E.3d 1206, 1210 (Mass. App. Ct. 2018). It is commonplace that "a release may be prompted by the settlement of a specific dispute or resolution of a specific issue," and yet the parties may choose to negotiate a general release that "operates to settle all other, unrelated matters." Eck, 831 N.E.2d at 300-01. The release has two meaningful limitations, but it nonetheless operates to extinguish many matters beyond those stemming from the QIAGEN litigation.

## B. **The District Court's Order**.

Notwithstanding the breadth of the language in which the release is couched, the district court held that the Hospitals' claim for royalty payments was beyond the purview of the release.

See Gen. Hosp. Corp., 2019 WL 4218706, at *3-4.  Refined to bare essence, the court reasoned that the Hospital's breach of contract claim accrued when Esoterix's unpaid royalties and fees became due and payable.  See id. at *3.  Because this payment deadline occurred after the effective date of the release, the district court determined that the breach of contract claim was not foreclosed.  See id.  Relatedly, the court rejected Esoterix's contention that its obligations to the Hospitals arose before the payment deadline.  See id. at *3-4.

The district court's focus on when the Hospitals' cause of action accrued is insupportable.  Massachusetts law is pellucid that a broad release can encompass all matters that come within its terms.  With respect to general releases covering "any and all claims . . . whatsoever of every name and nature," claims can be released even if they were not in the forefront of the parties' thinking.  Eck, 831 N.E.2d at 300-01; see Radovsky v. Wexler, 173 N.E. 409, 410 (Mass. 1930) ("A general release of all demands embraces everything included within its terms.").  This is so even when a cause of action has yet to accrue.  See Eck, 831 N.E.2d at 302; see also Sword & Shield Rest., Inc. v. Amoco Oil Co., 420 N.E.2d 32, 33 (Mass. App. Ct. 1981).  For instance, a contingent obligation can be released by a general release even before preconditions occur that would ripen that obligation into an enforceable promise.  See Radovsky, 173 N.E. at 410; see also

- 12 -

Pierce v. Parker, 45 Mass. (4 Met.) 80, 89-90 (1842).  The guiding principle is that the plain meaning of the unambiguous terms of the release control.  See, e.g., Leblanc v. Friedman, 781 N.E.2d 1283, 1290-91 (Mass. 2003); Schuster v. Baskin, 236 N.E.2d 205, 208 (Mass. 1968).

The district court's reasoning contravened this guiding principle by ignoring the terms of the release in two ways.  First, the release applies to considerably more than causes of action, liabilities, rights or demands.  It also encompasses, among other things, "any and all" "obligations," "promises," and "debts." Second, the release applies to all claims that "may have arisen" before its effective date.  Thus, the actual accrual of a cause of action lacks any talismanic significance.

What counts is the meaning of "arisen," which — depending on the object of the verb — may or may not be synonymous with the term "accrued."  See Eck, 831 N.E.2d at 302 (holding that claims arise "at the time of the underlying incident giving rise to the claim," which may be before any cause of action accrues in fact (quotations omitted)); see also John Doe No. 4 v. Levine, 928 N.E.2d 951, 953 (Mass. App. Ct. 2010) ("The two terms 'arise' and 'accrue' are not synonymous."); cf. United States v. Romain, 393 F.3d 63, 74 (1st Cir. 2004) (explaining that "words are like chameleons; they frequently have different shades of meaning depending upon the circumstances").  It follows that an isthmian

focus on the timing of the breach of contract claim would be inappropriate. "When the words the parties have selected possess a breadth enveloping myriad meanings, the judge need not rush to play the role of augur." Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1084 (1st Cir. 1989).

### C. **The Effect of the Release**.

Setting to one side the district court's reasoning, we consider afresh the extent to which the release covered Esoterix's unpaid royalties and other payment obligations. The "ordinary sense," Bukuras, 592 F.3d at 262, of the term "obligations," as used in the release, is wide-ranging and easily accommodates a duty to pay royalties and sublicensing fees. Nor do the Hospitals dispute that Esoterix's unfulfilled obligations "relate" to the License (a subject matter specified in the release). The analysis of the release's effect, then, reduces to what extent — if at all — Esoterix's obligations "may have arisen" before the effective date of the release. When reading the term "arisen," in conjunction with the object "obligation," the pivotal question becomes whether Esoterix's royalty and sublicensing fee obligations may have originated before June 27, 2017. To answer this question, we turn to the meat of the parties' financial arrangements.

The royalty and sublicensing fee provisions of the License make plain that Esoterix's obligations arise upon its sales

of processes and products, on the one hand, and its receipt of
sublicensing income, on the other hand.  The License provides, in
relevant part, that Esoterix "shall pay" a royalty for sales of
processes or products.  License § 4.5(a)-(b).  The obligatory
language — "shall pay" — is modified.  A royalty is paid
"[b]eginning with the first COMMERCIAL SALE," id. — defined as
having been "completed at the time [Esoterix] records a sale," id.
§ 1.6 — and "continuing during the term of the [License]," id.
§ 4.5(a)-(b).  Thus, a royalty obligation arises when the sale is
first recorded.  That Esoterix must pay a royalty "continuing"
during the agreement's term confirms that royalties are
continually owed upon sales until the license runs its course.

For sublicensing fees and other income, Esoterix "shall
pay" the Hospitals a percentage of "any and all fees" and of "any
royalty or similar payments."  Id. § 4.6(a)-(b).  The terms "fees"
and "royalty or similar payments" are each modified by past
participles — "actually received" and "paid," respectively.  Id.
Past participles can be "used as adjectives to describe the present
state of a thing," Henson v. Santander Consumer USA Inc., 137 S.
Ct. 1718, 1722 (2017), and also can "indicate[] past or completed
action," Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 554
U.S. 33, 39 (2008).  Read in context, the past participles of "to
receive" and "to pay" suggest that those actions must have occurred
for Esoterix's payments to be required.  In other words, Esoterix

owes a portion of sublicensing money when that money has been received by Esoterix or paid to it. The upshot is that Esoterix's obligations to pay sublicensing fees and other income originate as Esoterix receives the fruits of its sublicensing rights.

The structure of Esoterix's royalty and other payments lends further support to this interpretation. Apart from certain annual fees, see License § 4.3, Esoterix's other monetary obligations are structured to be proportional to sales (though the method of accounting when a sale occurs varies). The royalties owed on products, for example, are just a percentage of "NET SALES," see id. § 4.5(b), which are defined as occurring when Esoterix receives the amount payable, see id. § 1.22(c). Royalties owed on processes are amounts that are keyed both to sales and to utilization. See id. § 4.5(a).[4] That the amounts owed are tied to actual sales reinforces an inference that Esoterix's obligations arise from exercising its licensing rights. And this inference is buttressed by the logic that undergirds patent license royalties in general. Such royalties, in effect, allow licensees to engage in conduct that otherwise might constitute patent infringement. See Spindelfabrik Suessen-Schurr, Stahlecker &

_____

[4] Viewed from 50,000 feet, the amount is calculated by multiplying a royalty rate based on the utilization of the processes from the prior reporting period — defined in the License as the "AVERAGE REIMBURSEMENT" — against a base that also tracks sales through the "number of PROCESSES invoiced to THIRD PARTIES during the current REPORTING PERIOD." See License §§ 1.34, 4.5(a).

Grill GmbH v. Schubert & Salzer Maschinenfabrik
Aktiengesellschaft, 829 F.2d 1075, 1081 (Fed. Cir. 1987) ("[A]
patent license agreement is in essence nothing more than a promise
by the licensor not to sue the licensee."); see also 3 Roger M.
Milgrim, Milgrim on Trade Secrets § 10.02 (2021) (differentiating
between patent and trade secret licenses). "In this sense, [a]
patent license royalty is much like the payment of tolls on a
bridge or turnpike." Milgrim, supra, § 10.02. A duty to pay would
logically originate when and as the responsible party engages in
the licensed conduct.

The Hospitals demur. In their view, Esoterix's
unfulfilled royalty and other fee obligations — for uses and sales
that occurred before June 27 — arose when the payments became due
and payable. Stripped of rhetorical flourishes, the Hospitals
seek to uphold the judgment on their breach of contract claim by
focusing on when the Hospitals' right to demand payment came into
existence and when the breach of contract claim accrued. Were
this focus correct, the net result would be that the release did
not extinguish Esoterix's obligation to pay the unpaid amounts
because they became due only after the release's effective date.

But the Hospitals' focus is incorrect. Their thesis, at
bottom, rests on an assumption that there is a condition precedent
requiring that the amounts owed are due and payable before the
obligations can arise. See Mass. Mun. Wholesale Elec. Co. v. Town

- 17 -

of Danvers, 577 N.E.2d 283, 288 (Mass. 1991) (defining condition precedent under Massachusetts law as an event that must occur "before an obligation to perform arises under the contract"). Even so, the Hospitals have not mustered any plausible support for their thesis from within the four corners of the License. The absence of such support is telling. "Emphatic words are generally considered necessary to create a condition precedent that will limit or forfeit rights under an agreement." Id. (quotations omitted); see Restatement (Second) of Contracts § 226 cmt. a (Am. L. Inst. 1981) (explaining that words that create a condition precedent are "on condition that," "provided that," and "if"). A searching examination of the License leaves no doubt but that it is devoid of any terms that suggest that the obligations must be due or payable before they are deemed to originate. Rather, the royalty provisions' due and payable clauses are run-of-the-mine. See License §§ 4.5(e), 4.6(d) (stating that payments required by sections 4.5 and 4.6 "shall be due and payable" "within forty-five (45) days after the end of the REPORTING PERIOD" and that, for section 4.5, the first royalty payment would not be due for some specified time).

Nor is the "intent of the parties to create [a condition precedent] clearly manifested in the contract as a whole." Mass. Mun., 577 N.E.2d at 288. For example, no provisions indicate that the obligations arise upon demand or assessment. In point of fact,

the termination provision shows just the opposite. It states that "all royalties and other payments . . . accrued or due to [the Hospitals] as of the termination date shall become immediately payable." License § 10.7. This language clearly evinces the parties' understanding that royalty and sublicense fee obligations have significance independent of any contractual obligation to make timely payments. If a party terminated the License during a reporting period, Esoterix would still owe the monetary obligations that arose during that period even though those obligations were not yet payable.

Without any plausible support in the License, the Hospitals' asseverations defy common sense. A payment deadline may be informative as to when a breach for failure to pay occurs. Standing alone, though, it does not shed light on when a royalty obligation is incurred. After all, the postponement of a debt payment does not mean that the debt has not already been created; it means only that the payment is not yet required. For example, a bank may lend a homeowner $300,000, yet postpone payment obligations incrementally in line with a twenty-year repayment amortization schedule. That only a fraction of the principal is due each month does not mean, at any point in time, that the homeowner is absolved of her overall obligation to repay the entire loan balance.

The Hospitals' contention that Esoterix's payment obligations cannot arise until they are calculable is no more logical. Here, moreover, it is apparent that the royalties and sublicensing fees may be calculated at any time (even before the end of a reporting period when they become due). The royalty payments for processes are based on an equation in which all but one of the variables are known from the prior period. The single unknown variable is the number of processes invoiced to third parties during the current reporting period, which can be assessed at any time. See id. § 4.5(a). The royalties for products and payments related to sublicensing are just a percentage of payments and income received. See id. §§ 4.5(b), 4.6(a)-(b). These, too, are calculations that can be performed before the end of a reporting period.

The Hospitals identify two other potential cures for the infirmities that plague their position. On close scrutiny, though, neither potential cure proves to be a panacea.

To begin, the Hospitals say that even if the relevant payments are calculable on an incremental basis, they had "no way of knowing if any royalty would be due." This may be true, but it does not move the needle in the Hospitals' direction. The critical fact is that the release applies to obligations "known or unknown."

The Hospitals' second therapeutic fares no better. They implore us to consider the circumstances surrounding the

settlement.  The settlement discussions, the Hospitals insist, show that the parties never intended the result that Esoterix now seeks.  Building on a provision in the release that deals with "the payment of any past royalties," they argue that the release applies only to the "past royalties" at stake in the QIAGEN litigation.  This argument, though, encounters strong headwinds under Massachusetts law.

Examination of extrinsic evidence is improper where, as here, the terms of a contract are neither vague nor ambiguous. See NTV Mgmt., 140 N.E.3d at 443.  This rule applies with full force to releases.  See Radovsky, 173 N.E. at 410 ("A release which is absolute and unequivocal in its terms cannot be explained by parol evidence.").

To be sure, this general rule is susceptible to an exception under which extrinsic evidence can be used to "determine whether an apparently clear term is actually uncertain." Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995).  This exception, though, has no bearing here.  The reference in the release to "past royalties" — the proffered textual hook on which the asserted relevance of the settlement discussions is hung — appears in a clause that does nothing to limit the broad scope of the release.  It follows the phrase, "including but not limited to," and extrinsic evidence cannot write that phrase out of the release.  See id. at 180 (explaining that extrinsic evidence cannot

- 21 -

"be employed to contradict explicit contract language or to drain
an agreement's text of all content save ink and paper").  The
release plainly applies to any and all of Esoterix's royalty
obligations under the License, which arose prior to the release's
effective date.  And that holds true whether or not those royalties
relate to the QIAGEN litigation.

The breadth of the release was by choice of the
contracting parties.  Courts should not attempt to "accomplish by
judicial fiat what [a party] neglected to achieve contractually."
FDIC v. Singh, 977 F.2d 18, 23 (1st Cir. 1992) (alteration in
original) (quotations omitted).  That admonition has special force
where, as here, the parties are sophisticated entities that
negotiated a release with the benefit of counsel.  In signing the
settlement agreement, the parties acknowledged that they had been
"specifically advised" of the "consequences . . . and their
respective rights and obligations."  We are not at liberty to
rewrite this bargained-for arrangement.

To sum up, the terms of the License show that Esoterix's
royalty and sublicensing fee obligations arise upon its sales of
processes and products and its receipt of sublicensing income,
respectively.  As such, the unpaid obligations arose prior to the
effective date of the release and, thus, were extinguished by it.
In the absence of a duty to pay those amounts, there could be no
breach of the License, and judgment should not have entered in

favor of the Hospitals on their breach of contract claim.  Instead, the district court should have granted Esoterix's motion to dismiss that claim.

### D.  **Tying Up Loose Ends**.

In addition to having ruled in favor of the Hospitals on their breach of contract claim, the district court made certain other rulings.  Two of these other rulings require our attention.

The district court denied the defendants' motion to dismiss the Hospitals' claim of entitlement to a full audit and accounting of the relevant records for the reporting period ending June 30, 2017.  See Gen. Hosp. Corp., 2019 WL 4218706, at *5.  The court determined that it would award injunctive relief on that claim, see id. at *6, and entered judgment thereon in favor of the Hospitals.  This grant of relief draws its essence from section 5.4 of the License, which gives the Hospitals audit rights "solely for examination during normal business hours to verify any reports and payments made under, and/or to determine compliance in other respects with, [the License]."  License § 5.4.  Without Esoterix's duty to pay the unpaid amounts, the Hospitals' right to an audit and accounting to "verify" or "determine compliance" as to those payments would cease to exist.  Given our holding that the Hospitals have released Esoterix with respect to all obligations incurred up to June 27, 2017, the Hospitals are entitled to payment for only four days of the reporting period that they wish to audit.

This curtailment in the period that is open to audit may very well influence both the Hospitals' desire for the audit and the district court's determination that one is required (especially in view of the License-fee setoff).  We think it sensible, therefore, to vacate the judgment as to the audit-and-accounting claim; without prejudice, however, to the Hospitals' right to renew their request if they wish to do so under the materially changed circumstances.

The defendants also moved to dismiss count five — the Hospitals' claim for reformation of contract (the settlement agreement) — based on mistake.  See Gen. Hosp. Corp., 2019 WL 4218706, at *5.  The district court granted the motion as to the claim, dismissing it as moot.  See id.  Given the collapse of the Hospitals' breach of contract claim, see supra Part II(C), the reformation claim is no longer moot.  Since the district court did not decide the motion to dismiss count five on the merits, we vacate the order of dismissal so as to allow the district court to consider this repositioned claim in the first instance.  See Hochendoner v. Genzyme Corp., 823 F.3d 724, 735 (1st Cir. 2016).

## III. CONCLUSION

We need go no further.  For the reasons elucidated above, we vacate the judgment in favor of the Hospitals as to the breach of contract claim and direct the district court to enter judgment granting Esoterix's motion to dismiss that claim.  We vacate the

judgment as to the audit-and-accounting and reformation claims, without prejudice. We leave the judgment undisturbed as to all claims not specifically mentioned and remand the matter to the district court for further proceedings consistent with this opinion. Costs shall be taxed in favor of the defendants.

**So Ordered**.