UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| THE GENERAL HOSPITAL CORPORATION and DANA-FARBER CANCER INSTITUTE, INC., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 1:18-cv-11360-IT |
| v. | ) ) | (JURY TRIAL DEMANDED) |
| ESOTERIX GENETIC LABORATORIES, LLC and LABORATORY CORPORATION OF AMERICA HOLDINGS, | ) ) ) ) ) | **[LEAVE TO FILE THIS THIRD AMENDED COMPLAINT GRANTED AT 11/17/2021 STATUS CONFERENCE]** |
| Defendants. | ) ) | |

_____

## THIRD AMENDED COMPLAINT

The General Hospital Corporation ("MGH") and Dana-Farber Cancer Institute, Inc. ("DFCI") (collectively, the "plaintiffs") bring this Third Amended Complaint against the defendants Esoterix Genetic Laboratories, LLC ("Esoterix") and Laboratory Corporation of America Holdings (a/k/a Laboratory Corporation of America) ("LabCorp") (collectively, the "defendants") for []¹ claims[] arising from [] an Exclusive License Agreement dated May 2, 2005, and amendments thereto (the "License Agreement"). The plaintiffs seek to recover money that is due to them from the defendants under the License Agreement. In addition, the plaintiffs seek to recover, under Massachusetts General Laws Chapter 93A ("Chapter 93A"), for the defendants' [attempt] [] to secure [] un-bargained for benefits to the detriment of the plaintiffs.

_____

¹ Portions of the Second Amended Complaint have been removed from the plaintiffs' Third Amended Complaint in light of the First Circuit Court of Appeals' October 7, 2021 Opinion as reflected with brackets alone or as otherwise indicated.

## THE PARTIES

1.      The General Hospital Corporation is a not-for-profit Massachusetts corporation, which owns and operates Massachusetts General Hospital, and has its principal place of business at 55 Fruit Street, Boston, Massachusetts.

2.      Dana-Farber Cancer Institute, Inc. is a Massachusetts company with its principal place of business at 450 Brookline Avenue, Boston, Massachusetts.

3.      The plaintiffs are world-renowned centers for patient care, research and education.  They utilize the royalties paid by the defendants pursuant to the License Agreement to help fund innovative research and treatment for cancer and other patients who have sought treatment in their hospitals and other facilities.

4.      LabCorp is a Delaware corporation with its principal place of business at 358 South Main Street, Burlington, North Carolina.

5.      Esoterix is a Delaware limited liability company with its principal place of business at 358 South Main Street, Burlington, North Carolina.

6.      LabCorp is the sole member of Esoterix, and both share the same principal place of business.  There is a confused intermingling of activity between LabCorp and Esoterix, both of whom are engaged in a common enterprise with disregard of the separate nature of the two entities, and there is serious ambiguity about the manner and capacity in which they and their representatives are acting.

7.      While Esoterix is the licensee under the License Agreement, the general release [] was the result of negotiation with LabCorp and LabCorp employees, not Esoterix or its employees.  Moreover, the payments, reporting and other performance provided in accordance

2

with the License Agreement are provided by LabCorp, not Esoterix.  (*See* Ex. A.[2])  Similarly, correspondence concerning [] the License Agreement was sent by Kellie Watson, who identifies herself as LabCorp's "Head of Licensing, Corporate Development," and who asserted in a sworn declaration to this Court that in her capacity on behalf of LabCorp she is responsible for managing the License Agreement, and maintains supervision and control over business records of both Esoterix and LabCorp.  (*See* Ex. B; Ex. C.)  Moreover, in the context of this dispute, Ms. Watson sent an email from her "labcorp.com" email address to a representative of the plaintiffs in which she identified Esoterix as "EGL (LabCorp)," driving home the point to the plaintiffs that the control and authority rests with LabCorp, not Esoterix, which appears to be little more than a shell company designed to serve LabCorp's interests at its sole direction and control.  (*See* Ex. D.)  Indeed, other correspondence from the defendants concerning [] the License Agreement was sent by Kathryn Kyle, LabCorp's Vice President and General Counsel.  (*See* Ex. E.)  Notably, it does not appear that any of the correspondence from the defendants concerning [] the License Agreement was sent by an employee of Esoterix.  Further, and entirely consistent with the fact that LabCorp has directed and controlled the response to the plaintiffs' allegations, the defendants have admitted that Esoterix was created simply to manage LabCorp assets.  (*See* Dkt. 10, p. 3, fn. 3.)  To that end, the only officer identified in Esoterix's filings with the Massachusetts Secretary of State, as of July 11, 2018, is its manager, F. Samuel Eberts III.  (*See* Ex. F.)  Mr. Eberts is LabCorp's corporate secretary.  (*See* Ex. G.)  The only other person

---

[2] Information has been redacted from the Third Amended Complaint and from various exhibits attached thereto as agreed upon by the parties.  Where noted (with the text box "REDACTED" or "REDACTED SUBJECT TO THE DEFENDANTS' MOTION TO IMPOUND" or other variation thereof space permitting), the redacted information is redacted subject to the defendants' motion to impound.  The plaintiffs reserve their rights to submit the entire documents as needed or if the Court requires.

identified in Esoterix's filings with the Massachusetts Secretary of State is Glenn A. Eisenberg, LabCorp's Chief Financial Officer.  (*See* Ex. F; Ex. G.)

8.     As a result, and also upon information and belief, LabCorp exercises pervasive control over Esoterix, has intermingled business assets with Esoterix, has failed to observe corporate formalities, has improperly used Esoterix as a conduit for its own transaction, operates Esoterix as its alter ego, and has directed and controlled the misconduct of Esoterix for an improper and injurious purpose, *e.g.*, engaging in bad-faith negotiations with the plaintiffs and [] alleged herein, thereby causing significant injury to the plaintiffs.  The plaintiffs also have a reasonable expectation that discovery in this case will show, among other things, that Esoterix is thinly capitalized, does not maintain corporate records separate and distinct from that of LabCorp, has had its funds siphoned away by LabCorp, and does not have properly functioning mangers, officers and/or directors.

9.     To provide a meaningful remedy to the plaintiffs for their injuries, and to avoid injustice, LabCorp should be held liable for the defendants' [] contractual, common law and statutory obligations as alleged herein.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over the asserted claims pursuant to 28 U.S.C. § 1332.  As set forth by the defendants in their Notice of Removal (*see* Dkt. 1), the amount in controversy "well" exceeds $75,000, and the parties are citizens of different states. The plaintiffs are both citizens of Massachusetts in that they are Massachusetts corporations and maintain their principal place of business in Massachusetts.  The defendants are both citizens of Delaware and North Carolina in that LabCorp is a Delaware corporation that maintains its principal place of business in North Carolina, and Esoterix is a Delaware limited liability

company whose sole member is LabCorp.  Esoterix also maintains its principal place of business in North Carolina.

11.    This Court has personal jurisdiction over the defendants.  Both defendants are licensed to do business in Massachusetts, both have offices here, both regularly engage in extensive business transactions and solicitations here, and both have contracted to supply goods and services here.  More importantly, both defendants have consented to the jurisdiction of this Court for any disputes or matters arising out of one or more of the agreements that are at issue in this case.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in Massachusetts.

## BACKGROUND

13.    The plaintiffs own a number of patents directed to detecting the presence of the epidermal growth factor receptor ("EGFR") mutation which, when present, is predictive of the efficacy of certain chemotherapeutic treatments for lung cancer.  This groundbreaking technology was developed by the plaintiffs as part of their multi-million investment in research and development directed to improving patient care and saving lives.

14.    In 2005, as reflected in the License Agreement (attached hereto as Exhibit H), the plaintiffs licensed these patents and this technology to Genzyme Corporation.  Years later, in 2010, LabCorp purchased most of Genzyme's genetic testing business, including its rights under the License Agreement.  LabCorp created Esoterix to manage those assets for the benefit of LabCorp and thus had the License Agreement assigned to Esoterix who, at least nominally, would be the licensee going forward.

5

15.     Under the terms of the License Agreement, the licensee is entitled to sublicense the right to use the plaintiffs' patents and technology to third-parties.  This is consistent with the plaintiffs' mission, which is to ensure that its groundbreaking and life-saving technology is widely available.

16.     One such sub-license was granted in two different agreements to a company called DxS, Ltd., whose rights under the sub-license were later assumed by another company called QIAGEN Manchester Ltd. ("QIAGEN").

17.     In 2014, Esoterix sued QIAGEN for infringement of certain of the plaintiffs' patents, breach of the sublicense, and related claims.  Notably, Esoterix did not name the plaintiffs as a party to that lawsuit (even though the plaintiffs owned the patents), nor did the defendants even tell the plaintiffs that Esoterix was going to file the lawsuit.  The defendants just filed the lawsuit, which, in violation of the License Agreement, had the practical effect of putting the validity of the plaintiffs' patents at issue without their knowledge, consultation or consent to do so.

18.     When the defendants disclosed the QIAGEN lawsuit to the plaintiffs, the defendants mischaracterized it as being primarily a breach of contract action. Thereafter, despite being asked to do so, the defendants failed to keep the plaintiffs apprised of developments in the case.  In fact, the defendants did not tell the plaintiffs that the court had ruled in favor of QIAGEN on a dispositive motion challenging the validity of the plaintiffs' patents put in suit by defendants, nor did the defendants tell the plaintiffs that QIAGEN had asserted counterclaims challenging the validity of other of plaintiffs' patents and had successfully obtained a ruling invalidating those patents as well.

19.     It was in this context that the defendants and QIAGEN explored settlement of their case.  As that was occurring, it became clear to the plaintiffs that the defendants were seemingly unwilling to protect plaintiffs' rights to defend the validity of the plaintiffs' patents, whether in further proceedings before this Court or on appeal, causing plaintiffs concern that the defendants' interests were actually served by the finding of invalidity by the Court given that, at the very least, that ruling would have given the defendants an opening to attempt to renegotiate the terms of the license.  In any event, the plaintiffs were prepared to seek to intervene in the QIAGEN litigation to defend the validity of their patents.  At about the time the plaintiffs' intervention was to occur, the defendants notified the plaintiffs that the defendants and QIAGEN had agreed on settlement terms.  Under the License Agreement, the defendants required the plaintiffs' approval before any such settlement could be executed.

20.     From the start, the defendants put significant pressure on the plaintiffs to review the terms of settlement and approve them quickly.  The defendants' counsel, Robert Steiner (who also is trial counsel to the defendants in this case), even went so far as to send threating letters to the plaintiffs accusing them of acting in bad faith and violating the License Agreement simply by taking the time they needed to review the terms of settlement.  The defendants had failed to keep the plaintiffs apprised of the developments in the case, and the defendants and QIAGEN had been negotiating settlement terms for months.  It was unreasonable for the defendants to demand that the plaintiffs approve the terms in a matter of days, and to threaten them when they needed more time.  The problem was, the terms of settlement were both complicated and unacceptable to the plaintiffs.

21.     For example, the terms of settlement called for QIAGEN to pay the defendants an amount of money REDACTED SUBJECT TO THE DEFENDANTS' MOTION TO IMPOUND

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████.  The defendants, who upon information and

belief were themselves unhappy with the terms of the License Agreement, also demanded that

Esoterix be given a paid-up license to the plaintiffs' patents.  That clearly was not a term sought

by QIAGEN or that affected QIAGEN.  Rather, it was a brazen attempt by the defendants to use

the QIAGEN settlement of a lawsuit defendants had initiated as a vehicle to eliminate their own

going forward royalty payments to the plaintiffs.  In consideration for these and the other

settlement terms, the defendants proposed that the plaintiffs be given $[REDACTED] of the amount to

be paid by QIAGEN.

22.    As reflected in the e-mail exchange attached hereto as Exhibit I, the plaintiffs

rejected the proposal that Esoterix be given a paid-up license (such that the defendants still

would be required to continue to make **all** of their royalty payments due under the License

Agreement), and asked that they receive $[REDACTED] of the amount to be paid by QIAGEN ██

██ REDACTED SUBJECT TO THE DEFENDANTS' MOTION TO IMPOUND ████████

████████.  In response, the defendants accepted that they would have to continue making **all**

of their royalty payments due to the plaintiffs under the License Agreement, and Mr. Steiner

went so far as to represent to the plaintiffs that "[y]our 'counteroffer' makes clear that the **only**

issue now is how to divide the settlement proceeds," and that "we can continue the discussions as

to the proper division of the proceeds . . . ."  (*See* Ex. I, p. 1 (emphasis added).)

23.    At defendants' request, on May 31, 2017, the parties met in person in Boston.

Mr. Steiner was in attendance at that meeting.  Given that the defendants had already agreed that

they would continue to pay **all** their royalties due under the License Agreement, and given Mr.

8

Steiner's representation concerning the **"only"** unresolved issue, the focus of that meeting was on how to divide up the amount to be paid by QIAGEN pursuant to the settlement.

24.     The meeting concluded with the plaintiffs ███████ REDACTED SUBJECT TO THE DEFENDANTS' MOTION TO IMPOUND ███████ to $██REDACTED and the defendants offering $██REDACTED to the plaintiffs.  Shortly thereafter, through a further exchange of phone calls and e-mails, the parties agreed that the plaintiffs would receive $██REDACTED of the amount to be paid by QIAGEN ███████ **REDACTED SUBJECT TO THE DEFENDANTS' MOTION TO IMPOUND** ███████.  The defendants were to receive the remainder of the settlement proceeds to be paid by QIAGEN (an amount substantially greater than the portion paid to the plaintiffs) and continue to pay **all** their royalties due to the plaintiffs under the License Agreement.  These terms were contingent on this Court's vacating its orders invalidating the plaintiffs' patents in order to restore the status quo ante to the defendants' filing of the lawsuit, the basis on which the defendants would continue to pay all their royalties due to the plaintiffs.  This was reflected in a settlement agreement effective June 27, 2017 ("Settlement Agreement"), attached hereto as Exhibit J.

25.     Neither at the May 31, 2017 meeting, nor during the subsequent negotiation of the Settlement Agreement did anyone for any party ever state, suggest or even imply that one of the terms of settlement would be that the defendants would forgo a substantial portion of a significant royalty payment due to the plaintiffs under the License Agreement.  Indeed, by that point, as noted above, the defendants had already agreed that they would continue making **all** of their royalty payments due under the License Agreement, and that the **"only"** issue between the parties was how to divide up the proceeds being paid by QIAGEN.

26.     Pursuant to Section 4 of the License Agreement, royalty payments are first due and payable to the plaintiffs from Esoterix and/or LabCorp within 45 days of the end of each reporting period, which the License Agreement defines as "each six month period ending June 30 and December 31 of each calendar year" during the term of the agreement.

27.     Thus, the first royalty payment due to the plaintiffs after the effective date of the Settlement Agreement was due and owing on August 15, 2017 for the six month reporting period ending on June 30, 2017.

28.     However, as shown in the document entitled "LabCorp Reporting Q1 and Q2 2017," in September 2017 the defendants unilaterally withheld almost all of the royalty for the reporting period ended June 30, 2017, taking the position that the general release language in the Settlement Agreement relieved them of any obligation to pay the portion of the royalty payment attributable to royalty-bearing events occurring prior to June 27, 2017, which was the effective date of the Settlement Agreement.    That portion of the royalty payment exceeds $REDACTED.

29.     This was never discussed by the parties and was not their objective intent in entering into the Settlement Agreement.  Indeed, the plaintiffs already had made clear, and the defendants already had accepted, that the defendants would continue making **all** of their royalty payments due under the License Agreement.  As Mr. Steiner's earlier e-mail clearly represented, the **"only"** economic issue the Settlement Agreement resolved was how to divide up the settlement proceeds paid by QIAGEN.  In attempting now to interpret the agreement to include a further economic term never discussed, contemplated or objectively intended by the parties to the Settlement Agreement, the defendants are acting in bad faith and improperly attempting to secure an un-bargained for benefit to the detriment of the plaintiffs.

10

30.     [This paragraph has been removed in light of the First Circuit Court of Appeals' October 7, 2021 Opinion.]

31.     [This paragraph has been removed in light of the First Circuit Court of Appeals' October 7, 2021 Opinion.]

32.     [This paragraph has been removed in light of the First Circuit Court of Appeals' October 7, 2021 Opinion.]

33.     Despite repeated requests, the defendants have failed and refused to pay the amount due under the License Agreement.

34.     [This paragraph has been removed in light of the First Circuit Court of Appeals' October 7, 2021 Opinion.]

35.     Further, and pursuant to Section 5.3 of the License Agreement, semi-annual reports are required to be provided by the defendants within forty-five days after the end of each reporting period.  The form and substance of the reports are set forth in detail in Section 5.3 of the License Agreement.  [The final sentence of this paragraph has been removed in light of the First Circuit Court of Appeals' October 7, 2021 Opinion.]

36.     By letter dated November 3, 2017 (attached hereto as Exhibit K), the plaintiffs demanded that the defendants immediately provide a fully-compliant and signed semi-annual report that discloses all of the information required by Section 5.3 of the License Agreement for the entire reporting period ending on June 30, 2017.  The defendants failed to do so.

37.     The plaintiffs further demanded that the defendants remit payment, plus interest as calculated pursuant to Section 4.8 of the License Agreement, for the entire royalty attributable to the reporting period ending June 30, 2017.  After notice and demand, the defendants have failed to pay the amount due.

38.     Pursuant to Section 5.4 of the License Agreement, the plaintiffs invoked their audit rights for the reporting period ending on June 30, 2017.  The License Agreement states that MGH has the right to audit the defendants' records relating to the License Agreement "to verify any reports and payments made under, and/or to determine compliance in other respects with, th[e] Agreement."

39.     In accordance with the terms of the License Agreement, the plaintiffs requested that, by December 4, 2017, the defendants make available for inspection all records relating to royalty-bearing occurrences attributable to the reporting period ending on June 30, 2017. [] [T]he defendants failed and refused to allow MGH's auditor to review such records.

**COUNT I**
**(Breach of Contract)**
**[ADDRESSED BY THE FIRST CIRCUIT COURT OF APPEALS'**
**OCTOBER 7, 2021 OPINION]**

40.     [Addressed by the First Circuit Court of Appeals' October 7, 2021 Opinion].

41.     [Addressed by the First Circuit Court of Appeals' October 7, 2021 Opinion].

42.     [Addressed by the First Circuit Court of Appeals' October 7, 2021 Opinion].

43.     [Addressed by the First Circuit Court of Appeals' October 7, 2021 Opinion].

44.     [Addressed by the First Circuit Court of Appeals' October 7, 2021 Opinion].

45.     [Addressed by the First Circuit Court of Appeals' October 7, 2021 Opinion].

46.     [Addressed by the First Circuit Court of Appeals' October 7, 2021 Opinion].

**COUNT II**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

47.     The plaintiffs restate and incorporate by reference the allegations set forth above as if fully set forth herein.

48.     There is a covenant of good faith and fair dealing inherent in every contract.

49.     Having failed to secure different license terms from the plaintiffs as part of the QIAGEN settlement, and having represented to the plaintiffs that the **"only"** economic issue that the Settlement Agreement resolved was how to divide up the settlement proceeds paid by QIAGEN, the defendants, who upon information and belief were unhappy with the terms of the License Agreement, have engaged in an unfair, knowing, deceptive, malicious and bad faith scheme to deprive the plaintiffs of a more than $REDACTED royalty payment to which the plaintiffs are clearly entitled.

50.     The defendants' misconduct serves to prevent the objectives of the License Agreement from being realized – *i.e.*, fully compensating the plaintiffs for the defendants' commercial use of the plaintiffs' patents and technology.  Upon information and belief, the defendants realized economic and/or other gain on their use of the plaintiffs' patents and technology, and the defendants should not be permitted to unfairly and deceptively deprive the plaintiffs of their bargained for share of those proceeds.

51.     This misconduct violates the covenant of good faith and fair dealing inherent in the License Agreement, and the plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT III
### (Violation of M.G.L. Chapter 93A, §§ 2 and 11)

52.     The plaintiffs restate and incorporate by reference the allegations set forth above as if fully set forth herein.

53.     At all times relevant hereto, the plaintiffs and defendants have been engaged in trade or commerce.

54.     The defendants' failure and refusal to pay the plaintiffs [the] amount owed under the License Agreement was done knowingly and willfully.

13

55.     [This paragraph has been removed in light of the First Circuit Court of Appeals'
October 7, 2021 Opinion.]

56.     Indeed, the defendants' unfair, deceptive and unscrupulous conduct has had the
effect of depriving the plaintiffs of more than $REDACTED, which is money the plaintiffs use to
help fund innovative research and treatment for cancer and other patients who have sought
treatment in their hospitals and other facilities.

57.     This unfair, deceptive and unscrupulous misconduct constitutes an unfair and
deceptive act or practice in violation of M.G.L. Chapter 93A.

58.     The defendants' unfair, deceptive and unscrupulous practices occurred primarily
and substantially in Massachusetts.

59.     The plaintiffs have suffered monetary damages as a result of the defendants'
unfair, deceptive and unscrupulous practices.

## COUNT IV
### (Accounting/Injunctive Relief)
### [ADDRESSED BY THE FIRST CIRCUIT COURT OF APPEALS' OCTOBER 7, 2021 OPINION]

60.     [Addressed by the First Circuit Court of Appeals' October 7, 2021 Opinion].

61.     [Addressed by the First Circuit Court of Appeals' October 7, 2021 Opinion].

62.     [Addressed by the First Circuit Court of Appeals' October 7, 2021 Opinion].

63.     [Addressed by the First Circuit Court of Appeals' October 7, 2021 Opinion].

## COUNT V
### (Reformation of Contract – Mistake)

64.     The plaintiffs restate and incorporate by reference the allegations set forth above
as if fully set forth herein.

14

65.     While the plaintiffs contend that the plain language of the general release in the Settlement Agreement makes clear that they did not release the more than $REDACTED royalty payment due on August 15, 2017 under the License Agreement with respect the entire reporting period ending on June 30, 2017, should the Court determine otherwise, and as an alternative form of relief, the Court should, based on mistake, reform the release to exclude such royalty payment from its scope.

66.     At the time they entered into the Settlement Agreement, the plaintiffs made a basic assumption and understanding that the general release did not cover the royalty due on August 15, 2017 attributable to the reporting period ending June 30, 2017.   Indeed, the defendants already had agreed that they would continue to make **all** ongoing royalty payments under the License Agreement, and the defendants' counsel, Mr. Steiner, represented and made objectively clear at the time that the **"only"** economic issue that the Settlement Agreement was to address was how to divide up the settlement proceeds paid by QIAGEN.   Thus, in the event the Court determines that the general release covered that royalty payment, the plaintiffs' basic assumption and understanding was a mistake.

67.     Such a mistake, which would negate a more than $REDACTED royalty payment to the plaintiffs, would have a material effect on the agreed upon exchange of performances under the Settlement Agreement that is adverse to the plaintiffs.

68.     Pursuant to the Settlement Agreement, the plaintiffs received a payment of $REDACTED as their share of the amount paid to the defendants by QIAGEN to settle the QIAGEN litigation.   REDACTED SUBJECT TO THE DEFENDANTS' MOTION TO IMPOUND . The amount paid to the plaintiffs was the subject of contentious negotiation, with the plaintiffs contending that they were entitled to more than $

**REDACTED**, and the defendants alleging that the plaintiffs were acting in bad faith and threatening litigation.  The contentiousness was based on the fact that, if the parties were unable to agree on the plaintiffs share the proceeds, it was likely the defendants would not have settled with QIAGEN, and thus would not have received the amount paid under the settlement.

69.     After numerous calls, letters, emails and even a seven hour all hands meeting between the parties, the plaintiffs agreed to accept $**REDACTED**, which was less than half of what it initially thought it was entitled to.  As noted, **REDACTED SUBJECT TO THE DEFENDANTS' MOTION TO IMPOUND**

**REDACTED**, and nothing more.  At no point during the negotiation did the defendants or anyone suggest that, in addition to cutting the plaintiffs' share of the QIAGEN proceeds in half, the defendants also wanted a more than $**REDACTED** reduction in the royalty payable to the plaintiffs under the License Agreement.  But such a reduction would be the result of a mistaken release of such a royalty in the Settlement Agreement, and would reduce the net proceeds payable to the plaintiffs to $**REDACTED**, while, at the same time, unjustly and inequitably increasing the defendants' net proceeds by that amount.  Such a reduction in the net proceeds payable to the plaintiffs, had it been the parties' objective intent (which it was not), would have been expressly stated in the Settlement Agreement, not silently and/or mistakenly incorporated into the general release provision.

70.     Such a mistake, therefore, would have a material effect on the agreed upon exchange of performances under the Settlement Agreement that was adverse to the plaintiffs, and favorable to the defendants.

71.     The plaintiffs do not bear the risk of the mistake.  The Settlement Agreement did not allocate the risk to the plaintiffs.  Moreover, the plaintiffs were not operating with only

limited knowledge with respect to the facts to which the mistake relates, and thus could not have treated, and did not treat, such limited knowledge as being sufficient.

72.     The defendants had reason to know of the mistake.  As noted, the parties never discussed releasing a more than $██████ royalty payable to the plaintiffs.  Such a release, if the Court determines that it occurred, would have been the product of non-specific general release language in the Settlement Agreement that, upon information and belief, the defendants, who were unhappy with the terms of the License Agreement, were secretly interpreting as releasing such a royalty all while knowing that the plaintiffs, who originally thought they were entitled to twice as much as they ultimately received under the Settlement Agreement, held the opposite understanding.  In other words, if the release is found to cover the royalty payment, the defendants knew that the plaintiffs had made a mistake, but chose to stay silent and allow the mistake to be made.

73.     Alternatively, the defendants did not know of the mistake, such that at the time the Settlement Agreement was signed, the defendants also mistakenly understood that the release did not cover the more than $██████ royalty payment, and only discovered the parties' mutual mistake later when the royalty payment came due.

74.     Therefore, whether based on unilateral mistake or mutual mistake, the Court should reform the release and/or the Settlement Agreement to exclude such royalty payment from the scope of the release.

## COUNT VI
## (Piercing the Corporate Veil)
## [WITHDRAWN]

75.     [Withdrawn].

76.     [Withdrawn].

77.    [Withdrawn].

78.    [Withdrawn].

79.    [Withdrawn].

80.    [Withdrawn].

81.    [Withdrawn].

<u>**COUNT VII**</u>
**(Unjust Enrichment Against LabCorp)**

82.    The plaintiffs restate and incorporate by reference the allegations set forth above as if fully set forth herein.

83.    The plaintiffs provided a license to patent rights to the defendants, which greatly benefitted the defendants.

84.    In good conscience and equity the plaintiffs should be fully paid for the defendants' use of those patent rights.

85.    LabCorp asserts in this case that it is not a party to the License Agreement, and, for that reason, further asserts that the plaintiffs do not have a valid breach of contract cause of action against LabCorp.

86.    As set forth above, the defendants' misconduct in this case has occurred at the direction and control of LabCorp and for the express benefit of LabCorp.  Indeed, the defendants have already told the Court that Esoterix was created simply to manage LabCorp assets, including the License Agreement.

87.    [This paragraph removed in light of the First Circuit Court of Appeals' October 7, 2021 Opinion.]

18

88.     The plaintiffs have suffered damages in an amount to be determined at trial, and LabCorp has been unjustly enriched in excess of $REDACTED as a consequence of its unilaterally withholding almost all of the royalty for the reporting period ended June 30, 2017.

89.     [] [T]here is an absence of a remedy at law against LabCorp.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs, The General Hospital Corporation and Dana-Farber Cancer Institute, Inc., respectfully request that the Court enter the following relief:

1.     grant the plaintiffs judgment on all counts in the Third Amended Complaint;

2.     award the plaintiffs their damages, with interest;

3.     order injunctive relief and/or an accounting;

4.     order the defendants to pay the plaintiffs the amounts by which the defendants were unjustly enriched;

5.     award the plaintiffs double or treble damages in accordance with M.G.L. c. 93A;

6.     award the plaintiffs' their attorneys' fees and costs; and

7.     award the plaintiffs such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,
THE GENERAL HOSPITAL
CORPORATION AND DANA-FARBER
CANCER INSTITUTE, INC.

By their attorneys,


*/s/ Carolyn M. Crowley*
Douglas J. Nash (BBO# 633050)
Carolyn M. Crowley (BBO# 663616)
Barclay Damon LLP
160 Federal Street, Suite 1001
Boston, Massachusetts 02110
(617) 274-2900
dnash@barclaydamon.com
ccrowley@barclaydamon.com

Dated: November 24, 2021


## CERTIFICATE OF SERVICE

I, Carolyn M. Crowley, certify that on November 24, 2021, the plaintiffs' Third Amended Complaint filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to the non-registered participants.


*/s/ Carolyn M. Crowley*
Carolyn M. Crowley