# **<u>EXHIBIT H</u>**

*Execution Version*

THE GENERAL HOSPITAL CORPORATION
EXCLUSIVE LICENSE AGREEMENT

MGH Agreement No: 2004A18200
MGH Case No: 2568

This License Agreement (this "AGREEMENT") is made as of the 2nd day of May, 2005 ("EFFECTIVE DATE"), among Genzyme Corporation, a Massachusetts corporation, having a principal place of business at 500 Kendall Street, Cambridge, MA 02142 ("COMPANY"), The General Hospital Corporation, a not-for-profit Massachusetts corporation, which owns and operates Massachusetts General Hospital, having a principal place of business at Fruit Street, Boston, Massachusetts 02114 ("HOSPITAL"), and the Dana-Farber Cancer Institute, Inc., a non-profit Massachusetts organization having an address at 44 Binney Street, Boston, MA 02115 ("DFCI"). COMPANY, HOSPITAL and DFCI are each referred to herein individually as a "PARTY" and collectively as the "PARTIES".

## RECITALS

HOSPITAL and DFCI, each a center for patient care, research and education, own or control, respectively, by virtue of assignment, certain PATENT RIGHTS (defined below) and TECHNOLOGICAL INFORMATION (defined below);

HOSPITAL and DFCI have entered into the LISA AGREEMENT (as defined below) appointing HOSPITAL as DFCI's sole and exclusive agent for licensing DFCI PATENT RIGHTS;

HOSPITAL and DFCI each desire to grant a license of said PATENT RIGHTS and TECHNOLOGICAL INFORMATION to COMPANY in order to benefit the public by disseminating the results of its research via the commercial development, manufacture, distribution and use of products and processes; and

COMPANY has the capability to commercially develop, manufacture, distribute and use PRODUCTS and PROCESSES (defined below) for public use and benefit and desires to license the PATENT RIGHTS and TECHNOLOGICAL INFORMATION.

For good and valuable consideration, the sufficiency of which is hereby acknowledged, the PARTIES hereto agree as follows:

1

## 1. CERTAIN DEFINITIONS

The following terms shall have the following meanings as used herein, unless the context requires otherwise.

1.6    "COMMERCIAL SALE" shall mean any bona fide transaction to sell or to have sold or to perform or to have performed for value in the form of cash or otherwise a PRODUCT or PROCESS. A COMMERCIAL SALE shall be deemed completed at the time COMPANY, or any AFFILIATE or SUBLICENSEE, records a sale under its accounting principles, policies and practices, including without limitation, sales to a THIRD PARTY distributor. A COMMERCIAL SALE shall not include (i) any sale of a PRODUCT or PROCESS to any AFFILIATE or SUBLICENSEE, unless the AFFILIATE or SUBLICENSEE is the final purchaser of such PRODUCT or PROCESS, and (ii) any use of a PRODUCT or PROCESS in clinical trials or internal research conducted by COMPANY or any AFFILIATE for its own benefit and not for the direct benefit of any THIRD PARTY.

1.7    "CONFIDENTIAL INFORMATION" shall mean, without limitation, any technical, scientific, trade, research, manufacturing, marketing, supplier or other information that may be disclosed by one PARTY (a "DISCLOSING PARTY) to another PARTY (a "RECEIVING PARTY") which is identified as confidential at the time of disclosure to the RECEIVING PARTY regardless of whether such information is patentable or copyrightable. The terms of this AGREEMENT shall be considered CONFIDENTIAL INFORMATION.

1.9    "EGFR" shall mean epidermal growth factor receptor.

[redacted]

1.16   "LICENSE TERRITORY" shall mean world-wide.

[redacted]

1.22   "NET SALES" shall mean:

(a)   with respect to the COMMERCIAL SALE of a PRODUCT or PROCESS (i) the amounts actually received by COMPANY and its AFFILIATES (for the purposes of this Section 1.22, each a "SELLER") in connection with the delivery of a PRODUCT to, or the performance of a PROCESS for, the first THIRD PARTY to acquire the PRODUCT or PROCESS (unless AFFILIATE is the final purchaser of such PRODUCT or PROCESS), less (to the extent appropriately documented) the following amounts actually paid or otherwise incurred by SELLER in effecting such COMMERCIAL SALE:

(i)   credits and allowances by reason of rejection or return;

(ii)   reasonable and customary rebates, discounts, retroactive price reductions, credit balances and chargebacks;

(iii)   amounts for outbound transportation, insurance, handling and shipping, to the extent separately invoiced; and

(iv)    taxes, customs duties and other governmental charges levied on or measured by COMMERCIAL SALES, to the extent separately invoiced, whether paid by or on behalf of COMPANY so long as COMPANY's price is reduced thereby, but not franchise or income taxes of any kind whatsoever.

(b)    No deductions shall be made for commissions paid to individuals whether they be with independent sales agencies or employed by a SELLER or otherwise, or for any cost of collections.

(c)    NET SALES shall occur at the time COMPANY, or any AFFILIATE of COMPANY, actually receives the amount payable by the purchaser of a PROCESS or PRODUCT sold by the COMPANY, or any AFFILIATE of COMPANY.

(d)    If a COMMERCIAL SALE is not a bona fide transaction and results (i) in a sale price that is lower than the sale price customarily charged to similarly situated THIRD PARTIES, or (ii) the delivery of non-cash consideration (whether or not at a discount), NET SALES shall be calculated based on (a) the non-discounted cash amount charged in the same geographic market for the same customer type in a comparable transaction for the PRODUCT or PROCESS during the same REPORTING PERIOD or, in the absence of a comparable transaction, (b) the fair market value of the PRODUCT or PROCESS. Non-cash consideration shall not be accepted by a SELLER without the prior written consent of HOSPITAL, which consent shall not be unreasonably withheld or delayed.

(e)    In the case of a COMMERCIAL SALE between or among COMPANY and any AFFILIATE, NET SALES shall be based on the further COMMERCIAL SALE by such transferee, unless the AFFILIATE is the final purchaser of such PRODUCT or PROCESS .





1.28   "REPORTING PERIOD" shall mean each six month period ending June 30 and December 31 of each calendar year during the term of this AGREEMENT.



## 2. LICENSE AND AGENCY

2.1   <u>Grant of License.</u>

    (a)   Subject to the terms of this AGREEMENT, HOSPITAL and DFCI each hereby grants to COMPANY for use in the LICENSE FIELD in the LICENSE TERRITORY:

        (i)   an exclusive, royalty-bearing license under HOSPITAL's and DFCI's rights by ownership, license or assignment in the PATENT RIGHTS to make, have made, use, have used, offer to sell and sell PRODUCTS and PROCESSES;

        (ii)   the right to grant sublicenses under the rights granted in Section 2.1(a)(i) to SUBLICENSEES; and

        (iii)   the nonexclusive right to use and transfer TECHNOLOGICAL INFORMATION disclosed to COMPANY hereunder.

    (b)   The licenses granted in Section 2.1(a) above include the right to grant to the purchaser of PRODUCTS from COMPANY, AFFILIATES and SUBLICENSEES the right to use such purchased PRODUCTS in a method coming within the scope of PATENT RIGHTS.

7















## 4.  PAYMENTS AND ROYALTIES

4.1   <u>License Issue Fee</u>.  COMPANY shall pay HOSPITAL a non-refundable license issue fee in the sum of $▮▮▮▮▮ within forty-five (45) days following the date that COMPANY signs this AGREEMENT.



4.3 <u>Annual License Fee</u>. COMPANY shall pay to HOSPITAL the following amounts as an annual license fee:

    (a)    $▮▮▮ on or before August 15, 2006 and August 15, 2007; and

    (b)    $▮▮▮ on or before August 15, 2008 and on or before each subsequent August 15th thereafter during the term of this AGREEMENT.

    The annual license fee is nonrefundable; provided, however, the annual license fee shall be credited against royalties subsequently due under Section 4.5 and 4.6(b), if any, from COMPANY during the same calendar year, but shall not be credited against royalties due from COMPANY under Section 4.5 in any other year.





4.5     Royalties.

(a)     Beginning with the first COMMERCIAL SALE of a PROCESS in any country in
        the LICENSE TERRITORY, and continuing during the term of the
        AGREEMENT, COMPANY shall pay HOSPITAL a royalty equal to the product
        of (i) the royalty rate determined in accordance with the following sentence, and
        (ii) the CONTRACT NET SALES of PROCESSES sold by COMPANY or its
        AFLLIATES during for REPORTING PERIOD, where "CONTRACT NET
        SALES" is the product of (x) the AVERAGE REIMBURSEMENT from the prior
        REPORTING PERIOD, and (y) the number of PROCESSES invoiced to THIRD
        PARTIES        during        the        current        REPORTING        PERIOD.

        The royalty rate shall be established for each REPORTING PERIOD (except as
        for the first REPORTING PERIOD as noted below), and shall equal ███████
        ████ of the AVERAGE REIMBURSEMENT for the prior REPORTING
        PERIOD, rounded to the nearest hundredth of a percent; provided, however, the
        royalty rate shall in no event be less than ███████████████nor more than ██
        ██████████. The first REPORTING PERIOD shall commence on the date
        of the first COMMERCIAL SALE and shall end on the last date of the first full
        REPORTING PERIOD following the date of the first COMMERCIAL SALE.
        For example:

        (i)     if the AVERAGE REIMBURSEMENT for the prior REPORTING
                PERIOD equals $██████per PROCESS, the royalty rate for the
                REPORTING PERIOD shall equal █████████████, and the royalty
                payment payable to HOSPITAL shall equal the product of CONTRACT
                NET SALES x ██████;

        (ii)    if the AVERAGE REIMBURSEMENT for the prior REPORTING
                PERIOD equals $██████per PROCESS, the royalty rate for the
                REPORTING PERIOD shall equal █████████████, and the royalty

17

payment payable to HOSPITAL shall equal the product of CONTRACT NET SALES x █████;

(iii)   if the AVERAGE REIMBURSEMENT for the prior REPORTING PERIOD equals $█████ per PROCESS, the royalty rate for the REPORTING PERIOD shall equal █████████, however, because of the royalty rate minimum, the royalty rate shall equal █████ and the royalty payment payable to HOSPITAL shall equal the product of CONTRACT NET SALES x █████; or

(iv)   if the first COMMERCIAL SALE occurs on November 10, 2005, the first REPORTING PERIOD, and the period for which the AVERAGE REIMBURSEMENT shall be calculated, shall commence November 10, 2005 and shall end June 30, 2006.

(b)   Beginning with the first COMMERCIAL SALE of a PRODUCT in any country in the LICENSE TERRITORY, and continuing during the term of the AGREEMENT, COMPANY shall pay HOSPITAL a royalty equal to █████ ██████████ of the NET SALES of all PRODUCTS sold by COMPANY or its AFILLIATES.



(e)    All royalty payments due to HOSPITAL under this Section 4.5 shall be due and payable by COMPANY within forty-five (45) days after the end of each REPORTING PERIOD; provided, that the first royalty payment under this Section 4.5 shall not be due until forty-five (45) days after the end of the first full REPORTING PERIOD following the first COMMERCIAL SALE of a PROCESS. Each royalty payment made under this Section 4.5 shall be accompanied by a report as described in Section 5.3.

(f)    The payment of royalties under this Section 4.5 shall be subject to the following conditions: (i) only one royalty shall be due with respect to each unit of PROCESS or PRODUCT; (ii) no royalties shall be due upon the sale or transfer of a PROCESS or PRODUCT among COMPANY and its AFFILIATES, but in such cases the royalty shall be calculated and due upon the completion by COMPANY and its AFFILIATES of a COMMERCIAL SALE to the first THIRD PARTY; and (iii) except as specified in Section 4.5(g) below, no royalties shall accrue on the transfer without charge of PROCESSES or PRODUCTS in reasonable quantities by COMPANY and its AFFILIATES as samples (for promotion or otherwise) or as donations (for example, to non-profit institutions or government agencies for a non-commercial purpose).

(g)    Should COMPANY or its AFFILIATES use a PRODUCT manufactured by COMPANY or its AFFILIATES in a PROCESS, the NET SALES recognized by the COMPANY or its AFFILIATES from the sale of the PROCESS that used the PRODUCT shall not be subject to the royalty calculation set forth in Section 4.5(a), but each unit of PRODUCT used by COMPANY or its AFFILIATES in such PROCESS shall be included at fair market value in the calculation of the royalty to be paid by COMPANY as set forth in Section 4.5(b), provided that the volume of sales of said PRODUCT to THIRD PARTIES is sufficient to establish the fair market value.

4.6    <u>Sublicensing Fees and other Non-Royalty Income.</u>

(a)    COMPANY shall pay HOSPITAL ▓▓▓▓▓▓▓▓▓▓ of any and all fees (or the fair market value of any non-cash consideration) actually received by COMPANY or its AFFILIATES in consideration for the sublicensing to a SUBLICENSEE of any PATENT RIGHTS or the granting of any distribution rights to a THIRD PARTY for the sale of any PRODUCT or PROCESS, including but not limited to up-front fees, issuance fees, maintenance fees, and milestone payments; and

(b)    COMPANY shall pay HOSPITAL ▓▓▓▓▓▓▓▓▓▓ of any royalty or similar payments paid to COMPANY or its AFFILIATES based on sale proceeds generated by SUBLICENSEES of any PRODUCT or PROCESS.

(c)    Any (i) payments made to COMPANY or its AFFILIATES by a distributor as a transfer price for PRODUCTS, (ii) fees paid to COMPANY or its AFFILIATES

19

that specifically relate to the COMPANY's obligations described in Section 4.4 and which are passed through to HOSPITAL in satisfaction thereof, as evidenced in a sublicensing agreement provided to HOSPITAL in accordance with Section 2.2, and (iii) payments paid to COMPANY or its AFFILIATES to satisfy PATENT COSTS, as evidenced in a sublicensing agreement provided to HOSPITAL in accordance with Section 2.2, shall, in each case, not be included as income to the COMPANY and its AFFILIATES for purposes of this Section 4.6.

(d)     Any payments required to be paid by COMPANY under this Section 4.6 shall be due and payable within forty-five (45) days after the end of the REPORTING PERIOD during which the related amounts were received by COMPANY. Each payment made under this Section 4.6 shall be accompanied by a report as described in Section 5.3

4.8 Overdue Payments. The payments due under this AGREEMENT shall, if overdue, bear interest beginning on the first day following the date such payment was due and until payment thereof at a per annum rate equal to two percent (2.00%) above the prime rate in effect on the due date as reported by The Wall Street Journal, such interest rate being compounded on the last day of each REPORTING PERIOD after the due date, not to exceed the maximum permitted by law. Any overdue payments when made shall be accompanied by all interest so accrued. The accrual of interest, and the payment and acceptance thereof, shall not preclude HOSPITAL or COMPANY from exercising any other rights it may have as a consequence of the lateness of any payment.

## 5. REPORTS, RECORDS AND MEETINGS



5.3 Semi-Annual Reports. Following the first COMMERCIAL SALE, COMPANY shall deliver reports to HOSPITAL within forty-five (45) days after the end of each REPORTING PERIOD ("SEMI-ANNUAL REPORT"); provided, the first REPORTING PERIOD shall commence on the date of the first COMMERCIAL SALE and shall end on the last date of the first full REPORTING PERIOD following the date of the first COMMERCIAL SALE. Each SEMI-ANNUAL REPORT shall have substantially the format outlined in Appendix A, shall be signed by the Controller of the Genzyme Genetics division of the COMPANY and shall contain at least the following information as may be pertinent to a royalty and fee accounting hereunder for the immediately preceding REPORTING PERIOD:

(a) the number of PRODUCTS and PROCESSES sold by COMPANY, its AFFILIATES and SUBLICENSEES within the United States and outside the United States;

(b) the calculation of NET SALES for the applicable REPORTING PERIOD within the United States and outside the United States;, including an itemized listing of permitted deductions;

(c)     total royalties payable on NET SALES of PROCESSES and PRODUCTS, in U.S. dollars, together with the exchange rates used for conversion;

(d)     all fees and royalty payments received by COMPANY and its AFFLIATES, including an itemized listing of the source of the fees and royalty payments, and COMPANY'S calculation of the amount due and payable to HOSPITAL on account of such fees and royalty payments; and

(e)     any other payments due to HOSPITAL under this AGREEMENT.

If no amounts are due to HOSPITAL for any REPORTING PERIOD, the report shall so state.

5.4     HOSPITAL Audit Rights.  COMPANY shall maintain, and shall cause each of its AFFILIATES and SUBLICENSEES to maintain, complete and accurate records relating to the rights and obligations under this AGREEMENT and any amounts payable to HOSPITAL in relation to this AGREEMENT, which records shall contain sufficient information to permit HOSPITAL and its representatives to confirm the accuracy of any payments and reports delivered to HOSPITAL and compliance in all other respects with this AGREEMENT. COMPANY shall retain and make available to an independent auditor, selected by HOSPITAL and reasonably acceptable to COMPANY, and shall cause each of its AFFILIATES and SUBLICENSEES to retain and make available to such auditor, such records for at least five (5) years following the end of the calendar year to which they pertain.  During such five (5) year period the auditor, on behalf of HOSPITAL shall be granted access to such records solely for examination during normal business hours to verify any reports and payments made under, and/or to determine compliance in other respects with, this AGREEMENT; provided, that the auditor, on behalf of HOSPITAL may access such records not more than once each calendar year, such examination shall be at HOSPITAL's sole expense, and HOSPITAL shall furnish at least thirty (30) days' advance written notice of such inspection.  HOSPITAL shall furnish a copy of the audit results to COMPANY within thirty (30) days after the audit is completed, and COMPANY shall be entitled to dispute such results.   If any examination conducted by HOSPITAL or its representatives pursuant to the provisions of this Section 5.4, shows an underpayment of five percent (5.00%) or more of the aggregate amount reported in any in SEMI-ANNUAL REPORT, or more than Fifteen Thousand Dollars ($15,000), COMPANY shall bear the full cost of such audit and shall remit any amounts due to HOSPITAL within thirty (30) days after the date the PARTIES agree in writing that the underpayment is due and payable.  In accordance with Section 4.8, interest shall accrue and be payable by COMPANY from the payment date described in the preceding sentence.

5.5     COMPANY Audit Rights.  HOSPITAL shall cause LMM to maintain, complete and accurate records relating to the practice of LMM's retained rights under Section 2.3(b), which records shall contain sufficient information to permit COMPANY and its representatives to confirm compliance with this AGREEMENT.  LMM shall make such records available to an independent auditor, selected by COMPANY and reasonably acceptable to HOSPITAL for at least five (5) years following the end of the calendar year to which they pertain.  During such five (5) year period the auditor, on behalf of COMPANY, shall be granted access to such records

solely for examination during normal business hours to determine compliance with this AGREEMENT; provided, that the auditor, on behalf of COMPANY may access such records not more than once each calendar year, such examination shall be at COMPANY's sole expense, and COMPANY shall furnish at least thirty (30) days' advance written notice of such inspection. COMPANY shall furnish a copy of the audit results to HOSPITAL within thirty (30) days after the audit is completed, and HOSPITAL shall be entitled to dispute such results.   If any examination conducted by COMPANY or its representatives pursuant to the provisions of this Section 5.5, shows a material pattern of non-compliance, then HOSPITAL's rights under Section 2.3(b) to offer and sell the PROCESSES under the PATENT RIGHTS in the LICENSE FIELD shall terminate and LMM shall send to COMPANY any samples for PROCESSES in the LICENSE FIELD under the PATENT RIGHTS that it receives from any patient after such termination.







## 7.  INFRINGEMENT

7.4     Settlement.   No PARTY shall enter into any settlement, consent judgment or other voluntary final disposition of any infringement action without the prior written consent of the other PARTIES, which consent shall not be unreasonably withheld, provided, that COMPANY always shall be permitted to enter into a sublicense with any THIRD PARTY without requiring prior written consent of any PARTY hereto.

26







## 10.   TERM AND TERMINATION



10.6   <u>Effect of Termination on Sublicenses</u>.   COMPANY shall, within thirty (30) days of termination of this AGREEMENT or upon termination of any license granted hereunder under which a sublicense has been granted, provide to HOSPITAL non-redacted copies of all affected sublicense agreements and amendments thereto, including all exhibits, attachments and related documents.  Any sublicenses granted by COMPANY under this AGREEMENT shall provide for termination or assignment to HOSPITAL of COMPANY's interest therein, at the option of HOSPITAL, upon termination of this AGREEMENT or upon termination of any license hereunder under which such sublicense has been granted.

10.7   <u>Effects of Termination of AGREEMENT</u>.   Upon termination of this AGREEMENT or any of the licenses hereunder for any reason, final reports in accordance with Article 5 shall be submitted to HOSPITAL and all royalties and other payments, including without limitation any unreimbursed PATENT COSTS, accrued or due to HOSPITAL as of the termination date shall become immediately payable.   COMPANY shall cease, and shall cause its AFFILIATES to cease, all COMMERCIAL SALES and uses of PRODUCTS and PROCESSES upon such termination.   The termination or expiration of this AGREEMENT or any licenses granted hereunder shall not relieve COMPANY, its AFFILIATES or SUBLICENSEES of obligations arising before such termination or expiration.



## 12. CONFIDENTIALITY

12.1   Non-Disclosure and Non-Use.   Any RECEIVING PARTY shall (a) protect the CONFIDENTIAL INFORMATION with the same degree of care as it normally uses to preserve and safeguard its own proprietary information of a like nature, but not less than a reasonable degree of care; (b) use CONFIDENTIAL INFORMATION solely for the purposes of this AGREEMENT; and (c) disclose CONFIDENTIAL INFORMATION only to its employees, advisors, agents and AFFILIATES who have agreed to undertake an obligation of confidentiality substantially similar to that contained in this AGREEMENT.

12.2   Exceptions to CONFIDENTIAL INFORMATION.   Confidential Information shall not be deemed to include information which the RECEIVING PARTY can demonstrate by competent written proof: (a) was in the public domain prior to the time of its disclosure under this AGREEMENT; (b) entered the public domain after the time of its disclosure under this AGREEMENT through means other than an unauthorized disclosure resulting from an act or omission by the RECEIVING PARTY; (c) was independently developed by the RECEIVING PARTY; or (d) is disclosed to the RECEIVING PARTY without restriction on further disclosure by a third party having the right to make such disclosure.

12.3   Permitted Disclosures.   Notwithstanding any other provision of this AGREEMENT, disclosure of CONFIDENTIAL INFORMATION shall not be prohibited to the extent required to comply with applicable laws or regulations, or with a valid court or administrative order, provided that the RECEIVING PARTY: (a) promptly notifies the DISCLOSING PARTY in writing of the existence, terms and circumstances of such required disclosure; (b) consults with the DISCLOSING PARTY on the advisability of taking legally available steps to resist or narrow such disclosure; and (c) takes all reasonable and lawful actions to obtain confidential treatment for such disclosure.

12.4   Return of CONFIDENTIAL INFORMATION.   Upon request by the DISCLOSING PARTY, the RECEIVNIG PARTY shall return to the DISCLOSING PARTY or destroy all originals, copies, and summaries of documents, materials, and other tangible manifestations of CONFIDENTIAL INFORMATION in the possession or control of the RECEIVING PARTY; provided, however, that one (1) copy of the CONFIDENTIAL INFORMATION may be retained by the RECEIVING PARTY for the sole purpose of monitoring its ongoing obligations under this AGREEMENT.

## 13. MISCELLANEOUS

13.1   Entire Agreement.   This AGREEMENT constitutes the entire understanding between the PARTIES with respect to the subject matter hereof.

13.2   Notices.   Any written notices, reports, waivers, correspondences or other communications required under or pertaining to this AGREEMENT (excluding all payments required hereunder

which shall be paid to the address or account designated from time to time by any PARTY) shall be given by prepaid, first class, registered or certified mail or by an express/overnight delivery service provided by a commercial carrier, properly addressed to the other PARTY.

The notice address for HOSPITAL and DFCI shall be one and the same, and shall be as follows:

> Director, Corporate Sponsored Research and Licensing
> Massachusetts General Hospital
> Building 149, 13th Street, Suite 5036
> Charlestown, MA  02129

The notice address for COMPANY shall be as follows:

> President, Genzyme Genetics
> 3400 Computer Drive
> Westborough, MA  01581

With copy to:

> General Counsel
> Genzyme Corporation
> 500 Kendall Street
> Cambridge, MA  02142

Notices and payments shall be considered timely if such notices are received on or before the established deadline date or sent on or before the deadline date as verifiable by legibly dated U.S. Postal Service postmark or dated receipt from a commercial carrier.

13.3   Amendment; Waiver.  This AGREEMENT may be amended and any of its terms or conditions may be waived only by a written instrument executed by an authorized signatory of the PARTIES or, in the case of a waiver, by the PARTY waiving compliance.  The failure of either PARTY at any time or times to require performance of any provision hereof shall in no manner affect its rights at a later time to enforce the same.  No waiver by either PARTY of any condition or term shall be deemed as a further or continuing waiver of such condition or term or of any other condition or term.

13.4   Binding Effect.  This AGREEMENT shall be binding upon and inure to the benefit of and be enforceable by the PARTIES hereto and their respective permitted successors and assigns.

13.5   Assignment.  Except as set forth in this Section 13.5, COMPANY shall not assign any of its rights or obligations under this AGREEMENT without the prior written consent of HOSPITAL. Provided COMPANY has fulfilled its diligence obligations as set forth in Article 3, no such consent will be required to assign this AGREEMENT to a successor of the COMPANY's business to which this AGREEMENT pertains or to a purchaser of substantially all of the COMPANY's assets related to this AGREEMENT, so long as such successor or

33

purchaser shall agree in writing to be bound by the terms and conditions hereof prior to such assignment. COMPANY shall notify HOSPITAL in writing of any such assignment and provide a copy of all assignment documents and related agreements to HOSPITAL within thirty (30) days of such assignment. Failure of an assignee to agree to be bound by the terms hereof or failure of COMPANY to notify HOSPITAL and provide copies of assignment documentation shall be grounds for termination under Section 10.4.

13.6    Force Majeure. Neither PARTY shall be responsible for delays resulting from causes beyond the reasonable control of such PARTY, including without limitation fire, explosion, flood, war, sabotage, strike or riot, provided that the nonperforming PARTY uses commercially reasonable efforts to avoid or remove such causes of nonperformance and continues performance under this AGREEMENT with reasonable dispatch whenever such causes are removed.

13.7    Use of Name.

(a)        No PARTY shall use the name of another PARTY or of any trustee, director, officer, staff member, employee, student or agent of the a PARTY or any adaptation thereof in any advertising, promotional or sales literature, publicity or in any document employed to obtain funds or financing without the prior written approval of the PARTY or individual whose name is to be used. For HOSPITAL, such approval shall be obtained from HOSPITAL's Chief Public Affairs Officer. For DFCI, such approval shall be obtained from the Vice President of DFCI's Office of Research and Technology Ventures.

(b)        COMPANY agrees that it will portray inventions covered by PATENT RIGHTS as co-discoveries between HOSPITAL and DFCI in any press release or communication referencing said inventions.

13.8    Dispute Resolution. Any dispute arising between the PARTIES relating, arising out of or in any way connected with this AGREEMENT or any term of condition hereof, or the performance by any PARTY of its obligations hereunder, whether before or after termination of this AGREEMENT (a "DISPUTE"), which is not settled by the PARTIES within thirty (30) days after notice of such DISPUTE is given by one PARTY to another PARTY in writing shall be referred to Director, Corporate Sponsored Research & Licensing at HOSPITAL, Vice President, Office of Research and Technology Ventures at DFCI and the President of Genzyme Genetics at COMPANY, each of whom is authorized to settle a DISPUTE on behalf of their respective companies ("SENIOR EXECUTIVES"). The SENIOR EXECUTIVES will meet one or more times for negotiations within thirty (30) days after the end of the thirty (30) day negotiation period at dates, times and places mutually acceptable to the SENIOR EXECUTIVES. If the DISPUTE is not resolved within the thirty (30) days after the end of the 30-day negotiation period referred to above (which periods may be extended by mutual agreement), subject to any rights to injunctive relief and unless otherwise specifically provided for herein, the DISPUTE shall be finally resolved by judicial process commenced by any PARTY.

13.9    Governing Law. This AGREEMENT shall be governed by and construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts, except that questions

affecting the construction and effect of any patent shall be determined by the law of the country in which the patent shall have been granted. Each PARTY agrees to submit to the exclusive jurisdiction of the Superior Court for Suffolk County, Massachusetts, and the United States District Court for the District of Massachusetts with respect to any claim, suit or action in law or equity arising in any way out of this AGREEMENT or the subject matter hereof.



13.11   Severability.  If any provision(s) of this AGREEMENT are or become invalid, are ruled illegal by any court of competent jurisdiction or are deemed unenforceable under then current applicable law from time to time in effect during the term hereof, it is the intention of the PARTIES that the remainder of this AGREEMENT shall not be effected thereby. It is further the intention of the PARTIES that in lieu of each such provision which is invalid, illegal or unenforceable, there be substituted or added as part of this AGREEMENT a provision which shall be as similar as possible in economic and business objectives as intended by the PARTIES to such invalid, illegal or enforceable provision, but shall be valid, legal and enforceable.

13.12   Survival.  In addition to any specific survival references in this AGREEMENT, Article 1, Sections 2.2, 2.4, 5.5, 8.1, 8.2, 9.3, 9.4, 10.6, and 10.7, and Articles 12 and 13 shall survive termination or expiration of this AGREEMENT.

13.13   Interpretation.   The PARTIES hereto are sophisticated, have had the opportunity to consult legal counsel with respect to this transaction and hereby waive any presumptions of any statutory or common law rule relating to the interpretation of contracts against the drafter.

13.14   Headings.  All headings are for convenience only and shall not affect the meaning of any provision of this AGREEMENT.

13.15   Confidentiality.  The existence and terms of this AGREEMENT shall not be disclosed by any PARTY without prior written permission from the other PARTIES.  Notwithstanding the foregoing, it is understood that it is the intention of the PARTIES to issue a press release upon execution of this AGREEMENT in accordance with Section 13.7, and after such press release becomes public, any PARTY may disclose the existence of the AGREEMENT and any information contained in such press release, without permission from the other PARTY.

*Next page is the "Signature Page to Exclusive License Agreement"*

IN WITNESS WHEREOF, the PARTIES have caused this AGREEMENT to be executed by their duly authorized representatives as of the date first written above.

**GENZYME CORPORATION**
 (the COMPANY)

BY: _____
 Name: Mara G. Aspinall
 Title: President, Genzyme Genetics
 Date: 4-28-05

BY: _____
 Name: MICHAEL S. WYZGA
 Title: EXECUTIVE VICE PRESIDENT- FINANCE
 Date: 4-28-05

**THE GENERAL HOSPITAL CORPORATION**
 (the HOSPITAL)

BY: _____
 Name:

TITLE: Director, CSRL

DATE: 5/3/05

**DANA-FARBER CANCER INSTITUTE**
 (the DFCI)

BY: _____
 Name: Anthony A. del Campo, M.B.A.
 Vice President
 Research and Technology Ventures
 TITLE: Dana Farber Cancer Institute

DATE: 5/5/05

## Appendix A

## COMMERCIAL SALES REPORTS

**AGREEMENT INCOME REPORT**          **Non-royalty Income**

MGH Agreement # -
Licensee --
Sub-Licensee

*Separate reports must be filed for:*
    *1.  Payments associated with each product*

**Product Name:** _____

**Report Time Period:**

        From     *mm/dd/yyyy*          _____

        To       *mm/dd/yyyy*          _____

_____

                                        *Detailed Explanation of Payment*
                                        *Required for "Other Payment"*

*Annual Fees*                    _____   _____

*Milestone Payments*             _____   _____

*Sublicense Fees and Royalties*  _____   _____

*Other Payment*                  _____   _____

*Other Payment*                  _____   _____

*Other Payment*                  _____   _____

*TOTAL*                          _____

_____

## PLEASE ATTACH DETAIL AS REQUIRED

**AGREEMENT INCOME REPORT**          **Royalty Income**

MGH Agreement # -
Licensee –
Sub-Licensee

*Separate reports must be filed for:*
      *1.   **Each product sold.***
      *2.   **Each country's sales.***

**Product Name:** _____

**Report Time Period:**

       From    *mm/dd/yyyy*        _____

       To      *mm/dd/yyyy*        _____

---

*U.S. and Ex-U.S.*    _____  _____  _____

*Quantity Sold*    _____  _____  _____

*Gross Sales (USD)*    _____  _____  _____

*Exchange Rate*    _____  _____  _____

*Deductions and Credits (Itemize)*
*Please list each deduction and credit separately. Use same definition as appears in contract and*
*Include the contract paragraph as a reference*

     *1*    _____  _____  _____
     *2*    _____  _____  _____
     *3*    _____  _____  _____
     *4*    _____  _____  _____

*Net Sales*    _____  _____  _____

*Royalty Percentage*    _____  _____

*Royalty Due*    _____  _____  _____

---

**PLEASE ATTACH DETAIL SALES REPORTS AS REQUIRED**





kmq

## ESOTERIX GENETIC LABORATORIES, LLC
### 1700 West Park Drive
### Westborough, MA 01581

Friday, March 18, 2011

Director, Corporate Sponsored Research and Licensing
Massachusetts General Hospital
Building 149, 13th Street, Suite 5036
Charlestown, MA 02129

      Re:    License Agreement between The General Hospital Corporation and the
Dana Farber Cancer Institute, Inc. and Genzyme Corporation, dated May
2, 2005, as amended on August 31, 2007 and August 31, 2008 (the
"Agreement")

Dear Sir/Madam:

Effective December 1, 2010, Esoterix Genetic Laboratories, LLC ("EGL")
acquired Genzyme Corporation's genetic testing business unit, Genzyme Genetics™.
EGL is a wholly-owned subsidiary of Laboratory Corporation of America Holdings
("LabCorp"). This letter provides you with notice of the above-described transaction and
the assignment of the Agreement with you to EGL. This letter also confirms that EGL
hereby agrees to be bound by all the terms and conditions of the Agreement. In addition,
enclosed for your reference is a copy of the General Assignment and Bill of Sale which
was used for the above-described transaction (the Agreement was a "Transferred Asset"
as described therein).

Please use the following contact information for future notices to EGL:

Esoterix Genetic Laboratories, LLC      *with a copy to:*
1700 West Park Drive, Suite 400      Laboratory Corporation of
Westborough, MA  01581      America Holdings
Telephone:  (800) 848-4436      531 S. Spring St.
Fax:  (508) 870-7504      Burlington, NC 27215
Attn: SVP and General Manager      Attn: Law Department

All payments under your agreement, if any, should now be submitted to the
address below and checks should be made payable to Esoterix Genetic Laboratories, LLC
(Tax ID 27-3267315).

Remittance Address:    Esoterix Genetic Laboratories, LLC
                    1700 West Park Drive
                    Westborough, MA 01581
                    Attn: Finance Department

Genzyme Genetics and its logo are trademarks of Genzyme Corporation and used by Esoterix Genetic
Laboratories, LLC, a wholly-owned subsidiary of LabCorp, under license. Esoterix Genetic Laboratories
and LabCorp are operated independently from Genzyme Corporation.

I will be happy to address any questions you may have about the transaction or this letter, so please do not hesitate to call me at (336) 436-7156. EGL looks forward to continuing its relationship with The General Hospital Corporation and the Dana Farber Cancer Institute, Inc.

Best regards,

Sissy Holloman
Law Department

Enclosures



1



2

ORIGINAL

## AMENDMENT No. 1 to EXCLUSIVE LICENSE AGREEMENT
## MGH Agreement No. 2004A18200
## MGH Agreement No. A018200.02

WHEREAS, Genzyme Corporation, having a principal place of business at 500 Kendall Street, Cambridge, MA 02142 ("COMPANY"), The General Hospital Corporation, a not-for-profit Massachusetts corporation, doing business as Massachusetts General Hospital, having a principal place of business at Fruit Street, Boston, Massachusetts 02114 ("HOSPITAL"), and the Dana-Farber Cancer Institute, Inc., a non-profit Massachusetts organization having an address at 44 Binney Street, Boston, MA 02115 ("DFCI") are parties to the Exclusive License Agreement effective as of May 2, 2005 (the "AGREEMENT"). COMPANY, HOSPITAL and DFCI are each referred to herein individually as a "PARTY" and collectively as the "PARTIES".

WHEREAS, the PARTIES now wish to amend certain provisions in the AGREEMENT on the terms and subject to the conditions set forth in this first amending agreement ("AMENDMENT No. 1").

NOW THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, the PARTIES hereto agree as follows:







4

**3.** In Section 4.5, deleting subsection (a) in its entirety and replacing it with the following:

> "(a) Beginning with the first COMMERCIAL SALE of a PROCESS in any country in the LICENSE TERRITORY, and continuing during the term of the AGREEMENT, COMPANY shall pay HOSPITAL a royalty equal to the product of (i) the royalty rate determined in accordance with the following sentence, and (ii) the CONTRACT NET SALES of PROCESSES sold by COMPANY or its AFLLIATES during for REPORTING PERIOD, where "CONTRACT NET SALES" is the product of (x) the AVERAGE REIMBURSEMENT from the prior REPORTING PERIOD, and (y) the number of PROCESSES invoiced to THIRD PARTIES during the current REPORTING PERIOD."

"The royalty rate shall be established for each REPORTING PERIOD (except as for the first REPORTING PERIOD as noted below), and shall equal ███████████ of the AVERAGE REIMBURSEMENT for the prior REPORTING PERIOD, rounded to the nearest hundredth of a percent; provided, however, the royalty rate shall in no event be less than ████████████. The first REPORTING PERIOD shall commence on the date of the first COMMERCIAL SALE and shall end on the last date of the first full REPORTING PERIOD following the date of the first COMMERCIAL SALE. For example,:"

"(a)(i)   if the AVERAGE REIMBURSEMENT for the prior REPORTING PERIOD equals $████ per PROCESS, the royalty rate for the REPORTING PERIOD shall equal ██████████), and the royalty payment payable to HOSPITAL shall equal the product of CONTRACT NET SALES x ████;"

"(a)(ii)  if the AVERAGE REIMBURSEMENT for the prior REPORTING PERIOD equals $████ per PROCESS, the royalty rate for the REPORTING PERIOD shall equal ███████████ and the royalty payment payable to HOSPITAL shall equal the product of CONTRACT NET SALES x ████;"

"(a)(iii) if the AVERAGE REIMBURSEMENT for the prior REPORTING PERIOD equals ██████ per PROCESS, the royalty rate for the REPORTING PERIOD shall equal ███████████, however, because of the royalty rate minimum, the royalty rate shall equal ████ and the royalty payment payable to HOSPITAL shall equal the product of CONTRACT NET SALES x ████"

6



5.  In Section 4.6 deleting subsections (a) and (b) in their entireties and replacing them with the following:

"(a)   COMPANY shall pay HOSPITAL ███████████ of any and all fees (or the fair market value of any non-cash consideration) actually received by COMPANY or its AFFILIATES in consideration for the sublicensing to a SUBLICENSEE of any PATENT RIGHTS or the granting of any distribution rights to a THIRD PARTY for the sale of any PRODUCT or PROCESS, including but not limited to up-front fees, issuance fees, maintenance fees, and milestone payments; and"

"(b)   COMPANY shall pay HOSPITAL ███████████ of any royalty or similar payments paid to COMPANY or its AFFILIATES based on sale proceeds generated by SUBLICENSEES of any PRODUCT or PROCESS."



## VII.    REFERENCE TO AND EFFECT ON THE AGREEMENT

On and after the AMENDMENT No. 1 EFFECTIVE DATE, each reference in the EXCLUSIVE LICENSE AGREEMENT to "AGREEMENT" and each reference to the AGREEMENT in any and all other agreements, documents and instruments delivered by any of the PARTIES shall mean and be a reference to the AGREEMENT as amended by this AMENDMENT No. 1.  Except as specifically amended by this AMENDMENT No. 1, the AGREEMENT shall remain in full force and effect and is hereby ratified and confirmed.



IN WITNESS WHEREOF, the PARTIES have executed this AMENDMENT No. 1 to the AGREEMENT.

**GENZYME CORPORATION**
(the COMPANY)

BY: _____
    Mara G. Aspinall
    President, Genzyme Genetics

DATE: _____10/18/07_____

**THE GENERAL HOSPITAL CORPORATION**
(the HOSPITAL)

BY: _____
NAME:
TITLE:  FRANCES TONEGUZZO, Ph.D.
        DIRECTOR
        CORPORATE SPONSORED RESEARCH AND LICENSING
DATE: _____

**DANA-FARBER CANCER INSTITUTE**
(the DFCI)

BY: _____
NAME: Anthony A. del Campo, M.B.A.
TITLE:      Vice President
        Research and Technology Ventures
DATE:   Dana Farber Cancer Institute   10/31/07

10









1



2





4





