UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE GENERAL HOSPITAL CORPORATION and DANA-FARBER CANCER INSTITUTE, INC., <br>       Plaintiffs, <br><br> v. <br><br> ESOTERIX GENETIC LABORATORIES, LLC and LABORATORY CORPORATION OF AMERICA HOLDINGS, <br>       Defendants. | C.A. No. 1:18-cv-11360-IT |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

The plaintiffs, The General Hospital Corporation and Dana-Farber Cancer Institute, Inc., submit this Memorandum of Law in opposition to the defendants' Motion to Dismiss the Third Amended Complaint.[1] The defendants' motion should be denied for several reasons.

First, the defendants' motion relies heavily on the First Circuit Court of Appeals' October 7, 2021 Opinion (the "First Circuit Opinion") reversing this Court's earlier grant of summary judgment in favor of the plaintiffs on their breach of contract claim. The First Circuit Opinion, however, only addressed the plaintiffs' breach of contract claim. It did not address the plaintiffs' other claims, and, while the defendants repeatedly quote the First Circuit as having held that the parties "manifestly intended to enter into a release with many attributes of a general release—a release that broadly discharge[d] liability for all claims and demands, whether known or

---

[1] Information has been redacted from this Memorandum pursuant to the Court's December 15, 2021 Order (Dkt. No. 173) granting the defendants' motion to impound (Dkt. No. 172). The plaintiffs will submit an unredacted version under seal to the Court.

1

unknown," that holding only stands for the proposition that the plaintiffs knowingly entered into the release. It does not resolve the question as to whether, in the lead up to the execution of the release, the defendants engaged in misconduct that was intended to or had the effect of misleading the plaintiffs as to how that release would be applied to the royalty payment in dispute in this case. That is the question posed by the surviving claims in the plaintiffs' claims in the Third Amended Complaint, and it is a factual question not answered by the First Circuit Opinion that cannot be answered on a motion to dismiss.

Second, the defendants already brought a motion to dismiss similar to the current motion, and it was denied by the Court. (*See* September 4, 2019 Memorandum and Order, Dkt. No. 133.) Other than liberally quoting from the First Circuit Opinion about the now dismissed breach of contract claim, the defendants' motion generally is a mere reformulation of the arguments previously made and rejected by this Court. (*Id.*)

Third, there is no basis for dismissal of the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. While the defendants focus on their performance under the License Agreement when viewed through the lens of the First Circuit Opinion, what they ignore is that the plaintiffs' implied covenant breach claim is based on the defendants' misconduct in the lead up to the execution of the release which gave the defendants the opening to withhold the disputed royalty payment that was otherwise due under the License Agreement. The plaintiffs, as this Court already found (Dkt. No. 133), allege conduct sufficient to demonstrate the defendants' lack of good faith in the lead up to the execution of the release, including, without limitation, allegations that the defendants were unhappy with the terms of the License Agreement and engaged in a bad faith scheme to deprive the plaintiffs of more than $███████ of a royalty payment in an

improper attempt to secure an un-bargained for benefit to the detriment of the plaintiffs. (*See*, *e.g.*, Third Amended Complaint ("TAC") ¶¶ 25, 29 & 49.)

Fourth, there is no basis for dismissal of the plaintiffs' claim under Massachusetts General Laws Chapter 93A ("Chapter 93A") because – as with the implied covenant claim and as the Court already found (Dkt. No. 133) – the plaintiffs allege facts sufficient to demonstrate the defendants' bad faith in the lead up to the execution of the release. For example, the plaintiffs allege that:

- the defendants represented that the Settlement Agreement did not apply to the payments due under the License Agreement;

- the defendants would continue to make all royalty payments;

- the defendants knew of the plaintiffs' understanding of the Settlement Agreement and used the plaintiffs' understanding to induce the plaintiffs to agree, all while interpreting the agreement to exclude the royalty payment for their own financial gain;

- in email communications, the defendants represented that the "only" remaining issue was dividing the settlement proceeds; and

- the parties met in Boston and discussed only the QIAGEN settlement and did not address royalty payment terms under the License Agreement because those were already off the table. (TAC ¶¶ 22, 23, 25, 29 & 72.)

The plaintiffs also allege that "the defendants' unfair, deceptive and unscrupulous conduct has had the effect of depriving the plaintiffs of more than $[redacted], which is money the plaintiffs use to help fund innovative research and treatment for cancer and other patients who have sought treatment in their hospitals and other facilities." (*Id.* at ¶ 56.) As the Court previously found (Dkt. No. 133), these allegations are sufficient to state a claim upon which relief may be granted for violation of Chapter 93A.

Fifth, the defendants' contention that the plaintiffs fail to state a claim for reformation of contract based on unilateral mistake because the plaintiffs do not allege that the defendants "knew or had reason to know of the purported mistake" (Def. Mem. 19), is directly refuted by the

3

allegations in the Third Amended Complaint. (*See*, *e.g.*, TAC ¶¶ 66, 68, 69 & 72, "[T]he defendants already had agreed that they would make *all* ongoing royalty payments"; the plaintiffs allege that the "defendants had reason to know of the mistake"; the defendants knew the plaintiffs "originally thought they were entitled to twice as much as they ultimately received under the Settlement Agreement"; and "the defendants knew that the plaintiffs had made a mistake.") While the defendants dispute these allegations, that dispute is not something that can be resolved on a motion to dismiss.

With respect to the alternative theory of mutual mistake, the plaintiffs alleged in the Third Amended Complaint that "the parties never discussed releasing a more than $█████ royalty payable to the plaintiffs" under the License Agreement (including because "the defendants had already agreed that they would continue making *all* of their royalty payments due under the License Agreement, and [agreed] the **"*only*"** issue between the parties was how to divide up the proceeds being paid by QIAGEN"), and such "reduction in the net proceeds payable to the plaintiffs, had it been the parties' objective intent (which it was not), would have been expressly stated in the Settlement Agreement, not silently and/or mistakenly incorporated into the general release provision." (TAC ¶¶ 25, 69 & 72.) The defendants' assertion that the email "that Defendants' counsel sent in the process of negotiating the Settlement Agreement [] does not even remotely suggest any understanding on the part of either party that Defendants would pay the royalties at issue" (Def. Mem. 3) is a disputed question of fact that cannot be resolved on a motion to dismiss. Indeed, as alleged in the Third Amended Complaint, in the lead up to the Settlement Agreement, the defendants attempted, but ultimately failed to leverage the QIAGEN settlement into a paid-up license for itself, and thus, acknowledged it would have to continue to make all royalty payments due to the plaintiffs under the License Agreement. The email from the

4

defendants' counsel explicitly states that "[y]our 'counteroffer' makes clear that the ***only*** issue now is how to divide the settlement proceeds," and that "we can continue the discussions as to the proper division of the proceeds …." (TAC ¶ 22, Ex. I, p. 1 (emphasis added).) Because the defendants had already agreed that they would continue to pay the royalties due under the License Agreement and given their prior representation that the **"*only*"** unresolved issue was how to divide up the proceeds, the focus of the in person meeting in Boston, not surprisingly, was on how to divide up the amount to be paid by QIAGEN pursuant to the settlement. (TAC ¶¶ 23-25.) A reasonable jury could conclude based on these alleged facts, which must be accepted as true in the context of the defendants' motion, that the defendants had agreed in the lead up to the execution of the release that they would continue making ***all*** of their royalty payments due under the License Agreement, and that they only discovered the parties' mutual mistake in the release that allowed the defendants to avoid the disputed payment after the fact when they opportunistically decided to capitalize on that mistake and withhold payment.

Finally, the plaintiffs have pled a viable unjust enrichment claim against LabCorp. Here, there is an absence of a remedy at law against LabCorp, which is the beneficiary of the defendants' unjust failure to pay more than $███████ of the royalty payment due under the License Agreement.

For all these reasons, and as set forth more fully below, the defendants' Motion to Dismiss should be denied.

## BACKGROUND

The Court is familiar with the background, which is set forth in the plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss and in Support of Their Cross-Motion for Partial Summary Judgment (Dkt. No. 94, pp. 3-8). (*See also* Dkt. No. 133, pp. 2-5.)

## STANDARD OF REVIEW

When ruling on a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the court must accept as true all well-pleaded facts, and give the plaintiffs the benefit of all reasonable inferences. *See Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir. 1999). In addition, a party may rely on documents attached to or referenced in a complaint, which also must be accepted as true. *See Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 16-17 (1st Cir 1998).[2] Dismissal is only appropriate if the pleadings and exhibits, viewed in the light most favorable to the plaintiff, fail to support "'a plausible entitlement to relief.'" *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir. 2007), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). A complaint that states a plausible claim for relief survives a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## ARGUMENT

**I. THE PLAINTIFFS HAVE PLED A PLAUSIBLE CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING BASED ON THE DEFENDANTS' MISLEADING CONDUCT IN THE LEAD UP TO THE EXECUTION OF THE RELEASE**

The defendants' assertions that the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing "seeks to improperly impose on Defendants obligations that conflict with the Settlement Agreement's express and unambiguous terms" (Def. Mem. 10) and is based on their "failed breach of contract claim" (Def. Mem. 11) are without merit. The plaintiffs are not seeking to impose obligations that do not exist or that conflict with the Settlement Agreement. The plaintiffs' implied covenant claim is based on allegations that the defendants acted in bad faith in the lead up to the execution of the release and that this misconduct allowed the defendants to negate

---

[2] 2 James Wm. Moore *et al.*, *Moore's Federal Practice* § 12.34[2] (3d ed. 1997) (explaining that courts may consider "undisputed documents alleged or referenced in the complaint" in deciding a motion to dismiss); *see generally* Fed. R. Civ. P. 10(c) (stating that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof").

the objectives of the License Agreement from being realized – *i.e.*, fully compensating the plaintiffs for the defendants' commercial use of the plaintiffs' patents and technology. (TAC ¶ 50.) The plaintiffs are not alleging breach of the implied covenant in the negotiation of the License Agreement, but instead are alleging that the covenant was breached when, during the performance of the License Agreement, the defendants engaged in misleading conduct to induce the plaintiffs to sign the release in the Settlement Agreement.

More specifically, the Third Amended Complaint alleges that the defendants: (1) represented that the Settlement Agreement did not apply to the payments due under the License Agreement; (2) would continue to make all royalty payments; (3) knew of the plaintiffs' understanding of the Settlement Agreement and used the plaintiffs' understanding to induce the plaintiffs to agree, all while interpreting the agreement to exclude the royalty payment for their own financial gain; (4) in email communications, represented that the "only" remaining issue was dividing settlement proceeds; and (5) the parties met in Boston and discussed only the QIAGEN settlement and did not address royalty payment terms under the License Agreement. (*Id.* at ¶¶ 22, 23, 25, 29 & 72.) These allegations, as this Court previously found (Dkt. No. 33), are sufficient to state a claim upon which relief may be granted.

The defendants' assertion that the plaintiffs "do not allege a single fact that gives rise to a plausible inference that Defendants acted with bad faith" (Def. Mem. 12) ignores, and thus is divorced from, the actual allegations in the plaintiffs' Third Amended Complaint. This is essentially the same argument the defendants made in their prior motion, which was rejected by the Court. (Dkt. No. 133.)

In addition, the plaintiffs are not, as the defendants allege, seeking "to transform their unsuccessful breach of contract claim into a valid claim for breach of the implied covenant." (Def.

Mem. 12.) The plaintiffs' breach of contract claim was based on the defendants' failure to make the full royalty payment on August 15, 2017 under the License Agreement. In contrast, the plaintiffs allege in their Third Amended Complaint, *inter alia*, that the defendants' conduct in the lead up to the execution of the release resulted in the defendants violating the covenant of good faith and fair dealing inherent in the License Agreement. (*See* TAC ¶¶ 25 & 29.)

Indeed, "[a] party may breach the covenant of good faith and fair dealing implicit in every contract ***without breaching any express term of that contract*** . . . . Otherwise, the implied covenant would be a mere redundancy." *Speakman v. Allmerica Fin. Life Ins. & Annuity Co.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (citations omitted) (emphasis added);[3] *see also Bergeron v. Ridgewood Secs. Corp.*, 610 F. Supp. 2d 113, 141 (D. Mass. 2009) ("The implied covenant of good faith and fair dealing is a judicial convention designed to protect the spirit of an agreement when, ***without violating an express term of the agreement***, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain.") (internal citations omitted) (emphasis added).

As discussed above, the defendants breached the implied covenant when, during the performance of the License Agreement, they engaged in misleading conduct to induce the plaintiffs to execute the release in the Settlement Agreement. *See*, *e.g.*, *Clinical Tech., Inc. v. Covidien Sales, LLC*, 192 F. Supp. 3d 223, 238 (D. Mass. 2016) (representation to plaintiff that it would remain as "the exclusive distributor for its IDN customers for the length of each IDN Agreement during the course of performance, both before and after [the defendant] made the

---

[3] According to the Restatement (Second) of Contracts, "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Id.* § 205, cmt. a. "The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." *Speakman*, 367 F. Supp. 2d at 132.

8

decision to terminate the agreement and engage in a direct sales effort" sufficient to withstand summary judgment on implied covenant claim).

The defendants ignore the allegations in paragraphs 25, 29, 49 and 50 in the Third Amended Complaint. These factual allegations, which, on a motion to dismiss, have to be accepted as true, and must be viewed in a light most favorable to the plaintiffs, are more than sufficient to demonstrate the defendants' lack of good faith in the lead up to the execution of the release and show that their misconduct was motivated by a desire to gain an unfair advantage, and/or had the effect of injuring the plaintiffs' rights to the fruits of the License Agreement.[4] *See Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 471-472 (1991) (The implied covenant of good faith and fair dealing provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . ."); *see also Ramey v. Beta Bionics, Inc.*, Dkt. No. SUCV2018-03240-BLS1, 2020 Mass. Super. LEXIS 108, at *21 (Suffolk Sup. Ct. June 15, 2020) (implied covenant claim based on misrepresentation about the benefits to be provided in the lead up to an agreement survived a motion to dismiss).

Further, the defendants' reliance on the First Circuit Opinion is misplaced because the First Circuit did not address the plaintiffs' implied covenant claim and did not, as the defendants argue, hold that all of the "Defendants' conduct" was "consistent with the unambiguous Settlement Agreement." (Def. Mem. 12.) Indeed, the First Circuit declined to examine any extrinsic evidence and held only that based on the contract language, "the unpaid obligations arose prior to the

---

[4] Contrary to the defendants' assertion, the facts here are not "exactly like those at issue in *Pimental v. Wachovia Mortg. Corp.* ...." (Def. Mem. 11.) *Pimental* involved a provision in a construction loan granting the lender the power to inspect the construction of a house, which was a condition precedent to the lender's disbursement of funds, and allegations that the lender breached the contract and was negligent in its disbursement of loan funds. *Pimental* did not allege that "the contract was entered into through coercion, fraud, or other unfair and deceptive means," but that Wachovia acted in bad faith by wrongfully disbursing funds." 411 F. Supp. 2d at 39. The facts here are that the defendants engaged in release negotiations in bad faith during performance of the License Agreement and the implied covenant breach is the defendants misleading the plaintiffs in a way that modified the defendants' performance under the License Agreement to deny the plaintiffs the fruits of their bargain. (TAC ¶¶ 22-25, 29, 49-51.)

effective date of the release and, thus, were extinguished by it." *General Hosp. Corp. v. Esoterix*, 16 F.4th 304, 314 (1st Cir. 2021).

For these reasons, the plaintiffs have pled a plausible cause of action for breach of the implied covenant of good faith and fair dealing, and the defendants' motion to dismiss should be denied.

## II. THE PLAINTIFFS HAVE PLED A PLAUSIBLE CAUSE OF ACTION UNDER CHAPTER 93A BASED ON THE DEFENDANTS' MISLEADING CONDUCT IN THE LEAD UP TO THE EXECUTION OF THE RELEASE

Whether a particular set of circumstances are unfair or deceptive under Chapter 93A is a question of fact, which means that issue generally cannot be resolved on a motion to dismiss. *See*, *e.g.*, *Incase, Inc. v. Timex Corp.*, 421 F. Supp. 2d 226, 239 (D. Mass. 2006) (whether conduct is unfair or deceptive is a question of fact that focuses on "the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors") (citation omitted). "Chapter 93A liability is decided case-by-case, and Massachusetts courts have consistently emphasized the 'fact-specific nature of the inquiry.'" *Gallagher v. Amedisys, Inc.*, No. 17-cv-11390-ADB, 2018 U.S. Dist. LEXIS 81614, *18 (D. Mass. May 15, 2018); *see also Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 39 (1st Cir. 2000) ("whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact"). And the First Circuit did not, as the defendants' contend, hold that the "[d]efendants' conduct was consistent with the Settlement Agreement and thus cannot be deemed unfair, immoral, unethical, oppressive or unscrupulous, as required by the statute." (Def. Mem. 13.) That language appears nowhere in the First Circuit Opinion, which makes sense because the First Circuit did not address the defendant's misconduct in the lead up of the execution of the release, which is what gives rise to the plaintiffs' Chapter 93A claim.

The defendants' additional argument that the plaintiffs have not alleged that the "Defendants acted with anything other than good faith in complying with the unambiguous terms

10

of the Settlement Agreement exactly as written and negotiated" (Def. Mem. 15) is focused on the defendants' performance under the License Agreement in light of the release but ignores the well-pled allegations in the Third Amended Complaint concerning the defendants' misleading conduct in the lead up to the execution of the release. (TAC ¶¶ 20-25, 29, 49 & 72.) A party to a contract cannot on the one hand mislead the other party into executing the contract (which is what the defendants did), and then on the other hand argue that there is no Chapter 93A claim because after the deception they were just following the contract that the plaintiffs never would have entered into but for the misleading conduct. *See Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 69-70 (1st Cir. 2009) (explaining that "stringing along a counterparty to induce detrimental reliance can constitute a chapter 93A violation" because "Massachusetts cases . . . recognize a need to police negotiations -- even those among relatively sophisticated parties -- to ensure that they are not unfair or deceptive" (citation omitted)); *see also Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016) (to determine whether conduct is deceptive, the finder of fact must assess whether the conduct "possesses a tendency to deceive" and "could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted"); *see also The General Hospital Corp. v. QLT Phototherapeutics, Inc.*, No. 1:09cv10364-WGY (D. Mass. May 21, 2009) at Tr. 9:3-19[5] (dismissing contract claim but denying motion to dismiss Chapter 93A claim even though defendant argued, and the Court appeared to accept, "there is no question about compliance with" contract).[6]

---

[5] A copy of the hearing transcript from this unreported decision is attached here as Exhibit A.

[6] The defendants' reliance on *Whitman v. Longview*, *Formulatrix, Inc. v. Rigaku Automation, Inc.*, *Pimental v. Wachovia Mtg., Corp.* and various other cases cited on page 14 of their memorandum, is misplaced. Those cases are all grounded on a breach and related allegations, where the parties freely contracted to the terms. Here, the plaintiffs' allegations concerning the defendants' unfair, deceptive and unscrupulous conduct are based on, among other things, the defendants' misrepresentations in the lead up to the release that made it appear the Settlement Agreement would not impact the defendants' obligation to make the disputed royalty payment. (*See* TAC ¶¶ 25, 29, 72.)

### III. THE PLAINTIFFS HAVE PLED A PLAUSIBLE REFORMATION CLAIM

#### 1. Evidence of the Parties' Intent Is Admissible

In a reformation case, particularly one involving a release provision, "[i]f an agreement does not express the true intent of the parties because of a mutual mistake that existed at the time of the agreement's execution, the contract may be revised by a court of equity at the request of the aggrieved party to correct the mutual mistake." *Shea v. Eisenberg*, 02-4411, 2004 Mass. Super. LEXIS 465, *10 (Middlesex Sup. Ct. Oct. 2, 2004), citing *Mickelson v. Barnet*, 390 Mass. 786, 791 (1984). For this reason, evidence of the parties' intent is ***always*** admissible, and must ***always*** be considered by the Court, with respect to a claim for reformation of contract. *See OneBeacon Am. Ins. Co. v. Travelers Indem. Co. of Ill.*, 465 F.3d 38, 41 (1st Cir. 2006) (In a reformation case, "the usual restrictions on contract interpretation, such as the parol evidence rule, do not apply to a court's inquiry into the parties' intent," and "it does not matter that a contract unambiguously says one thing. A court still will accept extrinsic evidence in evaluating a claim that both parties to the contract intended it to say something else."); *see also Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 756 (1993) ("The parol evidence rule does not bar extrinsic proof of intent" in a reformation case.)

There is nothing to the contrary in the First Circuit Opinion, which was focused on the plaintiffs' breach of contract claim, and thus where, as here, such evidence is pled in the complaint, it must be regarded as true in the face of a motion to dismiss. *See Stone v. Gelinas*, No. 16-30087-MGM, 2017 U.S. Dist. LEXIS 116471, *9 (D. Mass. Jan. 17, 2017) (The court inferred that the plaintiffs may be able to prove that there was a mistake that would justify reformation, and "at this stage of the litigation, the court must accept the truth of the facts alleged in the complaint, and these facts alleged provide a sufficient basis for equitable relief," citing *Iqbal*, 556 U.S. at 678).

Here, the allegations concerning the parties' settlement communications go directly to the plaintiffs' claim for reformation based on mistake, and not their (now dismissed) breach of contract claim. The parol evidence is offered to this Court to demonstrate that the plaintiffs clearly did not intend to release the defendants from their obligation to make the disputed royalty payment. As such, this Court may take into account the parol evidence as to the parties' intent in entering into the release – namely, whether the parties intended to exclude the disputed royalty payment due on August 15, 2017 from its scope. *See Polaroid Corp.*, 414 Mass. at 756.

### 2. The Plaintiffs Sufficiently Pled a Reformation Claim

"The elements necessary for reformation of a contract, are: 1) a mistake as to a 'basic assumption' of the contract, 2) having a 'material effect on the agreed exchange of performances,' and 3) the party seeking reformation does not bear the 'risk of mistake.'" *Shea*, 2004 Mass. Super. LEXIS 465, at *11-12, quoting *Dover Pool & Racquet Club, Inc. v. Brooking*, 366 Mass. 629, 633 (1975); *see also* Restatement (Second) of Contracts § 152. Contrary to the defendants' assertions, the plaintiffs pled all of these elements. (TAC ¶¶ 64-74.) The defendants' argument that the First Circuit explicitly held that the plaintiffs "manifestly intended to enter into a release with many attributes of a general release—a release that broadly discharge[d] liability for all claims and demands, whether known or unknown," misses the point. (Def. Mem. 15.) There is no dispute the plaintiffs understood they were entering into a release. The reformable mistake, which is based on the defendants' misleading statements and conduct leading up to the execution of that release, was as to the scope of the release about which it is abundantly clear there was a fundamental misunderstanding among the parties.

#### A. The Plaintiffs Sufficiently Allege Unilateral Mistake

The defendants' contention that the plaintiffs fail to state a unilateral mistake reformation claim because the plaintiffs do not sufficiently allege "that Defendants understood that they would

13

be required to pay the Disputed Royalties" (Def. Mem. 18) is directly refuted by the allegations in the Third Amended Complaint. Specifically, in paragraph 66 of the Third Amended Complaint, the plaintiffs allege that "the defendants already had agreed that they would continue to make ***all*** ongoing royalty payments under the License Agreement, and the defendants' counsel, Mr. Steiner, represented and made objectively clear at the time that the **"*only*"** economic issue that the Settlement Agreement was to address was how to divide up the settlement proceeds paid by QIAGEN."

Moreover, the plaintiffs do allege facts to demonstrate that "Defendants knew or had reason to know of the purported mistake," contrary to what the defendants argue. (Def. Mem. 19.) Specifically, in paragraph 72 of the Third Amended Complaint, the plaintiffs allege that the "defendants had reason to know of the mistake" and that the defendants knew the plaintiffs "originally thought they were entitled to twice as much as they ultimately received under the Settlement Agreement." In addition, the plaintiffs allege that "the parties never discussed releasing a more than $▇▇▇▇▇▇ royalty payable to the plaintiffs" under the License Agreement, and such "reduction in the net proceeds payable to the plaintiffs, had it been the parties' objective intent (which it was not), would have been expressly stated in the Settlement Agreement, not silently and/or mistakenly incorporated into the general release provision." (*Id.* at ¶¶ 69, 72.)

In addition, the plaintiffs allege in the Third Amended Complaint that "the defendants knew that the plaintiffs had made a mistake, but chose to stay silent and allow the mistake to be made." (*Id.* at ¶ 72.) And the plaintiffs allege that the defendants, upon information and belief, "were unhappy with the terms of the License Agreement" and had already tried to eliminate their royalty obligation, which supports the plaintiffs' assertion that the defendants "were secretly interpreting [the Settlement Agreement] as releasing such a royalty all while knowing that the

14

plaintiffs, who originally thought they were entitled to twice as much as they ultimately received under the Settlement Agreement, held the opposite understanding." (*Id.*) A reasonable jury could conclude based on these alleged facts, which have to be accepted as true, that the plaintiffs made a mistake and that the defendants had reason to know of the mistake, which requires the denial of the defendants' motion.

The defendants also argue that the plaintiffs "do not allege that they informed Defendants of their interpretation of the Settlement Agreement." (Def. Mem. 19.) That simply is not an element of a reformation claim. *See Shea*, 2004 Mass. Super. LEXIS 465, at *11-12. But, in any event, as alleged in the Third Amended Complaint, the defendants knew full well that the plaintiffs were unwilling to eliminate the defendants' royalty payments under the License Agreement when the plaintiffs expressly told them so, which, at best, makes the defendants' argument that they did not know they would be obligated to pay royalties between January 1 and June 27, 2017 difficult to understand. (*See* TAC ¶ 22 & Ex. I.) Indeed, that argument by the defendants is contradicted by the litany of other factual allegations in the Third Amended Complaint, including, without limitation, the allegations in paragraphs 21 and 22. (*See also* TAC Ex. I.)

The defendants next argument, that the plaintiffs "do not have a claim for reformation against Defendants if their own counsel failed to explain the consequences of the general release they were executing," similarly is baseless. (Def. Mem. 19.) The defendants do not cite any legal authority – beyond the First Circuit Opinion which did ***not*** address the merits of the reformation claim – to support this proposition. Moreover, there is no evidence in the record bearing on this issue, just an attorney argument.

The defendants also argue that if there was a unilateral mistake made by the plaintiffs it was based on their own negligence and, under such circumstances, there can be no claim for

reformation. (*Id.*) While the plaintiffs dispute they were negligent, it is sufficient for present purposes to point out that negligence is a factual question for trial, and the only thing in the record concerning negligence is an unsupported assertion made by the defendants' attorneys. *See Zezuski v. Jenny Mfg. Co.*, 363 Mass. 324 (1973) ("Ordinarily the question of negligence is one of fact for the jury.") That is not evidence, and it cannot be used to support a motion to dismiss.[7]

In light of the foregoing, the plaintiffs' have pled a plausible cause of action for reformation based on unilateral mistake.

### B. The Plaintiffs Also Sufficiently Allege Mutual Mistake

"[R]eformation of a contract may be warranted by mutual mistake to effectuate the agreement intended by the parties to a contract where the contract language fails to capture that agreement." (Def. Mem. 16, citation omitted.) "Central to [the mutual mistake] doctrine is the fundamental underpinning that the parties had reached an agreement on a point which they intended to enshrine in the written contract but which, for some reason, was mistakenly omitted from that written contract." *Id.* The plaintiff must allege that the parties made the same mistake about the same subject matter, and that the mistake relates to an essential element of the agreement. *See Finamore v. Garcia*, 2011 WL 13244945, at *7 (D. Mass. Dec. 8, 2011).

Here, the plaintiffs sufficiently pled a plausible claim for reformation based on mutual mistake. Contrary to the defendants' unsupported argument that they never agreed to continue to make royalty payments (*see* Def. Mem. 6), that is precisely what they agreed to do. (TAC ¶ 22.)

---

[7] The defendants' reliance on *Finamore v. Garcia*, No. CV 06-11855-RBC, 2011 WL 13244945, at *7 (D. Mass. Dec. 8, 2011), is misplaced. In *Finamore*, after a bench trial (not a motion to dismiss), the Court found that, "to the extent that there was a mistake made [in the case], it was a unilateral mistake by Garcia based upon his own negligence," and "[h]e has not presented 'clear and convincing' evidence of a mutual mistake." 2011 WL 13244945, at *9. Here, there is no evidence of negligence, and the Third Amended Complaint is replete with evidence of a mistake, all of which must be accepted as true on a motion to dismiss. The defendants' reliance on *Rohm & Hass Elec. Materials, LLC v. Elec. Circuits Supplies, Inc.*, similarly is misplaced. Here, unlike the plaintiff in *Rohm & Hass Elec.*, the plaintiffs have alleged the factual allegations for reformation based upon mistake, and those facts have to be accepted as true.

Specifically, as reflected in an e-mail exchange, the plaintiffs rejected the defendants' proposal that Esoterix be given a paid-up license (such that the defendants still would be required to continue to make *all* of the royalty payments due under the License Agreement), and asked that the plaintiffs receive $▮▮▮▮▮▮▮ of the amount to be paid by QIAGEN ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.*) In response, the defendants necessarily accepted and agreed that they would have to continue making *all* of their royalty payments due to the plaintiffs under the License Agreement because they represented to the plaintiffs that "[y]our 'counteroffer' makes clear that the *only* issue now is how to divide the settlement proceeds," and that "we can continue the discussions as to the proper division of the proceeds . . . ." (TAC Ex. I, p. 1 (emphasis added).)[8]

The plaintiffs also allege that "the defendants did not know of the mistake, such that at the time the Settlement Agreement was signed, the defendants also mistakenly understood that the release did not cover the more than $▮▮▮▮▮▮ royalty payment, and only discovered the parties' mutual mistake later when the royalty payment came due. (*Id.* at ¶ 73.) Contrary to the defendants' assertions, this allegation is neither the "Plaintiffs' sole allegation of mutual mistake" nor is it "entirely conclusory." (Def. Mem. 17.) The plaintiffs further allege that "[s]uch a mistake, which would negate a more than $▮▮▮▮▮▮ royalty payment to the plaintiffs, would have a material effect on the agreed upon exchange of performances under the Settlement Agreement that is adverse to the plaintiffs." (*Id.* at ¶ 67; *see also* ¶¶ 69 &70.)

As explained above, and contrary to the defendants' argument, the parties "had reached an agreement" as required for mutual mistake. (Def. Mem. 17.) Indeed, the parties had reached

---

[8] Indeed, the plaintiffs specifically allege that "the defendants already had agreed that they would continue to make *all* ongoing royalty payments under the License Agreement, and the defendants' counsel, Mr. Steiner, represented and made objectively clear at the time that the ***"only"*** economic issue that the Settlement Agreement was to address was how to divide up the settlement proceeds paid by QIAGEN." (TAC ¶ 66.)

17

agreement on the defendants' ongoing royalty payments. Specifically, "the defendants already had agreed that they would continue to make *all* ongoing royalty payments under the License Agreement, and the defendants' counsel, Mr. Steiner, represented and made objectively clear at the time that the **"*only*"** economic issue that the Settlement Agreement was to address was how to divide up the settlement proceeds paid by QIAGEN." (TAC ¶ 66.) Here, the payment of ongoing royalties was specifically discussed. (*Id.*) The plaintiffs allege that what was not discussed, and certainly would have been, was the plaintiffs releasing a more than $▮▮▮▮▮▮ royalty payable to the plaintiffs. (*Id.* at ¶¶ 72-73.) And to the extent a mutual mistake must "involve a fact capable of ascertainment at the time the contract was entered into, and not a mere expectation or opinion about future events," *Finamore*, 2011 WL 13244945, at *7; *see also Eck*, 444 Mass. at 731, the disputed royalty payment was known to both parties at the time the release was executed. (*See*, *e.g.*, TAC ¶ 66 ("the defendants already had agreed that they would continue to make *all* ongoing royalty payments") & ¶ 73 ("the defendants also mistakenly understood that the release did not cover the … royalty payment"). Indeed, the plaintiffs' winning argument to the First Circuit on the breach of contract claim was that the obligation to make that disputed payment arose before the release was signed. *See General Hosp. Corp.*, 16 F.4th at 314.

  A reasonable jury could conclude based on these alleged facts, which must be accepted as true, that the defendants had agreed in the lead up to the execution of the release that they would continue making *all* of their royalty payments due under the License Agreement, and that they only discovered the parties' mutual mistake in the release that allowed the defendants to avoid the disputed payment after the fact when they opportunistically decided to capitalize on that mistake and withhold payment.

In light of the foregoing, the plaintiffs have pled a plausible cause of action for reformation based on mutual mistake.

## IV.    THE PLAINTIFFS PLEAD A PLAUSIBLE CAUSE OF ACTION FOR UNJUST ENRICHMENT AGAINST LABCORP

Unjust enrichment is an "equitable stopgap for occasional inadequacies in contractual remedies at law." *Watkins v. Omni Life Sci., Inc.*, 692 F. Supp. 2d 170, 179 (D. Mass 2010). Under the doctrine of unjust enrichment, a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable. *Id*. Here, the facts alleged support a claim for unjust enrichment against LabCorp. Specifically, the plaintiffs allege that the defendants' misconduct in this case has occurred at the direction and control of LabCorp and for the express benefit of LabCorp. (TAC ¶ 86.) The plaintiffs also allege that LabCorp (and Esoterix) agreed that the defendants would continue to pay ***all*** royalties due under the License Agreement, and that LabCorp (and Esoterix) represented that the ***"only"*** unresolved issue was how to divide up the proceeds. (*Id.* at ¶ 66.) By its conduct and involvement, "LabCorp has been unjustly enriched in excess of $███████." (*Id.* at ¶ 88.)

The defendants' argument that the plaintiffs' unjust enrichment claim against LabCorp fails because the plaintiffs' breach of contract claim against Esoterix failed misses the point. (Def. Mem. 20). While it is correct that where a plaintiff has available an adequate remedy at law, a claim of unjust enrichment is unavailable. Here, LabCorp denies that it is a party to the License Agreement (Def. Mem. 4; *see also* TAC ¶ 85,) and the plaintiffs do not have an adequate remedy at law against LabCorp (*see* TAC ¶ 89).[9]

---

[9] The defendants' reliance on *Flores v. OneWest Bank, F.S.B.* is misplaced because the plaintiffs in that case had an adequate remedy. Similarly, the defendants' reliance on *Fernandes v. Havkin* is inapt because, unlike in *Fernandes*, here, LabCorp denies that it is a party to the License Agreement. And the defendants' reliance on footnote 17 in *Shaulis v. Nordstrom, Inc.* is confusing because that footnote discusses an implied covenant claim, not unjust enrichment. Finally, the defendants' reliance on the First Circuit Opinion is misplaced because the First Circuit addressed ***only*** the plaintiffs' breach of contract claim against Esoterix, did ***not*** address the plaintiffs' unjust

19

**CONCLUSION**

For all of the foregoing reasons, the plaintiffs The General Hospital Corporation and Dana-Farber Cancer Institute, Inc. respectfully request that the Court deny the defendants' Motion to Dismiss, and that the Court order further relief as it deems just and proper.

Respectfully submitted,
THE GENERAL HOSPITAL
CORPORATION AND DANA-FARBER
CANCER INSTITUTE, INC.

By their attorneys,

*/s/ Carolyn M. Crowley*
Douglas J. Nash (BBO# 633050)
Carolyn M. Crowley (BBO# 663616)
Barclay Damon LLP
160 Federal Street, Suite 1001
Boston, MA 02110
(617) 274-2900
dnash@barclaydamon.com
ccrowley@barclaydamon.com

Dated: January 5, 2022

**CERTIFICATE OF SERVICE**

I, Carolyn M. Crowley, certify that on January 5, 2022, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to the non-registered participants.

*/s/ Carolyn M. Crowley*
Carolyn M. Crowley

---

enrichment claim against LabCorp, and did ***not*** address the relationship between the plaintiffs and LabCorp. The First Circuit did, however, note that the "district court deemed the record insufficient to determine whether LabCorp was liable for the breach and granted partial summary judgment against Esoterix only." (First Circuit Op. 7.) That ruling was not challenged. (*Id*.)