<pre>
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2

 3   _____

 4   THE GENERAL HOSPITAL CORPORATION and  )
     DANA-FARBER CANCER INSTITUTE, INC.,    )
 5                                          )
             Plaintiffs,                    )
 6                                          )
         v.                                 )    Civil Action No.
 7                                          )    1:18-cv-11360-IT
     ESOTERIX GENETIC LABORATORIES, LLC,    )
 8   and LABORATORY CORPORATION OF AMERICA )
     HOLDINGS,                              )
 9                                          )
             Defendants.                    )
10                                          )
     _____
11

12

13       BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

14

15              MOTION HEARING BY VIDEOCONFERENCE

16

17                  Thursday, May 26, 2022
                         3:42 p.m.

18

19

20

21   John J. Moakley United States Courthouse
     Courtroom No. 9
22   One Courthouse Way
     Boston, Massachusetts
23

24   Robert W. Paschal, RMR, CRR
     Official Court Reporter
25   rwp.reporter@gmail.com
</pre>

1                     **A P P E A R A N C E S**

2

   On behalf of the Plaintiffs:

3

       BARCLAY DAMON LLP
4      BY:  CAROLYN M. CROWLEY
       160 Federal Street
5      10th Floor
       Boston, MA  02110
6      (617) 274-2900
       ccrowley@barclaydamon.com
7

8

   On behalf of the Defendants:

9

       KELLEY DRYE & WARREN LLP
10     BY:  ROBERT I. STEINER
       3 World Trade Center
11     175 Greenwich Street
       New York, NY  10007
12     (212) 808-7800
       rsteiner@kelleydrye.com
13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1
2          (In open court at 3:42 p.m.)

3          THE DEPUTY CLERK:  United States District Court is

4     now in session, the Honorable Judge Indira Talwani presiding.

5          This is Case Number 18-cv-11360, The General

6     Hospital Corporation, et al., versus Esoterix Genetic

7     Laboratories, LLC, et al.  Will counsel please identify

8     themselves for the record.

9          MS. CROWLEY:  Good afternoon, Your Honor.  Carolyn

10    Crowley of Barclay Damon for the plaintiffs, The General

11    Hospital Corporation and Dana-Farber Cancer Institute.

12          THE COURT:  Good afternoon.

13          MR. STEINER:  Good afternoon, Your Honor.  Robert

14    Steiner from Kelley Drye & Warren for Esoterix Genetic

15    Laboratories and the Laboratory Corporation of America

16    Holdings.

17          THE COURT:  Good afternoon.

18          So we are back where we were a couple years ago, I

19    think.  And I have defendants' motion to dismiss.  So I tend

20    to start with the moving party and go back and forth.

21          MR. STEINER:  Thank you, Your Honor, if I may.

22          If I could just say a few words about the

23    First Circuit decision, because I think it does inform the

24    remaining claims and whether or not they can survive.  And,

25    obviously, it's our view, and as stated in our papers, that

1    in light of the First Circuit's decision, the remaining

2    claims can't survive.

3              The First Circuit, Your Honor, concluded that, by

4    its terms, the parties -- and this is a quote -- "manifestly

5    intended to enter into a release that broadly discharged all

6    claims and demands, whether known or unknown."

7              THE COURT:  Then, why did they vacate the other

8    cause of action and send it back to me?  Why not just wrap it

9    all up?

10             MR. STEINER:  That certainly would have been

11   easier, Your Honor, and that would have been our preference,

12   but --

13             THE COURT:  But it's not what they did.

14             MR. STEINER:  It is not, and they did not reach

15   those issues.  They sent it back to Your Honor for

16   consideration; however, the decision by the First Circuit, I

17   think, is instructive and informative in terms of how

18   Your Honor analyzes the remaining claims.

19             THE COURT:  Well, don't I -- when the question is

20   what their manifest agreement was, isn't it the case that

21   what the First Circuit was talking about and the only thing

22   that the First Circuit was talking about was what did the

23   release say?

24             MR. STEINER:  The First Circuit, yes, talks about

25   what the release said, but it also excluded other things.

1          THE COURT:  It excluded -- it excluded all of the

2     other things because, in contract law, one only looks at the

3     contract terms.  So the First Circuit said, "Our job is

4     limited to the words of the contract, and the contract -- the

5     words of the contract manifestly say X."

6          MR. STEINER:  That's correct.

7          THE COURT:  That's all they did, but it didn't -- I

8     mean, I understand that that language sounds really broad and

9     would knock everything out.  But if you ask the First Circuit

10    whether that's what they meant by that, I mean, it's

11    completely inconsistent with remanding it on the other

12    things.  All they were talking about was the contract claim.

13         MR. STEINER:  Well, let me -- let me, then,

14    address, Your Honor, the specifics of the claims.

15         THE COURT:  Okay.

16         MR. STEINER:  And I'll start with the breach of the

17    duty of good faith and fair dealing claim.  Now, plaintiffs'

18    brief -- and this is on page 9 -- they claim that by seeking

19    to impose an obligation under the duty of good faith and fair

20    dealing -- they quote -- "don't seek to impose obligations

21    that conflict with the settlement agreement."

22         THE COURT:  So I -- am I correct that there are two

23    different contracts that are part of this whole dispute?

24         MR. STEINER:  That's correct, Your Honor.  There's

25    a license agreement and a settlement agreement.

1          THE COURT:  Okay.  And every contract has an

2     implied covenant of good faith and fair dealing.  Which

3     contract's implied covenant of good faith and fair dealing

4     are we discussing, in your view, in this cause of action?

5          MR. STEINER:  Well, my view -- in plaintiffs' view,

6     they're talking about the license agreement.  That's what

7     they've made very clear, that they're talking about the

8     implied covenant of good faith and fair dealing as it relates

9     to the license agreement.

10         THE COURT:  Okay.

11         MR. STEINER:  But Your Honor needs to look at the

12    relationship of the parties as manifested by the contracts

13    between them, and that is both the license agreement and the

14    settlement agreement, and you can't read one without the

15    other.  So if you impose an obligation under the license

16    agreement that is clearly inconsistent with the settlement

17    agreement, then you're imposing contractual terms that are

18    inconsistent with what the parties intended in and contracted

19    for.

20         THE COURT:  No.  So here's the -- here's why I

21    think that the analysis goes somewhat differently than that.

22    I think you have two different claims, and you have two

23    different causes of action, so two different contracts and

24    two different causes of action.

25         The contract, breach of contract, is that the --

1    they failed to pay the amount due in the license agreement.

2    And the First Circuit says, no, because you have this second

3    contract, and they paid you in accordance with the second

4    contract.

5           And the plaintiff says well, but we -- you're not

6    supposed to do things to deprive us of the benefit of our

7    bargain.  We have a -- we have a contract, and the implied

8    covenant of good faith and fair dealing isn't just, like,

9    another way of saying the contract.  The implied covenant of

10   good faith and fair dealing says, in addition to the contract

11   terms, there's a further duty to not inter- -- to not take

12   steps to fire -- to take away people's right to the benefit

13   of their bargain.

14          So the case, right, where it makes out originally

15   in Massachusetts, you -- I haven't read it in a long time,

16   but *Fortune*, right?  The employee is fired.  He's an at-will

17   employee.  He's allowed to be fired, but they said, well,

18   wait a minute.  You fired him right before something vested

19   so that you couldn't get the benefit of what was vested.

20   That's what you were doing there, and you couldn't do that.

21   It didn't mean you couldn't fire him, but you breached the

22   other part of it.

23          I mean, that's -- so why -- why is the fact -- it

24   may be that this doesn't breach the implied covenant of good

25   faith and fair dealing.  That's going to be a question later.

1    But why can't they allege that at this point based on what

2    happened here even though the First Circuit says, yeah, but

3    that contract, we're enforcing that contract and that -- or

4    we're looking at that contract, and you don't have a breach,

5    but --

6            MR. STEINER:  But they can't allege it here.  They

7    don't make out a plausible claim here, because the covenant

8    can't apply where we have exercised an express contractual

9    right.  And the expressed contractual right that we have

10   exercised is to not pay the past royalties, and that --

11           THE COURT:  So the -- but the express contractual

12   right you exercise was under which contract?

13           MR. STEINER:  The -- was under the settlement

14   agreement.

15           THE COURT:  Okay.  And so you wrote a settlement

16   up.  A settlement agreement was written up which had an

17   effect on the other contract.  You may be allowed to -- that

18   contract, they asked me to enforce it.  I said I'm enforcing

19   it.  I was wrong.  I can't enforce that contract, but that

20   doesn't mean it was okay for you to negotiate that.  I don't

21   see where I'm any different than I was the first time around

22   when I denied the motion to dismiss on this ground.

23           MR. STEINER:  I think it's different, Your Honor,

24   and I re-read Your Honor's decision, obviously.  And I think

25   you denied the motion originally because you said that we had

1    breached the license agreement and that there was this other

2    alleged conduct, and that's in your opinion.  You say it's

3    based on those two things, the breach of the license

4    agreement and other alleged conduct.

5          But what the First Circuit has said is that we

6    didn't breach the license agreement.

7          THE COURT:  No, you didn't breach -- you didn't

8    breach the release.  That's what they said.  There's no

9    breach of the release.  The release said you released all

10    claims.  That's what they analyzed.

11         MR. STEINER:  But the release, Your Honor, was

12    release of obligations under the license agreement; and so,

13    therefore, we didn't breach the license agreement because we

14    were released from those obligations.  So there's no -- there

15    can't be a breach of the release without some object of that

16    release being impacted, and the object that was being

17    impacted by the release were the obligations under the

18    license agreement.

19         So you need to have both, because if you impose an

20    obligation of good faith and fair dealing that, essentially,

21    is what that contractual right is under the license agreement

22    that the First Circuit says doesn't exist, then that's

23    contrary to the agreement of the parties.  One can't be --

24          THE COURT:  Well, you know what?  Ms. Crowley, let

25    me have you take that up there.

1          MS. CROWLEY:  Sure.  So the way we're looking at it

2    is the same way Your Honor's looking at it.  The implied

3    covenant claim is not alleging a breach of the settlement

4    agreement.  The implied covenant claim is focused on the

5    license agreement, and you're right, the First Circuit did

6    not say anything about a breach of the license agreement.

7          The claim here is all about the defendants' lack of

8    good faith or bad faith in the performance of the license

9    agreement.  The issue is not whether the defendants abided by

10   the letter of the contract in the course of performance, and

11   I think that's my brother's argument.  His argument is

12   focused on whether they abided by the letter of the contract.

13         The issue here that we're focused on is the

14   challenged conduct, that is the defendants' misleading

15   conduct to induce the plaintiffs to execute the release in

16   the settlement agreement and whether that conformed to the

17   parties' reasonable understanding of the performance

18   obligations.  And here it did not.

19         So the facts are that the defendants engaged in

20   release negotiations in bad faith during the performance of

21   the license agreement -- the license agreement.  It's focused

22   on the license agreement.

23         THE COURT:  Can I -- I haven't gone back and read

24   the license agreement in a couple years, but do I recall

25   correctly that the license agreement had provisions for both

1    defendants' own -- whatever this is -- a test and, also,

2    royalty payments, that there were two different sets of

3    payments?

4              MS. CROWLEY:  There are.  There's the two -- I

5    think there's the direct and then there's the sublicense.

6              THE COURT:  And the other lawsuit that was in front

7    of Judge Burroughs involved a sublicense matter?

8              MS. CROWLEY:  Correct.

9              THE COURT:  And the sublicense matter, if the

10   sublicensee had continued paying normally, there would have

11   been a flow of royalty money to plaintiffs, correct?

12             MS. CROWLEY:  Correct.

13             THE COURT:  And by the sublicensee and the

14   defendants' dispute, all of a sudden, the money that was

15   going to come in as a royalty payment was coming in as a lump

16   sum instead of under the course of the contract; is that

17   correct?

18             MS. CROWLEY:  That's correct.

19             THE COURT:  Okay.  Mr. Steiner?

20             MR. STEINER:  I don't believe that is --

21             THE COURT:  What's wrong with that understanding of

22   the license agreement?

23             MR. STEINER:  Because the suit under the license

24   agreement related to QIAGEN selling things outside of what

25   their rights were under the license agreement, that they were

1    selling tests for commercial purposes; and so, therefore,

2    they were taking away what otherwise would have been a market

3    that EGL had.  The settlement of the dispute with QIAGEN,

4    which was with MGH's consent, as was memorialized in the

5    settlement agreement, was for QIAGEN to pay a lump sum

6    payment in settlement of that issue; and then as part of

7    that, QIAGEN also got a fully paid-up U.S. license.

8              THE COURT:  Okay.  And that fully paid-up U.S.

9    license meant that plaintiffs were no longer getting a stream

10   of royalty; they were instead going to get a portion of this

11   fully paid-up license.

12             MR. STEINER:  Well, the settlement agreement

13   doesn't divide -- the settlement agreement between EGL Lab

14   Corp. and the plaintiffs doesn't specify that specific

15   provision.  You know, our view under the license agreement --

16             THE COURT:  Well, let me just -- hold on.  Let me

17   just make sure I'm understanding this.

18             The reason that there was money coming from the --

19   I'm sorry; I can't get their name --

20             MR. STEINER:  QIAGEN.

21             THE COURT:  QIAGEN.  The reason there was money

22   coming from QIAGEN may have been for various different bad

23   things, but the claim that plaintiffs here had for a chunk of

24   the money was saying, "Well, now you're giving them a paid-up

25   license, so we want our portion of that," correct?

```
 1              MR. STEINER:  No, Your Honor.  That's not right.
 2              THE COURT:  Okay.
 3              MR. STEINER:  And I explained it in two ways.  A,
 4    they, obviously, filed no complaint and never articulated a
 5    claim.  Under our view of the license agreement, of the --
 6              THE COURT:  They didn't articulate a claim, but you
 7    couldn't do any of this without their agreement, so it
 8    doesn't -- I mean --
 9              MR. STEINER:  Well --
10              THE COURT:  -- this wasn't just gratuitously given
11    to plaintiffs.
12              MR. STEINER:  No, but if Your Honor will just let
13    me explain the dynamic of what the plaintiffs were entitled
14    to, based on the claims that were being made in the QIAGEN
15    case.  The plaintiffs were entitled to 8 percent of the
16    settlement amount less legal expenses paid.
17              Now, without getting into the math of that, that
18    number was well below the number that we ultimately paid them
19    in this settlement agreement.  There were negotiations back
20    and forth as to -- as there are in any, you know, commercial
21    relationship between the Lab Corp. parties and the MGH
22    parties where there was a resolution of that -- of that
23    dispute --
24              THE COURT:  Of which dispute?
25              MR. STEINER:  -- all wrapped up into one.
```

1          THE COURT:  What dispute was resolved?

2          MR. STEINER:  The dispute as to how much MGH and

3     DFCI were entitled to of the QIAGEN money.

4          THE COURT:  Okay.  Got it.  So that's how much they

5     got.  And that was resolving all of the QIAGEN matters.  The

6     agreement was then written to say, oh, and there's this whole

7     other stream of money that's coming, the license fee, and a

8     part of that money is now going to not go to MGH.  That was

9     the resolution, even though that wasn't the subject of the

10    dispute.  What was the subject of the dispute was the

11    QIAG- --

12         MR. STEINER:  QIAGEN.

13         THE COURT:  -- QIAGEN litigation.

14         MR. STEINER:  The parties negotiated, Your Honor, a

15    resolution to their disagreement, and that's what you see,

16    frankly, in my May 27th e-mail, is you see Mr. Eisenstein

17    sends an e-mail and says, "We want you to do all of these

18    things."

19         And my response, if you read the e-mail, is

20    basically, "Look, you can't withhold consent.  You have an

21    obligation under the license agreement to consent to this

22    settlement.  And you are, frankly, acting in bad faith by

23    withholding consent to this settlement agreement.  And we can

24    work it out amongst ourselves after this what the terms of

25    any resolution are between us."

1            That's what the e-mail says.  The e-mail doesn't

2     say we're going to pay you ongoing royalties.  It doesn't say

3     anything about paying past royalties.  It doesn't say

4     anything about a lot of things that ultimately end up in the

5     settlement agreement.

6            And, in fact, there are things that are demanded in

7     Mr. Eisenstein's e-mail that never ended up in the settlement

8     agreement, which just shows that there were more and further

9     negotiations.  And as to this -- this argument, Your Honor,

10    that somehow we or I, you know, duped MGH and DFCI into

11    signing a settlement agreement, I think there are a couple of

12    points that need to be made.

13           First, you know, going back to the First Circuit's

14    opinion, the First Circuit does say the breadth of the

15    release was, obviously, by choice of the contracting parties.

16    The First Circuit does say that that should be respected,

17    especially where people are represented by counsel.  So that

18    decision by the First Circuit is important in that regard.

19           THE COURT:  I just keep coming back to what the

20    First Circuit's eyes on the ball were, was only the contract

21    language of the release.  That's what they were interpreting.

22    That's what they decided.  That's what they reversed me on.

23           They did not reverse me -- they did not say to me

24    and now remand -- deal with all of these other things.

25    Dismiss all these other things.  They did not say you're

1    done.  They said, really, the opposite.  They said we're

2    remanding for the open claims, and the one claim that I said

3    was moot, that one, they reopened.

4          MR. STEINER:  Your Honor, so if I could just

5    continue on the good faith and fair dealing claim for just

6    another moment, the --

7          THE COURT:  What I'm actually really more

8    interested in -- and maybe it comes back, again, to the good

9    faith and fair dealing at the end -- I am actually more

10   interested in the mistake argument for now and whether there

11   was a mistake or wasn't a mistake.  So it all sort of ties

12   back in some ways here, and maybe I'm going to put the hot

13   seat here on Ms. Crowley.

14         How is there a mutual mistake?

15         MS. CROWLEY:  Sure.

16         THE COURT:  I understand your arguments for

17   unilateral, but what are your arguments, really, for future

18   mistake?  I think Mr. Steiner is very clear that they

19   understood what they were doing every step of the way, and

20   you've sort of alleged that.

21         MS. CROWLEY:  Yes, Your Honor.  So let me just,

22   too, make one point before I turn to that.  I did just want

23   to point out, too, that the defendants argued to the

24   First Circuit that the reformation claim, the dismissal

25   should be affirmed on the merits.  Their reply brief to the

1    First Circuit argued that the First Circuit could affirm on

2    any grounds, and the First Circuit declined to do that.

3              THE COURT:  Yeah, but they always do.  I can't go

4    too far on that.  The First Circuit will take the argument,

5    and they're respectful of our role in that regard in that

6    they really -- they don't want to save you the time and just

7    say let's jump to it.  They'll give it back to me.

8              So I understand they presented it there, but the --

9    that's not at all surprising to me that the First Circuit

10   said let's take a look at it.  But if you could address the

11   mutual mistake, because I don't -- I don't really see how

12   that squares with your allegations.

13             MS. CROWLEY:  Sure.  And so we do have the

14   unilateral mistake, the fact of, well, they knew, and we did

15   know.  In a sense, to use Mr. Steiner's words, we were duped.

16             So the plaintiffs do also allege that the

17   defendants didn't know of the mistake at the time such that

18   at the time the settlement agreement was signed, the

19   defendants also mistakenly understood that the release didn't

20   cover the royalty payment.  It only --

21             THE COURT:  Well, what's -- I mean, that's, really,

22   kind of a conclusory allegation, isn't it?

23             MS. CROWLEY:  Well, Your Honor, I would say we've

24   also alleged that, to the extent that there was going to be a

25   release of this large sum of money, it would have been

discussed.  And we've alleged that they asked for it.  We said no.  And we moved forward.  And the statements are, okay, we're only going to look at the issue of how to divide the settlement proceeds.

So at the time, the parties are looking at it the same way.  That issue is in the past.  We're only looking at how to divide the settlement proceeds.  But they realize it later, is the allegations that we've made on the mutual mistake.

THE COURT:  I guess I'm still not -- I understand your unilateral mistake argument.  I'm still not understanding the mutual mistake argument.

I mean, there -- there's no -- there certainly was a statement saying we're not dealing with this, but then negotiations continued, and the language was grafted, and you don't have anything that would suggest that the defendants didn't know what they were doing when they put that release -- I mean, is the -- you don't have any allegations as to -- that would suggest they didn't know what they were doing when they put that release together.

I mean, somehow, the dollar -- money was bridged.  There was a dispute.  You were very far apart on dollars, and somehow it was bridged, and I don't have any reason to not think well, they were bridging it by thinking, well, if we have a release, we don't have to pay that.

1          MS. CROWLEY:  Perhaps, but they may also have been

2     thinking in the same mindset as us, that, of course, it

3     didn't cover that; but then when the payment came due, they

4     looked and thought, "Oh, we don't have to make that payment."

5     So at the time, we were both on the same page.  We were only

6     looking at how to divide things and not looking at this

7     issue; and, after the fact, they realized it.

8          THE COURT:  Mr. Steiner, if this case goes forward,

9     how will we be dealing with the fact that you are the

10    percipient witness here?

11         MR. STEINER:  We have actually looked at that,

12    Your Honor, under Massachusetts law.  I'm not prepared to

13    give you the chapter and verse on that, but we're comfortable

14    that we can work around that.  But that is an issue that came

15    up initially in the retention of this case, so I don't want

16    you to think that we just ignored it.

17         But if I could just respond to counsel's argument.

18    You know, this really is on all fours with the *Eck* case.  The

19    *Eck* case, you know, even if you accept the facts as pled,

20    would say that even if both parties didn't contemplate

21    something in a release, the legal effect of that release is

22    the same.  And so --

23         THE COURT:  Isn't there a difference -- I mean, it

24    is -- it is typically the case that what you are bargaining

25    for in a release is things that nobody has thought of.  And

1    so that's what that case is dealing with.  There is an

2    agreement to cover things that nobody has thought of.

3              But that's a different thing than saying we are

4    also covering things that are known things, and there's just

5    a disagreement as to whether this language covers it or not.

6              MR. STEINER:  Well, two points on that, Your Honor,

7    so -- and I think Massachusetts law is very clear on

8    releases, that if you want to exclude something from a

9    lease -- release, you need to specifically say it.

10              THE COURT:  Well, that's why they're going to lose

11    on the express contract interpretation, but this isn't an

12    express contract.  This is a mistake question.  So --

13              MR. STEINER:  And --

14              THE COURT:  -- I own -- I own three cars, and we

15    have a negotiation for me to sell you two cars, and I don't

16    mention the third car because none of us are talking about

17    it, and I say I'm going to sell my cars.  That express

18    language is cars.  It's all your cars.

19              But that isn't what I meant and that -- that is a

20    mistake, and it's a mistake on my part only.  And if you

21    didn't know that I was making that mistake, it goes nowhere.

22              MR. STEINER:  That's right.

23              THE COURT:  But if you had a reason to know about

24    it, then isn't that what unilateral mistake is about?

25              MR. STEINER:  It is, Your Honor, but then I go back

1    to their pleading, and their pleading specifically says that

2    this was never discussed.  They, in fact, say -- I think it's

3    in paragraph 66 -- that they simply assumed that the release

4    wouldn't cover these types of claims.

5            Your Honor, I think the -- I don't think we make a

6    large point of it, but we cite in our brief, the *Rohm & Hass*

7    case is -- actually addresses all three of the claims here:

8    the good faith and fair dealing claim, the 93A claim, and the

9    mistake claim.  And it is in the context of a preliminary

10   injunction, but the Court evaluates those claims where a

11   party actually inserted at the last minute a contractual

12   term.  And the other side signed it without realizing it.

13           And in the *Rohm & Hass* case, basically, what they

14   say is that you should have read the agreement.  You should

15   have read the agreement and understood what it meant.  You

16   can't use the language of mistake to create obligations that

17   don't exist or to shift the risk of your -- your alleged lack

18   of understanding to the other side.

19           And that's where, again, I get back to this idea:

20   They are represented by counsel.  There is a merger clause in

21   the agreement.  There's a clause that says you're relying on

22   your counsel for their -- for their advice.  So for them to

23   come back now and say, "Well, we just assumed that this

24   release wasn't going to cover these claims," that is not a

25   basis to claim mistake.

1          THE COURT:  Well, they're not saying, "We just
2     assumed."  They're saying you said to them, "Okay.  Then the
3     only things up are these other things."  They're saying
4     that's what you said to them.
5          MR. STEINER:  Well, a couple of points on that.
6     "A" is that -- they actually say in the -- in the agreement,
7     it was never discussed.  So --
8          THE COURT:  Well, but they also say that you said
9     that -- that you asked to do a license, they said no, and
10    then you said we're not talking about anything other than
11    this other stuff.
12         MR. STEINER:  Your Honor, much like if you were --
13    the e-mail that is -- that is cited, which is Exhibit J, it
14    just doesn't say what they say it says.  And much like when
15    we're analyzing a contract, you would look at the contract
16    and see what does it say.
17         If you read the last paragraph of my e-mail, it
18    says if no agreement is possible after that meeting, I
19    suppose Lab Corp. and MGH can mediate or litigate the dispute
20    between them.  What cannot happen is that the withholding of
21    consent terminates the best and only settlement available.
22    That's what I was talking about.
23         And there's no contemplation here of even having an
24    agreement.  What this e-mail exchange is about is you need to
25    give consent, and then we can work it out between ourselves

1     afterwards what happens next.

2          And that's obvious by Mr. Eisenstein's e-mail to

3     me, because he lists all of these things that they want, half

4     of which don't even end up in the settlement agreement.  And

5     so, you know, it's no more of a mistake that the -- that

6     the -- the patents weren't put, according to his e-mail, on a

7     Track 1 application and that we didn't ratify our commitment

8     to fund ongoing EU opposition than it is a mistake that they

9     signed a release which discharged us of obligations under the

10    license agreement.

11         If they had come to Your Honor and said, "Oh, it

12    was a mistake because Mr. Steiner agreed to, basically,

13    everything we were saying in the May 26th e-mail; and so,

14    therefore, Lab Corp. needs to authorize a Track 1 patent

15    application and needs to pay for, you know, continued

16    funding," Your Honor would say, "Well, where is that in the

17    agreement?"

18         THE COURT:  But all you're convincing me of,

19    Mr. Steiner, is that you felt it was really, really unfair

20    that they held -- withheld consent and that you didn't like

21    the dollar amount.  And so you got this agreement, and if you

22    needed to sneak something by them elsewhere, maybe that's

23    what happened.  You're not convincing me that that other

24    thing was or wasn't part of the deal.

25         MR. STEINER:  Your Honor, there's no sneaking

1    anything by MGH and DFCI and their in-house and outside

2    lawyers and --

3         THE COURT:  So you were fully aware -- so the idea

4    of mutual mistake is you were fully aware that this is what

5    was contemplated at all times?  Is that what you're saying?

6         MR. STEINER:  What I'm saying is what was

7    contemplated was a broad, general release.

8         THE COURT:  Including -- were you contemplating

9    that they weren't going to pay amounts due under the license

10   agreement?

11        MR. STEINER:  Your Honor, I can't answer that

12   question right now.  I can't answer that question,

13   because, A -- no, but, Your Honor, with -- no, seriously,

14   what was contemplated was to get a broad general release of

15   things that were known and unknown.

16        THE COURT:  Were you involved in anything other

17   than the -- this other litigation and resolving it?  Were you

18   involved in their ongoing licensing/business agreements?

19   Maybe she's --

20        MR. STEINER:  I don't know that there were ongoing

21   licensing/business agreements between them.

22        THE COURT:  Well, there was an ongoing agreement.

23   I mean, I feel like that's kind of the thing that's kind of

24   silent in the First Circuit's decision, is there's an

25   ongoing -- there still is an ongoing relationship between the

1     parties.

2          MR. STEINER:  We pay licensing fees.

3          THE COURT:  This is not a release that people

4     normally sign and walk off forever and have nothing to do

5     with each other.  These are businesses that are in business

6     together.

7          MR. STEINER:  That's correct.  And they -- and

8     so -- and under the terms of the license agreement -- I'm

9     sorry -- under the terms of the settlement agreement -- and

10    there hasn't been any argument because we've been paying the

11    money -- we were paying royalties on a go-forward basis.  But

12    the settlement agreement clearly says, in no -- in no

13    uncertain terms, that we do not have to pay past royalties.

14         THE COURT:  A matter -- it's not the past -- it's

15    not the past royalties.  It's the past license fees, right?

16    They're different things.  Am I --

17         MR. STEINER:  Sorry.  Maybe I'm not following,

18    Your Honor.  They are -- they are -- license fees, royalties

19    are amounts that are owed under the license agreement.

20         THE COURT:  But they are amounts owed under the

21    license agreement for Esoterix's own sale of the -- of the

22    test or whatever this device was.  The amount that's coming

23    here is different.  It's something qualitatively different

24    than what was at issue in the other litigation.

25         MR. STEINER:  I believe, if I'm understanding

1    Your Honor's question correctly, yes, that is right.

2           THE COURT:  Okay.  I've asked you about

3    unilateral -- about mutual mistake.  On the unilateral

4    mistake, Mr. Steiner, maybe let me ask you this question:

5           Assuming I find that the facts are sufficiently

6    alleged that plaintiffs were unaware of the mistake they were

7    making, that they were making a mistake, they did not intend

8    to give up the license fee and they made a mistake, is it

9    your contention that the allegations are insufficient as

10   to -- that you should have known that they were making a

11   mistake?

12          Do you have any reason to suggest that, other than

13   they're good lawyers and they should have read the agreement,

14   do you have any reason to challenge the allegations?  I mean,

15   the allegations are the allegations.  I'm not asking you to

16   challenge them factually, but do you have any reason to say

17   the facts aren't sufficiently alleged to say that it is

18   their -- that they didn't know it, but you believed that you

19   had reason to know that they didn't -- that they didn't

20   realize the mistake?

21          MR. STEINER:  I would point Your Honor to

22   paragraphs 29 and 66 of the complaint.  In both of those

23   paragraphs, they admit that the issue of past royalties was

24   not discussed and that they simply made an assumption.  And I

25   think those paragraphs take them out of any contention that

1    we knew that somehow they were proceeding under this mistaken
2    belief.

3           THE COURT:  Ms. Crowley, what's your response to is
4    that?

5           MS. CROWLEY:  If I may, Your Honor, paragraphs 29
6    and 66 are all about what we discussed earlier, how the
7    defendants had asked to not have to make those payments, and
8    we said no.  And then they reference Exhibit I.  That's the
9    e-mails.  We're now going forward.  The only issue is how to
10   divide up the settlement proceeds.  They don't say what
11   Mr. Steiner is saying they say.

12          THE COURT:  Okay.  All right.  Let me just go
13   through my notes here and the questions that I have.

14          Ms. Crowley, you may have already answered this,
15   but your response to Mr. Steiner's argument that where the
16   First Circuit has said you can't rewrite the bargained for
17   arrangement using implied covenant of good faith and fair
18   dealing -- sorry.

19          The First Circuit said that you're sophisticated
20   entities, negotiated the release with the benefit of counsel,
21   you can't rewrite it.  What's your response to his argument
22   that, in seeking to enforce the implied warranty of good
23   faith and fair dealing, that's exactly what you're trying to
24   do, is rewrite the bargained for arrangement?

25          MS. CROWLEY:  Because we're not, Your Honor,

because, one, that language is specific to the contract.  And
what the plaintiffs are alleging here and have sufficiently
pled is that it's the misconduct in the lead-up to the
execution of release.  It's all the things we've just talked
about.  It's the ask for the paid-up license.  It's the
denial of that.  It's the moving forward with just dividing
up the settlement proceeds.  It's all the conduct leading up
to the execution of the release.

THE COURT:  Why wouldn't -- I mean, you know, I
sort of think about when there's -- forget about release for
a minute, but simply contract modifications.  Why wouldn't
anybody be able to argue, any time there's a contract
modification that they don't like, that it violates the
spirit of the original contract?  Because it kind of does,
right?  You come back in, and you say now you're going to get
less money.

MS. CROWLEY:  I think because it's fact specific,
because it's -- here, it's the bad faith that we're focusing
on.  So it's not just -- it's not just "Oh, there's a
contract modification.  We're unhappy."  It's what led to
that contract modification.  It's the bad faith.

THE COURT:  So I sort of feel like some of these
implied covenant cases, that they really sort of go into --
you know, what you'll often see is you have a breach of
contract; and on top of that, you have a breach of the

1      implied covenant of good faith and fair dealing that gives
2      you a little bit more even than the breach of contract
3      because of it.
4              But when you don't have the breach contract, can
5      you really -- without the breach of contract, does the -- you
6      know, it's one thing -- the example I gave the *Anthony's Pier*
7      *Four*, I think there was no breach of contract.  That didn't
8      go very -- I don't think that was the focus of it.  Although,
9      as I said, I haven't read it in a while.
10             But does the implied covenant of good faith and
11     fair dealing really breathe life into something in the face
12     of not having an express -- in the face -- not just you can't
13     really reach the contract, but, you know, you're contract
14     claim kinds of goes the other way for you.  And if so, where
15     are the cases where I get that?
16             MS. CROWLEY:  Sure, Your Honor.  And so -- so I
17     think that it can in specific circumstances.  And if you look
18     at page 8 of our opposition, we cited to the *Clinical Tech,*
19     *Inc.* case.  It's a District of Massachusetts case.  It's
20     192 F.Supp.3d 223.  In there, the focus, again, was during
21     the course of performance, and an implied covenant claim was
22     allowed to survive summary judgment.
23             THE COURT:  Despite the contract claim being
24     denied?
25             MS. CROWLEY:  Yes.

1          THE COURT:  That's what I'm looking for, is where
2     the contract claim fails and yet you can somehow -- rather
3     than it simply being gravy to get you something more than the
4     contract claim, which is, I think, where often it happens.
5          MS. CROWLEY:  Right.  No, this was something
6     different.  So not having that, the Court still found that
7     this implied covenant claim could survive on summary judgment
8     because of the representations that had been made during the
9     course of the performance.
10          And I think, too, we also cited to the Restatement
11     (Second) of Contracts, which, I think, makes this point well.
12     It says, "Good faith performance or enforcement of a contract
13     emphasizes faithfulness to an agreed common purpose or
14     consistency with the justified expectations of the other
15     party.
16          "The essential inquiry is whether the challenged
17     conduct conformed to the parties' reasonable understanding of
18     the performance obligations as reflected in the overall
19     spirit of the bargain, not whether the defendant abided to
20     the letter of the contract in the course of performance."
21          THE COURT:  And do any of these -- do any of these
22     go to, you know, what I'm now describing as a modification of
23     the contract?  I mean, I think that's -- I think that may be
24     the problem for you on the implied covenant, is that while
25     you can't do things to take away the benefit of the bargain,

1  where you have now sanctioned it by signing on to the

2  modification, can you really make the implied covenant

3  argument?

4          MS. CROWLEY:  I think you can under the *Clinical*

5  *Tech* case.

6          THE COURT:  And, Mr. Steiner, I assume that's

7  exactly -- what I'm just saying now is what you were saying

8  earlier, is that if you have signed off on contract, you

9  can't have -- you've signed off on the new contract, you

10  can't have the implied covenant for denying you the bargain

11  of the old contract?

12          MR. STEINER:  That's correct, Your Honor, unless it

13  creates an inconsistency.  And I'm glad counsel cited to the

14  *Clinical* case, because I was actually just going to do that

15  when it became my turn.

16          What you heard is it's all the conduct leading up

17  to the execution of the settlement agreement that forms the

18  basis for their good faith and fair dealing claim, but the

19  *Clinical* case actually speaks to that directly.  It says,

20  "The prohibition contained in the covenant applies only to

21  conduct during performance of the contract, not to conduct

22  occurring prior to the contract's existence, such as conduct

23  affecting contract negotiations."  And that's in the *Clinical*

24  case.

25          And so -- and then it goes on to say --

```
1              THE COURT:  No, no, no.  But that's a different
2    point.  Hold on one minute there.  Let's say you have only
3    one contract.  Anything else that happens before that
4    contract is started is not covered by the implied covenant of
5    good faith and fair dealing.
6              The question I was asking -- you're under the
7    existing contract, and now you're negotiating to modify that
8    existing contract.  Is there a duty, an implied covenant of
9    good faith and fair dealing, from the original contract that
10   would somehow limit your ability to negotiate a new contract?
11             And I would -- I guess I would say to you,
12   Ms. Crowley, it would seem to me the answer is yes, until the
13   point when you sign it.
14             So if they come to you -- for example, you have
15   a -- you have a lease of house, and it's a 12-month lease.
16   And your landlord comes to you and says, I want to have
17   you -- I want to negotiate the terms of the lease during the
18   course of the lease, and you have to pay more than you're
19   already paying.  And if not, I'm going to make your life
20   miserable.  You're sort of interfering with the benefit of
21   the bargain.
22             But a landlord comes to you and says, "I'll renew
23   it for another year, but only if you agree to a higher price
24   for the last two months."  Can you do an implied covenant of
25   good faith and fair dealing?  I don't -- I'm afraid not, that
```

1  that -- once -- if they try to negotiate it and you don't

2  agree with it, you can say they're trying to take away your

3  bargain or they just implemented -- but once you sign on to

4  it, can you still make that argument?  And I don't know

5  whether you're saying *Clinical Tech* is that example or not.

6           Mr. Steiner, you were saying that *Clinical Tech* was

7  talking about negotiations for contract.  But what I'm

8  interested in is negotiations during the life of a contract

9  for the next contract.

10          MR. STEINER:  And I'm not sure whose turn it is.

11          THE COURT:  Either one of you.

12          MR. STEINER:  So I think the problem becomes -- and

13 I think Your Honor has identified it -- is that once you

14 enter into a new contract, then that is what defines the

15 relationship between the parties.

16          And so if you have a contract, particularly where

17 it's an integrated agreement, which we have here, that says,

18 look, you no longer have these rights, and you've signed on

19 to that, then the only way -- then that would extinguish any

20 claim for the implied covenant of good faith and fair

21 dealing, which would vary the rights that you have an

22 absolute contractual right to exercise under the agreement

23 that you signed.

24          And so it is simply impossible in this case --

25 we're not talking about the spirit of the bargain in the

1    license agreement.  What we're talking about is parties that

2    negotiated an amendment, essentially a release of obligations

3    in that license agreement, signed on to it with, again, the

4    advice of counsel, with an integration clause, with a

5    representation that they were relying on counsel.  And now

6    one party comes back and says, "We don't like the deal we

7    struck.  You misled us into signing this agreement, and we

8    don't like it."  And that would open up every contract --

9         THE COURT:  Well, it wouldn't open up every

10    contract if everyone understands what they're agreeing to, so

11    that gets me back to mutual mistake, not implied covenant.

12         MR. STEINER:  Well, I think everyone understands,

13    you know, part of the reason we put these bells and whistles

14    on some of these contracts, like integration clauses and

15    reliances, is to avoid what we're arguing about here, which

16    is, you know, "Don't rely on what I'm saying.  Rely on what

17    your lawyer is saying.  Rely on the advice that your lawyer

18    is giving you.  Read the agreement."

19         And, again, that goes to the *Rohm & Hass* case where

20    there was a restrictive covenant agreement.  The parties

21    entered into it, had a dispute; and then, ultimately, one

22    party slipped in a provision -- actually slipped in a

23    provision -- to extinguish the restrictive covenant

24    obligation.  And the Court said, well, look, I mean, you

25    signed an agreement.  You should have read it.  You should

1    understand what it says.  Your reliance is not reasonable.

2              THE COURT:  Well, the question on mutual mis- -- on

3    unilateral mistake isn't reasonable reliance, is it?

4              MR. STEINER:  Well, the *Rohm & Hass* case does --

5    does say that.  It says sophisticated businesses modifying a

6    contract are expected to read the documents submitted, and

7    that's in the context of their discussion of the 93A claim,

8    and it's in the context, I believe -- I actually may have --

9    of the mistake claim in *Rohm & Hass* as well, is that you need

10   to read the agreement before you sign it and not shift the

11   risk of your alleged error to the counterparty.

12             THE COURT:  Any response to that, Ms. Crowley?

13             MS. CROWLEY:  Your Honor, I would go back to -- to

14   what we were just talking about with regard to the implied

15   covenant.  It basically -- the argument is that you can't

16   pull a fast one and say, "Oh, sorry, too bad.  You signed a

17   modification."  So I think there is still this implied

18   covenant claim that exists.

19             And the distinction too may be it's not a new

20   contract.  The license agreement is an ongoing agreement, and

21   the settlement agreement here was a separate agreement.  So

22   it's -- it makes it factually different from the scenario

23   that --

24             THE COURT:  Well, they have used the settlement

25   agreement as a modification of the license agreement, not as

1    a separate -- that's the way they are reading it.

2            MS. CROWLEY:  Correct.  Right.  And we just don't

3    see it that way.  That was with regard to one specific issue.

4    And here what they're saying is, "Oh, sorry.  Too bad.  You

5    agreed to this modification, so don't worry about the fact

6    that we violated the spirit of the license agreement and its

7    terms."

8            THE COURT:  Yeah, I am -- I hear the argument that

9    this seems inconsistent with the spirit of an ongoing

10   business relationship.  Frankly, I find the whole dispute

11   inconsistent with how I would think parties with an ongoing

12   relationship would want to behave.

13           But that said, at this point, the fact that it

14   seems to me a separate contract doesn't -- that's not the end

15   of the day.  The First Circuit has concluded that that

16   language, by its express terms, extinguishes everything.

17           I mean, it's sort of an interesting thing where you

18   have an ongoing relationship, because normally, when you have

19   a release -- and I don't think there was a single sentence in

20   the First Circuit's decision that was cognizant that there

21   was an ongoing relationship.  But normally, when you have a

22   release, what you're trying to do is clean up everybody's

23   mess and go your separate ways, not have an ongoing

24   relationship.

25           But that's neither here nor there.  I think the

problem -- and I will sort of go through it.  I did feel like
I had addressed the -- good faith and fair dealing the last
time around, but I think this point of but if you have now
signed off on it, even if what it was doing was impairing
your rights, can you still bring a claim? -- and I will go
look at the case law that you've all cited to me again and
try to figure that out.

I remain focused on the unilateral mistake
question.  And maybe this is the last issue I want to address
before we call it a day here.  So under Massachusetts law, I
believe that the requirement for proving unilateral mistake
was that one party made a mistake.  The party -- the other
party knew or should have known of the mistake; in other
words, they knew you were making a mistake.  They didn't --
or caused the mistake.

And I guess I would ask just whether you have any
disagreement that that's -- those are the two things that you
would have had to allege or that you have to prove if the
case goes forward.

MS. CROWLEY:  I think Your Honor has that correct,
and I think that's what we have alleged.

THE COURT:  Mr. Steiner, would you disagree that
those are the elements that they needed to cover?

MR. STEINER:  No, I think those are -- those are
the basic elements that -- and I would just reiterate they

1    haven't pled those elements, certainly not plausibly; and, in

2    fact, I think they've pled themselves out of those elements,

3    because there had to have been a meeting of the minds that

4    then, ultimately, wasn't memorialized in the agreement that

5    we knew about and they didn't.  And there's just no facts

6    pled to support that.

7            THE COURT:  Well, I guess that's always a funny

8    thing.  The -- and I find myself -- I find the case law a

9    little bit confusing.

10           The meeting of the minds gets established once you

11   signed off on that contract.  So we're not having a

12   conversation about meeting of the minds.  The meeting of the

13   minds is you both agree that that's the language you're going

14   to sign, and you sign that agreement.

15           The reason you have a defense of or a claim about

16   mistake is not arguing that there wasn't a meeting of the

17   minds.  The argument is that the meeting of the minds --

18   i.e., this contract that you signed -- was based on a

19   mistake, no?

20           MR. STEINER:  Maybe that is a fair point,

21   Your Honor.  I understand the Court's distinction between

22   that.  But, again, I think there has to be -- the

23   insurmountable obstacle they have, and they haven't presented

24   any evidence of it, certainly haven't presented any evidence

25   of it, is there was some communication between the parties

1   which evidences our knowledge of what they were thinking.

2   And their allegations are the exact opposite of that.  Their

3   allegation is we assumed this, and it was never discussed.

4        MS. CROWLEY:  That's not correct, Your Honor.  Our

5   argument isn't that it's assumed.  And if you look at

6   Exhibit I and the allegations that we made in paragraphs 29

7   and earlier and 66, is that's they asked for this, and we

8   said no, and we moved forward dealing with the only other

9   issue, dealing with how to divide the settlement proceeds.

10       THE COURT:  So how about -- what's the answer to

11   the question of, when you saw the words "release" in the

12   release, what you thought it meant?

13       MS. CROWLEY:  Well, we -- so the plaintiffs

14   acknowledge that they were entering into a release, but it's

15   the impact of the release that's the mistake.

16       THE COURT:  Well, no.  If it's the impact of the

17   release, that's just saying, you know, "I got an adjustable

18   rate mortgage, and I didn't realize the rate was going to go

19   up."  That doesn't get you anywhere.

20       Isn't the -- I thought your argument was that you

21   thought the release had to do with this dispute here and that

22   you didn't think that the release was going to have to do

23   with the other language.  And so the question then is, if

24   that is the mistake, how did they know that you agreed to

25   this oblivious of the fact that, the following week, they

1    weren't going to send you the license fee?

2            MS. CROWLEY:  For two reasons, because it was

3    already taken off the table, and because if it was going to

4    have been agreed to, it would have been discussed.  So it was

5    already agreed it was off the table.  And if we were going

6    to --

7            THE COURT:  Okay.  So let me -- this may not be the

8    way it happened, but let's assume that -- give me a little

9    bit of leeway here.  People have a conversation, and they

10   say, "These are the three things we want to talk about, and

11   we agree to it."  And then you exchange written drafts, but

12   you're not talking anymore and you put something in the

13   written draft, and the other side doesn't respond.

14           How can you -- can you say, well, they put this in

15   there, but it wasn't what we were talking about?  I mean,

16   presumably you didn't talk about releases at all.  You were

17   just talking about two or three terms.  So now you talked

18   about the release, and I think what you're saying is, "We

19   didn't -- they knew -- they knew that we couldn't be -- they

20   had a plan to not pay a million dollars over there.  They

21   knew that didn't even occur to us that that was their plan."

22           And my question is what allegation do you have in

23   the complaint to show that they knew that you didn't

24   contemplate that extra million dollars and that you were

25   mistaken?

1          MS. CROWLEY:  Sure.  And I think this -- this may

2     answer it, Your Honor.

3          So at paragraph 72 of the third amended complaint,

4     the plaintiffs allege that the defendants have reason to know

5     of the mistake and that the defendants knew the plaintiffs

6     originally thought they were entitled to twice as much as

7     they ultimately received under the settlement agreement.

8          In addition, the plaintiffs allege that the parties

9     never discussed releasing the royalty payment to the

10    plaintiffs under the license agreement.  And such reduction

11    on the net proceeds payable to the plaintiffs had it been the

12    objective intent, which it was not, would have been expressly

13    stated in the settlement agreement, not silently or

14    mistakenly incorporated in the general release provision.

15    That's the allegations in 69 and 72.

16          THE COURT:  Okay.

17          MR. STEINER:  Your Honor?

18          THE COURT:  Yes.

19          MR. STEINER:  So, I mean, what -- what has happened

20    there is that allegation, essentially, parrots the elements

21    of the claim.  It's not factual.  But what is in there is,

22    again, this idea that the issue was never discussed.  And if

23    the issue was never discussed, then there couldn't be any

24    knowledge that we knew what they were thinking.  And so, you

25    know --

1        THE COURT:  Well, I'm not sure if that follows, but

2    I'll think about that.

3        MR. STEINER:  But I -- I think, Your Honor, just

4    one last point on the mistake issue, because I think what

5    counsel did say and then you corrected the argument is we

6    didn't understand -- "we" being MGH/DFCI -- didn't understand

7    the impact that signing the release would have.  The problem

8    with that argument is it runs right into *Eck*.  And that does

9    not make -- that does not make a mistake, unilateral or

10   otherwise.

11       THE COURT:  Ms. Crowley, I'm going to give you the

12   last word, and then we're going to call it quits here.

13       MS. CROWLEY:  Sure.  It's -- we discussed this

14   point earlier, so I'll just be brief.  It doesn't run right

15   in the face of *Eck*, Your Honor.

16       THE COURT:  Okay.  I will go back and read some of

17   these cases again and try to get something out sooner rather

18   than later.

19       MR. STEINER:  Thank you, Your Honor.

20       MS. CROWLEY:  Thank you, Your Honor.

21       THE COURT:  Thank you.

22       (Court in recess at 4:40 p.m.)

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4          I, Robert W. Paschal, Registered Merit Reporter and

5     Certified Realtime Reporter, in and for the United States

6     District Court for the District of Massachusetts, do hereby

7     certify that pursuant to Section 753, Title 28, United States

8     Code, the foregoing pages are a true and correct transcript

9     of the stenographically reported proceedings held in the

10    above-entitled matter and that the transcript page format is

11    in conformance with the regulations of the Judicial

12    Conference of the United States.

13

14                              Dated this 10th day of June, 2022.

15

16

17

18

19                         /s/ Robert W. Paschal
                           _____
20
                           ROBERT W. PASCHAL, RMR, CRR
21                         Official Court Reporter

22

23

24

25