UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE GENERAL HOSPITAL CORPORATION and DANA-FARBER CANCER INSTITUTE, INC., | * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 1:18-cv-11360-IT |
| ESOTERIX GENETIC LABORATORIES, LLC, and LABORATORY CORPORATION OF AMERICA HOLDINGS, | * * * * * | |
| Defendants. | | |

MEMORANDUM & ORDER

June 27, 2022

TALWANI, D.J.

Pending before the court is Esoterix Genetic Laboratories, LLC ("Esoterix") and Laboratory Corporation of America Holdings' ("LabCorp") Motion to Dismiss [Doc. No. 174] Plaintiffs the General Hospital Corporation ("MGH") and Dana-Farber Cancer Institute, Inc.'s ("Dana Farber") (collectively, "the Hospitals") Third Amendment Complaint [Doc. No. 169]. For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

**I.     Factual Background**

As alleged in the Third Amended Complaint ("TAC") [Doc. No. 169] and incorporated documents, the facts are as follows. The Hospitals own several diagnostic patents directed at detecting the presence of an epidermal growth factor mutation, a biomarker that predicts treatment efficacy for lung cancer. TAC ¶ 13 [Doc. No. 169]. In 2005, the Hospitals licensed the patents to Esoterix's predecessor-in-interest. Id. at ¶ 14; see also Settlement Agreement [Doc.

No. 169-10] (referencing the "Master License Agreement"). Under the license agreement (which remained in effect throughout this dispute), the Hospitals received an annual licensing fee, royalties on uses and sales of the patents, and a portion of fees and royalties from any sublicenses of the patents. License Agreement §§ 4.1, 4.3, 4.5, 4.6 [Doc. No. 169-8]. The royalties accrue during two annual reporting periods ending June 30 and December 31 of the calendar year, and payment of the accrued amounts is due forty-five days after the end of the given reporting period. Id. §§ 1.28, 4.5.

In 2008, Esoterix's predecessor-in-interest sublicensed the patents to a non-party, which ultimately assigned its rights in the sublicense to QIAGEN Manchester, Ltd. ("QIAGEN"). TAC ¶ 17 [Doc. No. 169]; see also Settlement Agreement [Doc. No. 169-10] (referencing the "2008 Agreement"). In 2010, LabCorp purchased most of the predecessor-in-interest's genetic testing business, including its rights under the License Agreement. Id. at ¶ 14. LabCorp created Esoterix to manage those assets for the benefit of LabCorp and assigned the license agreement to Esoterix. Id.

In 2014, Esoterix sued QIAGEN for breach of the sublicense, patent infringement, and other related claims. Id. Esoterix did not name the Hospitals as parties to the lawsuit or alert them that it would be filing suit, despite the Hospitals owning the patents at issue. Id. Esoterix and LabCorp subsequently mischaracterized the suit and failed to tell the Hospitals (1) that QIAGEN had asserted counterclaims against Esoterix and LabCorp, challenging the validity of the patents, and (2) that a district judge had ruled in favor of QIAGEN, concluding that the patents were directed at patent-ineligible subject matter and were therefore invalid. Id. at ¶¶ 17-18. It was against this backdrop that LabCorp and Esoterix explored settlement with QIAGEN. Id. at ¶ 19.

The Hospitals became concerned that that LabCorp and Esoterix would not adequately defend the validity of the patents. Id. They therefore sought to intervene in the QIAGEN litigation. Id. At about that time, LabCorp and Esoterix informed the Hospitals that they had agreed to settlement terms with QIAGEN. Id.

Pursuant to the license agreement, the Hospitals needed to approve any settlement agreement between Esoterix and a sublicensee before the settlement could be executed. Id. LabCorp and Esoterix put significant pressure on the Hospitals to quickly approve the terms of the proposed settlement, which included both that QIAGEN would make a payment to Esoterix and that Esoterix would be given a paid-up license to the Hospitals' patents. Id. at ¶ 21. In return for the Hospitals' approval of these settlement terms, LabCorp and Esoterix offered the Hospitals a portion of the payment from QIAGEN. Id.

The Hospitals found the terms unacceptable. Id. at ¶¶ 20-21. Specifically, they rejected Esoterix's demand for a paid-up license to the patents. Id. at ¶¶ 21-22. The Hospitals' counteroffer also sought a much larger portion of the payments by QIAGEN to Esoterix. Id. at ¶ 22. Counsel for LabCorp and Esoterix responded that the Hospital's counteroffer made clear that the only remaining issue was how to divide the settlement proceeds from QIAGEN. Id.

Ultimately, the parties to the QIAGEN litigation reached a settlement agreement, which was contingent upon the district court's vacatur of its orders finding the Hospitals' patents invalid. See Unopposed Motion to Vacate, Esoterix Genetic Laboratories, LLC v. Qiagen N.V. et al, No. 14-cv-13228 (D. Mass. Jun. 29, 2017), ECF No. 177. The Hospitals reached an agreement with LabCorp and Esoterix, also contingent on the district court's vacatur of its orders, pursuant to which Esoterix would pay the Hospitals a portion of the settlement amount paid by QIAGEN. TAC ¶ 24 [Doc. No. 169].

The settlement agreement contained a provision which released Esoterix from "any and all liabilities, losses, damages, charges, complaints, claims, counterclaims, obligations, promises, agreements, controversies, actions, causes of action, suits, rights, demands, costs, debts and expenses (including attorneys' fees and court costs) of any nature whatsoever, known or unknown, suspected or unsuspected" that may have arisen before the June 27, 2017 effective date, "relating to or arising from (i) the Litigation, (ii) the Patent Rights, (iii) the Master License Agreement, including . . . the payment of any past royalties or other fees pursuant to the Master License Agreement." Settlement Agreement § 3.1 [Doc. No. 169-10].

Under the license agreement, a reporting period closed on June 30, 2017, and payment for that reporting period was therefore due on August 15, 2017. TAC ¶ 27 [Doc. No. 169]. Esoterix reported revenue and royalty information only for the period of June 28-30, 2017. Id. at ¶ 28.

By letter dated November 3, 2017, the Hospitals demanded that Esoterix provide a semi-annual report for the period from January 1 through June 30, 2017, as required by the license agreement, and pay the full amount of the royalties accrued during that period. Id. at ¶¶ 36-37. Esoterix refused to do so. Id. The Hospitals also invoked their audit rights for that reporting period and requested that by December 4, 2017, Esoterix make available for inspection all records relating to royalties for the reporting period ending June 30, 2017. Id. at ¶¶ 38-39. Esoterix refused the request. Id. at ¶ 39.

## II. Procedural Background

The Hospitals brought this action in state court against Esoterix and LabCorp, who removed the action based on diversity jurisdiction. Not. of Removal [Doc. No. 1]. Thereafter, the Hospitals amended their complaint, Second Am. Compl. [Doc. No. 81], Esoterix and LabCorp

4

moved to dismiss, Mot. to Dismiss [Doc. No. 88], and the Hospitals filed a Motion for Partial Summary Judgment [Doc. No. 95].

The court consolidated the motions for hearing; granted the Hospitals partial summary judgment as to the breach of contract claim (Count I) and claim for an accounting (Count IV) against Esoterix; denied the Hospital's motion without prejudice as to LabCorp; and allowed Esoterix and LabCorp's Motion to Dismiss [Doc. No. 88] the contract reformation claim (Count V) and denied the motion as to the remaining claims. Mem. & Order [Doc. No. 133]. Following the parties' stipulation to dismiss the remaining claims without prejudice, the court entered a Judgment [Doc. No. 154] for the Hospitals on the breach of contract claim in the agreed-upon amount of $1,291,427.13 plus interest.

The First Circuit reversed. USCA Opinion 14-17 [Doc. No. 164]. It found that the settlement agreement's release provision was broader than the obligations related to the QIAGEN litigation, and that it was meaningfully limited only in two ways: it was limited temporally "to any matter that 'may have arisen' before its effective date," and that the subject was limited to a matter that "relat[es] to or aris[es] from" an enumerated topic, including "the License." Id. at 10-11. The First Circuit found further that under the terms of the license agreement, Esoterix's royalty obligations arose when a sale was first recorded, not when the payment became due forty-five days after the close of the reporting period. Id. at 14-17. Consequently, "the unpaid obligations [from January 1 through July 27, 2017] arose prior to the effective date of the release and, thus, were extinguished by it." Id. at 22.

In reaching that decision, the First Circuit declined to consider the circumstances surrounding the settlement agreement, finding the language neither vague nor ambiguous. Id. at 21. The First Circuit determined that "[t]he breadth of the release was by choice of the

contracting parties" and that where, as here, "the parties are sophisticated entities that negotiated a release with the benefit of counsel," it was "not at liberty to rewrite this bargained-for arrangement." Id. at 22. The First Circuit therefore vacated the judgment in favor of the Hospitals as to the breach of contract claim and directed the court to enter judgment granting Esoterix's motion to dismiss that claim. Id. at 24-25.

In light of the limited period for which payments were therefore due, the court also vacated the judgment as to the accounting claim, but without prejudice to the Hospitals' right to renew this claim if they wished to do so under the materially changed circumstances. Id. at 24. Finally, the First Circuit reversed the dismissal of the Hospital's reformation claim where the court had found that claim moot given its finding on the breach of contract claim and had not considered the claim on its merits. Id. In accordance with that mandate, the court dismissed the Hospitals' breach of contract claim. Partial Order of Dismissal [Doc. No. 166].

The Hospitals thereafter filed the operative Third Amendment Complaint [Doc. No. 169], which no longer includes the breach of contract and accounting claims but realleges claims against Esoterix and LabCorp for breach of the implied covenant of good faith and fair dealing (Count II), violation of Mass. Gen. Laws ch. § 93A (Count III), reformation based on unilateral mistake (Count V), and a claim against LabCorp for unjust enrichment (Count VII). Esoterix and LabCorp move to dismiss all counts.

### III.     Standard of Review

In evaluating a motion to dismiss for failure to state a claim, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## IV. Discussion

### A. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Under Massachusetts law, "[t]he covenant of good faith and fair dealing is implied in every contract," UNO Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385, 805 N.E.2d 957 (2004), and provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract," Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471-72, 583 N.E.2d 806 (1991). While the implied covenant may not "be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship," UNO Rests., 441 Mass. at 385-86, the essential inquiry is "whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 612 (D. Mass. 2016).

The Hospitals allege that (1) having failed to secure different license terms from the Hospitals as part of the QIAGEN settlement and (2) having represented to the Hospitals that the "only" economic issue resolved by the settlement agreement was the division of the proceeds paid to Esoterix by QIAGEN, Esoterix and LabCorp "engaged in an unfair, knowing, deceptive,

7

malicious and bad faith scheme to deprive the [Hospitals] of . . . royalty payment[s] to which the [Hospitals] are clearly entitled." TAC ¶ 49 [Doc. No. 169]. Esoterix counters that the First Circuit concluded that the Hospitals are *not* entitled to those royalty payments and that Esoterix therefore could not have breached the covenant where it was not required to make the payments.

The Hospitals might have been able to state a claim for relief if LabCorp and Esoterix's alleged scheme did not amount to a new contract. But where the alleged scheme resulted, in essence, in a modification of the license agreement through the settlement agreement's release provision, allowing a breach of the implied covenant of good faith would create rights not contemplated by the parties' modified contractual relationship.

B.     *Violation of Chapter 93A*

Chapter 93A provides a cause of action for any person (1) engaged in trade or commerce who (2) suffers a loss of money or property (3) as a result of (4) the use or employment of an unfair method of competition or unfair or deceptive act or practice by another person engaged in trade or commerce. Mass. Gen. Laws ch. 93A, § 11. In business disputes between sophisticated parties, courts must determine whether the alleged misconduct rises to an unacceptable level of unfairness, considering the "nature of the challenged conduct and the purpose and effect of that conduct"; "the standard of the commercial marketplace"; and "the equities between the parties, including what both parties knew or should have known." Malden Transp., Inc. v. Uber Techs., Inc., 404 F. Supp. 3d 404, 419 (D. Mass. 2019) (citing Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 820, 17 N.E.3d 1066 (2014)). "To be actionable, the challenged misconduct must rise to the level of an 'extreme or egregious' business wrong, 'commercial extortion,' or similar level of 'rascality' that raises 'an eyebrow of someone inured to the rough and tumble of the world of commerce.'" Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co., 802

F.3d 39, 54 (1st Cir. 2015) (quoting Baker v. Goldman Sachs & Co., 771 F.3d 37, 49-51 (1st Cir. 2014); Zabin v. Picciotto, 73 Mass. App. Ct. 141, 169 896 N.E.2d 937 (2008).

In this case, the worst conduct that the Hospitals have alleged is that (1) in a precontractual settlement communication, LabCorp stated that the Hospitals' "'counteroffer' makes clear that the only issue now is how to divide the settlement proceeds," Steiner Email [Doc. No. 169-9], and (2) based on that email, at a May 31, 2017 meeting, the parties did not discuss whether the terms of the settlement agreement would release Esoterix from its obligation to make certain royalty payments, TAC ¶¶ 23, 25, 29 [Doc. No. 169]. This behavior, even if true, is not so "extreme" or "egregious" that it is akin to "extortion." Accordingly, the Hospitals have not alleged conduct that rises to the level of a chapter 93A violation based on Esoterix and LabCorp's conduct leading up to the settlement.

    C.    *Reformation*

The Hospitals next claim is for reformation of the contract based on either unilateral or mutual mistake. The Hospitals allege that (1) they "made a basic assumption and understanding that the general release did not cover the royalty due on August 15, 2017 attributable to the reporting period ending June 30, 2017"; (2) this assumption was based on the precontractual settlement communication discussed above; and (3) Esoterix and LabCorp either knew that the Hospitals were mistaken about the scope of the release or were similarly mistaken. Id. at ¶¶ 66, 72, 73.

    1.    Mutual Mistake

The doctrine of mutual mistake "exists to effectuate the agreement intended by the parties to a contract where the contract language fails to capture that agreement. Central to this doctrine is the fundamental underpinning that the parties had reached an agreement on a point which they

9

intended to enshrine in the written contract but which, for some reason, was mistakenly omitted from that written contract." Caron v. Horace Mann Ins. Co., 466 Mass. 218, 223, 993 N.E.2d 708 (2013). The Hospitals' only allegation related to mutual mistake is that

> [a]lternatively, the defendants did not know of the mistake, such that at the time the [s]ettlement [a]greement was signed, the defendants also mistakenly understood that the release did not cover the [January 1 through June 27, 2017] royalty payment, and only discovered the parties' mutual mistake later when the royalty payment came due."

TAC ¶ 73 [Doc. No. 169]. But no factual allegations support this conclusion. To the contrary, the Hospitals allege that the scope of the release was "never discussed" by the parties. Id. at ¶¶ 29, 72. And where the Hospitals "silently harbored an assumption" that the release did not encompass royalties that accrued between January 1 through June 27, 2017, that cannot be the basis for reformation of the settlement agreement. Caron, 466 Mass. at 225.

        2.        Unilateral Mistake

Although "[u]nilateral mistake is a disfavored defense," Greene v. Ablon, 794 F.3d 133, 147 (1st Cir. 2015), Massachusetts law permits reformation of written contracts "containing a mistake if the mistake . . . was made by one party . . . such that the other party knew or had reason to know of it," Nissan Automobiles Of Marlborough, Inc. v. Glick, 62 Mass. App. Ct. 302, 306 (2004). Here, the Hospitals allege that Esoterix and LabCorp were unhappy with the terms of the license agreement and had previously tried to eliminate their ongoing royalty obligation. Then, during settlement negotiations, Esoterix and LabCorp agreed to make all ongoing royalty payments under the license agreement and represented that the only issue to be addressed in the settlement agreement was the division of the QIAGEN settlement proceeds. The Hospitals claim that given this context, Esoterix and LabCorp knew that the Hospitals intended the release provision to apply only to the QIAGEN sublicense but chose to stay silent and allow the Hospitals to make the mistake of agreeing to a release of *all* royalty payments.

"A party seeking recovery for a unilateral mistake must present full, clear, and decisive proof that a mistake occurred and that the other party knew or had reason to know of the mistake." Id. (internal citations omitted). The Hospitals face an uphill battle to muster the evidence to support these allegations. But at this point in the proceedings, the allegations are sufficient to state a claim for reformation based on unilateral mistake.

D. *Unjust Enrichment*

Finally, the Hospitals bring a claim for unjust enrichment against LabCorp. "Unjust enrichment is an 'equitable stopgap for occasional inadequacies in contractual remedies at law.'" Watkins v. Omni Life Sci., Inc., 692 F. Supp. 2d 170, 179 (D. Mass. 2010) (quoting Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 234 (1st Cir. 2005)). However, "Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment." Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006).

When this issue previously came before the court, the court explained that the unjust enrichment claim and the now-withdrawn claim for piercing the corporate veil were both "mechanism[s] for securing damages . . . from LabCorp for Esoterix's breach of contract. Mem. & Order 10 [Doc. No. 133]. But where the First Circuit has now concluded that Esoterix did not commit a breach of contract, the existence of the valid settlement agreement bars the application of the equitable doctrine of unjust enrichment. See Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d 154, 162 (1st Cir. 2005).

V. **Conclusion**

For the foregoing reasons, Esoterix and LabCorp's Motion to Dismiss [Doc. No. 174] is GRANTED as to Count II (breach of the implied covenant of good faith and fair dealing), Count

11

III (chapter 93A) and Count VII (unjust enrichment), and DENIED as to Count V (to the extent that it alleges reformation based on unilateral mistake).

    IT IS SO ORDERED

June 27, 2022                                                                                  /s/ Indira Talwani
                                                                                          United States District Judge